**Nos. 24-5493 & 24-5691**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

*IN RE NATIONAL FOOTBALL LEAGUE'S SUNDAY TICKET ANTITRUST LITIGATION*,

NINTH INNING, INC., *ET AL.*,

*Plaintiffs-Appellants*,

v.

NATIONAL FOOTBALL LEAGUE, INC., *ET AL.*,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Central District of California
No. 2:15-ml-02668-PSG-SK
Hon. Philip S. Gutierrez

---

### APPELLANTS' OPENING BRIEF
### <u>PROVISIONALLY FILED UNDER SEAL</u>

---

Marc M. Seltzer
SUSMAN GODFREY LLP
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Telephone: (310) 789-3100

Scott Martin
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Telephone: (646) 357-1100

Howard Langer
LANGER GROGAN & DIVER, P.C.
1717 Arch Street, Suite 4130
Philadelphia, PA 19103
Telephone: (215) 320-5660

Jeffrey A. Lamken
MOLOLAMKEN LLP
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
Telephone: (202) 556-2000

*Counsel for Plaintiffs-Appellants*

# DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Appellants Ninth Inning, Inc., d/b/a "The Mucky Duck," and 1465 Third Avenue Restaurant Corp., d/b/a "Gael Pub," state that they have no parent corporations and that no publicly held corporation owns 10% or more of their stock.

Date: January 10, 2025

*/s/ Marc M. Seltzer*
*Attorney for Plaintiffs-Appellants*

## TABLE OF CONTENTS

DISCLOSURE STATEMENT ...................................................................i

TABLE OF CONTENTS ..................................................................... ii

TABLE OF AUTHORITIES.................................................................vi

INTRODUCTION ...............................................................................1

JURISDICTIONAL STATEMENT .......................................................7

ISSUES PRESENTED..........................................................................7

STATUTES AND RULES .....................................................................8

STATEMENT OF THE CASE................................................................9

    I.    Defendants' Conspiracy to Restrict the Output of NFL Game Telecasts and to Fix the Price of Sunday Ticket ...................................9

        A.    NFL Game Telecasts and Sunday Ticket ...................................9

        B.    Defendants' Interlocking Agreements......................................11

            1.    The Teams-NFL Agreement and the Sports Broadcasting Act........................................................12

            2.    The NFL-DirecTV Agreements and the NFL's "Premium" Price Requirement .....................................13

            3.    The NFL-Network Agreements with CBS and Fox and the NFL's Agreement to Impose a "Premium" Price .........................................................17

    II.    The Plaintiff Classes and Their Experts .............................................19

        A.    Prof. Rascher's Yardstick Opinion...........................................20

            1.    College Football was a Particularly Apt Yardstick ......................................................................21

            2.    The NFL's "New Frontier" Study Supports Rascher's Use of College Football as a Yardstick ......................................................................24

3.    Defendants' Efforts to Exclude Rascher's Opinion ...............................................25

B.    Dr. Zona's Opinions ...............................................26

1.    Zona's Econometric Models ...............................27

2.    Defendants' Efforts to Exclude Zona's Opinions ...........28

III.    The Jury's Verdict ...............................................29

IV.    The District Court's Posttrial JMOL Order and Judgment .................29

A.    The Court Retroactively Excluded Rascher and Zona .............30

B.    The District Court Granted JMOL ...........................32

C.    In the Alternative, the District Court Ordered a New Damages Trial ...............................................33

D.    The District Court Summarily Dismissed Plaintiffs' Claims for Injunctive Relief ...............................34

SUMMARY OF THE ARGUMENT ...............................................35

STANDARDS OF REVIEW ...............................................38

ARGUMENT ...............................................39

I.    The District Court Should Not Have Excluded Plaintiffs' Experts ...............................................39

A.    Prof. Rascher's Testimony Should Not Have Been Excluded ...............................................40

1.    The District Court Erred By Demanding "Definitive" Answers From Rascher About the But-For World ...............................................40

2.    The District Court Erred by Crediting Evidence Supposedly "Contradicting" Rascher's Opinion ...........45

3.    The District Court Usurped the Jury's Role In Assessing the Purported Differences Between the College and NFL Markets ...............................48

i)    Availability of College Football Telecasts ...........49

ii) College Teams' Game Feeds and Local Telecasts ............................................................... 51

B. Dr. Zona's Testimony Should Not Have Been Excluded ...................................................................... 52

1. The District Court Erred by Excluding Zona's "Single Competitor" Model ............................ 53

i) It Was for the Jury to Decide Whether a Direct-to-Consumer Competitor Was Feasible .......................................................... 53

ii) Zona Clearly Defined His "Direct-to-Consumer" Competitor to Include a Streaming Platform .............................. 55

2. The District Court Erred by Excluding Zona's "NFL Tax" Opinion for No Reason at All ..................... 56

C. The District Court Offered No Explanation for Excluding the Rest of Rascher's and Zona's Testimony ............................................................... 57

II. JMOL Must Be Reversed Even if This Court Affirms the Exclusions of Rascher and Zona ........................................................ 58

A. JMOL Must Be Reversed Because the Record Contains Ample Evidence of the *Fact* of Plaintiffs' Injury .................... 58

B. A New Trial on Damages Should Be Ordered if Rascher's and Zona's Retroactive Exclusion is Affirmed ............................................................... 62

III. The District Court's Alternative Order, Vacating the Jury's Damages Awards, Should Be Reversed ............................................. 63

A. The District Court Committed Legal Error by Attempting to Reverse-Engineer the Jury's Damages Calculations and then Evaluating the Rationality of those Supposed Calculations ..................................... 64

B. The District Court Abused Its Discretion Because the Jury's Awards Weren't "Irrational" ........................................... 67

iv

1.     A "But for" Price of $102.74/year Wouldn't Have Been "Irrational"—It was *Invited* by the Defense ......................................................................68

2.     An "Actual Price" of $294/Year Wouldn't Have Been "Irrational"...........................................70

3.     Applying the Same "Overcharge" to the Commercial Classes Wouldn't Have Been "Irrational" ...................................................71

C.     The Alternative Remittitur Amount for the Residential Class Should Have Been $2.81 Billion or at Least $1.39 Billion.......................................................................72

IV.     The District Court's Summary Dismissal of Plaintiffs' Claims for Injunctive Relief Should be Vacated .............................................73

V.     The Court Erred By Instructing the Jury Not to Consider Certain Additional Documents ....................................................75

CONCLUSION .................................................................................76

STATEMENT OF RELATED CASES ...................................................80

CERTIFICATE OF COMPLIANCE......................................................81

ADDENDUM A: STATUTORY TEXT..........................................ADD-1

ADDENDUM B: TEXT OF RULES 50 AND 59 OF THE FEDERAL RULES OF CIVIL PROCEDURE ......................................ADD-5

ADDENDUM C: TEXT OF RULE 702 OF THE FEDERAL RULES OF EVIDENCE ..........................................................ADD-8

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ace v. Aetna Life Ins. Co.*,
    139 F.3d 1241 (9th Cir. 1998) ................................................ 60

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
    738 F.3d 960 (9th Cir. 2013) ........................... 48, 49, 50, 52

*American Needle, Inc. v. NFL*,
    560 U.S. 183 (2010) ......................................................... 9

*Brewer v. Hustler Mag., Inc.*,
    749 F.2d 527 (9th Cir. 1984) ............................................. 64

*Bucklew v. Hawkins, Ash, Baptie & Co., LLP*,
    329 F.3d 923 (7th Cir. 2003) ............................................. 75

*Cargill, Inc. v. Monfort of Colo., Inc.*,
    479 U.S. 104 (1986) ........................................................ 74

*Celador Int'l Ltd. v. Walt Disney Co.*,
    2010 WL 11505709 (C.D. Cal. Dec. 21, 2010), *aff'd*, 499 F. App'x
    721 (9th Cir. 2012) ......................................................... 65

*City of Long Beach v. Standard Oil Co. of California*,
    46 F.3d 929 (9th Cir. 1995) ............................................... 39

*Cone v. W. Virginia Pulp & Paper Co.*,
    330 U.S. 212 (1947) ........................................................ 62

*Cool Fuel, Inc. v. Connett*,
    685 F.2d 309 (9th Cir. 1982) ............................................. 39

*Delong Equip. Co. v. Washington Mills Electro Minerals Corp.*,
    990 F.2d 1186 (11th Cir.), *amended,* 997 F.2d 1340 (11th Cir.
    1993) ......................................................................... 43

*Elosu v. Middlefork Ranch Inc.*,
    26 F.4th 1017 (9th Cir. 2022) ..................................... 39, 45

*Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*,
    762 F.3d 829 (9th Cir. 2014) ............................................... 55

*Glen Holly Ent., Inc. v. Tektronix Inc.*,
    343 F.3d 1000 (9th Cir. 2003) .............................................. 61

*Gov't Emps. Ins. Co. v. Dizol*,
    133 F.3d 1220 (9th Cir. 1998) (en banc) ........................... 73

*Guy v. City of San Diego*,
    608 F.3d 582 (9th Cir. 2010) ....................................... 46, 47

*Hardeman v. Monsanto Co.*,
    997 F.3d 941 (9th Cir. 2021) ............................................... 38

*Hasbrouck v. Texaco*,
    842 F.2d 1034 (9th Cir. 1987) ............................................. 41

*Humetrix, Inc., v. Gemplus S.C.A.*,
    268 F.3d 910 (9th Cir. 2001) ............................................... 53

*Hyer v. City & Cnty. of Honolulu*,
    118 F.4th 1044 (9th Cir. 2024) ............................................ 56

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) ............................... 40, 42, 48

*In re College Athlete NIL Litig.*,
    No. 20-cv-03919 CW, 2023 WL 8372787 (N.D. Cal. Nov. 3, 2023) ............... 20

*In re Elec. Books Antitrust Litig.*,
    No. 11 MD 2293 DLC, 2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) ............................................................... 43

*In re Exxon Valdez*,
    270 F.3d 1215 (9th Cir. 2001) ....................................... 64, 65

*In re First Alliance Mortgage Company*,
    471 F.3d 977 (9th Cir. 2006) ........................................ 66, 67

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
    933 F.3d 1136 (9th Cir. 2019) .......................................*passim*

vii

*In re NCAA Grant-in-Aid Cap Antitrust Litigation*,
   375 F. Supp. 3d 1058 (N.D. Cal. 2019), *aff'd*, 958 F.3d 1239 (9th
   Cir. 2020) ............................................................................................20

*In re Scrap Metal Antitrust Litigation*
   527 F.3d 517 (6th Cir. 2008) ...............................................................66

*In re Urethane Antitrust Litigation*
   768 F.3d 1245 (10th Cir. 2014) .....................................................66, 68

*Knutson v. Daily Rev., Inc.*,
   548 F.2d 795 (9th Cir. 1976) .........................................................58, 61

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999)..............................................................................42

*Laumann v. Nat'l Hockey League*,
   105 F. Supp. 3d 384 (S.D.N.Y. 2015) ......................................35, 61, 74

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
   791 F.2d 1356 (9th Cir. 1986) .......................................................64, 65

*National Collegiate Athletic Association v. Board of Regents of
   University of Oklahoma*,
   468 U.S. 85 (1984).......................................................................4, 12, 22

*O'Bannon v. NCAA*,
   7 F. Supp. 3d 955 (N.D. Cal. 2014), *vacated in part*, 802 F.3d 1049
   (9th Cir. 2015)................................................................................20, 45

*Oracle Corp. v. SAP AG*,
   765 F.3d 1081 (9th Cir. 2014) .................................................39, 72, 73

*Pipitone v. Biomatrix, Inc.*,
   288 F.3d 239 (5th Cir. 2002) ...............................................................54

*Portland Retail Druggists Ass'n v. Kaiser Found. Health Plan*,
   662 F.2d 641 (9th Cir. 1981) ...............................................................74

*Primiano v. Cook*,
   598 F.3d 558 (9th Cir. 2005) ...............................................................46

*Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*,
   752 F.3d 807 (9th Cir. 2014) ...............................................................57

*S&H Farm Supply, Inc. v. Bad Bolt, Inc.*
   25 F.4th 541, 552 (8th Cir. 2022) ...............................................42, 43

*Shaw v. Dallas Cowboys Football Club, Ltd.*,
   172 F.3d 299 (3d Cir. 1999) .........................................................13

*Stollings v. Ryobi Techs., Inc.*,
   725 F.3d 753 (7th Cir. 2013) .........................................................53

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
   282 U.S. 555 (1931)...............................................................41, 69

*Syufy Enterprises v. Am. Multicinema, Inc.*,
   793 F.2d 990 (9th Cir. 1986) ........................................................48

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
   546 F.3d 991 (9th Cir. 2008) ........................................................61

*Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*,
   223 F.3d 585 (7th Cir. 2000) ........................................................64

*Wallace v. City of San Diego*,
   479 F.3d 616 (9th Cir. 2007) .............................................39, 57, 61

*Whitlock v. Pepsi Ams.*,
   527 F. App'x 660 (9th Cir. 2013) ..............................................56, 57

*William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*,
   668 F.2d 1014 (9th Cir. 1981) .......................................................61

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
   395 U.S. 100 (1969)....................................................................41

**Statutes**

15 U.S.C. §§ 1 & 2..............................................................*passim*

15 U.S.C. § 15 ...........................................................8, 35, 73

15 U.S.C. § 26 .....................................................................74

15 U.S.C. § 1291 ....................................................8, 12, 13, 44

28 U.S.C. § 1291 ....................................................................7

ix

**Rules**

Fed. R. Civ. P. 12 ...................................................................................[1](#)

Fed. R. Civ. P. 23 .................................................................................[19](#)

Fed. R. Civ. P. 50 ...........................................................................*[passim](#)*

Fed. R. Civ. P. 56 .................................................................................[74](#)

Fed. R. Civ. P. 59 ..........................................................................[8](#), [35](#)

Fed. R. Evid. 602 .................................................................................[75](#)

Fed. R. Evid. 702 ...........................................................................*[passim](#)*

**Other Authorities**

1 ABA Section of Antitrust Law, Antitrust Law Developments at 834
(9th ed. 2022) ...............................................................................[48](#)

J. Hastings & M. Williams, *What is a "But-For World"?* 31 *Antitrust*,
Fall 2016, at 102 ...........................................................................[43](#)

Nathaniel Grow, *Regulating Professional Sports Leagues*, 72 Wash.
& Lee L. Rev. 573, 617 (2015)......................................................[23](#)

P. Areeda & H. Hovenkamp, Antitrust Law: An Analysis of Antitrust
Principles and Their Application § 309b (5th ed. 2024) ...................[42](#)

Wright & Miller, 11 Fed. Prac. & Proc. Civ. § 2815 (West 3d ed.)........[72](#)

# INTRODUCTION

This Court should affirm the jury's verdict that Defendants—the NFL and its 32 member teams—violated the antitrust laws and inflicted significant injury on Plaintiffs. The jury found that Defendants conspired to charge Plaintiffs inflated prices for telecasts of what the NFL called "out-of-market" games. The NFL and its teams did this using an interlocking web of agreements—with each other, DirecTV, and two networks: CBS and Fox. Those agreements gave DirecTV the exclusive right to distribute out-of-market game telecasts. DirecTV sold these telecasts as an add-on, premium-priced package called "Sunday Ticket." Plaintiffs are the individuals and businesses that bought Sunday Ticket.

In the prior appeal in this case, this Court held that the conspiracy alleged by Plaintiffs, to restrict the distribution of NFL game telecasts, would violate the antitrust laws. *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1151–52 (9th Cir. 2019) ("*In re Sunday Ticket*") (reversing Rule 12(b)(6) dismissal). The alleged conspiracy, this Court explained, is a "naked restraint on output" indistinguishable from price-fixing. *Id.* at 1155–56, 1158. By colluding to restrict the distribution of their out-of-market telecasts to just one distributor (DirecTV), Defendants reduced the output of these telecasts and artificially inflated their price. The anticompetitive nature of the alleged conspiracy is obvious. "[A]n observer with even a rudimentary understanding of economics could conclude that

1

the arrangements in question would have an anticompetitive effect on customers and markets." *Id.* at 1156 (cleaned up).

At trial Plaintiffs proved, and the jury found, that exact conspiracy. Plaintiffs also proved that DirecTV—at the NFL's insistence, and as required by the NFL's agreements with CBS and Fox—sold Sunday Ticket only as a separate add-on package for which it charged a "premium" price. Defendants' avowed purpose, in requiring this "premium" price, was to protect CBS and Fox from competition from DirecTV's out-of-market game telecasts. In exchange, CBS and Fox paid the NFL more than they otherwise would have for the rights to telecast *in*-market NFL games. The jury found that Plaintiffs had been injured and awarded them $4.7 billion in damages—substantially less than the total amount of Plaintiffs' claimed overcharge.

After dismissing the jury, the district court retroactively excluded the testimony of two of Plaintiffs' economic experts; found that Plaintiffs had not proven antitrust injury or damages once that testimony was excluded; and entered judgment as a matter of law ("JMOL") for Defendants. The district court did this despite concluding that the jury had sufficient evidence to find that Defendants had violated the antitrust laws. The court then summarily dismissed Plaintiffs' request for *injunctive* relief, without giving Plaintiffs an opportunity to present evidence or argument.

2

The court's posttrial order got *Daubert* egregiously wrong. Plaintiffs' experts used reliable and accepted economic methods. Before trial the same district judge twice rejected Defendants' *Daubert* motions. The experts testified consistent with their detailed reports. After trial the district court substituted its own view of the evidence for what the jury could reasonably believe. That violated settled law under the Federal Rules and *Daubert*.

The court faulted one expert (Professor Daniel Rascher) for not providing "definitive" testimony about how the NFL and its teams would have distributed telecasts if they hadn't violated the antitrust laws. That was legal error. Experts in antitrust cases aren't required to testify definitively about how market participants would have arranged their affairs in the absence of illegal restraints. The "but-for" world is, by definition, a world that never existed and cannot be described with precision. Yet that degree of exactitude was what the district court—after the fact—required of Rascher.

Rascher has dedicated his academic career to the study of sports economics. Here, he used the "yardstick" method for estimating Plaintiffs' damages. The yardstick method is well-accepted among economists. This Court has repeatedly affirmed the use of similar yardsticks in estimating the damages caused by antitrust violations. Applying this method, Rascher used the competitive market for telecasts of games between top-ranked *college* football teams as his yardstick for estimating

3

the price Plaintiffs would have paid to watch *NFL* games, but for Defendants' illegal restraints. In the college market, similar restraints once existed but were removed in 1984 after the Supreme Court struck them down as violating the antitrust laws. *In re Sunday Ticket*, 933 F.3d at 1147 (discussing the holding and aftermath of *National Collegiate Athletic Association v. Board of Regents of University of Oklahoma*, 468 U.S. 85 (1984) ("*NCAA*")). During the class period, almost every top-ranked *college* football game was telecast nationwide on channels that were available to Plaintiffs through their basic DirecTV service. Based on his analysis of the real-world college football market, Rascher opined that, but for Defendants' restraints, Plaintiffs could have watched the out-of-market NFL games on their basic DirecTV service, without paying *any* additional subscription fees for Sunday Ticket—let alone the "premium" prices that Defendants required. Plaintiffs' damages, therefore, were the $7.01 billion they paid DirecTV to purchase more than 24 million annual Sunday Ticket subscriptions during the twelve-year class period.

This Court's caselaw makes clear that the comparability of the two markets is a question of fact for the jury. The district court nonetheless seized on minor differences between the college and NFL markets as a justification for retroactively excluding Rascher's yardstick analysis. That was legal error. Rascher considered the differences identified by the district court and explained—in his reports and his trial

testimony—why they didn't change his conclusions. The jury was entitled to consider his testimony and make its own judgments about it.

Plaintiffs' other expert (Dr. Douglas Zona) presented alternative damages calculations based on econometric modeling. The court's posttrial order faulted Zona for not having "conclusive" evidence that another platform could have competed with DirecTV by "streaming" out-of-market game telecasts directly to consumers during the early years of the class period. But the reasonableness of an expert's assumptions is a question of fact for the jury. The jury heard ample evidence that Zona's assumption of a streaming competitor was reasonable. Platforms livestreamed telecasts of games played by every other major professional sports league. DirecTV began streaming NFL telecasts in 2012, just one year after the class period began. The jury could reasonably conclude that, but for Defendants' restraints, a DirecTV competitor could have done the same. The court usurped the jury's role.

The district court's JMOL grant must be reversed for other reasons as well. JMOL was based on Plaintiffs' supposed failure to prove they were injured. But the jury found that Defendants' conspiracy caused "anticompetitive effects," and the district court affirmed that finding, since there was "evidence in the record—even without the testimonies of Dr. Rascher and Dr. Zona—to support" it. 1-ER-20. That Plaintiffs were injured by those "anticompetitive effects" was beyond obvious.

Defendants' conspiracy limited Plaintiffs' choices to one exclusive distributor and caused that distributor to charge Plaintiffs supracompetitive prices. Limited choices and higher prices—the intended objectives of Defendants' conspiracy—are the archetypes of antitrust injury. The district court didn't identify evidence that Defendants somehow missed their mark. And the district court certainly didn't identify evidence, of Plaintiffs' supposed non-injury, that was so overwhelming that every reasonable jury would be compelled to accept it.

The district court committed yet more error in its *alternative* judgment, which would take effect only if this Court were to reverse JMOL. That judgment vacated the jury's damages awards as "irrational" and granted a new trial on damages. But the jury awarded $2.3 billion *less* than what Rascher's yardstick analysis supported, so its awards were supported by the evidence. The district court justified its alternative judgment by "reverse engineering" the jury's damages calculations and then attempting to divine the thought process the jury used to arrive at a lower damages award. The court then declared that the jury's thought process, as reconstructed by the court, was "irrational." This exercise invaded the jury's province and failed to give the "substantial deference" to which jurors are entitled. Even if this exercise were permitted (it isn't), there was no "irrationality." The jury could reasonably have used, as the "but-for" price of Sunday Ticket, a dollar amount that Defendants themselves implied was the appropriate price.

6

The district court's final posttrial error was dismissing Plaintiffs' requests for declaratory and injunctive relief without hearing them, despite evidence that Defendants' violations are ongoing. The court gave no reasons for its summary dismissal. Perhaps the court assumed, without saying so, that its JMOL order foreclosed equitable relief. If so, that was error. Plaintiffs have standing to seek injunctive relief based on the threat of future harm—including *non-monetary* harm like reduced consumer choice. Future harm had been expressly excluded from the jury trial and reserved for further proceedings. Those proceedings never happened. The district court entered judgment on forward-looking relief anyway, over Plaintiffs' objection, and without explanation. This summary dismissal violated fundamental procedural and substantive requirements.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 1291. Plaintiffs filed a timely notice of appeal from the district court's October 4 order, which certified as final the district court's judgment.

## ISSUES PRESENTED

1.      Did the district court err by retroactively excluding Plaintiffs' expert witnesses' testimony?

2.      Did the district court err by granting JMOL despite all the *non-excluded* evidence of Plaintiffs' injury?

3.      (a) Did the district court err by granting, in the alternative, a new trial on damages based on its "reverse engineering" of the jury's calculations, where the jury's awards were *less* than the maximum amounts supported by Rascher's yardstick? (b) Did the district court err by setting remittitur at "nominal damages" for the residential class?

4.      Did the district court err by granting judgment on Plaintiffs' claims for declaratory and injunctive relief without giving Plaintiffs an opportunity to present evidence and argument on those claims?

5.      Did the district court abuse its discretion by denying Plaintiffs' motion to admit additional documents?

## STATUTES AND RULES

There are three Addendums bound with this brief. Addendum A contains the statutory text: Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 & 2); Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) & 26); and the Sports Broadcasting Act ("SBA") (15 U.S.C. §§ 1291–1295). Addendum B contains the text of Rules 50 and 59 of the Federal Rules of Civil Procedure. Addendum C contains the text of Rule 702 of the Federal Rules of Evidence.

## STATEMENT OF THE CASE

I.  **Defendants' Conspiracy to Restrict the Output of NFL Game Telecasts and to Fix the Price of Sunday Ticket**

    A.  **NFL Game Telecasts and Sunday Ticket**

The National Football League is the most lucrative sports league in the world, earning well over $100 billion during the class period (June 2011 to February 2023). 7-ER-1183 (Tr. 786:7–13). The lion's share of that revenue came from licensing the NFL teams' rights to telecast their games. 8-ER-1365–66 (Tr. 967:23–968:1). Of the 50 most-watched telecasts in the United States in 2021, 46 were NFL games. 10-ER-1878–79 (Tr. 1478:6–1479:14).

To maximize their profits, the NFL and its 32 teams (each of which is an independently owned and managed business[1]) conspired to carve up the market for NFL game telecasts to create multiple revenue streams from distributors who are protected from competing with each other.

One of those streams is derived from Sunday Ticket, a bundled package of live telecasts of the television viewer's *out-of-market* Sunday afternoon games. On any given Sunday afternoon, NFL teams usually play between ten and thirteen games. However, a viewer in the United States is only able to watch three or four of

_____

[1] 7-ER-1098 (Tr. 701:10–17); 8-ER-1367 (Tr. 969:7–14); *American Needle, Inc. v. NFL*, 560 U.S. 183, 196 (2010).

those games by tuning his television to his local CBS and Fox affiliates' over-the-air telecasts (or by watching those stations on cable or satellite, for a basic subscription fee).[2] The NFL calls these the viewer's *in-market* games. They include any games being played by his local teams.[3] The viewer's "out-of-market" games are the *other* six to ten NFL games being played that Sunday afternoon, which are *not* telecast by his local CBS and Fox affiliates. The NFL's Sunday Ticket package consists of the live "feeds" of all those out-of-market games.[4] Those feeds are produced by CBS and Fox and are also telecast by those networks' affiliates in regions outside the viewer's region; in those other regions, three or four of those other games are being telecast as *those* regions' *in-market* games. But in the viewer's region, the local CBS and Fox affiliates aren't showing any of the other six to ten games, which makes those games *out-of-market* for that viewer.

If someone in the United States wanted to watch an out-of-market NFL game on television during the class period, he had only two options: either (1) pay $1,000

---

[2] 7-ER-1113–17 (Tr. 716:20–720:22) (Rascher); 15-ER-3026–31 (demonstratives); 4-ER-588–89 (Tr. 194:23–195:5).

[3] 6-ER-999–1000 (Tr. 603:11–604:6).

[4] *See* 4-ER-592 (Tr. 198:4–20); 6-ER-1005 (Tr. 609:13–18). Sunday Ticket doesn't contain the viewer's in-market games. DirecTV's customers could watch their in-market games only on CBS and Fox, which they had access to as part of their basic DirecTV subscription. *See* 8-ER-1372–73 (Tr. 974:21–975:18).

or more to subscribe to DirecTV's satellite service, pay to install a satellite dish, and then pay nearly $300 to DirecTV for an annual residential subscription to Sunday Ticket; or else (2) go to a sports bar or restaurant that itself paid thousands of dollars per year for a commercial subscription to Sunday Ticket. *See* 4-ER-589–91 (Tr. 195:15–197:1); 7-ER-1112 (Tr. 715:1–9). Plaintiffs represent two classes: those who paid for residential Sunday Ticket subscriptions and those who paid for commercial subscriptions.

### B. Defendants' Interlocking Agreements

Plaintiffs' evidence at trial proved that the prices class members paid for Sunday Ticket were inflated by Defendants' conspiracy to restrict output and fix prices of out-of-market game telecasts. That conspiracy involves three interlocking agreements: the Teams-NFL Agreement; the NFL-DirecTV Agreements; and the NFL-Network Agreements (with CBS and Fox). These are described below.

As intended by the conspirators, DirecTV agreed to charge what the contracting parties called "premium" prices for Sunday Ticket, which were designed to prevent DirecTV's telecasts from competing with CBS and Fox. DirecTV could charge high prices because viewers had no other way to watch out-of-market games. In a "but for" world without the illegal restraints on competition, the telecasts of out-of-market games would have been far more accessible, and DirecTV could not have charged supracompetitive prices to see them.

### 1.     The Teams-NFL Agreement and the Sports Broadcasting Act

The Teams-NFL Agreement is an agreement among the NFL's 32 independent teams not to compete with one another in selling telecasts of their games. Before the Teams-NFL Agreement, each team had separately negotiated the sale of its telecast rights in its own games. 7-ER-1102–03 (Tr. 705:16–706:8). Now, instead of competing, each team transfers its telecast rights to the NFL, which acts as the teams' joint selling agent. 8-ER-1367 (Tr. 969:7–14). This agreement gives the NFL monopoly power over the sale of telecast rights to professional football games. 7-ER-1108–12 (Tr. 711:10–715:11).

In the prior appeal, this Court held that the Teams-NFL Agreement alleged in the complaint eliminates competition that would otherwise exist and "places an artificial limit on the quantity of televised football that is available." 933 F.3d at 1149–52 (*quoting NCAA*, 468 U.S. at 99). In 1961, Judge Grim of the Eastern District of Pennsylvania enjoined a nearly identical version of the Teams-NFL Agreement in an action brought by the United States, finding the agreement to be an illegal restraint of trade. *See id.* at 1145.

In response to that injunction, the NFL lobbied Congress to enact the Sports Broadcasting Act ("SBA"). The SBA is "a tailored exemption" from the antitrust laws. *In re Sunday Ticket*, 933 F.3d at 1146. It provides that the Sherman Act shall not apply to any agreement among professional sports teams to "sell[]" their

12

"rights . . . in the sponsored telecasting of [their] games." 15 U.S.C. § 1291. The SBA's term "sponsored telecasting" means "broadcasts which are financed by business enterprises (the 'sponsors') in return for advertising time and are therefore provided free to the general public." *In re Sunday Ticket*, 933 F.3d at 1147 (quoting *Shaw v. Dallas Cowboys Football Club, Ltd.*, 172 F.3d 299, 301 (3d Cir. 1999)). In other words, the exemption applies to free over-the-air television. In *Shaw*, the Third Circuit held that the NFL teams' agreements with each other and DirecTV, which created Sunday Ticket, were *not* protected by the SBA, since Sunday Ticket isn't a "sponsored telecast[]." 172 F.3d at 301–03.

### 2. The NFL-DirecTV Agreements and the NFL's "Premium" Price Requirement

The NFL teams sold to DirecTV the exclusive rights to distribute the teams' out-of-market game telecasts through DirecTV's paid satellite service.[5] In the prior appeal, this Court held that this is "the exact type of arrangement that Judge Grim concluded violated the Sherman Act—and, more importantly, that the Supreme Court held caused an injury to competition in the context of college football." *In re*

---

[5] These NFL-DirecTV contracts were also agreements among the 32 independent teams, each of which ratified these contracts. 4-ER-598–99 (Tr. 204:16–205:2); 19-ER-4023 (contract contingent upon "member club approvals"); 19-ER-4037–38 (contract contingent upon "the Required Approvals" of the teams).

*Sunday Ticket*, 933 F.3d at 1151. Over the class period, DirecTV paid the NFL $15 billion for these rights. 7-ER-1126 (Tr. 729:20–23).

The NFL teams' decision to give DirecTV *exclusive* distribution rights caused 35 million NFL fans to be unable to watch their preferred games each week.[6] These fans' preferred games were out-of-market, and these fans couldn't or wouldn't pay DirecTV's high prices to subscribe to Sunday Ticket. 7-ER-1142 (Tr. 745:18–20) (the "cost" of Sunday Ticket was "far and away the main reason why" these fans couldn't watch their preferred games).

Sunday Ticket's high price was no accident. Defendants required DirecTV to make Sunday Ticket available only as a separate, add-on package and to charge a "premium" price for it. In the written contract, DirecTV agreed that "in all cases NFL Sunday Ticket shall be marketed and offered in a manner consistent with its status as a high-quality, *premium* subscription sports offering."[7] (Emphasis added here and in all other quotations in this brief.) Brent Lawton, the NFL's Vice

---

[6] 20-ER-4161 (TX-172, at 9) (NFL consumer survey finding that "[t]here is a large out-of-market population that is underserved by the current live game distribution dynamics"); 20-ER-4164 (*id.* at 12) (finding that 35 million fans weren't able to watch the games they preferred because those games weren't aired by CBS and Fox in those fans' local markets); *see also* 7-ER-1139–43 (Tr. 742:1–746:13) (describing similar internal NFL documents); 15-ER-3050–56 (demonstratives).

[7] 19-ER-4029 (TX-44, § 2(f)); 19-ER-4048 (TX-45, § 2(c)).

14

President of Media Strategy, testified that the NFL understood this contractual provision to require that Sunday Ticket be "*priced* as a premium product." 14-ER-2943 (94:06–94:10). Steve Bornstein, another NFL executive, testified that "premium subscription would imply *a premium price*" for Sunday Ticket. 4-ER-687 (Tr. 293:13–18). Roger Goodell, the NFL's Commissioner, testified that "We've always said [Sunday Ticket] was sold at a premium." 10-ER-1897 (Tr. 1497:23). The "premium" price promise was extracted from DirecTV as required by Defendants' interlocking agreements with the networks—CBS and Fox—which are discussed below.

DirecTV kept its promise to charge a premium price—and then some. After a price decrease in 2012, near the start of the class period, the price of Sunday Ticket steadily rose for residential customers to $294/year in 2018. *See* 20-ER-4280 (TX-417). The price stayed at $294/year from 2018 through the end of the class period in early 2023. 9-ER-1634–36 (Tr. 1235:21–1237:5). The price dip in 2012 gave DirecTV a one-time surge in subscribers that dissipated once DirecTV raised its prices again. *See* 20-ER-4280 (TX-417).

The jury heard evidence that the NFL closely monitored and enforced DirecTV's premium price. Each year, the NFL demanded and got materials from DirecTV documenting the next year's proposed price for Sunday Ticket. 14-ER-2944 (Tr. 95:15–97:06). In an internal email sent in 2017, the Chief Operating

15

Officer of NFL Media, Hans Schroeder, described the pricing of Sunday Ticket as having been "agreed to"—meaning, agreed to between DirecTV and the NFL. 15-ER-3111 (TX-684, at 2).

DirecTV's documents also showed the NFL's control over Sunday Ticket pricing. A 2015 internal DirecTV presentation, titled "NFL Sunday Ticket 101 & DIRECTV Rights," stated that "*Subject to NFL approval*, DIRECTV determines seasonal Pricing" for Sunday Ticket. 15-ER-3108 (TX-267, at 2). In 2018, DirecTV's Senior Director of Revenue sent an email to his colleagues stating that he "wanted to drop the price" for Sunday Ticket but could not do so because "the NFL deems their product as a Premium Product" and "have pushed back hard." 20-ER-4278 (TX-269).

In 2021, Defendants received bids from other companies interested in replacing DirecTV as the distributor of Sunday Ticket. ESPN's bid was rejected because ESPN proposed to sell Sunday Ticket for $70 per year, a price the NFL deemed too "low," because it would not be "complementary" to CBS's and Fox's telecasts. 20-ER-4325 (TX-697); 8-ER-1421–23 (Tr. 1023:19–1025:8). Instead, Defendants chose Google as the new exclusive distributor of Sunday Ticket to residential subscribers, pursuant to a multi-year contract that continues in force today. Google's price: $349. 8-ER-1410–11 (Tr. 1012:19–1013:2); 8-ER-1424–25 (Tr. 1026:1–1027:22).

Plaintiffs sought to admit additional documents—mostly emails among NFL and DirecTV employees—that demonstrated the NFL's pricing control over Sunday Ticket. The court permitted Plaintiffs to use these documents for impeachment, but summarily denied Plaintiffs' motion to admit them for any other purpose and instructed the jury to consider them only for evaluating certain witnesses' credibility. *See infra*, at 75–76. This brief doesn't cite or rely on any of these additional documents.

### 3. The NFL-Network Agreements with CBS and Fox and the NFL's Agreement to Impose a "Premium" Price

CBS and Fox together paid Defendants $23 billion throughout the class period for the rights to telecast NFL games "over-the-air."[8] 7-ER-1112 (Tr. 715:12–19); 7-ER-1183 (Tr. 786:2–3).

Defendants promised CBS and Fox that Sunday Ticket wouldn't be shown cheaply; viewers would have to purchase a separate subscription for Sunday Ticket for an additional fee above DirecTV's basic service. 11-ER-2076–77 (Tr. 1675:15–1676:14).[9] Defendants further promised that Sunday Ticket would be sold at a

---

[8] "Over the air" means to broadcast via a signal sent over the airwaves. 4-ER-586 (Tr. 192:10–18).

[9] The contracts required Defendants to ensure that Sunday Ticket was sold "on a subscription basis." 20-ER-4206 (TX-187, at §2.5(a)); 20-ER-4240 (TX-188, at §2.5(a)); 20-ER-4096 (TX-145, at §2.5(a)); 20-ER-4130 (TX-146A, at §5(c)(i)); 20-ER-4148, 4151 (TX-146D, at §5(c) & Schedule 5).

17

"premium" price. The most recent versions of the NFL-Network contracts state that "Resale packages" (*i.e.*, Sunday Ticket) shall be "*marketed as premium products* for avid League fans that satisfy complementary demand to the offering of in-market Game Broadcasts by" CBS and Fox.[10] The phrase "satisfy complementary demand to" is a euphemism that means "do not meaningfully compete with."

As CBS explained to the NFL in 2009, when bidding to renew its contract, "*[t]he concept here has always been* that these [Sunday Ticket] packages are sold at a premium, thereby limiting distribution." 20-ER-4328 (TX-750, at 2). CBS Sports' former Chairman, Sean McManus, testified that the goal was to prevent competition: CBS "wanted a premium price for Sunday Ticket because CBS didn't want Sunday Ticket taking away more eyeballs from CBS viewership." 11-ER-2073 (Tr. 1672:2–5). He testified that CBS got what it wanted: the NFL "agreed to a premium price for Sunday Ticket which limits distribution of Sunday Ticket." 11-ER-2078 (Tr. 1677:16–19).

Fox likewise emphasized to the NFL in its contract negotiations "*the agreed principle* that Sunday Ticket would remain a complementary, premium product that *would not materially compete* with Fox's in-market games." 20-ER-4276 (TX-257, at 9). This "agreed principle" was important to Fox because a "[m]aterial change to

---

[10] 20-ER-4130 (TX-146A, at §5(c)(i)); 20-ER-4151 (TX-146D, at Schedule 5).

18

the distribution of Sunday Ticket is an existential threat to Fox's NFL business." *Id.* Larry Jones—a senior Fox executive—testified that it was Fox's understanding, throughout the class period, that "Sunday Ticket would be a premium product for avid fans." 6-ER-915–16 (Tr. 519:18–520:3). A "premium product," he explained, means a product that sells for "a premium fee." 6-ER-923 (Tr. 527:1–9).

Robert Kraft, the owner of the New England Patriots and co-chair of the NFL's Media Committee, testified that "ensuring a high subscription price for Sunday Ticket is a priority for the NFL." 14-ER-2934 (20:22–21:1). Charging a premium price was a priority, Kraft explained, because a lower price "would devalue our over-the-air partners' packages" and then CBS and Fox "wouldn't be incented to continue and pay us the way they pay us." 14-ER-2934 (Tr. 29:3–9). Commissioner Goodell testified that "[w]e don't want it [Sunday Ticket] to interfere with the Sunday afternoon" telecasts by CBS and Fox. 10-ER-1898 (Tr. 1498:14–15). The NFL's Chief Media Officer, Brian Rolapp, agreed that it was "the NFL's goal to make Sunday Ticket … a complement to and not a substitute of the network Sunday Afternoon Games" on CBS and Fox. 8-ER-1512 (Tr. 1114:7–11).

## II. The Plaintiff Classes and Their Experts

The district court certified classes for damages and injunctive relief under Rule 23(b)(3) and (b)(2). 3-ER-332. Based on its "rigorous" analysis of Plaintiffs'

experts' reports, 3-ER-310, the court found that "antitrust violation, antitrust impact, and damages . . . are common questions capable of class-wide proof," 3-ER-326.

At trial, Plaintiffs called two expert economists, Professor Daniel Rascher and Dr. Douglas Zona, to testify regarding the anticompetitive nature of Defendants' conspiracy and the harm it caused to the classes. Plaintiffs also called Professor Einer Elhauge—an expert in antitrust economics at Harvard Law School—to rebut one of Defendants' experts.

## A.    Prof. Rascher's Yardstick Opinion

Rascher, a professor at the University of San Francisco, is a noted expert in sports and antitrust economics. 18-ER-3766–88 (CV). He has published numerous articles in these fields. 18-ER-3768–73. Federal courts have repeatedly relied on Rascher's analyses in seminal sports antitrust cases.[11] Businesses have also relied on him: Rascher has consulted on more than 100 different projects, including work for several NFL teams. 7-ER-1093–94 (Tr. 696:21–697:22). He was the only expert at trial who has devoted his career to studying the economics of sports. The district

---

[11] *O'Bannon v. NCAA*, 7 F. Supp. 3d 955, 976–82 (N.D. Cal. 2014) (crediting Rascher's testimony in granting injunction), *vacated in part for reasons unrelated to Rascher*, 802 F.3d 1049 (9th Cir. 2015); *In re College Athlete NIL Litig.*, No. 20-cv-03919 CW, 2023 WL 8372787, at *5–27 (N.D. Cal. Nov. 3, 2023) (relying on Rascher to certify the class); *In re NCAA Grant-in-Aid Cap Antitrust Litigation*, 375 F. Supp. 3d 1058, 1067–68 (N.D. Cal. 2019) (crediting Rascher's testimony), *aff'd*, 958 F.3d 1239, 1258 (9th Cir. 2020) (favorably citing Rascher's testimony).

court qualified him to testify as "an expert in the field of sports economics and antitrust economics." 7-ER-1092–95 (Tr. 695:12–698:19).

Rascher opined regarding both liability and damages at the class-certification and merits phases. He submitted four reports containing 645 pages of analysis. His merits-phase reports are at 19-ER-3809 and 18-ER-3548.

Rascher's trial testimony was entirely consistent with his reports. *See* 7-ER-1092–307 (Tr. 695:12–910:23); 8-ER-1329–62 (Tr. 931:10–964:1); 15-ER-3003–98 (demonstratives).

### 1.    College Football was a Particularly Apt Yardstick

To calculate damages, Rascher used a yardstick method. In this method, the expert identifies a competitive market that doesn't have the challenged restraints on competition. That other market is the yardstick used to measure what the consumer price would have been in the affected market, absent the restraints. This is a common method used by economists "to derive a but-for price." 19-ER-3954.

Rascher's yardstick was the market for telecasts of college football games in which both teams were in the Associated Press Poll's Top 25 ranking. 18-ER-3685–86; *see* 7-ER-1278–79 (Tr. 881:23–882:5). College football, Rascher explained, has "many parallels to NFL football." 7-ER-1145–46 (Tr. 748:14–749:25). College football is the second most popular sport nationwide—just behind NFL football. 7-ER-1146 (Tr. 749:17–18); 19-ER-3963–69. Like NFL teams, top-ranked college

21

football teams have fixed-fee, multi-year telecast agreements with major media distributors, which sell advertising to recoup the fees they pay for the right to telecast the games. 19-ER-3964–68. Like NFL teams' fans, college football teams' fans are located across the country. 19-ER-3963.

College football provides a rare opportunity to observe what happens when the restraints imposed by Defendants are *removed*. Like the NFL now, the NCAA at one time exercised total control over the sale of telecast rights to college football games, and it used that control to limit the output of telecasts. That was the "exact type of arrangement" as alleged in this case—as this Court noted in the prior appeal. 933 F.3d at 1151. In striking down the NCAA's television plan as violating the Sherman Act, the Supreme Court predicted that "if member institutions were free to sell television rights, many more games would be shown on television." *NCAA*, 468 U.S. at 105.

That prediction quickly proved true. The Supreme Court handed down *NCAA* in June 1984. The college football season began six weeks later. In that short period of time, the colleges and networks rearranged their affairs and entered into new telecast deals that significantly increased viewership. 7-ER-1147 (Tr. 750:1–24); 8-ER-1358–59 (Tr. 960:14–961:10). The "number of televised college football games grew exponentially," and "broadcasters collectively pa[y] half as much for the rights to televise a larger number of games." *In re Sunday Ticket*, 933 F.3d at 1147 (quoting

Nathaniel Grow, *Regulating Professional Sports Leagues*, 72 Wash. & Lee L. Rev. 573, 617 (2015)).

Rascher explained that major college football games are among today's most widely viewed telecasts. 7-ER-1153 (Tr. 756:5–25); 19-ER-3963–65 (15 million people watched the 2021 championship game between Alabama and Georgia). All four major television networks—CBS, NBC, ABC and Fox—televise college football games nationally, as do at least three ESPN channels (ESPN, ESPN2, and ESPNU), Fox Sports 1, and CBS Sports Network. 19-ER-3965. In 2019, 94% percent of games between top-ranked college teams (Rascher's yardstick) were telecast nationwide on "over-the-air" networks; another 3% were on basic cable channels. 19-ER-3976. All these telecasts were available, for no extra charge to the viewer, on most cable and satellite platforms as part of a basic subscription to that platform. 19-ER-3969. And all were available to Plaintiffs on DirecTV. *Id*.; 7-ER-1176–77 (Tr. 779:7–780:7).

Based on his detailed analysis of the before-and-after history of college football telecasts, Rascher testified that, but for Defendants' anticompetitive agreements, out-of-market NFL telecasts would all have been shown on channels already available to Plaintiffs on DirecTV or a similar basic satellite or cable service, without requiring Plaintiffs to purchase the additional Sunday Ticket package. 7-ER-1176 (Tr. 779:7–23); 18-ER-3681. Rascher also confirmed by regression analyses

23

that there was no evidence that Plaintiffs would have had to pay more for their satellite or basic cable service if out-of-market games had been shown on over-the-air or basic subscription channels. 19-ER-3978–84.

There were about 24 million paid annual residential subscriptions and about 500,000 paid annual commercial subscriptions during the twelve-year class period. 7-ER-1118 (Tr. 721:11–21). The residential class paid $5.66 billion, and the commercial class $1.35 billion, for these subscriptions: $7.01 billion in total. 9-ER-1588–89 (Tr. 1189:22–1190:2). These numbers did *not* include the cost of Plaintiffs' underlying subscription to DirecTV's basic service; Plaintiffs' cost of installing satellite dishes; or the value DirecTV received from having the draw of Sunday Ticket to attract customers for its basic service. 7-ER-1179 (Tr. 782:18–23). Rascher's $7.01 billion damages opinion is based solely on the Plaintiffs' costs of their Sunday Ticket subscriptions.

## 2. The NFL's "New Frontier" Study Supports Rascher's Use of College Football as a Yardstick

In 2017, the NFL's senior leaders considered an alternative to Sunday Ticket they dubbed the "New Frontier," which would "[d]istribute regular out-of-market simulcasts on basic cable networks instead of exclusively through DirecTV Sunday Ticket (ST)." 20-ER-4297 (TX-686, at 13); *see* 8-ER-1535–38 (Tr. 1137:16–1140:10). The study concluded that distributing out-of-market games over-the-air and for no extra charge on basic cable could cause "average distribution for NFL

regular season games . . . to double from ~39% to ~77% of U.S. TV HHs [households]." 20-ER-4298 (TX-686, at 14).

All the networks named in the New Frontier study were available to class members at no extra charge because they were included in the members' underlying DirecTV basic service. 7-ER-1160 (Tr. 763:10–17); 15-ER-3071 (demonstrative). This study proves that Rascher's but-for world could have been achieved. 18-ER-3595–97. If the NFL teams had removed their restraints on competition, the out-of-market games would have been made available to the Plaintiff classes for no extra charge—just like college football telecasts.

Like Rascher, the New Frontier study used college football as its comparator. 20-ER-4295–96 (TX-686, at 4–5). It noted that one college conference's games (the Big Ten's) reached 61% of American households, whereas the NFL's reached just 39%. *Id.* "Ohio State's games average higher distribution than all NFL Clubs, except the Dallas Cowboys." *Id.* The NFL's decision to use top-ranked college football telecasts as the relevant comparator to NFL game telecasts confirmed the aptness of Rascher's yardstick. 7-ER-1155–57 (Tr. 758:19–760:10).

### 3. Defendants' Efforts to Exclude Rascher's Opinion

Before trial, the district court twice rejected Defendants' efforts to exclude Rascher's testimony. Defendants claimed that Rascher was "simply speculating that college football is comparable to the NFL" and ignoring "differences" in "college

football television distribution." 3-ER-319. The district court ruled that using a yardstick was an "accepted methodology," that Rascher had identified "structural similarities between college and professional football," and that Defendants' criticisms "properly go to weight, not admissibility." *Id.* After Defendants "reraise[d]" the "same objections" *in limine*, the court again overruled them. 3-ER-320.

## B.    Dr. Zona's Opinions

Zona presented alternative damages models that estimated the effect on price of just two of the challenged restraints: (1) the NFL teams' requirement that DirecTV charge a premium price, and (2) the NFL teams' restriction of Sunday Ticket to just one exclusive distributor.

Zona has 40 years of experience as a practicing economist. 9-ER-1567–69 (Tr. 1168:25–1170:20); 17-ER-3472–82 (CV). He has consulted for the Department of Justice, the FTC, AT&T, and others. 9-ER-1569 (Tr. 1170:11–20). The district court qualified Zona as an "expert in applied econometrics and econometric modeling." 9-ER-1571 (Tr. 1172:6–9). His reports are at 17-ER-3419 and 17-ER-3374. Zona's trial testimony was entirely consistent with his reports. *See* 9-ER-1567–681 (Tr. 1168:20–1282:11); 15-ER-3099–106 (demonstratives).

### 1. Zona's Econometric Models

Zona used DirecTV's data and other viewership data—"giant data set[s]" containing "billions of records"—to calculate demand curves for Sunday Ticket. 9-ER-1573–77 (Tr. 1174:1–1178:2). He then analyzed what price would have maximized DirecTV's profits in two but-for world scenarios. 9-ER-1577–82 (Tr. 1178:22–1183:1).

***The "NFL Tax" Model.*** Zona's "NFL Tax" model analyzed what would have happened if DirecTV could have set whatever price it wanted, without the NFL's insistence that it charge a "premium" price. *See* 9-ER-1582–83 (Tr. 1183:2–1184:10). He calculated that DirecTV would have maximized its profits by charging a *24.6 percent lower* price for Sunday Ticket. 9-ER-1581 (Tr. 1182:7–11); 9-ER-1587 (Tr. 1188:18–24). Zona referred to the difference between Sunday Ticket's profit-maximizing price and the actual price as the "NFL tax." That tax amounted to $1.39 billion for residential class members and $330 million for commercial class members. 9-ER-1589 (Tr. 1190:3–19).

***The "Single Competitor" Model.*** Zona's Single Competitor model began with the assumption that DirecTV could select its own price without NFL interference and then added another parameter: He also assumed Defendants had permitted a single, direct-to-consumer service to compete with DirecTV. By "direct-

to-consumer," Zona meant a competitor who could "stream[] content to anyone." 17-ER-3466.

Zona calculated that DirecTV's profit-maximizing price, if faced with just one such competitor, would have been *49.7% less* than what Plaintiffs actually paid, 9-ER-1581 (Tr. 1182:12–14); *see* 15-ER-3102 (demonstrative), resulting in damages of $2.81 billion for the residential class and $670 million for the commercial class, 9-ER-1589–91 (Tr. 1190:23–1192:2).

Rascher separately corroborated Zona's Single Competitor model. The model's predicted 49.7% price reduction was consistent with Sunday Ticket's price in Canada. 7-ER-1180–81 (Tr. 783:7–784:12); *see also* 19-ER-3995 (Sunday Ticket cost "approximately US$149" in Canada in 2022). In Canada, Sunday Ticket was sold by multiple distributors rather than a single exclusive distributor. 7-ER-1170 (Tr. 773:2–13); 19-ER-3994–95. Rascher did additional analysis to confirm that the price difference wasn't due to lower demand in Canada. 19-ER-3996–97. The Canadian pricing of Sunday Ticket thus independently supported Dr. Zona's finding that DirecTV would have charged half as much, for Sunday Ticket, if Defendants had allowed competition.

### 2. Defendants' Efforts to Exclude Zona's Opinions

The district court twice rejected Defendants' *Daubert* challenges to Zona's opinions. 3-ER-316–18; 2-ER-283–85. It ruled that Defendants' complaints about

Zona's models went "to weight, not admissibility." 3-ER-318. The court said Defendants "may have valid arguments that Dr. Zona's conclusions are weak or wrong, but that is not the task of a *Daubert* motion." *Id*.

## III. The Jury's Verdict

The jury unanimously found that Defendants violated Section 1 of the Sherman Act by conspiring to "unreasonably restrain[] trade in" the "market for professional football telecasts in the United States." 2-ER-237. It unanimously found that Defendants violated Section 2 by conspiring to "engage in anticompetitive conduct with the specific intent that one of the parties to the agreement would obtain or maintain monopoly power" in the same market. 2-ER-239.

At Defendants' request, the jury also rendered a special verdict on "antitrust injury." It answered "yes" to four special interrogatories, finding that Plaintiffs had "proven that" they "suffered injury to their business or property as a result of this conspiracy." 2-ER-238, 240.

And the jury unanimously awarded damages of $4,610,331,671.74 to the residential class and $96,928,272.90 to the commercial class. 2-ER-241.

## IV. The District Court's Posttrial JMOL Order and Judgment

On August 1, 2024, five weeks after trial and less than 24 hours after oral argument, the district court granted the NFL's posttrial Rule 50(b) motion for JMOL. 1-ER-9–24.

## A. The Court Retroactively Excluded Rascher and Zona

The district court first retroactively excluded all of Rascher's and Zona's testimony. 1-ER-13–19. Before trial, the district court had deemed Rascher's opinions, based on the college football yardstick, to be admissible because "structural similarities between college and professional football" created a "valid basis" for comparison. 3-ER-320. Posttrial, the court found that Rascher failed to explain how "production, distribution, advertising, or revenue sharing" would work in the but-for world. 1-ER-14. In the district court's view, Rascher was required not only to estimate the price Plaintiffs would pay in the but-for world, but also to describe in detail how Defendants would have rearranged their affairs, including by "definitively answer[ing] how [NFL teams] would have shared revenues." 1-ER-15. Absent such "definitive" answers, the court concluded Rascher's detailed analysis boiled down to "just saying market participants would have figured it out." 1-ER-14.

The court also faulted Rascher for "contradict[ing]" other trial evidence. It identified two purported contradictions. First, the district court highlighted testimony from Sean McManus, CBS Sports' President, that the network would not share its telecast feeds with competitors. 1-ER-15 n.6. The court did not, however, address testimony that Fox (and CBS) *had* "provide[d] the feed to DirecTV," 7-ER-

1289 (Tr. 892:15–17), and had ceded to the NFL all of their rights to these feeds, 6-ER-892 (Tr. 496:5–6).

Second, the court cited testimony of Cathy Yancy, the NFL's corporate representative at trial, who doubted that television networks could adjust to a new schedule of NFL games if the NFL didn't have centralized control. But the court did not address evidence showing that the same networks accommodated a varied and often changing schedule for significantly more college football games. 8-ER-1343–44 (Tr. 945:20–946:10).

Third, the district court identified what it called "significant differences" between college football and the NFL, namely, that *some* college games were shown only on premium platforms and that college football teams didn't rely on networks "sharing feeds" of "guaranteed … telecasts of local teams." 1-ER-16. But the court failed to acknowledge that Rascher had considered those differences and explained why they did not affect his conclusions. 18-ER-3746–59.

The district court then turned to Zona. But it didn't identify any problem with Zona's "NFL Tax" model. That model did not depend on a comparison with college football and did not presume the existence of a competitor to DirecTV; it looked only to the impact of the NFL's requirement that Sunday Ticket be sold at a premium price. The court's only mention of Zona's "NFL Tax" model was to imply that Defendants' objections to it lacked merit. 1-ER-18.

Although the district court had previously ruled that Defendants' criticisms of Zona's Single Competitor model went to "weight, not admissibility," 3-ER-318, the court's posttrial order declared that the Single Competitor model wasn't "feasible," because Zona had not identified "*another* distributor," besides DirecTV, that "could have provided live streaming of Sunday Ticket [over the internet] since 2011." 1-ER-18–19. But the jury heard ample evidence that "live-streaming of sports— including of Sunday Ticket—existed before the class period"—as the court concluded in its posttrial order. 1-ER-18–19. The court didn't explain why the jury wasn't entitled to credit that evidence. The court simply declared that the record evidence of live-streaming sports wasn't sufficiently "conclusive." 1-ER-19. The court didn't mention Rascher's study of the Canadian price of Sunday Ticket, which corroborated Zona's results.

## B. The District Court Granted JMOL

Having excluded Rascher's and Zona's testimony in its entirety, the district court granted JMOL in favor of Defendants. It recognized that, even without Rascher and Zona, the "evidence in the record" would "support a reasonable jury's finding of an unreasonable restraint of trade at each step of the rule of reason", including that the web of agreements had "anticompetitive effects." 1-ER-20. But the court concluded that, without Rascher and Zona, a reasonable jury could not "make a finding of injury and an award of actual damages." *Id.*

32

The court did not explain the contradiction between affirming the jury's finding that Defendants' conspiracy had caused "anticompetitive effects" while simultaneously granting JMOL on the jury's finding that Plaintiffs had "suffered injury . . . as a result of this conspiracy." 2-ER-238, 240.

Nor did the court discuss the abundant *non-expert* evidence proving that Defendants had required DirecTV to charge a "premium" price. *See supra*, at 13–19. The district court did not say a jury couldn't credit that evidence to find that Plaintiffs had paid at least *some* supracompetitive price as a result of Defendants' conspiracy. Nor did the district court acknowledge the elementary economic principle that this Court explained in the prior appeal: if "firms restrict output directly"—something Defendants indisputably did—then "price will . . . rise in order to limit demand to the reduced supply." *In re Sunday Ticket*, 933 F.3d at 1158 (holding that Defendants' alleged restrictions on the output of telecasts were "functionally indistinguishable from" a "price-fixing" conspiracy) (cleaned up).

And the court did not explain why, standing alone, Zona's "NFL Tax" model wouldn't prove both the fact of injury and $1.4 billion in damages. It said nothing negative about the NFL Tax model at all.

## C.   In the Alternative, the District Court Ordered a New Damages Trial

In the alternative, the district court "vacated the jury's damages verdict, remitted Defendants' award to nominal damages, and conditionally granted a new

trial based on the jury's irrational damages award." 1-ER-20. The district court acknowledged that jury awards receive "great deference, and should be upheld unless … 'clearly not supported by the evidence' or 'only based on speculation or guesswork.'" 1-ER-21. But it deemed this the "rare situation where it is clear, without speculation, that the award was based on improperly considered evidence." 1-ER-22. In the court's view, the jury based its damages on the difference between $294/year, Sunday Ticket's residential list price in 2018 and later years, and $102.74/year, an average of prices paid by class members *and* non-members receiving promotional free subscriptions. 1-ER-21–22. That difference, the district court continued, actually reflected a "discount." 1-ER-24. It failed to acknowledge that Defendants themselves, throughout the trial, suggested to the jury that $102.74 should be used as an appropriate price for Sunday Ticket. *See infra*, at 38, 68–71.

### D. The District Court Summarily Dismissed Plaintiffs' Claims for Injunctive Relief

On August 6, 2024, five days after the JMOL order, Plaintiffs requested the court's guidance on their "requests for declaratory, injunctive, or other equitable relief." 2-ER-42–43. Two days later, the court ordered Defendants to submit a proposed form of judgment. 2-ER-41. Defendants then filed a proposed form asking the court to enter judgment "as to all claims." 2-ER-36–40.

Plaintiffs objected that "[e]ntering Defendants' proposed judgment" would dismiss the claims for injunctive and declaratory relief that "Plaintiffs have not had

an opportunity to press, that the parties have not had an opportunity to litigate, and that the court has not had an opportunity to resolve." 2-ER-29. The court had precluded the introduction at trial of "evidence or argument about injunctive relief and forward-looking changes." 2-ER-296. Defendants' pre-verdict and post-verdict motions under Rules 50 and 59 did not mention Plaintiffs' claims for equitable relief. Nor did the court's JMOL order, which addressed only evidence of *past* injury, rather than the threat of *future* injury relevant to claims for injunctive relief under the Clayton Act. *See* 2-ER-27. Plaintiffs also pointed out that the court could enter injunctive relief even if "plaintiffs cannot prove their damages case on a class-wide basis." 2-ER-30 (quoting *Laumann v. Nat'l Hockey League,* 105 F. Supp. 3d 384, 398 (S.D.N.Y. 2015)).

Less than twenty-four hours after Plaintiffs filed their objection, the district court summarily entered Defendants' proposed judgment without mentioning Plaintiffs' filing. *See* 1-ER-4–8. The district judge retired from the bench two months later.[12]

## SUMMARY OF THE ARGUMENT

**I.** The district court erred by retroactively excluding Plaintiffs' experts.

---

[12] Federal Judicial Center, *Gutierrez, Philip S.* (last accessed Jan. 10, 2025), https://www.fjc.gov/history/judges/gutierrez-philip-s.

**A.** None of the court's three reasons for excluding Rascher was valid. **(1)** The law doesn't require antitrust plaintiffs, or their experts, to provide "definitive" details of how market participants would have arranged their affairs in the "but for" world. **(2)** Rule 702 doesn't allow a district court to exclude experts based on supposed "contradictions" between the expert's opinion and fact witness testimony. It is for the jury, not the judge, to decide which witnesses to credit. Regardless, the supposed "contradictions" the court identified aren't supported by the record. **(3)** The market for telecasts of the top-ranked college teams' games is a valid yardstick for measuring the price effect of Defendants' restraints on the market for NFL telecasts. It was for the jury, not the judge, to determine whether any differences between the two markets rendered Rascher's comparison unpersuasive.

**B.** The court erred by excluding Zona's alternative damages models, which independently support the jury's finding that Plaintiffs were injured. **(1)** Zona's Single Competitor model assumed that DirecTV was faced with a single direct-to-consumer competitor, such as a "streaming" service. The jury heard ample evidence to support the reasonableness of that assumption. Streaming of live sports events was common throughout the class period. **(2)** Zona's "NFL tax" model didn't depend on any such assumption—it assumed that DirecTV faced no competition. The district court gave no reason for excluding it. That is an automatic abuse of discretion.

**C.** The court also abused its discretion by excluding Rascher's and Zona's testimony in its entirety, when the court's reasoning applied only to parts of their testimony.

**II.** Even if this Court were to affirm the exclusions of Rascher's and Zona's testimony, JMOL should nevertheless be reversed. **A.** The special verdict on injury only required the jury to find the *fact* of antitrust injury, not the *amount* of damages. The jury heard ample non-excluded evidence proving that Defendants' restrictions caused Plaintiffs at least *some* antitrust injury in the form of inflated prices and limited choices. **B.** A new trial on damages (rather than JMOL) is the correct outcome if this Court were to affirm the exclusion of Rascher's and Zona's testimony. There is sufficient non-excluded evidence for a second jury to award damages, and at a new trial, Plaintiffs should be permitted to offer additional evidence.

**III.** The district court's alternative order, vacating the jury's damages award and granting a new trial on damages, should be reversed.

**A.** The jury's awards were *lower* than the amounts supported by Rascher's yardstick model and therefore were within the range supported by evidence. That is the end of the matter, given the "substantial deference" the law gives to a jury's damages verdict. The district court erred by trying to first "reverse engineer" the

37

jury's math, and then to reconstruct and critique the thought process behind that math.

**B.** Even if that exercise were appropriate (it wasn't) the jury's damages awards had a plausible basis in the record. The defense itself urged the jury to award less than Rascher proposed, and implied throughout trial that $102.74/year was an appropriate price.

**C.** If a new trial on damages were ordered, this Court should increase the residential class's remittitur to $2.81 billion, or at the very least $1.39 billion, since those amounts were supported by Zona's models.

**IV.** The district court's summary dismissal of Plaintiffs' request for declaratory and injunctive relief should be vacated. The JMOL order didn't address forward-looking relief from Defendants' ongoing antitrust violations. Plaintiffs' forward-looking claims were never tried.

**V.** The district court abused its discretion by denying Plaintiffs' motion to admit additional documents.

## STANDARDS OF REVIEW

"Whether the district court applied the correct legal standard under *Daubert* is reviewed de novo[.]" *Hardeman v. Monsanto Co.*, 997 F.3d 941, 960 (9th Cir. 2021).

This Court reviews JMOL de novo. *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007). JMOL must be reversed unless this Court finds that "the evidence permits *only* a conclusion that is contrary to the jury's verdict." *Id.* at 629 (reversing JMOL).

The district court's conditional grant of a new trial on damages, and the "remittitur amount," are reviewed for abuse of discretion. *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1086–87 (9th Cir. 2014).

The district court's refusal to give Plaintiffs an opportunity to be heard on their claims for equitable relief is a legal error reviewed de novo. *See Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 312 (9th Cir. 1982).

The district court's order denying Plaintiffs' motion to admit additional documents into evidence is reviewed for abuse of discretion. *City of Long Beach v. Standard Oil Co. of California*, 46 F.3d 929, 936 (9th Cir. 1995).

## ARGUMENT

### I. The District Court Should Not Have Excluded Plaintiffs' Experts

The "test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022). The judge's role is to be "a gatekeeper, not a fact finder." *Id.* Before trial, the district court twice applied that test correctly and twice denied Defendants' *Daubert* motions.

39

The court's posttrial order defied *Daubert* and this Court's precedent. It improperly "weighed the evidence and discredited [the experts'] 'ultimate conclusions.'" *Id.* at 1027.

### A.   Prof. Rascher's Testimony Should Not Have Been Excluded

### 1.   The District Court Erred By Demanding "Definitive" Answers From Rascher About the But-For World

The district court excluded Rascher primarily because it believed that Rascher didn't explain, with sufficient precision, how the "production, distribution, advertising, or revenue sharing for the out-of-market [NFL] telecasts would have worked in his most likely but-for world." 1-ER-14. The court believed Rascher was required to "definitively answer" how these matters would have been arranged. 1-ER-15.

The district court's demand for "definitive" prognostication about those aspects of the but-for world was legal error. Neither Defendants nor the court cited any case requiring "definitive" testimony about such specifics. Definitive testimony isn't required in antitrust cases because juries can "rely on probable and inferential proof … to approximate damages." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1221 (9th Cir. 1997) (affirming antitrust award based on yardstick method).

The standard of proof for antitrust damages is "relaxed … because market uncertainties often preclude a precise showing of 'where' the plaintiff would have

been absent the proven antitrust violation." *Id.* "[D]amage issues in [antitrust] cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts," and therefore "the factfinder" may calculate damages "as a matter of just and reasonable inference." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123–24 (1969) (cleaned up). "The wrongdoer is not entitled to complain that [damages] cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise." *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931).

In *Hasbrouck v. Texaco*, this Court held that the antitrust damages expert was *not* required to give definitive answers about how the but-for world would have operated. 842 F.2d 1034, 1043 (9th Cir. 1987). This Court affirmed denial of JMOL by relying on an expert's testimony of "estimated [damages] figures using six economic projections," which were "based on different underlying assumptions" about how the but-for world would have worked. *Id.* The Court held that the expert's "various projections" of different but-for scenarios didn't *negate* the expert's testimony (for failure to pick just one "definitive" scenario), but rather were useful evidence that "permitted the jury to compare estimates of damages in different market situations." *Id.*

*Daubert* did not alter the relaxed legal standard for proving antitrust damages. The *Daubert* standard is a "flexible" one that asks whether the expert's "method is generally accepted in the relevant … community" and whether the expert has employed "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150, 152 (1999); *see also* P. Areeda & H. Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application § 309b (5th ed. 2024)[13] ("It would be an inappropriate use of *Daubert* to exclude the testimony of an economist who was using methodologies and assumptions that are acceptable within the discipline of economics[.]"). The field of economics does *not* require a yardstick analysis to provide specific descriptions of how market participants would have arranged their affairs in the but-for world. *See* 19-ER-3954–59. The yardstick method avoids the need to specify the details of the but-for world by instead assessing how a relevant variable (here, price) actually behaved in a comparable *real-world* competitive market. *Image Tech.*, 125 F.3d at 1221–23.

Damages experts in antitrust cases routinely rely on models that accommodate a wide variety of possible ways in which market participants could have behaved

---

[13] Available on Lexis at: Antitrust Law: An Analysis of Antitrust Principles and Their Application (CCH) 309.

absent the restraints at issue, and courts routinely deny *Daubert* challenges complaining that those experts haven't given sufficiently "definitive" opinions. In *S&H Farm Supply, Inc. v. Bad Boy, Inc.*, the Eighth Circuit affirmed denial of a *Daubert* motion alleging that a damages expert had not considered "additional factors" that may have affected lost profits in the but-for world. 25 F.4th 541, 552 (8th Cir. 2022). "That [the expert's] opinion was open to such challenges cannot be sufficient to mandate exclusion; otherwise, expert testimony on lost profits would rarely be admissible because every model relies on assumptions and no model can account for every conceivably relevant factor." *Id.* There are many other such cases.[14] In short: Rule 702 "does not require specification of … features" of the but-for world in an antitrust case. J. Hastings & M. Williams, *What is a "But-For World"?*, 31 *Antitrust*, Fall 2016, at 102–04.[15]

---

[14] *E.g., Delong Equip. Co. v. Washington Mills Electro Minerals Corp.*, 990 F.2d 1186, 1204 (11th Cir.), *amended*, 997 F.2d 1340 (11th Cir. 1993) (reversing grant of new damages trial where expert "presented the jury with five scenarios"); *In re Elec. Books Antitrust Litig.*, No. 11 MD 2293 DLC, 2014 WL 1282293 at *27 (S.D.N.Y. Mar. 28, 2014) (denying *Daubert* motion because expert could "us[e] a well-established mode of analysis to compare collusive pricing to competitive pricing" without "develop[ing] an opinion about many of the issues [defendant] contends are important features of a but-for world").

[15] Available on Westlaw at: 31-Fall Antitr. 102.

Besides, Rascher did consider the various ways in which the market participants involved—the NFL teams, the television networks, the cable and satellite distributors, and the advertisers—could and would have arranged their affairs in a world free from Defendants' contractual restraints. 18-ER-3746–59. Rascher described the likely arrangements, taking into account the realities of the market and the incentives of its participants, including Defendants and the networks. 7-ER-1253–55 (Tr. 856:25–858:18); 7-ER-1289–96 (Tr. 892:13–899:6). His testimony, on these points, was corroborated by Professor Elhauge, whose expert testimony wasn't even discussed by the district court. *See* 13-ER-2556–58 (Tr. 2153:21–2155:24).

Absent Defendants' restraints, the NFL teams would likely continue to take advantage of the SBA to pool their rights to *sponsored* telecasts and to sell them, collectively, to over-the-air television networks like CBS and Fox. 7-ER-1151 (Tr. 754:7–22); *see also* 13-ER-2529–32 (Tr. 2126:4–2129:24) (Elhauge). The NFL could and likely would require those networks to share their feeds with out-of-market distributors. 7-ER-1289 (Tr. 892:13–17); 7-ER-1291–93 (Tr. 894:17–896:4); *see also* 13-ER-2609–10 (Tr. 2206:4–2207:15) (Elhauge). Telecasters would cooperate in arrangements with advertisers, just as CBS and Fox cooperated with DirecTV during the class period. 7-ER-1294–96 (Tr. 897:14–899:6); *see also* 13-ER-2611–2614 (Tr. 2208:3–2211:6) (Elhauge).

44

NFL football is extremely popular and highly coveted programming, so each NFL team would be able to obtain a distribution deal for its rights to telecast its out-of-market games. 7-ER-1169 (Tr. 772:8–18). And NFL teams would continue to enjoy enormous, shared revenues from sources other than Sunday Ticket that would be more than sufficient to make them profitable. 7-ER-1231 (Tr. 834:1–10); *see also* 7-ER-1112–13 (Tr. 715:20–716:1); 7-ER-1276 (Tr. 879:3–6); 7-ER-1300 (Tr. 903:6–7); 13-ER-2563–67 (Tr. 2160:6–2164:4) (Elhauge). Both Rascher and Elhauge testified that in the *real-world* yardstick, the colleges and networks had been able to remake their telecast arrangements in a matter of weeks after the Supreme Court's *NCAA* decision. 8-ER-1358–59 (Tr. 960:14–961:10); 13-ER-2532–33 (Tr. 2129:8–2130:23) (Elhauge).

## 2. The District Court Erred by Crediting Evidence Supposedly "Contradicting" Rascher's Opinion

The district court further erred by excluding Rascher on the ground that some of his testimony about the but-for world was "contradicted by the record." 1-ER-15 n.6. A district court's role is *not* "to evaluate whether [the expert's testimony] is corroborated by other evidence on the record…. That is for the litigants to argue, and for the jury to decide." *Elosu*, 26 F.4th at 1026. As the Advisory Committee explained, Rule 702's emphasis on "'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." Fed. R. Evid. 702 (advisory

45

note). After all, a jury can "properly refuse to credit" any witness at trial. *Guy v. City of San Diego*, 608 F.3d 582, 588 (9th Cir. 2010). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2005). The district court's effort to credit Defendants' fact witnesses over Plaintiffs' experts invaded the province of the jury.

Even if Rule 702 authorized the district court to exclude Rascher based on "contradictions" with other evidence (it does not), the supposed "contradictions" are unsupported. The court's first "contradiction" was testimony from McManus that CBS would not share its feeds with other networks. 1-ER-15 n.6. But CBS didn't have the power to make that decision. The NFL owned the rights to those feeds, and could have shared them with whomever it chose.[16] In fact, the NFL did exactly that when it created Sunday Ticket. CBS's and Fox's feeds, which were owned by the NFL, were shared with DirecTV throughout the class period, and those same feeds are now shared with Google. 7-ER-1289 (Tr. 892:15–17). That is what Sunday

---

[16] 4-ER-595–96 (Tr. 201:18–202:5) ("I believe the NFL owned the right to all the broadcast games that they televised."); 6-ER-892 (Tr. 496:5–6) ("Fox does not own the intellectual property of the NFL"); 6-ER-900 (Tr. 504:12–13) ("Well, every broadcast of the NFL games starts with the NFL who owns the copyright."); 20-ER-4103 (TX-145, at 66) ("League … shall be the exclusive owner of … all copyrights worldwide in and to all Game Broadcasts.").

Ticket was and is: a collection of CBS's and Fox's feeds of NFL games. *Id.* CBS's and Fox's feeds were also shared with other networks—as *Defendants themselves* told the district court in a pretrial motion.[17] The NFL's New Frontier study was based on the NFL's (correct) assumption that it could share CBS's and Fox's feeds. 20-ER-4298 (TX-686, at 14); *see* 7-ER-1289 (Tr. 892:18–25). In addition to sharing NFL game feeds, the networks also share feeds of other sports' games. 7-ER-1289–90 (Tr. 892:25–893:14).

The other supposed "contradiction" was Rascher's purported failure to "account for whether competitor networks could have even created programming for such a schedule." 1-ER-15 n.6. But Rascher did account for this: He even prepared exemplar game and telecast schedules that NFL teams could use in the but-for world. 7-ER-1150–52 (Tr. 753:13–755:14). The district court credited instead the testimony of Yancy, an NFL employee, who fretted that changing the schedule of Sunday afternoon games would complicate the networks' efforts to plan in advance. 11-ER-2167–69 (Tr. 1766:8–1768:13). Yancy did not say that accommodating schedule changes would have been impossible, and the jury didn't have to believe her regardless. *Guy*, 608 F.3d at 588. After all, up to 40 college games are telecast each

---

[17] D. Ct. Dkt. 705-1, at 16–17 (representing to the court that CBS's, Fox's, and NBC's feeds were shared with the NFL Network, Twitter, and Amazon Prime Video). Rascher noted and relied on these representations. 19-ER-3978–79 (¶ 350 & n. 480).

Saturday (about three times the number of NFL games played on Sunday), and the networks are able accommodate shifting college game schedules. 7-ER-1147–51 (Tr. 750:6–754:3). One solution to Yancy's concern would have been a "flex schedule," like the networks use for college football. 8-ER-1343–44 (Tr. 945:20–946:10); *see also* 13-ER-2614–16 (Tr. 2211:7–2213:5) (Elhauge).

### 3. The District Court Usurped the Jury's Role In Assessing the Purported Differences Between the College and NFL Markets

The district court erred yet again when it invoked supposedly "significant differences" between the yardstick market—telecasts of games played between top-ranked college football teams—and the market for NFL telecasts. 1-ER-16.

First, this Court has repeatedly held that whether the yardstick market "properly compares to the relevant market" presents "a question of fact for the jury." *Image Tech.*, 125 F.3d at 1221; *see also Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 968–69 (9th Cir. 2013) ("differences between" the comparator and relevant market, even if "colorable," do not "go to admissibility" but instead "amount to impeachment"); *Syufy Enterprises v. Am. Multicinema, Inc.*, 793 F.2d 990, 1003 (9th Cir. 1986) ("It is for the jury and not for us to weigh the conflicting evidence" regarding whether "the two markets were comparable"). As a leading ABA treatise explains: "Whether the plaintiff has met [its] burden of showing comparability [of a yardstick] ordinarily is a question for the trier of fact." 1 ABA

48

Section of Antitrust Law, Antitrust Law Developments at 834 (9th ed. 2022).[18] By taking this issue of comparability away from the jury, the district court failed to apply the correct legal standard under Rule 702.

Second, district courts screen only for "unreliable nonsense"; they do not "exclude opinions merely because they are impeachable." *Alaska Rent-A-Car*, 738 F.3d at 969. The differences identified by the district court do not render Rascher's yardstick "unreliable nonsense." They are the stuff of cross-examination—which the jury heard and rejected.

### i)  *Availability of College Football Telecasts*

The court's first "difference" was that some college games are "available only by purchasing premium offerings." 1-ER-16. This appeared central to the district court's view: It repeatedly voiced concern that some games played by Notre Dame (the judge's alma mater) had only been made available on the ACC Network (a premium cable channel) or Peacock (a streaming service), both of which would have charged the judge an additional fee. 2-ER-57; 2-ER-79–80; 11-ER-2029–30 (Tr.

---

[18] Available on Lexis at: 1-9 Antitrust Law Developments 9C-3-b.

1628:8–1629:2). But the district judge's personal experience is not evidence in the record and has no bearing where the judge is not the trier of fact.

The district court failed to appreciate both the rarity of these games and the fact that they were played against low-ranked opponents. Rascher's yardstick was the games played between *top-ranked* college teams because those are the games that are most similar to NFL games. *Supra*, at 21–23. Only 3% of *those* games required a premium subscription. *Id.* The other 97% were shown over-the-air or on basic cable, without any additional charge to Plaintiffs. *Id.* That 3% difference between the reality of how the games played between college football's top-ranked teams are telecast and Rascher's opinion as to the likely availability of NFL games does not render the comparison "unreliable nonsense." *Alaska Rent-A-Car*, 738 F.3d at 969.

The court also failed to note the identity of Notre Dame's *opponent* in the two games shown on the premium Peacock platform during the class period. In both games, Notre Dame played low-ranked opponents. 19-ER-3976–77. These are the "least valued games." 19-ER-3976–77. Telecasts of Notre Dame playing "another highly popular team (as would be the case in the NFL)" were transmitted nationwide—either on over-the-air channels that were free to everyone, or else on basic channels like ESPN that most Americans could access through basic cable or satellite service. *Id.* Those two Peacock games actually underscore Rascher's point

50

that, in the real world, the most popular college games are shown on widely available over-the-air or basic cable channels, not on niche platforms that have fewer viewers. There are *no* unpopular NFL games, based on their television ratings, so it is highly unlikely that *any* professional football games would wind up only on niche platforms. 19-ER-3970–77.

### ii) *College Teams' Game Feeds and Local Telecasts*

The district court also excluded Rascher's yardstick analysis because his "most likely version of the but-for world … retained the NFL's distribution of in-market games on CBS and FOX," which was different from the college market, which "does not involve" networks like CBS and Fox "sharing feeds" and "does not have guaranteed access to telecasts of local teams." 1-ER-16.

Rascher acknowledged these differences. 19-ER-3987–88. He also explained why they don't matter. As already discussed, the NFL could have required over-the-air networks to share "their" feeds—which were actually owned by the NFL. *Supra*, at 44–47. For similar reasons, the NFL could have continued to require these networks to telecast games in teams' local "in market" regions. The networks would have every incentive to comply with these requirements in order to continue having the extremely valuable rights to air NFL games. 7-ER-1296 (Tr. 899:1–8). In a competitive market, all the participants would have been incentivized to distribute

51

telecasts in the way that maximized overall distribution—which would have meant showing these games on the most widely available channels. 19-ER-3866–75.

In short: Rascher's yardstick model was not "unreliable nonsense." *Alaska Rent-A-Car*, 738 F.3d at 969. It was for the jury (based on the record) and not the judge (based on his personal experience) to decide whether any differences between the markets rendered the model unpersuasive.

### B.    Dr. Zona's Testimony Should Not Have Been Excluded

Even if the district court had been correct to exclude Rascher, the opinions of Plaintiffs' second expert, Zona, independently support the jury's verdict. The district court barely tried to explain why it excluded Zona's damages models. The court thought it implausible that a direct-to-consumer competitor to DirecTV could have emerged during the class period. But that cannot explain why the court excluded Zona's NFL Tax model, which assumed that DirecTV would have had *no* competition in the but-for world; that model evaluated only the effect of the NFL's insistence on premium pricing. Nor did the court's rationale support exclusion of Zona's Single Competitor model. Whether an expert's assumptions are reasonable is for the jury to decide. The record demonstrates that direct-to-consumer platforms actually existed throughout the class period.

### 1. The District Court Erred by Excluding Zona's "Single Competitor" Model

Zona's Single Competitor model assumed a but-for world in which DirecTV faced a single direct-to-consumer competitor. *Supra*, at 27–28. As Rascher explained, that model's result (a nearly 50% decrease in price) was confirmed by the real-world example of Canada, where the presence of competing distributors caused the Canadian prices of Sunday Ticket to be half of what they were in the United States. *Supra*, at 28.

### i) *It Was for the Jury to Decide Whether a Direct-to-Consumer Competitor Was Feasible*

The district court's primary rationale for excluding the Single Competitor model was its finding that Zona's assumption—that a direct-to-consumer competitor to DirecTV could have arisen, but for Defendants' restraints—wasn't supported by sufficiently "conclusive" record evidence. 1-ER-19. This was legal error. "[T]he reasonableness of the assumptions underlying the experts' [damages] analysis … [is] a matter for the jury's consideration in weighing that evidence." *Humetrix, Inc., v. Gemplus S.C.A.*, 268 F.3d 910, 919 (9th Cir. 2001); *see also Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 766 (7th Cir. 2013) (reversing exclusion because district court had "intruded too far into the province of the jury" by finding that an expert's assumption was unreliable; the "soundness of the factual underpinnings of the expert's analysis … are factual matters to be determined by the trier of fact")

53

(citation omitted); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249-50 (5th Cir. 2002) (reversing exclusion because it is for the "fact-finder" to "decide whether it should accept or reject [the expert's] testimony after considering … whether the predicate facts on which [the expert] relied are accurate"). Because the reasonableness of Zona's assumption was for the jury, the court's demand for "conclusive" evidence was legal error. In order to exclude Zona's testimony on this basis, the court would have had to find, as a matter of law, that no reasonable juror could have believed that a direct-to-consumer competitor was feasible during the class period. The court's order didn't say *that*.

Ample evidence in the record proves that a competitor to DirecTV could have live-streamed NFL telecasts directly to consumers during the class period. The NFL believed that live-streaming telecasts of its games was a viable option: Its 2009 contract with DirecTV gave that company the right to do so. 19-ER-4029–31. By 2012, just one year into the class period, DirecTV was already streaming Sunday Ticket—with the NFL's approval. 11-ER-2182–88 (Tr. 1781:9–1787:21).

If DirecTV could stream Sunday Ticket to its customers, a competitor could have done so too. The NFL's expert conceded that DirecTV's competitors live-streamed telecasts of *other* sports' games directly to viewers throughout the class period. 9-ER-1767–68 (Tr. 1368:15–1369:11); *see also* 18-ER-3589 (listing live-streaming options available since 2011 for watching professional baseball,

basketball, and hockey games). The NFL's Super Bowl championship game—the most-watched live event on television—was live-streamed in 2012, one year into the class period. 11-ER-2199 (Tr. 1798:12–18).

The district court dismissed all that evidence as insufficiently "conclusive." 1-ER-19. That posttrial pronouncement echoed the court's earlier comment that Plaintiffs "want to just pretend that live streaming was a real option, and it wasn't." 11-ER-1027 (Tr. 1626:16–18). Not only was this pronouncement flat-out wrong, it was also a question for the jury (as the fact-finder) not the court. The evidence summarized above was more than sufficient for a reasonable jury to find that a direct-to-consumer competitor could have entered the market.

### ii) *Zona Clearly Defined His "Direct-to-Consumer" Competitor to Include a Streaming Platform*

The district court also stated that it was excluding Zona's Single Competitor model because Zona "failed to define" what he meant by a direct-to-consumer competitor. 1-ER-19. That was legal error many times over.

The court lacked authority to enter JMOL on this basis because Defendants failed to argue it in their Rule 50(a) and 50(b) motions. 2-ER-141–80, 244–79. *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 844 n.13 (9th Cir. 2014) (court lacked "authority to grant … [JMOL] on these alternate grounds because [defendant] did not raise them in either his pre-verdict Rule 50(a) or his post-verdict Rule 50(b)(3) motion").

55

In any event, Zona's definition of "direct-to-consumer" competitor was clear enough. It obviously included a competitor that streamed the telecasts directly to consumers—as the district court recognized. 1-ER-18–19. Zona's report defines the competitor as "streaming content to anyone." 17-ER-3466. He testified that a "Netflix-like service" could fit that definition. 9-ER-1676 (Tr. 1277:14–19). The NFL's expert understood that "[w]hen [Zona] said 'DTC' [direct-to-consumer], [what] I had in my mind—what I thought of was streaming services." 9-ER-1766 (Tr. 1367:16–22).

### 2. The District Court Erred by Excluding Zona's "NFL Tax" Opinion for No Reason at All

Zona's "NFL Tax" model measured DirecTV's profit-maximizing price absent *any* competition. *Supra*, at 27. Zona found that, without the NFL's insistence on a "premium" price, DirecTV could have maximized its profits by charging 24.6% less for Sunday Ticket. The district court found no fault with that conclusion or with Zona's methodology. None. It simply ignored evidence of $1.4 billion in damages. That was error. A court isn't allowed to exclude *all* of an expert's opinions simply because it finds *some* of them to be "inadmissible." *Hyer v. City & Cnty. of Honolulu*, 118 F.4th 1044, 1059 (9th Cir. 2024). And excluding an expert's opinion "without explanation" is "impermissibl[e]." *Whitlock v. Pepsi Ams.*, 527 F. App'x 660, 662 (9th Cir. 2013).

### C. The District Court Offered No Explanation for Excluding the Rest of Rascher's and Zona's Testimony

Although the district court's order addressed only parts of Rascher's and Zona's testimony, it excluded that testimony in its entirety. That was an abuse of discretion, *Hyer*, 118 F.4th at 1059, and it independently requires reversal. Rascher provided significant background information about the structure and operation of the relevant markets. *See supra*, at 21–23. He testified that, in the Canadian market, competition dramatically reduced Sunday Ticket's price. 7-ER-1170 (Tr. 773:2–13); 19-ER-3994–96. And both Rascher and Zona testified that when supply is restricted to an exclusive distributor, the result is an increase in price.[19] The court abused its discretion by retroactively excluding all that testimony "without explanation." *Whitlock*, 527 F. App'x at 662; *see Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 814 (9th Cir. 2014). Had that testimony not been excluded, it would have supported the jury's finding of injury, precluding JMOL. *Wallace*, 479 F.3d at 624 (requiring review of "entire evidentiary record").

---

[19] 7-ER-1122 (Tr. 725:4–19) ("Sunday Ticket is very expensive because of the exclusivity ...."); 7-ER-1127–28 (Tr. 730:13–731:9) ("if you had multiple distributors -- DirecTV was competing with, say, Comcast -- that would be a lower price"); 9-ER-1571 (Tr. 1172:14–15) ("[Plaintiffs] would have paid less if there had been more competition").

## II.    JMOL Must Be Reversed Even if This Court Affirms the Exclusions of Rascher and Zona

### A.    JMOL Must Be Reversed Because the Record Contains Ample Evidence of the *Fact* of Plaintiffs' Injury

The jury heard substantial evidence—separate and apart from Rascher's and Zona's testimony—proving the *fact* of Plaintiffs' injury. And the "*fact* of" injury is all that's required for a judgment of liability in an antitrust case. *Knutson v. Daily Rev., Inc.*, 548 F.2d 795, 811 (9th Cir. 1976). The jury did not need "proof of *amount* of damage" in order to find the "fact of" Plaintiffs' injury and thus to find Defendants liable. *Id.* at 813 (reversing judgment for defendants and remanding for new damages trial, since the "infirmities" in plaintiffs' "evidentiary showing of damages" were "not so significant as to call into question the fact of damages, but relate only to the amount of damage").

The jury heard and saw ample evidence, besides Rascher's and Zona's testimony, proving that Plaintiffs paid at least *somewhat* higher prices, for Sunday Ticket, because Defendants had limited the distribution of out-of-market games to one exclusive distributor and had required that distributor to charge "premium" prices. *Supra*, at 9–19. Witness after witness so testified; document after document made this clear. For example:

- An NFL team owner and co-chair of the NFL's media committee admitted that "*ensuring a high subscription price* for Sunday Ticket" was "a priority for the NFL." 14-ER-2934 (Tr. 20:22–21:1).

58

- The jury saw a document stating that the NFL "pushed back hard" when one senior DirecTV employee "wanted to drop the price." 20-ER-4278 (TX-269).

- NFL executives and employees told the jurors that the NFL's contracts with DirecTV required DirecTV to charge "*a premium price*." 4-ER-687 (Tr. 293:13–18); 14-ER-2943 (94:6–10) (testifying that Sunday Ticket was required to be "priced as a premium product").

- A Fox executive testified that Fox's agreements with the NFL required that Sunday Ticket be sold for "*a premium fee*." 6-ER-915–16, 923 (Tr. 519:18–520:3, 527:1–9).

The district court never suggested, much less identified evidence to indicate, that Defendants somehow failed to achieve their goals of reduced distribution of, and supracompetitive prices for, Sunday Ticket.

Moreover, the jury was also permitted to find that Plaintiffs paid a supracompetitive price based on the NFL's New Frontier study, which estimated that eliminating DirecTV's exclusivity would double the number of households with access to out-of-market game telecasts. *Supra*, at 24–25; 20-ER-4298 (TX-686, at 14). The NFL's belief that it could double access to game telecasts, just by eliminating DirecTV's exclusivity, allowed a reasonable jury to infer that other providers were willing and able to distribute telecasts for less.

No expert testimony was needed in order for the jurors to grasp and apply the common-sense economic principle that by limiting the *supply* of NFL game telecasts, Defendants' conspiracy caused the "price" of those telecasts to "rise in order to limit demand to the reduced supply." *In re Sunday Ticket*, 933 F.3d at 1158

(cleaned up). If expert testimony on this rudimentary principle were needed, then the NFL's own experts supplied it. They admitted that "more competition leads to lower prices," 10-ER-1809 (Tr. 1409:4–24), and that an exclusive distributor "can take advantage of the buyers." 12-ER-2369 (Tr. 1967:9–22). Plaintiffs' experts said the same thing, in testimony that the district court gave no reason for excluding. *Supra*, note 19.

The district court even *relied on* this evidence of injury—limited output means higher prices—in concluding that

> There was evidence in the record—even without the testimonies of Dr. Rascher and Dr. Zona—to support a reasonable jury's finding of an unreasonable restraint of trade at each step of the rule of reason. *See 50(b) Opp. 9:7–12:10* (citing the trial exhibits and testimony in support of each step).

1-ER-20. In that passage, the court cited with approval a section of Plaintiffs' Rule 50(b) opposition brief that, in turn, cited the record evidence demonstrating that Defendants' "agreements … worked as intended, limiting output and raising prices" for Plaintiffs. D. Ct. Dkt. 1495, at 9:13-14.

Plaintiffs also suffered *non-monetary* antitrust injuries from Defendants' conspiracy—which the district court simply ignored. *See Ace v. Aetna Life Ins. Co.*, 139 F.3d 1241, 1247 (9th Cir. 1998) (reversing JMOL where district court "ignored significant and undisputed evidence"). Defendants' conspiracy deprived Plaintiffs of "a viable choice between market alternatives," and "limited [their] choice to one

60

source of output"—both of which are antitrust injuries. *Glen Holly Ent., Inc. v. Tektronix Inc.,* 343 F.3d 1000, 1010–11 (9th Cir. 2003); *see also Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1003 (9th Cir. 2008) (antitrust injury where defendants' agreement "prevents choice between market alternatives"). For precisely this reason, courts can find defendants liable for violating the antitrust laws even when "plaintiffs cannot prove their damages case." *Laumann*, 105 F. Supp. 3d at 388.

Despite its obligation to "review the entire evidentiary record" before taking the momentous step of granting JMOL, *Wallace*, 479 F.3d at 624, the district court never addressed all this evidence, separate and apart from Rascher's and Zona's testimony, proving the *fact* of Plaintiffs' antitrust injuries. The court didn't even try to explain how this record "compel[s] a conclusion contrary to that of the jury" as to the fact of Plaintiffs' injury. *Id*. at 630.

As for the *amount* of damages, the district court lacked authority to enter *judgment* based on that issue. Judgment can only be entered if the plaintiff's "claim" "can be maintained … only with a favorable finding on [the] issue" in question. Fed. R. Civ. P. 50(a)(1)(B). Here, Plaintiffs' "claims" under the antitrust laws can be "maintained" even *without* a "favorable finding" as to the amount of their compensatory damages. Only the *fact* of Plaintiffs' injury is a required element. *Knutson*, 548 F.2d at 811; *see also William Inglis & Sons Baking Co. v. ITT Cont'l*

61

*Baking Co.*, 668 F.2d 1014, 1051 (9th Cir. 1981) (the "essential element" of a "cause of action for damages under" the antitrust laws is "the fact of antitrust injury, as distinguished from the amount of damages").

### B. A New Trial on Damages Should Be Ordered if Rascher's and Zona's Retroactive Exclusion is Affirmed

If the jury should not have heard Rascher or Zona, then a new trial to consider the remaining evidence of damages would "serve the ends of justice." *Cone v. W. Virginia Pulp & Paper Co.*, 330 U.S. 212, 215 (1947).

Plaintiffs presented their damages case in reliance on the court's pretrial *Daubert* rulings. Had Plaintiffs known before trial that their experts' damages opinions would be excluded, they would have presented their case differently. For starters, Plaintiffs would have moved for a continuance and for leave to obtain new experts. And even if that motion had been denied, Plaintiffs still would have had a damages case to present. Plaintiffs would have called Leonard DeLuca—an expert in sports media who had timely served a pretrial report. 17-ER-3494. DeLuca would have testified in detail about how NFL telecasts likely would have been distributed in the but-for world. His testimony, combined with the NFL's New Frontier study, would have allowed the jury to award damages up to the full amount Plaintiffs paid for Sunday Ticket. The New Frontier plan alone would have given Plaintiffs access to the out-of-market game telecasts, simply by eliminating DirecTV's exclusivity. *Supra*, at 24–25. Rascher relied on DeLuca's report in forming his opinions. 18-ER-

3790. Plaintiffs elected not to call DeLuca because the court had ruled that Rascher could testify.

If this Court remands for a new trial, then the district court should be instructed to allow Plaintiffs the opportunity to submit supplemental expert reports from Rascher, Zona, and others, if necessary to conform to this Court's rulings.

## III. The District Court's Alternative Order, Vacating the Jury's Damages Awards, Should Be Reversed

This Court should also reverse the district court's *alternative* order, which (a) vacated the jury's damages awards and (b) ordered a new trial on damages unless Plaintiffs remitted their claims to nominal damages. 1-ER-20.

The alternative order is based on the district court's attempt to reverse-engineer the jury's damages calculations, to reconstruct the jurors' thought processes, and to assess the rationality of those thoughts—even though the verdict form didn't ask the jury to explain how it calculated the damages awards, and Defendants didn't ask that the jury do so. This attempt was legal error because it failed to give the substantial deference to the jury's decisionmaking that the law requires. The jury's damages awards were $2.3 billion *lower* than Rascher's yardstick analysis supported, and thus were well within the range supported by the evidence. And there are rational explanations for what the jury did, based on arguments that Defendants themselves made at trial, in any event.

**A.    The District Court Committed Legal Error by Attempting to Reverse-Engineer the Jury's Damages Calculations and then Evaluating the Rationality of those Supposed Calculations**

The district court committed legal error by deciding to "'play Monday morning quarterback' and supplant the jury's [damages] evaluation … with [its] own." *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1366 (9th Cir. 1986). The court "encroach[ed] upon the jury's proper function under the Constitution," *id.* at 1365, by failing to give the "substantial deference to a jury's finding of the appropriate amount of damages" that this Court's precedent requires, *In re Exxon Valdez*, 270 F.3d 1215, 1248 (9th Cir. 2001) (cleaned up). The district court was not permitted to "second-guess the jury's award." *Brewer v. Hustler Mag., Inc.*, 749 F.2d 527, 529 (9th Cir. 1984). Instead, the court's task was to determine whether the *amount* of the award was "within a range supported by the record." *Id.* It was: Rascher's $7 billion damages opinion set the outer bound of permissible damages in this case. The jury awarded $2.3 billion less.

Courts routinely reject the argument made by Defendants here, that a jury's damages award should be vacated because it's "*too small to make sense*." *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000) (Posner, J.) (emphasis in original). That is a "pointless" argument that no court should "credit." *Id.* "[I]f the award is within the bounds of reason, the fact that the jury may not have used reason to arrive at it … will not prevent it from being upheld." *Id.*

In *Memorial Coliseum*, this Court affirmed an antitrust damages award against the NFL even though certain damages estimates were speculative and there were some "questionable elements" in plaintiff's damages case. 791 F.2d at 1366. The key point for this Court was that the jury awarded *less* than the total damages supported by the evidence, and therefore the jury had "sufficient evidence … on which to reach the damages amounts" that it awarded. *Id.*

This Court rejected a similar attack on the damages award in *Exxon Valdez*, 270 F.3d 1215. Exxon argued—like Defendants here—that "it is not possible to arrive at the [compensatory damages] numbers the jury did" by "apply[ing] the theories offered by [the] expert witnesses to the data." *Id.* at 1248. This Court affirmed the jury's award anyway, because "[r]easonable jurors need not accept the views of one side's expert or the other's, but may make their own reasonable judgment on the evidence, accepting part, all, or none of any witness's testimony." *Id.*; *see also Celador Int'l Ltd. v. Walt Disney Co.*, 2010 WL 11505709, at *23, *24 n.16 (C.D. Cal. Dec. 21, 2010) (rejecting defendants' attempts to "get to what the jury did" in arriving at a damages award that did "not correspond precisely to any of [plaintiff's expert's] damages scenarios," because such arguments were "an inappropriate inquiry into the jury's deliberative process"), *aff'd*, 499 F. App'x 721, 723 (9th Cir. 2012) (affirming because "the jury's award of damages is afforded 'substantial deference'").

Other Circuits agree. The Tenth Circuit, in *In re Urethane Antitrust Litigation*, upheld the jury's award of $400,049,039—a precise dollar amount that no expert endorsed—even though the plaintiffs' expert had calculated damages of $496,680,486. 768 F.3d 1245, 1268 (10th Cir. 2014). The court rejected defendant's argument that there was "no evidentiary basis for [the] smaller amount" awarded by the jury, since "a jury can reduce an expert's calculations on damages even when unable to run the exact numbers." *Id.* (cleaned up).

Similarly, in *In re Scrap Metal Antitrust Litigation*, the Sixth Circuit affirmed a jury award of $11.5 million even though the plaintiff's expert testified that damages were $20.9 million. 527 F.3d 517, 532–34 (6th Cir. 2008). "[T]he fact that the jury chose to assess damages in an amount substantially below that recommended by plaintiff's expert does not mean that the evidence offered in support of lost profits was inadequate as a matter of law." *Id.* (cleaned up).

The district court's reliance on *In re First Alliance Mortgage Company*, 471 F.3d 977 (9th Cir. 2006), was misplaced. The damages award in *First Alliance* (about $50 million) vastly exceeded the amount supported by the admissible evidence of plaintiffs' damages (about $15.9 million).[20] *First Alliance* doesn't authorize a district

---

[20] The jury arrived at its $50 million award by ignoring the trial court's instructions and taking the average of (i) the "out-of-pocket" damages and (ii) the much greater

court to vacate a damages award where, as here, sufficient evidence at trial permitted the jury to award *even more* damages than it did. On the contrary, *First Alliance* re-affirmed that the jury, when calculating damages, "is not bound to accept the bottom line provided by any particular damages expert." *Id.* at 1002.

The court committed legal error by second-guessing damages awards that were lower than the amount supported by the admissible evidence.

## B. The District Court Abused Its Discretion Because the Jury's Awards Weren't "Irrational"

Even if it weren't legal error to even attempt this exercise, the court still abused its discretion when it pronounced these jury awards "irrational." There are plausible, rational reasons why this jury could have awarded lower damages—reasons that were supplied to the jury by the defense itself.

The jury was instructed that it should calculate damages (the "overcharge") by subtracting (a) the but-for prices, *i.e.*, "the prices Plaintiffs would have paid had there been no agreement to restrict output," from (b) "the prices Plaintiffs actually paid for Sunday Ticket." 2-ER-228. The court's posttrial order concluded that the jury calculated an average annual overcharge, of $191.26/year, by subtracting (a) a but-for price of $102.74/year from (b) an actual price of $294/year, and that the jury

---

"benefit-of-the-bargain" damages that plaintiff's expert had calculated. But benefit-of-the-bargain damages weren't authorized by law—as the district court had (belatedly but correctly) instructed the jury. *Id.* at 1002–03.

then multiplied that average overcharge by the total number of annual subscriptions purchased by the class members. 1-ER-21–22. There's no direct evidence that the jury did this; the verdict form contains only the final awards. But even if the jury did use those numbers, it was not "irrational" to do so.

### 1. A "But for" Price of $102.74/year Wouldn't Have Been "Irrational"—It was *Invited* by the Defense

Defendants' experts didn't present the jury with an alternative damages model. But the defense's closing arguments implied that there would have been additional costs—and thus, a greater than zero price—for Sunday Ticket in the "but for" world. *See* 14-ER-2862 (Tr. 2458:16–19); 14-ER-2864 (Tr. 2460:10–15); 14-ER-2868–69 (Tr. 2464:24–2465:11). Based on such arguments, the jury could have concluded that Plaintiffs would have paid *some* price above zero to watch out-of-market games in the but-for world. *See In re Urethane*, 768 F.3d at 1268 (jury "might have discounted" plaintiff's expert's damages number "based on Dow's arguments regarding systems" (cleaned up)).

Defendants themselves interjected the $102.74/year figure into the record by plucking it from Zona's calculations,[21] and then implying that this amount was an

_____

[21] The amount is an intermediate step in Zona's calculations. 9-ER-1583–84 (Tr. 1184:13–1185:10). $102.74/year is the *average* amount paid by *all* subscribers to

appropriate price for a sports league's package of telecasts. Defense counsel tried to make this point when cross-examining Zona,[22] and repeatedly emphasized the $102.74 number in opening and closing. 4-ER-573 (Tr. 179:13–14) ("People had a choice. They had a choice to pay $102.70 on average."); *see also* 4-ER-546–47 (Tr. 152:9–153:4); 4-ER-557 (Tr. 163:20–24); 4-ER-563 (Tr. 169:2–17); 14-ER-2853–54 (Tr. 2449:9–2450:3). Defendants' econometric expert said he agreed with $102.74 as a "benchmark." 9-ER-1752–53 (Tr. 1353:15–1354:6). Especially given the relaxed standard that applies in estimating antitrust damages, Defendants should not now be heard "to complain" that the jury selected its but-for price based on arguments that Defendants "alone" were "responsible for making." *Cf. Story Parchment*, 282 U.S. at 563.

The jury could have concluded that $102.74/year was a reasonable "but for" price because that was the average price DirecTV was willing to accept for Sunday Ticket from all customers (including customers who never paid anything for Sunday

_____

Sunday Ticket—both class members and non-class members who received free promotional subscriptions. No evidence suggested that any particular subscriber actually paid $102.74.

[22] 9-ER-1608–09 (Tr. 1209:19–1210:3) ("[Y]ou believe that the model's estimates of demand responses will be accurate when priced relatively close to 103; right?"); 9-ER-1669 (Tr. 1270:14–16) ("[T]hat price 102.74 is far lower than any of the other leagues' packages that exist; the NBA, the NHL, and the MLB. Right?"); 9-ER-1670 (Tr. 1271:6–7) ("[A]ll of them [the other sports leagues' packages] are more expensive than 102.74, aren't they, in 2018?").

Ticket because they received it as part of a promotional deal, *see supra* note 21).

Defense counsel stated in closing that $102.74/year was the "price paid by all the subscribers. Not just the class members, and if I said that, I misspoke." 14-ER-2853 (Tr. 2449:9–11). DirecTV was willing to accept nearly the same amount from college students ($99.96/year) for a streaming version of Sunday Ticket. 15-ER-3110 (TX-684); *see also* 5-ER-825 (Tr. 430:4–12).

The jury also could have chosen $102.74/year as the "but for" price because it was in the middle of a range of other prices supported by the record. ESPN had proposed $70/year, 20-ER-4325 (TX-697), and Apple had proposed $15/month or about $75/season, 20-ER-4290 (TX-504, at 6). In Canada, where Sunday Ticket is sold by multiple competing distributors, the price charged for Sunday Ticket was "around $149 U.S." 7-ER-1170 (Tr. 773:7–13). $102.74/year falls neatly in the middle of that range.

For all these reasons, the jury's consensus damages award could have reflected a decision to accept Defendants' suggestion and use $102.74 as a reasonable estimate of a but-for residential subscription price.

### 2. An "Actual Price" of $294/Year Wouldn't Have Been "Irrational"

In order to calculate the overcharge, the jury had to subtract (a) the but-for price from (b) the actual price. 2-ER-228. The district court found that the jury used $294/year as the actual price. That was DirecTV's list price for residential

subscribers from 2018 through the end of the class period. 20-ER-4280; 9-ER-1634–36 (Tr. 1235:21–1237:5). This price was advertised on DirecTV's website and was actually paid by millions of class members. 9-ER-1599 (Tr. 1200:3–23).

The District Court faulted the jury for using $294/year since the list price was lower in earlier years. But the jury could have reasonably concluded that the average overcharge would have remained a constant dollar difference between the actual and but-for world prices. In other words, the jury could have reasoned that in earlier years, when the list price was lower, the but-for price would also have been lower by a similar amount.

### 3. Applying the Same "Overcharge" to the Commercial Classes Wouldn't Have Been "Irrational"

The district court faulted the jury for applying the same $191.26 average annual overcharge to the commercial class, even though the commercial plaintiffs paid much higher prices. But here again, this could have been a rational decision by the jury. The defense emphasized that Plaintiffs didn't have viewership data for commercial subscribers—and for that reason, Zona's models had to extrapolate results for commercial subscribers based on residential data. 9-ER-1617–21 (Tr. 1218:6–1222:16) (Zona cross); 9-ER-1756–57 (Tr. 1357:25–1358:20) (NFL's expert); 14-ER-2872 (Tr. 2468:3–12) (defense closing). The jury could have credited the defense's arguments and decided that they weren't able to award the commercial plaintiffs a greater overcharge than the residential plaintiffs.

71

*     *     *

Following this hotly contested trial, the jury was entitled to accept or reject any or all of the evidence presented by either side. What matters is that the jurors agreed unanimously on damages amounts that were significantly *below* what Rascher's expert testimony supported. The jury's decision is entitled to "substantial deference" under the law, wasn't "irrational," and should not have been set aside.

### C. The Alternative Remittitur Amount for the Residential Class Should Have Been $2.81 Billion or at Least $1.39 Billion

Even if this Court were to affirm the district court's alternative order vacating the damages awards, the Court should still reverse the *remittitur* amount—of "nominal damages"—for the residential class. 1-ER-20. A nominal damages award defies common sense.

A remittitur offers the plaintiff a choice: either accept a reduced award in the amount stated or else face a new trial on damages. Wright & Miller, 11 Fed. Prac. & Proc. Civ. § 2815 (West 3d ed.). This Court's "power" to order remittitur "is the same as that of the trial court." *Id.* § 2820.

Remittitur must be set at "the maximum amount sustainable by the proof." *Oracle Corp.*, 765 F.3d at 1085 (cleaned up). Therefore, if affirming the alternative order vacating the damages awards, this Court should instruct the district court to offer $2.81 billion as the remittitur amount for the residential class. That is the amount proved by Zona's Single Competitor model. If this Court were to affirm the

72

exclusion of that model, then it should instruct the district court to offer remittitur of $1.39 billion for the residential class. That is the amount proved by Zona's "NFL Tax" model, and the district court identified no problems at all with *that* model.

It doesn't matter that the jury in this case didn't adopt the numbers from Zona's models and instead awarded more damages. That was also the case in *Oracle*, where this Court ordered remittitur at the highest amount sustainable by a lower damages model that the jury hadn't adopted. 765 F.3d at 1085–86, 1095.

## IV. The District Court's Summary Dismissal of Plaintiffs' Claims for Injunctive Relief Should be Vacated

The district court erred by summarily dismissing Plaintiffs' claims for equitable relief from Defendants' illegal restraints—restraints that the jury reasonably found to have caused "anticompetitive effects." 1-ER-20. Evidence already in the record proves that Defendants' violations of the antitrust laws continue. The teams colluded with each other to enter into a new multi-year exclusive contract with Google, which is selling Sunday Ticket for even higher prices than DirecTV previously charged. *Supra*, at 16.

The district court's failure to articulate any basis for its dismissal of Plaintiffs' equitable claims, standing alone, warrants vacatur and remand. *See Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1225 (9th Cir. 1998) (en banc) ("If on appeal the record is devoid of reasoning after an appropriate objection is registered, the case must be remanded to the district court[.]").

73

The court's JMOL order, on Plaintiffs' claims for past damages under Section 4 of the Clayton Act, did not address and does not foreclose Plaintiffs' request for equitable relief under Section 16, which does not require proof of *past* injury. Section 16 requires only a showing of *threatened, future* injury. *See* 15 U.S.C. § 26 (authorizing "injunctive relief" for "threatened loss or damage by a violation of the antitrust laws"); *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110–11 (1986). The future harms that will be caused by Defendants' conspiracy include *non-monetary* injuries, like Plaintiffs' limited choices for watching out-of-market games. *Supra*, at 60–61. Non-monetary injuries confer standing to sue for injunctive relief, even if Plaintiffs aren't entitled to monetary damages. *Cargill*, 479 U.S. at 111 & n.6; *Laumann*, 105 F. Supp. 3d at 398–400.

Plaintiffs never had a chance to make their case for injunctive relief. Rule 50(a)(1) permits judgment as a matter of law only "[i]f a party has been fully heard on an issue during a jury trial." The court here precluded Plaintiffs from introducing any evidence or argument regarding injunctive relief at the trial, 2-ER-296, and Defendants stipulated that Plaintiffs' equitable claims would be briefed separately, "*after* a jury verdict is made." 2-ER-289. But that never happened. Rule 56 requires that the party against whom judgment is to be entered be given "notice and a reasonable time to respond." Fed. R. Civ. P. 56(f) & (a); *see Portland Retail Druggists Ass'n v. Kaiser Found. Health Plan*, 662 F.2d 641, 646 (9th Cir. 1981).

The judgment on Plaintiffs' equitable claims should be vacated and those claims remanded for further proceedings.

## V. The Court Erred By Instructing the Jury Not to Consider Certain Additional Documents

While this Court need not reach the issue in order to reverse the judgment, the district court also abused its discretion by summarily denying Plaintiffs' motion to introduce documents—mostly emails from NFL and DirecTV employees—demonstrating Defendants' control over Sunday Ticket pricing. 14-ER-2742–43 (Tr. 2338:23–2339:3); *see* D. Ct. Dkt. 1371, at 2–4; D. Ct. Dkt. 1459. The court instructed the jury, over Plaintiffs' objection, to consider these documents solely for purposes of assessing the credibility of certain witnesses. 2-ER-191. Plaintiffs preserve their objection for review in the event these erroneously excluded documents prove relevant in response to Defendants' cross-appeal.

Defendants objected that Plaintiffs could not establish a foundation for the documents under Federal Rule of Evidence 602 because Plaintiffs had not called a "custodian/recipient" to testify. *E.g.*, D. Ct. Dkt. 1378, at 166 (referring to TX-801). But Rule 602 concerns the scope of *witness testimony*; it says nothing about whether a *document* may be admitted. *Bucklew v. Hawkins, Ash, Baptie & Co., LLP*, 329 F.3d 923, 927 (7th Cir. 2003) ("Admissible documents are evidence, just like testimony. They do not require sponsorship."). The documents' authenticity was not

in dispute and it was clear, on the face of the documents, what they were. The jury should have been allowed to consider these documents for any relevant purpose.

## CONCLUSION

For the foregoing reasons, the district court's judgment should be REVERSED, and the district court instructed to enter judgment for Plaintiffs in accordance with the jury's special verdict. The alternative order, vacating the damages awards, should also be REVERSED.

If vacatur is affirmed, then this Court should instruct the district court to offer the residential class a remittitur in the amount of $2.81 billion or at least $1.39 billion. Nominal damages are not supported by this record and are patently unreasonable where proven antitrust violations have caused substantial harm for many years.

In addition, the summary dismissal of Plaintiffs' claims for equitable relief should be VACATED, and those claims remanded to give Plaintiffs an opportunity to be heard.

Dated:  January 10, 2025          Respectfully submitted,

/s/ Marc M. Seltzer
/s/ Steven M. Shepard

SUSMAN GODFREY LLP

76

Marc M. Seltzer
Kalpana Srinivasan
Amanda Bonn
Eliza Finley
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
Fax: (310) 789-3150
mseltzer@susmangodfrey.com
ksrinivasan@susmangodfrey.com
abonn@susmangodfrey.com
efinley@susmangodfrey.com

William Christopher Carmody
Steven M. Shepard
Seth Ard
Samir Doshi
Tyler Finn
One Manhattan West, Fl. 50
New York, NY 10001
Tel: (212) 336-8330
Fax: (212) 336-8340
bcarmody@susmangodfrey.com
sshepard@susmangodfrey.com
sard@susmangodfrey.com
sdoshi@susmangodfrey.com
tfinn@susmangodfrey.com

Ian M. Gore
401 Union Street, Suite 3000
Seattle, WA 98101
Tel: (206) 516-3880
Fax: (206) 516-3883
igore@susmangodfrey.com

Taylor C. Hoogendoorn
1000 Louisiana, Suite 5100
Houston, TX 77002-5096
Tel: (713) 651-9366
Fax: (713) 654-6666
thoogendoorn@susmangodfrey.com


LANGER GROGAN & DIVER, P.C.

Howard Langer
Edward Diver
Peter Leckman
Kevin Trainer
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703
hlanger@langergrogan.com
ndiver@langergrogan.com
pleckman@langergrogan.com
ktrainer@langergrogan.com


HAUSFELD LLP

Scott Martin
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322
smartin@hausfeld.com

Michael P. Lehmann
Christopher L. Lebsock
Samuel Maida
600 Montgomery St., Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 633-4980
mlehmann@hausfeld.com
clebsock@hausfeld.com
smaida@hausfeld.com


Sathya S. Gosselin
Farhad Mirzadeh
888 16th Street, N.W., Suite 300
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201
sgosselin@hausfeld.com
fmirzadeh@hausfeld.com


MOLOLAMKEN LLP

Jeffrey A. Lamken
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
Tel: 202.556.2000
jlamken@mololamken.com

*Attorneys for Plaintiffs-Appellants*

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6

9th Cir. Case Numbers 24-5493 & 24-5691

I am an attorney for Appellants. I am unaware of any related cases currently pending in this court.

**Signature** _/s/ Marc M. Seltzer_          **Date:** January 10, 2025

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

**CERTIFICATE OF COMPLIANCE**

Form 8

9th Cir. Case Numbers 24-5493 & 24-5691

I am the attorney for Appellants.

   **This brief contains 17,267 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

   I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.
[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
[ ] it is a joint brief submitted by separately represented parties;
[ ] a party or parties are filing a single brief in response to multiple briefs; or
[ ] a party or parties are filing a single brief in response to a longer joint brief.
[ ] complies with the length limit designated by court order dated _____.
   [**X**] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _/s/ Marc M. Seltzer_          **Date**  January 10, 2025

# ADDENDUM

## ADDENDUM A: STATUTORY TEXT

Section 1 of the Sherman Act provides:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 1.

Section 2 of the Sherman Act provides:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 2.

Section 4 of the Clayton Act provides in relevant part:

[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. . . .

15 U.S.C. § 15(a).

**ADD-1**

Section 16 of the Clayton Act provides in relevant part:

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue . . . .

15 U.S.C. § 26.

Section 1 of the Sports Broadcasting Act ("SBA") provides:

**Exemption from antitrust laws of agreements covering the telecasting of sports contests and the combining of professional football leagues**

The antitrust laws, as defined in section 1 of the Act of October 15, 1914, as amended (38 Stat. 730), or in the Federal Trade Commission Act, as amended (38 Stat. 717), shall not apply to any joint agreement by or among persons engaging in or conducting the organized professional team sports of football, baseball, basketball, or hockey, by which any league of clubs participating in professional football, baseball, basketball, or hockey contests sells or otherwise transfers all or any part of the rights of such league's member clubs in the sponsored telecasting of the games of football, baseball, basketball, or hockey, as the case may be, engaged in or conducted by such clubs. In addition, such laws shall not apply to a joint agreement by which the member clubs of two or more professional football leagues, which are exempt from income tax under section 501(c)(6) of the Internal Revenue Code of 1986, combine their operations in expanded single league so exempt from income tax, if such agreement increases rather than decreases the number of professional football clubs so operating, and the provisions of which are directly relevant thereto.

15 U.S.C. § 1291.

Section 2 of the SBA provides:

**ADD-2**

**Area telecasting restriction limitation**

Section 1291 of this title shall not apply to any joint agreement described in the first sentence in such section which prohibits any person to whom such rights are sold or transferred from televising any games within any area, except within the home territory of a member club of the league on a day when such club is playing a game at home.

15 U.S.C. § 1292

Section 3 of the SBA provides:

**Intercollegiate and interscholastic football contest limitations**

The first sentence of section 1291 of this title shall not apply to any joint agreement described in such section which permits the telecasting of all or a substantial part of any professional football game on any Friday after six o'clock postmeridian or on any Saturday during the period beginning on the second Friday in September and ending on the second Saturday in December in any year from any telecasting station located within seventy-five miles of the game site of any intercollegiate or interscholastic football contest scheduled to be played on such a date if--

(1) such intercollegiate football contest is between institutions of higher learning both of which confer degrees upon students following completion of sufficient credit hours to equal a four-year course, or

(2) in the case of an interscholastic football contest, such contest is between secondary schools, both of which are accredited or certified under the laws of the State or States in which they are situated and offer courses continuing through the twelfth grade of the standard school curriculum, or the equivalent, and

(3) such intercollegiate or interscholastic football contest and such game site were announced through publication in a newspaper of general circulation prior to August 1 of such year as being regularly scheduled for such day and place.

15 U.S.C. § 1293

Section 4 of the SBA provides:

**ADD-3**

**Antitrust laws unaffected as regards to other activities of professional sports contests**

Nothing contained in this chapter shall be deemed to change, determine, or otherwise affect the applicability or nonapplicability of the antitrust laws to any act, contract, agreement, rule, course of conduct, or other activity by, between, or among persons engaging in, conducting, or participating in the organized professional team sports of football, baseball, basketball, or hockey, except the agreements to which section 1291 of this title shall apply.

15 U.S.C. § 1294

Section 5 of the SBA provides:

**"Persons" defined**

As used in this chapter, "persons" means any individual, partnership, corporation, or unincorporated association or any combination or association thereof.

15 U.S.C. § 1295

## ADDENDUM B: TEXT OF RULES 50 AND 59 OF THE FEDERAL RULES OF CIVIL PROCEDURE

Rule 50 of the Federal Rules of Civil Procedure provides in relevant part:

(a) Judgment as a Matter of Law.

**(1)** *In General.* If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:

(A) resolve the issue against the party; and

(B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

**(2)** *Motion.* A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury. The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment.

**(b) Renewing the Motion After Trial; Alternative Motion for a New Trial.** If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment--or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged--the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may:

**(1)** allow judgment on the verdict, if the jury returned a verdict;

**(2)** order a new trial; or

**(3)** direct the entry of judgment as a matter of law.

**(c) Granting the Renewed Motion; Conditional Ruling on a Motion for a New Trial.**

**(1) *In General.*** If the court grants a renewed motion for judgment as a matter of law, it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed. The court must state the grounds for conditionally granting or denying the motion for a new trial.

**(2) *Effect of a Conditional Ruling.*** Conditionally granting the motion for a new trial does not affect the judgment's finality; if the judgment is reversed, the new trial must proceed unless the appellate court orders otherwise. If the motion for a new trial is conditionally denied, the appellee may assert error in that denial; if the judgment is reversed, the case must proceed as the appellate court orders.

Rule 59 of the Federal Rules of Civil Procedure provides:

(a) In General.

**(1) *Grounds for New Trial.*** The court may, on motion, grant a new trial on all or some of the issues--and to any party--as follows:

(A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court; or

(B) after a nonjury trial, for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court.

**(2) *Further Action After a Nonjury Trial.*** After a nonjury trial, the court may, on motion for a new trial, open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment.

**(b) Time to File a Motion for a New Trial.** A motion for a new trial must be filed no later than 28 days after the entry of judgment.

**(c) Time to Serve Affidavits.** When a motion for a new trial is based on affidavits, they must be filed with the motion. The opposing party has 14 days after being served to file opposing affidavits. The court may permit reply affidavits.

**(d) New Trial on the Court's Initiative or for Reasons Not in the Motion.** No later than 28 days after the entry of judgment, the court, on its own, may order a new trial for any reason that would justify granting one on a party's motion. After

**ADD-6**

giving the parties notice and an opportunity to be heard, the court may grant a timely motion for a new trial for a reason not stated in the motion. In either event, the court must specify the reasons in its order.

**(e) Motion to Alter or Amend a Judgment.** A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment.

### ADDENDUM C: TEXT OF RULE 702 OF THE FEDERAL RULES OF EVIDENCE

Rule 702 of the Federal Rules of Evidence provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form15instructions.pdf

**9th Cir. Case Number(s)** | 24-5493; 24-5691

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

1. Form 20: Notice of Intent to Unseal;
2. Appellants' Opening Brief; and
3. Excerpts of Record, Volumes 17 to 20

**Signature** | /s/ Marc M. Seltzer | **Date** | 01/10/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 15** | *Rev. 12/01/2018*