**Nos. 24-5493 & 24-5691**

In The
# United States Court of Appeals
## for the Ninth Circuit

---

NINTH INNING INC., ET AL.,

*Plaintiffs-Appellants,*

v.

NATIONAL FOOTBALL LEAGUE, INC., ET AL.,

*Defendants-Appellees.*

---

On Appeal from the
United States District Court for the Central District of California
Honorable Philip S. Gutierrez, No. 2:15-ml-02668-PSG

---

## BRIEF FOR THE UNITED STATES OF AMERICA AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS-APPELLANTS

---

DOHA MEKKI
*Acting Assistant Attorney General*
JOHN W. ELIAS
*Deputy Assistant Attorney General*
DAVID B. LAWRENCE
*Policy Director*
SPENCER D. SMITH
ALICE A. WANG
*Counsels*
DANIEL E. HAAR
NICKOLAI G. LEVIN
L. ALLISON HERZOG
*Attorneys*
U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave., N.W. #3224
Washington, D.C. 20530-0001
(202) 802-6444

*Counsel for the United States*

## TABLE OF CONTENTS

**Page**

ISSUE PRESENTED ................................................................ 2

STATEMENT ......................................................................... 2

SUMMARY OF THE ARGUMENT ........................................ 10

ARGUMENT ......................................................................... 12

   I.   Injunctions Serve the Public Interest by Deterring Illegal Conduct and Restoring Competition .................................................... 13

   II.  The District Court Erred by Dismissing Plaintiffs' Injunctive Claims Without Analyzing Threatened Loss ....................... 17

CONCLUSION ..................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                     **Page(s)**

*American Booksellers Association, Inc. v. Barnes & Noble, Inc.*,
135 F. Supp. 2d 1031 (N.D. Cal. 2001) ................................................ 20

*Board of Regents of University of Oklahoma v. NCAA*,
707 F.2d 1147 (10th Cir. 1983) ............................................................ 18

*Board of Regents of University of Oklahoma v. NCAA*,
546 F. Supp. 1276 (W.D. Okla. 1982) ............................................. 17-18

*B-S Steel of Kansas, Inc. v. Texas Industries, Inc.*,
439 F.3d 653 (10th Cir. 2006) ............................................................. 20

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
479 U.S. 104 (1986) ............................................................... 10, 16, 18

*Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*,
754 F.2d 404 (1st Cir. 1985) ............................................................... 20

*Datagate, Inc. v. Hewlett-Packard Co.*,
941 F.2d 864 (9th Cir. 1991) ....................................................... 11, 19-20

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) .............................................................................. 7

*EEOC v. Go Daddy Software, Inc.*,
581 F.3d 951 (9th Cir. 2009) ................................................................. 3

*Ford Motor Co. v. United States*,
405 U.S. 562 (1972) ....................................................................... 10, 14

*fuboTV Inc. v. Walt Disney Co.*,
No. 24-cv-01363, 2024 WL 3842116 (S.D.N.Y. Aug. 16, 2024) ............. 5

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977) ................................................................ 16

*In re Google Play Store Antitrust Litigation*,
  No. 21-md-02981, 2024 WL 4438249 (N.D. Cal. Oct. 7, 2024) ....... 17-18

*In re Multidistrict Vehicle Air Pollution*,
  538 F.2d 231 (9th Cir. 1976) .................................... 14, 15, 16

*In re NFL's Sunday Ticket Antitrust Litigation*,
  933 F.3d 1136 (9th Cir. 2019) .................................... 2, 3, 4, 5

*In re Warfarin Sodium Antitrust Litigation*,
  214 F.3d 395 (3d Cir. 2000) ........................................... 17

*LaDuke v. Nelson*,
  762 F.2d 1318 (9th Cir. 1985) ........................................ 17

*Laumann v. NHL*,
  105 F. Supp. 3d 384 (S.D.N.Y. 2015) ............................... 20

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007) ..................................................... 22

*National Society of Professional Engineers v. United States*,
  435 U.S. 679 (1978) ..................................................... 15

*NCAA v. Board of Regents of University of Oklahoma*,
  468 U.S. 85 (1984) ............................................... 2, 18, 22

*Northern Pacific Railway Co. v. United States*,
  356 U.S. 1 (1958) .................................................. 13, 14

*Optronic Technologies, Inc. v. Ningbo Sunny Electronics Co., Ltd.*,
  20 F.4th 466 (9th Cir. 2021) ..................................... 15, 17

iv

*United States Gypsum Co. v. Indiana Gas Co.*,
   350 F.3d 623 (7th Cir. 2003) .................................................. 16

*United States v. Borden Co.*,
   347 U.S. 514 (1954) ............................................................. 15

*United States v. Columbia Pictures Industries, Inc.*,
   507 F. Supp. 412 (S.D.N.Y. 1980) ......................................... 6

*United States v. Columbia Pictures Industries, Inc.*,
   659 F.2d 1063 (2d Cir. 1981) ................................................. 6

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
   395 U.S. 100 (1969) ................................. 10, 11, 14, 16, 17, 19

## Statutes:

15 U.S.C. § 4 ............................................................................ 15

15 U.S.C. § 15 .......................................................................... 14

15 U.S.C. § 25 .......................................................................... 15

15 U.S.C. § 26 ........................................................... 2, 9, 14, 17

## Other Authorities:

*NFL, RedBird Capital Partners form new venture to deliver Sunday Ticket to commercial establishments*, NFL NEWS (MARCH 28, 2023), https://www.nfl.com/news/nfl-redbird-capital-partners-form-new-venture-to-deliver-sunday-ticket-to-commer ........................................ 24

*NFL fans in US must pay $1,600 a year to watch every game after Netflix addition*, THE GUARDIAN (May 15, 2024), https://www.theguardian.com/sport/article/2024/may/15/nfl-netflix-steaming-exclusive-games-price ........................................ 24-25

## INTEREST OF THE UNITED STATES

The United States enforces the federal antitrust laws and has a strong interest in their correct application. The United States also has a significant interest in ensuring the availability of effective injunctive relief in antitrust cases and routinely seeks injunctive relief in its antitrust enforcement actions. Accordingly, it also has an interest in ensuring that such relief is available to private plaintiffs. *See, e.g.*, Brief of the United States of America and the Federal Trade Commission as Amici Curiae in Support of Plaintiff-Appellee, *Epic Games Inc. v. Google LLC, et al.*, No. 24-6256 (9th Cir. Jan. 7, 2025), ECF No. 147, https://www.justice.gov/atr/media/1383936/dl.

In this case, a jury found—and the district court found sufficient evidence of—the primary elements of liability under Section 1 of the Sherman Act: concerted action that unreasonably restrained trade. But the district court then applied an incorrect standard in dismissing Plaintiffs' claims for injunctive relief, improperly curtailing access to an important tool for redressing anticompetitive harm and restoring competition. The United States files this brief pursuant to Federal Rule of Appellate Procedure 29(a)(2) to urge this Court to correct that error.

1

## ISSUE PRESENTED

Whether the district court erred by dismissing Plaintiffs' injunctive claims without ever considering whether Plaintiffs could show "threatened loss or damage," 15 U.S.C. § 26.

## STATEMENT

This case is on appeal for the second time. This Court previously held that the complaint stated claims under Sections 1 and 2 of the Sherman Act and reversed the district court's order dismissing the case. *In re NFL's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1159 (9th Cir. 2019). The Court explained then that the "interlocking agreements at issue here" are "the exact type of arrangement [that the court in an early NFL broadcast case] concluded violated the Sherman Act—and, more importantly, that the Supreme Court held caused an injury to competition in the context of college football." *Id.* at 1151 (citing *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 104 (1984)). In addition, these Plaintiffs "suffered antitrust injury due to this conspiracy to limit output." *Id.* at 1158.

A jury subsequently found Defendants liable and awarded $4.7 billion in damages. The case is back on appeal, this time after the district court granted Defendants' post-verdict motion for judgment as a matter

2

of law and again dismissed Plaintiffs' claims. 1-ER-10. After trial, the district court excluded testimony from Plaintiffs' two expert witnesses, revisiting a *Daubert* motion it previously denied. On that basis, the court held that Plaintiffs failed to establish class-wide injury and to quantify that injury adequately. *Id.* But the court did not just throw out the jury's damages verdict; it also granted judgment to Defendants on Plaintiffs' claims for injunctive relief, even though the injunctive claims did not require Plaintiffs to quantify their injury—or indeed to show actual injury at all. 1-ER-3.

1. The National Football League comprises 32 separate teams. *See NFL Sunday Ticket*, 933 F.3d at 1148. For decades, all the teams have signed agreements to pool their broadcast rights in the NFL, which then sells those rights as a single package. The teams share equally in the resulting broadcast revenues. *Id.; see also* 1-ER-1367.[1] These pooling

---

[1] On a post-trial motion for judgment as a matter of law, the court must "view the evidence in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in that party's favor." *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). The court "may not make credibility determinations or weigh the evidence." *Id.* And it may not grant judgment unless "the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Id.*

agreements prevent teams from individually contracting to broadcast their games. *NFL Sunday Ticket*, 933 F.3d at 1154. Instead, the NFL coordinates with television networks CBS and Fox to produce a single telecast for each Sunday-afternoon NFL game, which is then made available "on free, over-the-air television" in the local area. *Id.* at 1148. As a result, in any part of the country, at most two or three local games are available on each Sunday during the NFL regular season. *Id.* Seven to ten more games are played each Sunday but not aired locally. *Id.*

Fans can watch games outside of their local area only by purchasing a subscription to "NFL Sunday Ticket"—a bundled package of all NFL games—formerly available on DirecTV's satellite service and now available on YouTube.[2] *Id.* at 1143. There is no way for fans to purchase access to a single game or a single team's games. 1-ER-2080. And the NFL requires that the bundle of games be sold at "premium" prices to ensure that they complement the network broadcasts rather than compete with them. 1-ER-2073 ("CBS wanted a premium price for Sunday Ticket because CBS didn't want Sunday Ticket taking away more

---

[2] In 1987, the NFL sold broadcast rights to ESPN. Since 1994, it has sold them exclusively to DirecTV. *NFL Sunday Ticket*, 933 F.3d at 1147.

eyeballs from CBS viewership."). When Sunday Ticket was on DirecTV, a fan could subscribe only by purchasing their cable television through DirecTV. *NFL Sunday Ticket*, 933 F.3d at 1149. As of 2015, an annual Sunday Ticket package cost about $250. *Id.* The NFL's recent contract with YouTube has increased the price of Sunday Ticket even higher, to $349 per year for YouTube TV subscribers and $449 for non-subscribers. 1-ER-1410-11, 1-ER-1425.

2. Residential and commercial Sunday Ticket subscribers filed class actions against the NFL and its members, alleging that the pooling agreements violated Sections 1 and 2 of the Sherman Act and seeking damages and injunctive relief. 1-ER-345-49, 1-ER-355-56. According to Plaintiffs, the pooling agreements made NFL games less accessible and more expensive to watch. 1-ER-339-41. The agreements kept NFL games off DirecTV's competitor platforms like Comcast, Spectrum, and DISH.[3] 1-ER-340, 1-ER-1120-21. And they increased the price of

---

[3] Courts have held similar exclusive pooling arrangements to be anticompetitive. *See, e.g.*, *fuboTV Inc. v. Walt Disney Co.*, No. 24-cv-01363, 2024 WL 3842116 (S.D.N.Y. Aug. 16, 2024) (preliminarily enjoining a joint venture between The Walt Disney Company, Fox Corporation, and Warner Brothers Discovery, Inc. to create a live sports streaming service because there was a substantial likelihood that it

subscription bundles for NFL games far above the price of similar bundles for MLB, NBA, or NHL games.  1-ER-341-42, 1-ER-1172.

The parties exchanged a volley of pre-trial motions.  Among them, Plaintiffs filed a motion in limine to prevent discussion of injunctive relief, expressing concern that Defendants might "suggest that the jury should speculate about forward-looking changes" that could result from the lawsuit.  1-ER-296.  The court granted the motion, citing case law that "a district court can sufficiently instruct the jury to determine only actual damages" and that the Clayton's Act statutory remedies "ha[ve] no relevance in determining the amount a plaintiff was injured by the anti-trust violation."  *Id.* (internal citations omitted).  The court ordered that "neither party can bring evidence or argument about injunctive relief and forward-looking changes."  *Id.*

---

would substantially lessen competition in the market for live pay television), *appeal voluntarily dismissed* (Jan. 8, 2025); *United States v. Columbia Pictures Indus., Inc.*, 507 F. Supp. 412, 430 (S.D.N.Y. 1980) (holding that a joint venture to create a pay television network exhibiting feature films was likely anticompetitive because it would substitute a profit sharing formula for competitive negotiations over the value of individual films in which the defendants previously engaged), *aff'd*, 659 F.2d 1063 (2d Cir. 1981).

6

Defendants filed a pre-trial motion for judgment as a matter of law, re-raising a challenge to Plaintiffs' expert witnesses under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), which the court had previously rejected. 1-ER-245, 1-ER-281. Without the expert witnesses, they argued, Plaintiffs failed to establish liability or class-wide damages. 1-ER-245, 1-ER-274-276. Although the motion sought judgment in Defendants' favor on all claims, it did not argue that Plaintiffs could not show threatened loss for purposes of the injunctive claims. *Id.* The court took Defendants' motion under submission but did not decide it before trial. 1-ER-243.

After a three-week trial, the jury found that Defendants violated Sections 1 and 2 of the Sherman Act, and it awarded $4.7 billion in damages. 1-ER-10, 1-ER-20. Defendants then renewed their motion for judgment as a matter of law, which the court granted. 1-ER-20, 1-ER-141. The court held that testimony by two of Plaintiffs' expert witnesses was inadmissible under *Daubert*. 1-ER-14-17, 1-ER-19. Yet "[e]ven without the testimonies of [the two experts]," the court found that "[t]here was evidence in the record . . . to support a reasonable jury's finding of an unreasonable restraint of trade at each step of the rule of reason." 1-

7

ER-20.  In particular, there was enough evidence for a reasonable jury to "find that there were anticompetitive effects, that Defendants' procompetitive justifications were pretextual or unrelated to the restraints, and/or that there were less-restrictive alternatives based on the record."  *Id.*

Nevertheless, the court believed that judgment for Defendants was warranted.  In its view, "it is impossible for a jury to determine on a class-wide basis that [Plaintiffs] would have indeed paid less in the absence of [Defendants'] anticompetitive conduct."  1-ER-20.  Thus, "Plaintiffs failed to provide evidence from which a reasonable jury could make a finding of injury and an award of actual damages that would not be erroneous as a matter of law."  *Id.*  The Order did not address Plaintiffs' injunctive claims.

To resolve the injunctive claims, Plaintiffs filed a notice requesting "the Court's guidance on how the Court prefers to move forward on the remaining proceedings, including requests for declaratory, injunctive, or other equitable relief."  1-ER-42.  And at the district court's request, Defendants filed a proposed judgment "in favor of the NFL Defendants

and against Plaintiffs," on all claims, "including . . . Plaintiffs' claims for equitable and declaratory relief." 1-ER-39.

Plaintiffs objected, arguing that judgment on the injunctive claims was improper. 1-ER-30-31. Actual injury is not needed to obtain an injunction, Plaintiffs explained, so "the Court's conclusions with respect to class-wide *monetary* relief for past conduct do not determine the propriety of class-wide *injunctive* relief for ongoing and future conduct." *Id.* "The equitable relief that Plaintiffs seek . . . requires no proof of monetary harm," only proof of threatened loss. *Id.*; *see* 15 U.S.C. § 26 (entitling plaintiffs "to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws").

Over Plaintiffs' objections, the court issued Defendants' proposed judgment and dismissed Plaintiffs' claims for damages as well as injunctive relief. 1-ER-7.

## SUMMARY OF THE ARGUMENT

Injunctions in antitrust cases are vital to "unfetter" markets from illegal restraints and "pry" them "open to competition." *Ford Motor Co. v. United States*, 405 U.S. 562, 577-78 (1972) (cleaned up). The United States often seeks injunctive relief in its enforcement actions, and the antitrust laws provide for those enforcement efforts to be supplemented by states and private parties. *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 130-31 (1969). Even in private actions, the purpose of an injunction "[i]s not merely to provide private relief, but . . . to serve as well the high purpose of enforcing the antitrust laws." *Id.* Injunctions in private actions thus serve both the plaintiffs' and the public's interests in competitive markets. *Id.*

The district court erred by dismissing Plaintiffs' claims for injunctive relief under an incorrect standard. It is "plain" that "[Clayton Act Section 4] requires a plaintiff to show actual injury [for damages], but [Section 16] requires a showing only of 'threatened' loss" for injunctive relief. *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 (1986) (internal citations omitted). Courts regularly grant injunctions when a plaintiff can show threatened loss. Moreover, both the Supreme Court

10

and the Ninth Circuit have reversed decisions denying injunctive relief based on the plaintiff's failure to show an actual injury. *See Zenith Radio*, 395 U.S. at 130-31 (The court of appeals' holding that the "failure to prove the fact of injury barred injunctive relief . . . was unsound."); *Datagate, Inc. v. Hewlett-Packard Co.*, 941 F.2d 864, 869-70 (9th Cir. 1991) (reversing and remanding to "consider the threat of loss").

Here, however, the district court dismissed Plaintiffs' injunctive claims on the basis that "Plaintiffs failed to provide evidence from which a reasonable jury could make a finding of injury," 1-ER-20—over Plaintiffs' objection—without ever analyzing whether Plaintiffs could show threatened loss, thus violating established precedent. The court did so in the face of a jury verdict for Plaintiffs and the court's own holding that—even without the challenged experts—the jury reasonably found that Defendants' pooling agreements unreasonably restrained trade. And the court failed to consider whether non-expert evidence in the record could show threatened loss.

## ARGUMENT

The decision below not only tossed out a multi-billion-dollar jury verdict in Plaintiffs' favor after finding enough evidence to support the jury's verdict of harm to competition. It also dismissed Plaintiffs' claims for injunctive relief without any legal analysis to justify doing so.

The United States urges this Court to vacate the judgment and remand for further proceedings. In dismissing Plaintiffs' claims for injunctive relief, the district court apparently relied on an evidentiary failure regarding expert testimony that, in its view, doomed Plaintiffs' damages claims. But even assuming the court did not abuse its discretion in excluding Plaintiffs' expert testimony, different standards apply for damages and injunctive claims: a plaintiff seeking damages must show an actual injury, while a plaintiff seeking an injunction must show only a threatened loss.

The district court's improper injunctive relief analysis could have significant anticompetitive consequences if affirmed by this Court. Unless corrected, the district court's analysis threatens Plaintiffs' interests in preventing future harm as well as the public's interest in effective enforcement of the antitrust laws and the restoration of

12

competition. Moreover, the district court's ruling could improperly increase the requirements for plaintiffs to seek relief under the Sherman and Clayton Acts; there is no legal requirement that a plaintiff put on expert testimony to show threatened loss.

This brief proceeds in two parts. Part I explains the importance of injunctions and how they differ from damages. Part II explains how the district court erred by dismissing Plaintiffs' injunctive class claims under the wrong standard. It also explains that, while the parties were precluded from specifically addressing injunctive relief at trial, there appears to be substantial non-expert evidence of threatened loss in the trial record.[4]

## I. Injunctions Serve the Public Interest by Deterring Illegal Conduct and Restoring Competition

The Sherman Act "was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958). It "rests on the premise that the unrestrained interaction of competitive

---

[4] The United States takes no position on whether the jury verdict should be sustained on other bases.

forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress." *Id.*

A private plaintiff can enforce the Sherman Act by seeking damages for injury to business or property, 15 U.S.C. § 15 (Section 4 of the Clayton Act), or "injunctive relief" against "threatened loss or damage by a violation of the antitrust laws," *id.* § 26 (Section 16 of the Clayton Act). While damages "make whole those who have been injured by the conduct of the violators," *In re Multidistrict Vehicle Air Pollution*, 538 F.2d 231, 235 (9th Cir. 1976), the purpose of "injunctive remedies [is] not merely to provide private relief, but . . . to serve as well the high purpose of enforcing the antitrust laws." *Zenith Radio*, 395 U.S. at 130-31.

As the Supreme Court has explained, antitrust remedies "should unfetter a market from anticompetitive conduct and pry open to competition a market that has been closed by defendants' illegal restraints," *Ford*, 405 U.S. at 577-78 (1972) (cleaned up), like those the jury found and the court explained were anticompetitive in this case. Injunctions are a vital tool to meet this goal. They can "put[] an end to the illegal conduct," deter future violations by "depriving violators of the benefits of their illegal conduct," and "restore[] competition in the

14

marketplace." *Multidistrict Vehicle Air Pollution*, 538 F.2d at 234; *see also Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., Ltd.*, 20 F.4th 466, 486 (9th Cir. 2021) (explaining "the district court can order conduct to 'avoid a recurrence of the [antitrust] violation and to eliminate its consequences[']" (quoting *Nat'l Soc'y of Prof'l Eng'rs v. United States,* 435 U.S. 679, 698 (1978)).

The Department of Justice commonly seeks injunctions in its civil enforcement actions under 15 U.S.C. §§ 4 and 25, including prohibitory injunctions and divestitures. *See, e.g.*, Complaint ¶ 342, *United States v. Google LLC*, 1:23cv108 (E.D.V.A. Jan. 24, 2023); Complaint ¶ 253, *United States v. RealPage, Inc.*; Complaint ¶ 87, 1:24-cv-710 (M.D.N.C. Aug. 23, 2024); *United States v. Am. Airlines Grp. Inc.*, 675 F. Supp. 3d 65, 128 (D. Mass. 2023); *see also California v. Am. Stores, Inc.*, 495 U.S. 271, 275 (1990) (concluding "divestiture is a form of injunctive relief").

And the "private-injunction action . . . supplements government enforcement of the antitrust laws." *United States v. Borden Co.*, 347 U.S. 514, 518 (1954). These "private and public actions were designed to be cumulative, not mutually exclusive." *Id.*

15

Moreover, injunctions can protect plaintiffs and the public against threatened harms before they occur. As a type of forward-looking relief, injunctions are "characteristically available even though the plaintiff has not yet suffered actual injury." *Zenith Radio*, 395 U.S. at 130 (internal citations omitted); *see Cargill*, 479 U.S. at 111. This means that a plaintiff who has not been injured in their business or property, and thus is not entitled to damages, may still be entitled to an injunction against threatened injury. *Multidistrict Vehicle Air Pollution*, 538 F.2d at 237 ("Plaintiffs who have not been injured in their business or property . . . have standing under § 16 to seek injunctive relief."). Similarly, injunctions protect against "contemporary violation[s] likely to continue or recur," *Zenith Radio*, 395 U.S. at 130, such that a plaintiff need not repeatedly wait to be harmed and sue for damages.

Injunctions are also available to certain plaintiffs who may never be able to seek damages. For example, an indirect purchaser is ordinarily barred from seeking damages under the Sherman Act under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), but can still sue for injunctive relief. *See U.S. Gypsum Co. v. Ind. Gas Co.*, 350 F.3d 623, 627 (7th Cir. 2003) (*Illinois Brick*'s "direct-purchaser doctrine does not foreclose

16

equitable relief."); *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 399 (3d Cir. 2000).

These unique features of injunctions make them a crucial tool for protecting not only a plaintiff's private interests in avoiding harm but also the public's interest in maintaining competitive markets.

## II. The District Court Erred by Dismissing Plaintiffs' Injunctive Claims Without Analyzing Threatened Loss

The district court erred by dismissing Plaintiffs' injunctive claims on the basis that Plaintiffs failed to show actual injury, without ever considering threatened loss.

Injunctive relief is available to private parties "against threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26. To obtain an injunction, a plaintiff must show a threatened loss—"a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Zenith Radio*, 395 U.S. at 130.

When a plaintiff shows a significant threat of harm, the Ninth Circuit and Supreme Court have consistently permitted injunctive relief. *See Optronic Techs., Inc.*, 20 F.4th at 486; *LaDuke v. Nelson*, 762 F.2d 1318, 1330 (9th Cir. 1985); *see also In re Google Play Store Antitrust*

17

*Litigation*, No. 21-md-02981, 2024 WL 4438249, at *9 (N.D. Cal. Oct. 7, 2024); *Bd. of Regents of Univ. of Okla. v. NCAA*, 546 F. Supp. 1276, 1302, 1326-27 (W.D. Okla. 1982) (enjoining the NCAA "from acting as the exclusive agent for the sale of telecasting rights to the football games of member institutions" where plaintiffs had "clearly established the prospect of threatened future injury"), *aff'd in part, remanded in part*, 707 F.2d 1147 (10th Cir. 1983), *aff'd*, 468 U.S. 85 (1984).

But importantly, the plaintiff need not to show an existing injury to obtain an injunction. As the Supreme Court has explained, it is "plain" that the Clayton Act sections allowing for damages and injunctive relief "differ in various ways," including that "[Section 4] requires a plaintiff to show actual injury, but [Section 16] requires a showing only of 'threatened' loss or damage[.]" *Cargill*, 479 U.S. at 111 (citations omitted).

In this case, Plaintiffs' complaint sought both damages and injunctive relief. But Defendants' motion for judgment as a matter of law challenged only Plaintiffs' failure to meet the standard for damages, not for an injunction. 1-ER-142, 1-ER-245. Defendants argued that Plaintiffs' expert's models were unsound, and that without the expert

18

testimony, Plaintiffs could not show an actual injury or quantify damages. 1-ER-274-75. The motion did not address whether Plaintiffs could show threatened loss.

The district court conducted only the damages analysis: It asked whether Plaintiffs adequately quantified their injury and concluded that they did not. But it then erroneously dismissed the claims for both damages and injunctive relief, without discussing threatened loss. 1-ER-7, 1-ER-20.

That was an error under Supreme Court and Ninth Circuit precedent. It is incorrect to dismiss injunctive claims because the plaintiff failed to prove actual injury. For example, in *Zenith Radio*, the Supreme Court reversed a court of appeals decision dismissing the plaintiff's claims for injunctive relief, because its holding that the "failure to prove the fact of injury barred injunctive relief . . . was unsound." 395 U.S. at 130. Similarly, in *Datagate, Inc. v. Hewlett-Packard Co.*, the Ninth Circuit reversed a trial court's dismissal of claims for injunctive relief: "[S]ection 16 of the Clayton Act invokes traditional principles of equity and authorizes injunctive relief upon the demonstration of threatened injury. Because the district court only considered the

19

evidence with regard to actual injury, and did not consider the threat of loss or damage . . . , we reverse and remand for the trial court to make such findings." 941 F.2d 864, 869-70 (9th Cir. 1991) (cleaned up).[5]

This precedent applies equally in cases like this one, where a court makes a finding of no injury because it excluded the plaintiffs' expert witnesses. In another sports case, the court held "the damages model submitted by plaintiffs' expert . . . inadmissible" and that "[a]s a result, plaintiffs cannot prove their damages case," yet the court nonetheless let the claims for injunctive relief proceed. *Laumann v. NHL*, 105 F. Supp. 3d 384, 398 (S.D.N.Y. 2015); *see also Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1037 (N.D. Cal. 2001) ("[A]rgument that the [expert] model is inadequate to prove actual injury . . . provides

---

[5] Other circuits have held so too. *See, e.g.*, *B-S Steel of Kan., Inc. v. Tex. Indus., Inc.*, 439 F.3d 653, 668 (10th Cir. 2006) (explaining that, where plaintiff failed to show an actual injury, granting summary judgment as to the plaintiff's claims for injunctive relief "is in error . . . because it ignores the distinction . . . between showing that antitrust injury actually occurred in the past and showing that it might occur in the future"); *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 407-08 (1st Cir. 1985) (holding that the district court's application of the Section 4 standard to a claim for injunctive relief under Section 16 was reversible error, because "[p]lainly, Congress empowered a broader range of plaintiffs to bring § 16 actions because the standards to be met are less exacting than those under § 4; under § 16, a plaintiff need show only a threat of injury rather than an accrued injury").

no support for granting summary judgment on plaintiffs' claim for injunctive relief under the Robinson-Patman Act" because "plaintiffs do not have to show that they suffered actual injury in order to obtain injunctive relief").

The district court's error is consequential. There is no legal requirement that a plaintiff put on expert testimony to show threatened loss, and the district court's ruling could improperly increase the requirements for plaintiffs to seek relief under the Sherman and Clayton Acts, inconsistent with the remedial purpose of those statutes.[6]

The jury found that Defendants' pooling agreements unreasonably restrained trade and injured Plaintiffs. 1-ER-237-38. And the district court acknowledged that "[t]here was evidence in the record—even without the testimonies of [the excluded experts]—to support a reasonable jury's finding of an unreasonable restraint of trade at each

---

[6] The United States takes no position on Plaintiffs' damages claims, but the district court's usurpation of the jury, by way of granting a *Daubert* motion it already denied post-verdict, is similarly troubling, as is the court's failure to consider seriously whether the qualitative evidence that established a rule-of-reason violation could have grounded findings of actual injury and damages. Given that portions of the record are under seal, the United States also takes no position on whether the district court abused its discretion in excluding expert testimony in granting the *Daubert* motion.

21

step of the rule of reason." 1-ER-20. That portion of the jury's verdict, which the district court found supported by the record, necessarily entails a finding that the pooling agreements harmed competition. *See Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) ("In its design and function the rule [of reason] distinguishes between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest."); *Bd. of Regents*, 468 U.S. at 104 ("[W]hether the ultimate finding is the product of a presumption or actual market analysis, the essential inquiry remains the same—whether or not the challenged restraint enhances competition.").

What is more, aside from Plaintiffs' experts, there was substantial evidence in the record that Defendants' pooling agreements are causing Sunday Ticket's "[p]rice [to be] higher and output lower than they would otherwise be, and both [to be] unresponsive to consumer preference." *Bd. of Regents*, 468 U.S. at 107. An NFL internal document showed that at least 35 million avid fans, and even more casual fans, are "underserved." 1-ER-1541-43. For many of these fans, the biggest "reason[] for dropping Sunday Ticket" is that the "cost/price" is "too high." 1-ER-1434.

22

Meanwhile, distributing out-of-market games on cable rather than through Sunday Ticket subscriptions had the "potential to double" the "average distribution for NFL regular season games . . . from 39 percent to 77 percent of U.S. TV households." 1-ER-2414.

This output restriction was no accident—CBS preferred that Sunday Ticket have a limited number of subscribers. 1-ER-2078 (Q: "And CBS preferred that Sunday Ticket have a limited number of subscribers. Fair?" Mr. Ard: "That was our request – our goal, yes."). Fox also wanted the NFL to license Sunday Ticket for no less than $294 and ideally materially higher than $294. 1-ER-1409-10. The NFL agreed with the networks to keep Sunday Ticket "a complementary product that is premium." 1-ER-1409.

When the NFL removed Sunday Ticket from DirecTV, it looked for a provider that would maintain Sunday Ticket's high price. During negotiations with Apple, the NFL internally discussed "a suggested retail price model that would provide incentive for them to keep the price high." 1-ER-1414. The NFL rejected a bid for Sunday Ticket from ESPN, because of "the low NFL Sunday Ticket price points they wanted to offer, $70 a season, and offering to sell on a team-by-team product," 1-ER-1422-

23, which were "not going to be complementary to Sunday afternoon," *id*. The NFL settled on YouTube, which charges $349 per year to YouTube TV subscribers and $449 to non-subscribers. 1-ER-1410-11, 1-ER-1424-26, 1-ER-1865-66.

Additional evidence that was not relevant at the jury trial may also be relevant to showing threatened loss in the form of potential increased prices and reduced output, compared to a world without the anticompetitive conduct found by the jury. For example, the creation in March 2023 of EverPass Media, a joint venture between the NFL and RedBird Capital that sells the rights and sets the prices for Sunday Ticket in commercial venues, may be relevant to threatened loss, even though it post-dates the class period (2011-2022 NFL seasons). *NFL, RedBird Capital Partners form new venture to deliver Sunday Ticket to commercial establishments*, NFL NEWS (March 28, 2023), https://www.nfl.com/news/nfl-redbird-capital-partners-form-new-venture-to-deliver-sunday-ticket-to-commer. Evidence about the NFL's negotiations with Google to move Sunday Ticket from DirecTV to YouTube, the number of subscribers to YouTube's Sunday Ticket, and Christmas 2024 games on Netflix similarly could also help show

threatened loss. *NFL fans in US must pay $1,600 a year to watch every game after Netflix addition*, THE GUARDIAN (May 15, 2024), https://www.theguardian.com/sport/article/2024/may/15/nfl-netflix-steaming-exclusive-games-price. This evidence could show how, in addition to causing overpayments, the NFL's pooling agreements continue to reduce the availability of Sunday Ticket.

The NFL's illegal practices are continuing. As a result, millions of NFL fans across the nation will continue to face a choice—watch only limited local games or pay "premium" prices for the Sunday Ticket bundle. Given that the challenged conduct has been found to have anticompetitive effects—yet continues out in the open—Plaintiffs are at least entitled to an opportunity to show that they meet the threatened-loss standard for an injunction.

## CONCLUSION

This Court should vacate the district court's judgment as to Plaintiffs' claims for injunctive relief and remand the case for the district court to consider Plaintiffs' evidence of threatened loss.

Respectfully submitted.

*/s/ L. Allison Herzog*

DOHA MEKKI
*Acting Assistant Attorney General*
JOHN W. ELIAS
*Deputy Assistant Attorney   General*
DAVID B. LAWRENCE
*Policy Director*
SPENCER D. SMITH
ALICE A. WANG
*Counsels*
DANIEL E. HAAR
NICKOLAI G. LEVIN
L. ALLISON HERZOG
*Attorneys*
U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave., N.W.  #3224
Washington, D.C. 20530-0001
(202) 802-6444
alli.herzog@usdoj.gov

January 17, 2025                    *Counsel for the United States*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** _____ 24-5493 & 24-5691 _____

I am the attorney or self-represented party.

**This brief contains** _____ 4747 _____ **words,** including _____ 0 _____ words manually

counted in any visual images, and excluding the items exempted by FRAP 32(f).

The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ L. Allison Herzog*_____ **Date** _____ 01/17/2025/ _____
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**            *Rev. 12/01/22*

27

## CERTIFICATE OF SERVICE

I, L. Allison Herzog, hereby certify that on January 17, 2025, I electronically filed the foregoing Brief of the United States of America as Amici Curiae in Support of Plaintiffs-Appellants with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the ACMS electronic filing system. I certify that all participants in this case are registered ACMS users and that service will be accomplished by the ACMS system.

January 17, 2025

*/s/ L. Allison Herzog*
L. Allison Herzog
*Counsel for the United States*