**Nos. 24-5493, 24-5691**

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

IN RE: NATIONAL FOOTBALL LEAGUE'S "SUNDAY TICKET" ANTITRUST LITIGATION

NINTH INNING, INC., ET AL.,

*Plaintiffs-Appellants /
Conditional Cross-Appellees*

v.

NATIONAL FOOTBALL LEAGUE, INC., ET AL.,

*Defendants-Appellees /
Conditional Cross-Appellants*.

On Appeal from the U.S. District Court for the Central District of California,
No. 2:15-ml-02668

**DEFENDANTS-APPELLEES/CONDITIONAL CROSS-APPELLANTS'
ANSWERING BRIEF AND OPENING BRIEF ON CROSS-APPEAL**

THEODORE J. BOUTROUS, JR.
DANIEL G. SWANSON
CHRISTOPHER D. DUSSEAULT
GIBSON, DUNN &
CRUTCHER, LLP
333 S. Grand Avenue
Suite 5300
Los Angeles, CA 90071
tboutrous@gibsondunn.com

PAUL D. CLEMENT
 *Counsel of Record*
ERIN E. MURPHY
JOSEPH J. DEMOTT
NICCOLO A. BELTRAMO
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

(*additional counsel on inside cover*)

*Counsel for Defendants-Appellees / Conditional Cross-Appellants*

June 10, 2025

CYNTHIA RICHMAN
GIBSON, DUNN &
CRUTCHER, LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504

DOLORES F. DIBELLA
NATIONAL FOOTBALL LEAGUE
345 Park Avenue
New York, New York 10154
(212) 450-2000

BETH A. WILKINSON
BRIAN L. STEKLOFF
RAKESH N. KILARU
JENNA H. PAVELEC
WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036

## CORPORATE DISCLOSURE STATEMENT

The National Football League ("NFL") is an unincorporated association with no parent corporation, organized under the laws of New York. NFL Enterprises LLC is a wholly owned subsidiary of NFL Ventures, L.P., a Delaware limited partnership. The individual defendant NFL Clubs are:

Arizona Cardinals Football Club LLC
Atlanta Falcons Football Club, LLC
Baltimore Ravens Limited Partnership
Buffalo Bills, LLC
Panthers Football, LLC
The Chicago Bears Football Club, Inc.
Cincinnati Bengals, Inc.
Cleveland Browns Football Company LLC
Dallas Cowboys Football Club, Ltd
Denver Broncos Team, LLC
The Detroit Lions, Inc.
Green Bay Packers, Inc.
Houston NFL Holdings, L.P.
Indianapolis Colts, Inc.
Jacksonville Jaguars, LLC
Kansas City Chiefs Football Club, Inc.
Miami Dolphins, Ltd.
Minnesota Vikings Football, LLC
New England Patriots LLC
New Orleans Louisiana Saints, L.L.C.
New York Football Giants, Inc.
New York Jets LLC
Raiders Football Club, LLC
Philadelphia Eagles, LLC
Pittsburgh Steelers LLC
Chargers Football Company, LLC
Forty Niners Football Company LLC
Football Northwest LLC
The Los Angeles Rams, LLC
Buccaneers Team LLC

Tennessee Football, LLC
Pro-Football, LLC

Five of the NFL clubs have parent corporations: KSA Industries, Inc. is the parent of Tennessee Football, LLC; Football Northwest Management Inc. is the parent of Football Northwest LLC; Pittsburgh Steelers Sports, Inc. is the parent of Pittsburgh Steelers LLC; Tepper Sports Holding, Inc. is the parent of Panthers Football, LLC; and Tampa Bay Broadcasting, Inc. is the parent of Buccaneers Team LLC. The other NFL member clubs do not have parent corporations. No publicly held corporation owns 10 percent or more of any of the above-listed member club's stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES.................................................................... vi

INTRODUCTION ........................................................................... 1

STATEMENT OF JURISDICTION .............................................................. 5

STATEMENT OF THE ISSUES ................................................................ 5

STATUTES AND RULES ..................................................................... 5

STATEMENT OF THE CASE................................................................... 5

    A.    The Sports Broadcasting Act ................................................. 5

    B.    The NFL's Telecasting Agreements....................................... 8

    C.    Plaintiffs' Lawsuit ........................................................ 10

    D.    The Trial ................................................................. 12

    E.    Post-Trial Proceedings.................................................... 18

SUMMARY OF ARGUMENT................................................................... 21

STANDARDS OF REVIEW ................................................................... 23

ARGUMENT ............................................................................... 24

I.    The District Court Correctly Granted Judgment As A Matter Of Law To Defendants ............................................................. 24

    A.    The District Court Acted Well Within Its Discretion in Excluding Rascher's Testimony ....................................... 27

        1.    The district court correctly concluded that Rascher's "college football but-for world" was based on "speculation and *ipse dixit*," not reliable economic principles ......................................... 28

        2.    Plaintiffs' contrary arguments lack merit................. 33

B.    The District Court Acted Well Within Its Discretion in Excluding Zona's Testimony ............................................... 40

    1.    The district court correctly concluded that Zona's efforts to model a but-for world without exclusivity were unreliable ........................................................ 41

    2.    The district court correctly rejected Zona's "NFL tax" calculation, which Plaintiffs abandoned in their post-trial briefing .............................................................. 47

    3.    The district court did not err in excluding Rascher's and Zona's testimony in its entirety ................................. 50

C.    The District Court Correctly Concluded That the Exclusion of Rascher's and Zona's Testimony Was Fatal to Plaintiffs' Case .................................................................................. 51

D.    There Are Alternative Grounds for Affirming the District Court's Grant of Judgment as a Matter of Law ................................. 62

II.    If This Court Does Not Affirm The Award Of Judgment As A Matter Of Law, It Should Reverse The District Court's Class Certification Order ................................................................................................. 63

III.    The District Court Properly Exercised Its Discretion By Holding, In The Alternative, That Defendants Are Entitled To A New Trial ................. 69

A.    The District Court Correctly Held That the Jury's Verdict Was "Clearly Not Supported by the Evidence" .......................... 71

B.    Plaintiffs' Contrary Arguments Lack Merit ....................................... 76

    1.    District courts are permitted to assess whether a jury's damages award is supported by the evidence .......................... 76

    2.    Plaintiffs' countertheory of how the jury arrived at its verdict is nonsensical ................................................ 80

CONCLUSION ................................................................................. 84

STATEMENT OF RELATED CASES

iv

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Allied Chem. Corp. v. Daiflon, Inc.*,
    449 U.S. 33 (1980) .................................................................. 70, 76

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
    190 F.3d 1051 (9th Cir. 1999) .................................................. 49

*Associated Diesel Serv. & Equip. Co. v. Terex Corp.*,
    1995 WL 23583 (9th Cir. 1995) ............................................. 77

*Associated Gen. Contractors of Cal., Inc.*
    *v. Cal. State Council of Carpenters*,
    459 U.S. 519 (1983) ................................................................ 53

*B.K. ex rel. Tinsley v. Snyder*,
    922 F.3d 957 (9th Cir. 2019) .................................................. 67

*Bd. of Trs. of the Glazing Health & Welfare Tr. v. Chambers*,
    941 F.3d 1195 (9th Cir. 2019) ................................................ 68

*Bigelow v. RKO Radio Pictures, Inc.*,
    327 U.S. 251 (1946) ............................................................ 35, 58

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
    152 F.3d 588 (7th Cir. 1998) .................................................. 33

*Brewer v. Hustler Mag., Inc.*,
    749 F.2d 527 (9th Cir. 1984) .................................................. 77

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993) ................................................................ 43

*Cash & Henderson Drugs, Inc. v. Johnson & Johnson*,
    799 F.3d 202 (2d Cir. 2015) ................................................... 61

*Catlin v. Wash. Energy Co.*,
    791 F.2d 1343 (9th Cir. 1986) ............................................. 60, 62

*Celador Int'l Ltd. v. Walt Disney Co.*,
    2010 WL 11505709 (C.D. Cal. Dec. 21, 2010) ..................... 79

*City of Pomona v. SQM N. Am. Corp.*,
  750 F.3d 1036 (9th Cir. 2014).........................................................25, 39

*Cold Mountain v. Garber*,
  375 F.3d 884 (9th Cir. 2004)................................................................50

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)..............................................................48, 64, 77

*Concord Boat Corp. v. Brunswick Corp.*,
  207 F.3d 1039 (8th Cir. 2000)...................................................38, 50, 53

*Cone v. W. Va. Pulp & Paper Co.*,
  330 U.S. 212 (1947)...................................................................3, 49

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)..................................................................25, 28

*Dep't of Commerce v. New York*,
  588 U.S. 752 (2019)........................................................................82

*Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*,
  773 F.2d 1506 (9th Cir. 1985)..............................................................41

*Domingo ex rel. Domingo v. T.K.*,
  289 F.3d 600 (9th Cir. 2002)...............................................................35

*Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp.*,
  2007 WL 4526618 (E.D.N.Y. Dec. 20, 2007).............................................61, 62

*EcoFactor Inc. v. Google LLC*,
  2025 WL 1453149 (Fed. Cir. May 21, 2025) .............................................38, 39

*Eleven Line, Inc. v. N. Tex. State Soccer Ass'n*,
  213 F.3d 198 (5th Cir. 2000)...............................................................38

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011)...............................................................64

*Elosu v. Middlefork Ranch Inc.*,
  26 F.4th 1017 (9th Cir. 2022).......................................................25, 36, 43, 46

vii

*Experience Hendrix LLC v. Hendrixlicensing.com Ltd.*,
762 F.3d 829 (9th Cir. 2014) ................................................................78

*Ezzo's Invs., Inc. v. Royal Beauty Supply, Inc.*,
243 F.3d 980 (6th Cir. 2001) ......................................................... 53, 58

*FTC v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020) ................................................................52

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ...................................................... 23, 30, 39

*Goebel v. Denv. & Rio Grande W. R.R. Co.*,
215 F.3d 1083 (10th Cir. 2000) ...........................................................25

*Guidroz-Brault v. Mo. Pac. R.R. Co.*,
254 F.3d 825 (9th Cir. 2001) ...............................................................36

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) ............................................................................64

*Hasbrouck v. Texaco, Inc.*,
842 F.2d 1034 (9th Cir. 1987) .............................................................35

*Hawkins v. Comparet-Cassani*,
251 F.3d 1230 (9th Cir. 2001) .............................................................24

*Hendrix ex rel. United States v. J-M Mfg. Co.*,
76 F.4th 1164 (9th Cir. 2023) ..............................................................25

*Ill. Brick Co. v. Illinois*,
431 U.S. 720 (1977) ............................................................................63

*In re First All. Mortg. Co.*,
471 F.3d 977 (9th Cir. 2006) ........................................... 75, 78, 79

*In re High-Tech Emp. Antitrust Litig.*,
289 F.R.D. 555 (N.D. Cal. 2013) ........................................................64

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
933 F.3d 1136 (9th Cir. 2019). ..................... 6, 8, 12, 18, 41, 52, 54, 55

*In re Nexium (Esomeprazole) Antitrust Litig.*,
    842 F.3d 34 (1st Cir. 2016) ................................................................ 53, 57

*In re Online DVD-Rental Antitrust Litig.*,
    779 F.3d 914 (9th Cir. 2015)................................................................36

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    725 F.3d 244 (D.C. Cir. 2013) ........................................................ 64, 65

*In re Scrap Metal Antitrust Litig.*,
    527 F.3d 517 (6th Cir. 2008)................................................................79

*In re the Exxon Valdez*,
    270 F.3d 1215 (9th Cir. 2001)..............................................................78

*In re Urethane Antitrust Litig.*,
    768 F.3d 1245 (10th Cir. 2014)............................................................79

*In re W. Liquid Asphalt Cases*,
    487 F.2d 191 (9th Cir. 1973)................................................................35

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999)........................................................ 28, 33, 39, 50

*L.A. Mem'l Coliseum Comm'n v. NFL*,
    791 F.2d 1356 (9th Cir. 1986)................................ 76, 77, 78, 79, 81

*Lab'y Corp. of Am. Holdings v. Davis*,
    2025 WL 1583302 (U.S. June 5, 2025) ............................................68

*Lara v. First Nat'l Ins. Co. of Am.*,
    25 F.4th 1134 (9th Cir. 2022)..............................................................66

*McGlinchy v. Shell Chem. Co.*,
    845 F.2d 802 (9th Cir. 1988)................................................ 33, 36, 44

*Merit Motors, Inc. v. Chrysler Corp.*,
    569 F.2d 666 (D.C. Cir. 1977) ........................................................ 60, 61

*Morris v. W. Hayden Ests. First Addition Homeowners Ass'n*,
    104 F.4th 1128 (9th Cir. 2024)............................................ 24, 70, 76

*MSW Corpus Christi Landfill, Ltd. v. Gulley-Hurst, LLC*,
    664 S.W.3d 102 (Tex. 2023) .................................................................59

*Murphy Tugboat Co. v. Crowley*,
    658 F.2d 1256 (9th Cir. 1981) ...........................................................41

*Murphy v. City of Long Beach*,
    914 F.2d 183 (9th Cir. 1990) .............................................................45

*Murray v. S. Route Mar. SA*,
    870 F.3d 915 (9th Cir. 2017) .............................................................39

*NCAA v. Bd. of Regents of the Univ. of Okla.*,
    468 U.S. 85 (1984) .............................................................................11

*NFL v. Ninth Inning, Inc.*,
    141 S.Ct. 56 (2020) ............................................................. 12, 62, 63

*Nichols v. Mobile Bd. of Realtors, Inc.*,
    675 F.2d 671 (5th Cir. 1982) .............................................................67

*Nova Designs, Inc. v. Scuba Retailers Ass'n*,
    202 F.3d 1088 (9th Cir. 2000) ...........................................................52

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022) ................................................. 58, 64, 65

*Oracle Corp. v. SAP AG*,
    765 F.3d 1081 (9th Cir. 2014) ...........................................................24

*Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*,
    752 F.3d 807 (9th Cir. 2014) .............................................................51

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) .............................................................56

*Reed v. Lieurance*,
    863 F.3d 1196 (9th Cir. 2017) ...........................................................26

*Sardis v. Overhead Door Corp.*,
    10 F.4th 268 (4th Cir. 2021) ..............................................................60

x

*Smith v. Univ. of Wash., L. Sch.*,
  233 F.3d 1188 (9th Cir. 2000) ...................................................................68

*Somers v. Apple, Inc.*,
  729 F.3d 953 (9th Cir. 2013) ....................................................................56

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021)..................................................................................68

*Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*,
  223 F.3d 585 (7th Cir. 2000) ....................................................................77

*U.S. Football League v. NFL*,
  634 F.Supp. 1155 (S.D.N.Y. 1986) .............................................................6

*U.S. Football League v. NFL*,
  842 F.2d 1335 (2d Cir. 1988).................................................................6, 7

*United States v. Bacon*,
  979 F.3d 766 (9th Cir. 2020).....................................................................51

*United States v. Hinkson*,
  585 F.3d 1247 (9th Cir. 2009)..................................................... 24, 33, 34, 78

*United States v. Holguin*,
  51 F.4th 841 (9th Cir. 2022)........................................................................3

*United States v. NFL*,
  116 F.Supp. 319 (E.D. Pa. 1953) ................................................................7

*United States v. NFL*,
  196 F.Supp. 445 (E.D. Pa. 1961) ................................................................7

*Van Dyk Rsch. Corp. v. Xerox Corp.*,
  631 F.2d 251 (3d Cir. 1980).......................................................................60

*Versata Software, Inc. v. Ford Motor Co.*,
  2023 WL 3175427 (E.D. Mich. May 1, 2023) ...........................................59

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)............................................................................. 67, 69

*Weisgram v. Marley Co.*,
  528 U.S. 440 (2000).......................................................................... 2, 50, 51, 59

**Statutes**

15 U.S.C. §1291 .........................................................................................7, 11

28 U.S.C. §1291 ............................................................................................5

28 U.S.C. §1331 ............................................................................................5

Sports Broadcasting Act,
  Pub. L. No. 87-331, 75 Stat. 732 (1961)............................................................7

**Rules and Other Authority**

Fed. R. Civ. P. 23 .........................................................................................63

Fed. R. Civ. P. 23(b)(3) ...............................................................................64

Fed. R. Civ. P. 59(a)(1)................................................................................70

Fed. R. Evid. 702 ................................................................................... 25, 39

Lillian Rizzo, *NFL 'Sunday Ticket' Streaming Is Coming to Bars and
  Restaurants This Season*, CNBC (July 2, 2024),
  https://tinyurl.com/4mn875nw..........................................................................10

# INTRODUCTION

These sprawling class actions rested on ambitious theories that unraveled at trial along with Plaintiffs' experts.  Plaintiffs sued the NFL and DirecTV, arguing that the pooling and exclusivity agreements underlying NFL Sunday Ticket inflicted common antitrust injury and measurable damages on every purchaser of Sunday Ticket, residential and commercial subscribers alike, for more than a decade.  That was always going to be a challenge to prove in light of (among other things) the Sports Broadcasting Act ("SBA"), which expressly authorizes the NFL's longstanding practice of pooling its members' telecast rights to Sunday afternoon games and collectively licensing them for free, over-the-air distribution in regional markets.  Due to the SBA, Plaintiffs faced the daunting task of forecasting what the 32 NFL teams—including those with a nationwide fan base and those with relatively fewer fans outside their regional market—would have done with their rights to "out of market" telecasts in a hypothetical world where they could license those telecasts on their own but still had to compete with the more popular over-the-air offerings.

Seeking to sidestep that complexity while maximizing their potential recovery, Plaintiffs invoked a strained analogy to college football to press the exceedingly unlikely theory that *all* the highly valuable content on Sunday Ticket would have been available to all class members—residential and commercial alike— *for free*.  That "but-for world," offered by Plaintiffs' expert Dr. Daniel Rascher,

conveniently suggested that every class member had been injured and that calculating damages required only tallying up what each had paid for Sunday Ticket over the years. But the model came apart at trial, when Rascher proved unable to offer any coherent explanation of *why* and *how*, in a world without the challenged agreements, all out-of-market games would "find their way on to … major networks" and "major cable stations" at no cost to consumers. 7-ER-1296. Plaintiffs' back-up theory, offered by Dr. J. Douglas Zona, was, if anything, even more incredible. It required believing in a but-for world where DirecTV sold Sunday Ticket for $52 per season and an unidentified competitor sold it for $178 per season, yet many consumers inexplicably opted for the latter, more expensive product.

After watching Plaintiffs' experts struggle at trial, the district court expressed serious doubts about their ill-conceived models and ultimately found their testimony unreliable and inadmissible. The court acted well within its broad discretion in doing so. It is well established that a trial court appropriately exercises its critical gatekeeping function when it excludes "expert" testimony that it finds unreliable via post-trial motions. If anything, post-trial determinations are entitled to even greater deference, as trial is the ultimate *Daubert* hearing. It is equally well established that a court may award judgment to the defendant when, "[s]horn of … erroneously admitted expert testimony, the record evidence is insufficient to justify a plaintiff's verdict." *Weisgram v. Marley Co.*, 528 U.S. 440, 443 (2000). Just so here: Absent

2

Rascher and Zona's deeply flawed expert testimony, there was nothing left of Plaintiffs' case on antitrust injury and damages. And, without competent evidence of a but-for world, Plaintiffs could establish neither past injury nor threatened future injury to support equitable relief—especially not an injunction directed at an NFL-DirecTV partnership that expired more than a year before trial.

Plaintiffs have not come close to shouldering their burden of demonstrating that any (let alone all) of the district court's judgment calls constituted an abuse of discretion. District courts are "well positioned to make the reliability findings that [Rule 702] require[s]," as they are the ones who hold *Daubert* hearings and see experts testify at trial. *United States v. Holguin*, 51 F.4th 841, 853 (9th Cir. 2022). Similarly, resolving a Rule 50(b) motion "calls for the judgment in the first instance of the judge who saw and heard the witnesses and has the feel of the case which no appellate printed transcript can impart." *Cone v. W. Va. Pulp & Paper Co.*, 330 U.S. 212, 216 (1947). The district court's decisions to exclude Rascher's and Zona's testimony and award judgment as a matter of law ("JMOL") to Defendants were well considered, far from an abuse of discretion, and should be affirmed.

Plaintiffs' efforts to identify evidence in the record sufficient to salvage a liability finding without Rascher's and Zona's testimony is unavailing. But even if those efforts were successful, they would simply pave the way for decertification of the classes. Rascher's and Zona's testimony was not only essential to Plaintiffs'

3

claims of antitrust injury and damages; it was unquestionably the only evidence of *classwide* injury or damages that Plaintiffs presented. Without that evidence, there is no basis for this case to proceed as a class action.

Finally, even if this Court were to reverse the grant of JMOL and decline to decertify the classes, it should at a minimum affirm the district court's grant of a new trial on all issues. The jury's verdict underscored the problems with Plaintiffs' experts, as it is flatly incompatible with the record evidence. The jury inexplicably treated an approximate *discount* enjoyed by the average residential customer as its measure of damages, and then even more inexplicably awarded commercial subscribers the same per-subscriber damages as residential subscribers, even though those distinct groups paid different prices under different business models. None of that makes any sense, and it leaves little doubt that the jury was hopelessly confused by what the district court aptly described as Plaintiffs' "gobbledygook with an expert." 11-ER-2032; *accord* 11-ER-2021-22. At a bare minimum, the verdict confirms that the jury failed to follow the court's instructions, as the court itself found in granting a conditional new trial.

In sum, Plaintiffs have not come close to showing any abuse of discretion that could warrant overruling the exclusion of Rascher's and Zona's testimony, much less reinstating the jury's manifestly irrational verdict or altering the amount of remittitur. This Court should affirm.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. §1331 and entered final judgment under Rule 54(b) as to the NFL, NFL Enterprises, LLC, and the NFL teams on October 4, 2024. 16-ER-3371. Plaintiffs timely appealed, and Defendants filed a timely notice of conditional cross-appeal on November 1, 2024. 16-ER-3371. This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

1. Did the district court abuse its discretion by excluding Plaintiffs' expert testimony under Federal Rule of Evidence 702?

2. Was the exclusion of Plaintiffs' expert testimony fatal to Plaintiffs' case?

3. If not, did the district court err in allowing this case to be litigated as a class action?

4. Did the district court abuse its discretion by conditionally granting Defendants' motion for a new trial and remitting the verdict to nominal damages?

## STATUTES AND RULES

Pertinent statutory provisions and rules are reproduced in the addenda to Plaintiffs' opening brief. *See* Blue.Br.Add.1-8.

## STATEMENT OF THE CASE

### A.   The Sports Broadcasting Act

As the NFL grew in popularity over the twentieth century, so too did live telecasts of its games. *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*

5

("*Sunday Ticket*"), 933 F.3d 1136, 1144 (9th Cir. 2019). In the earliest era of televised sports, the NFL permitted "individual teams" to control and exercise the rights to broadcast games in which they played. *Id.* In the 1950s, CBS began broadcasting regular season games, and NBC began broadcasting the NFL championship game. *U.S. Football League v. NFL*, 842 F.2d 1335, 1346 (2d Cir. 1988).

While that arrangement proved profitable for teams that could command high broadcast revenue, it posed challenges for the league as a whole, because "differentials in television revenues among teams would lead to a competitive imbalance that would diminish the overall attractiveness of the NFL's product." *Id.* at 1346. For example, "games of a popular team … would be telecast frequently and over a broad area, while the games of a less popular team would be aired less frequently, if at all, and to smaller audiences." *U.S. Football League v. NFL*, 634 F.Supp. 1155, 1161 n.2 (S.D.N.Y. 1986). The resulting "disparity in television income" would disproportionately benefit "popular team[s]" in large markets, which could spend more money on player salaries, facilities, and the like. *Id.* While that might seem like a good thing for big-market teams in the short run, in the long run it would hurt the entire NFL—and consumers—because competitive balance makes a sports league more entertaining. *See* 7-ER-1249-53; 2-SER-300-14.

6

To address those risks, in 1961, "the NFL teams agreed to sell their collective television rights as a single package and to share broadcast revenues equally among all franchises." *U.S. Football League*, 842 F.2d at 1346. That approach faced legal challenges. Applying now-outdated antitrust doctrine, a district court had held that an "earlier attempt by the NFL to control the sale of television rights" of its teams violated §1 of the Sherman Act and issued an injunction. *Id*.; *see United States v. NFL*, 116 F.Supp. 319 (E.D. Pa. 1953). The NFL and its media partners asked that court if their pooled-rights strategy would violate the injunction, and the court said that it would and refused to modify the injunction. *United States v. NFL*, 196 F.Supp. 445, 447 (E.D. Pa. 1961).

Congress responded in short order by enacting the Sports Broadcasting Act, Pub. L. No. 87-331, 75 Stat. 732 (1961), which creates an exemption from the federal antitrust laws for "joint agreements" among teams in certain professional sports leagues to "sell[] or otherwise transfer[] all or any part of the rights of such league's member clubs in the sponsored telecasting of the games." *Id*. §1 (codified at 15 U.S.C. §1291). The SBA provides that it shall not "be deemed to change, determine, or otherwise affect the applicability or nonapplicability of the antitrust laws" to any other agreements. *Id*. §4.

7

### B.     The NFL's Telecasting Agreements

Consistent with the SBA, the 32 NFL teams "pool their telecasting rights and give the NFL the authority to exercise those rights." *Sunday Ticket*, 933 F.3d at 1148. Individual teams thus do not contract with "networks, satellite TV providers, or internet streaming services" themselves; the NFL does that on behalf of the whole league, enabling it to coordinate the efficient production and distribution of games and ensure that revenues are distributed in ways that promote its strong interest in ensuring competitive balance. *Id.*

Pursuant to these arrangements, the NFL has entered into SBA-protected agreements with FOX and CBS to "create a single telecast for every Sunday-afternoon NFL game," which one or the other network broadcasts via "free, over-the-air television" to viewers within each team's geographic region. *Id.* Each Sunday afternoon during football season, every NFL fan can watch three or four such "in-market" games on free, over-the-air television—one or two on CBS and one or two on FOX. 4-ER-586-89; 5-ER-740. And the local team's games are always available on free, over-the-air television, no matter their time slot or how they are televised outside the local market. For example, all games involving the San Francisco 49ers are available over broadcast television in both the San Francisco market and the opposing team's market. 5-ER-741, 7-ER-1197.

8

CBS and FOX select which other Sunday afternoon games to show in which region based on which games they expect will be of most interest to fans in each part of the country. 5-ER-741-42. For example, a Sunday afternoon game between two undefeated teams that is expected to be a great matchup could be "in-market"—and thus free—for more than 80 percent of the country. 7-ER-1288, 11-ER-2168. In addition to these Sunday afternoon games, an NFL game is typically shown on national television on Sunday night, Monday night, and Thursday night. 7-ER-1112-13.

While this longstanding arrangement works well for most fans, some avid fans want access to all NFL games, and other fans—say, a life-long Denver Broncos fan who retired to Miami—regularly want to watch an out-of-market club. This led the NFL to partner with DirecTV to produce a satellite television package known as NFL Sunday Ticket, which DirecTV subscribers could purchase for an annual fee and provided access to "out-of-market" Sunday afternoon games being shown on CBS and FOX in other regions. 4-ER-589-91; 5-ER-739-43. Sunday Ticket was available exclusively through DirecTV until the end of 2022-23 NFL season. 8-ER-1368-69; 8-ER-1399.[1]

---

[1] The NFL now offers Sunday Ticket to residential customers through YouTube and YouTube TV rather than through DirecTV. 7-ER-1120. Commercial entities, such as bars and restaurants, can purchase Sunday Ticket through EverPass Media— delivered via either DirecTV or Internet streaming from EverPass. *See* 14-ER-2959-

From 2011 to 2023, Sunday Ticket was purchased by approximately 24 million residential subscribers, as well as 500,000 commercial subscribers ranging from small sports bars to large casinos. 15-ER-3085; 7-ER-1118. Unsurprisingly, the two groups paid very different prices and received very different discounts. 9-ER-1756-57. Commercial subscriptions varied based on the size of the establishment, 4-ER-533; the average commercial subscriber paid slightly more than $2,600, 15-ER-3085. By contrast, Sunday Ticket Basic was offered to residential subscribers at list prices ranging from $200 to $335 during the relevant period. 20-ER-4280. And Sunday Ticket MAX, which included additional content such as the Red Zone Channel, was offered to residential subscribers at list prices ranging from $300 to $396. 20-ER-4280; *see* 9-ER-1703-04. Because DirecTV offered numerous promotions and discounts to residential Sunday Ticket subscribers, however, the average residential subscriber paid far less than the list price—approximately $102.74 for the core Sunday Ticket product during the relevant period, according to Zona's calculations. 9-ER-1725-26; 9-ER-1666.

## C.    Plaintiffs' Lawsuit

In 2015, various residential and commercial subscribers to Sunday Ticket (collectively, "Plaintiffs") sued the NFL, its 32 teams, and NFL Enterprises LLC

---

62; Lillian Rizzo, *NFL 'Sunday Ticket' Streaming Is Coming to Bars and Restaurants This Season*, CNBC (July 2, 2024), https://tinyurl.com/4mn875nw.

(collectively, "Defendants), as well as DirecTV, arguing that the pooling and exclusivity agreements through which they made Sunday Ticket available on DirecTV violated §§1 and 2 of the Sherman Act.[2]  In essence, Plaintiffs argued that the teams could not pool their telecast rights with the NFL outside the "sponsored telecasting" context protected by the SBA, *see* 15 U.S.C. §1291, and that the decision to make Sunday Ticket available only on DirecTV was anticompetitive. The district court dismissed Plaintiffs' consolidated complaint for failure to state a claim, concluding, *inter alia*, that (1) "the pro-competitive benefits" of the pooling agreements were "abundantly clear" because some degree of coordination between the NFL and its teams is always necessary to offer televised games, 1-SER-56-57, and (2) the exclusivity agreements *increased* the output of televised NFL games, 1-SER-47-50.

Plaintiffs appealed, and a panel of this Court reversed.  Relying principally on the Supreme Court's decision in *NCAA v. Board of Regents of the University of Oklahoma*, 468 U.S. 85 (1984), which involved NCAA restrictions on the number and price of college football telecasts, this Court determined that Plaintiffs had adequately alleged "the same sorts of restrictions that *NCAA* concluded constituted

---

[2] The DirecTV Defendants filed a motion to compel arbitration of the claims against them, 1-SER-3-29, which the district court granted, 1-SER-68-78. Accordingly, the claims against them have been and remain stayed, and DirecTV is not a party to this appeal.  1-SER-78.

an injury to competition." *Sunday Ticket*, 933 F.3d at 1152. The Court concluded that Defendants' pooling and exclusivity agreements were "interlocking agreements" that must be analyzed "holistically," *id.* at 1152-53, and that Plaintiffs had adequately alleged injury to competition in the form of reduced output, *id.* at 1154-55. Finally, the Court concluded that Plaintiffs had adequately alleged antitrust injury by alleging that "prices for out-of-market games" on Sunday afternoons were "higher than they would be in the absence of the" challenged agreements. *Id.* at 1157. The Court accordingly remanded for further proceedings.

Defendants filed a petition for certiorari, which the Supreme Court denied. Justice Kavanaugh issued a statement respecting the denial of certiorari, noting that the denial "should not necessarily be viewed as agreement with the legal analysis of the Court of Appeals," which "appears to be in substantial tension with antitrust principles and precedents." *NFL v. Ninth Inning, Inc.*, 141 S.Ct. 56, 57 (2020). Among other things, he explained that "antitrust law likely does not require that the NFL and its member teams compete against each other with respect to television rights." *Id.*

## D. The Trial

On remand, Plaintiffs offered Rascher's and Zona's economic models in support of a motion to certify two classes made up of all those who purchased Sunday Ticket "at any time between June 17, 2011 and [February 7, 2023]." 3-ER-

12

332. One class included all "residential subscribers," while the other included all "commercial subscribers." 3-ER-332. Defendants filed *Daubert* motions to exclude Rascher's and Zona's testimony. 1-SER-111; 1-SER-145. They also opposed class certification on multiple grounds, including that Rascher's and Zona's models of a but-for world were too unreliable to establish class-wide injury and damages. *See* 3-ER-316-20; 3-ER-324-26. In a single order, the district court both denied Defendants' *Daubert* motions and granted Plaintiffs' motion to certify the two classes under Federal Rule of Civil Procedure 23(b)(2) and (b)(3). 3-ER-308.

The case proceeded to a two-and-a-half-week trial, during which Plaintiffs relied on Rascher's and Zona's testimony to prove antitrust injury and damages. After seeing both experts testify, the district court warned Plaintiffs' counsel that he "d[id]n't think much of" either one's "best shot," 11-ER-2024, and that he "probably … should have granted the *Daubert* motions as to" both, 11-ER-2022; *see also* 8-ER-1325, 11-ER-2027. The court expressly predicted "a viable chance for a Rule 50 [motion]," 11-ER-2022, and warned Plaintiffs that if he were to exclude both experts' testimony, there would be "nothing left" of their case, 11-ER-2024. Despite these warnings, Plaintiffs continued to pin all their hopes on Rascher and Zona, informing Defendants that they "would not call" another expert witness whom they had "intended to call." 12-ER-2251.

13

Rascher attempted to demonstrate antitrust injury by projecting how consumers and markets would have behaved if the NFL teams had not pooled their telecast rights and there had been no exclusive agreement between Defendants and DirecTV. *See* 7-ER-1204-05. Rascher maintained that in this "but-for" world, the market for telecasts of NFL games would have resembled the market for college-football telecasts. 7-ER-1146. Although universities have completely different organizational structures and business models from NFL teams, and college football has nothing resembling the NFL's SBA immunity for telecasting agreements, Rascher posited that NFL football and college football are "similar" because "[t]hey're both football," "[t]hey play during the same season," and they are both "very popular." 7-ER-1146. Based on those surface-level similarities and the fact that many (but by no means all) college football games between top 25-ranked teams are available through broadcast and/or basic cable packages, Rascher posited that, in a but-for world without the challenged pooling and exclusivity agreements, *all* NFL games would be available to *all* residential and commercial DirecTV customers at no cost beyond what they already paid for basic DirecTV service. 7-ER-1176-77.

On cross-examination, Rascher's theory quickly unraveled. For instance, while his testimony was premised on the theory that the NFL could just do what college football does, he ultimately acknowledged that college football telecast rights are rarely licensed by individual colleges. They are instead pooled at the level

of college conferences, which Rascher conceded are "sports league[s] in and of [themselves]." 7-ER-1219; 7-ER-1147. And although Rascher thought it likely that the NFL would continue to pool its members' telecast rights to Sunday afternoon games and collectively license them to CBS and FOX for free, over-the-air distribution (as the SBA expressly permits), 7-ER-1176, he acknowledged that there is no comparable arrangement for telecasts of local college football games, 7-ER-1234.

Moreover, when pressed on what the media market would actually look like in his but-for world, Rascher could not answer. He could not explain how NFL teams would have licensed their telecasting rights, how telecasts would have been produced, why broadcasters would have licensed games to competing distributors, or how or why telecasts would have been provided at no additional cost to consumers. *See, e.g.*, 7-ER-1291-93, 7-ER-1297-98, 7-ER1261-63. He would not even commit to whether the existing pooling of rights and league-wide broadcast agreements with CBS and FOX, which are squarely protected by the SBA, would continue to exist in his but-for world. 7-ER-1283-84. He instead just repeatedly insisted that these critical details did not matter because Defendants are "sophisticated entities" that would have "figured it out," given the popularity of their games. 7-ER-1295-96; *see also, e.g.*, 7-ER-1255, 7-ER-1258, 7-ER-1283-84, 7-ER-1297-99, 7-ER-1304-05.

15

As for Zona, he proffered a but-for world in which Defendants would have licensed distribution of Sunday Ticket to a second distributor that "[e]very household" could access for a standalone subscription fee. 9-ER-1627. While Zona posited that this second product would have cost *three times more* than the equivalent product on DirecTV, 9-ER-1747-48, he inexplicably posited that about a third of Sunday Ticket subscribers *who already had DirecTV* would have switched to it anyway. 9-ER-1749. Zona tried to justify that unlikely result by describing the second product as a standalone digital or streaming service available to all consumers with no underlying equipment or subscription cost like cable or satellite. 1-ER-18. But Zona admitted that he was unaware of any service that could have fit that model during much of the class period. 9-ER-1623, 9-ER-1627-28, 9-ER-1630.

When attempting to test the reliability of his economic model, Zona observed that it predicted that DirecTV should have been willing to sell Sunday Ticket, even exclusively, for a "low" price—well below the prices it actually charged. 9-ER-1581-82; *see* 17-ER-3457-59. Needless to say, that Zona's model's predictions contradicted the observed reality of DirecTV's actual pricing was a powerful strike against its reliability. 9-ER-1744-45. Zona attempted to explain away that problem by asserting that DirecTV was "influenced by the NFL" to charge a price above the profit-maximizing (or market-clearing) price—a difference he dubbed "the 'NFL tax.'" 9-ER-1582-83. Then, at trial, Plaintiffs attempted to transform this potential

16

flaw in Zona's model into a never-before-asserted theory of injury, eliciting testimony—over Defendants' objection—that "[r]esidential class members would have paid 1.39 billion less," and commercial subscribers would have paid "[a]bout 330 million, or .33 billion less," if "DirecTV had not charged more than their optimum price during the class period." 9-ER-1589.

The jury returned a verdict for Plaintiffs, awarding them $4,707,259,944.64 in damages—$96,928,272.90 to the commercial class and $4,610,331,671.74 to the residential class. 2-ER-236-41. Those exceptionally precise figures did not reflect any damages model Plaintiffs had offered. They instead confirmed the Court's fear that the jury might use "[a] phone calculator" to "create [its] own model," 14-ER-2900, as they mapped on precisely to record evidence that was not connected to any of Plaintiffs' classwide damages theories. In particular, the jury heard evidence that while the list price for residential Sunday Ticket Basic subscribers in 2018 and 2019 was $294, 20-ER-4280, the average price (over the entire class period) that subscribers actually paid after discounts, promotions, and the like was a much lower $102.74, 9-ER-1725-26; 9-ER-1666, meaning that residential subscribers in 2018 and 2019 received an average discount of about $191.26. The jury's damage award is simply $191.26 multiplied by the total number of subscriptions in each class, yielding identical damages-per-subscription for both the residential and commercial classes. *Compare* 2-ER-159, *with* 2-ER-241. Thus, the jury treated the approximate

17

*discount* enjoyed by the average residential subscriber as the *damages* that every residential *and commercial* subscriber supposedly suffered.

### E.    Post-Trial Proceedings

Defendants filed post-trial motions seeking judgment as a matter of law or a new trial on all issues, arguing, *inter alia*, that Rascher's and Zona's testimony must be excluded as unreliable and that the jury's irrational verdict could not stand.  16-ER-3364; *see also* 2-ER-141-80.  The district court granted the motion for judgment as a matter of law and, in the alternative, conditionally granted a new trial on all issues.  1-ER-20.

First, after having seen Rascher's and Zona's testimony in full, the court concluded that neither expert's testimony satisfied Rule 702.  1-ER-13-19.  The court acknowledged that college football may have been "a helpful analog at the pleading stage," 1-ER-17 (citing *Sunday Ticket*, 933 F.3d at 1151-52), but explained that simply "invoking the proliferation of [televised] college football … games after 1984" did not make Rascher's testimony reliable.  1-ER-17.  Importantly, Rascher failed to "explain how … out-of-market telecasts would have been available for free to cable and satellite subscribers in the but-for world," instead suggesting a wide variety of possible but-for worlds and simply insisting that Defendants would have "figure[d] it out."  1-ER-14.  Even worse, several of Rascher's proposed but-for worlds featured components that conflicted with unrefuted evidence, such as his

assumption that broadcasters would voluntarily license their productions to competitors even though fact witnesses consistently testified that they would not. 1-ER-15 & n.6. On top of that, Rascher failed to account for "significant differences" between "college football and the outcome in his college-football but-for world." 1-ER-16. For example, he proceeded as if all college football games are available for free when they are not. 1-ER-16. The court thus concluded that Rascher's testimony was not based on "reliable methodology," but was mere "*ipse dixit* opinion" and "speculation." 1-ER-16-17.

The court reached the same conclusion as to Zona, finding his testimony plagued by "irrational[]" predictions. 1-ER-18. For example, Zona's multiple-distributor but-for world assumed that a second Sunday Ticket distributor would charge significantly more for the same product, but that a sizable fraction of subscribers would choose that more-expensive option anyway. 1-ER-18. That would make sense, if at all, only if the competing product was a standalone streaming service—yet Zona failed to consider whether any such option was feasible throughout the class period, and other evidence demonstrated it was not. 1-ER-18-19. For those reasons (among others), the court concluded that Zona's testimony was not the product of a reliable methodology. 1-ER-19.

With Rascher's and Zona's testimony excluded, the court concluded, it would have been "impossible for a jury to determine on a class-wide basis" that Plaintiffs

19

had suffered antitrust injury due to the challenged agreements. 1-ER-20. Because antitrust injury is both an essential element of liability and necessary to prove damages, the court held that Defendants were entitled to judgment as a matter of law. 1-ER-20; *accord* 11-ER-2024 ("[O]nce you grant the *Daubert*[ motions], there's nothing left.").

The court further held, in the alternative, that even if judgment as a matter of law were not appropriate, it "would have vacated the jury's damages verdict, remitted [the] award to nominal damages, and conditionally granted a new trial" based on the verdict's "irrational[ity]." 1-ER-20-24. As the court explained, the precision of the jury's verdict left "no doubt" what it had done—namely, treat the approximate discount that residential subscribers had enjoyed as the damages suffered by each subscriber, residential and commercial alike. 1-ER-21-22. That approach was the "opposite of what the [c]ourt instructed." 1-ER-24. It was not only "clearly not supported by the evidence" but also "irrational," as it treated *discounts* as if they were *overcharges* (and treated residential discounts as commercial overcharges, for good measure). 1-ER-20; 1-ER-23-24.

Defendants filed a proposed judgment, 2-ER-36-40, and Plaintiffs objected, asserting that that they had not received "an opportunity to press" their "claims for injunctive, declaratory, and equitable relief," and that the court's JMOL decision did not "foreclose [those] claims"—supposedly because it had "upheld" "the liability

portion" of the verdict. 2-ER-29-30, 33. The court rejected those arguments, entering judgment "against Plaintiffs as to all [their] claims … including but not limited to Plaintiffs' claims for equitable and declaratory relief." 1-ER-7. The court also conditionally granted a new trial on all issues in the event its judgment as a matter of law were later vacated. 1-ER-7; *see* 1-ER-11, 20.

Plaintiffs appealed, and Defendants filed a conditional cross-appeal on the question of class certification in the event the Court were to reverse the grant of judgment as a matter of law.

## SUMMARY OF ARGUMENT

District courts have the duty to police expert testimony for compliance with Rule 702, and the corresponding authority to exclude expert testimony that does not make the cut, whether before, during, or after trial. While a district court's discretion over the admissibility of expert testimony is always broad, it is at its apex post-trial, as trial is the ultimate *Daubert* hearing.

The district court acted well within its considerable discretion in concluding that Plaintiffs' expert testimony was inadmissible after it proved wholly unreliable at trial. Rascher's attempt to analogize the market for NFL games to the market for college football games was strained from the start, as the similarities between the two largely begin and end with his unremarkable observations that both involve popular football games played during the same season. Most notably, the NFL

21

enjoys critical rights under the SBA that the NCAA does not. It is therefore unsurprising that Rascher's testimony fell apart once he was forced to confront questions as basic as what his but-for world would actually look like, and why economically rational actors would make this uniquely valuable television content available for free in any of the multitude of but-for worlds he hypothesized. Zona's testimony was, if anything, even less reliable, as he not only assumed that DirecTV subscribers would choose to pay much *more* for a competing Sunday Ticket offering not on DirecTV, but also assumed that a competing streaming option would have been available to all consumers long before that was technologically feasible.

The district court correctly concluded that the exclusion of Plaintiffs' expert testimony compelled judgment in Defendants' favor on all claims, including those seeking equitable relief, as that testimony was Plaintiffs' only proffered evidence of classwide antitrust injury and damages. But at the very least, the problems with Plaintiffs' experts would compel decertification of the classes. As is common in antitrust class actions, Plaintiffs' class-certification arguments depended entirely on their experts, whose models Plaintiffs promised would prove the classwide injury and damages necessary to demonstrate predominance. Once again, without those experts' testimony, Plaintiffs' case falls apart. Indeed, the glaring deficiencies with those models are an even bigger problem for Plaintiffs' class-certification arguments, as Rule 23(b) requires a more rigorous and demanding analysis than Rule 702.

Accordingly, if this Court were to reverse the judgment as a matter of law, it should decertify the classes.

If the Court reaches the issue, it should affirm the conditional grant of a new trial on all issues. The jury's verdict is undeniably irrational—so much so that it reveals profound confusion about basic elements of Plaintiffs' case and theory of liability. The jury inexplicably treated an approximate measure of discounts enjoyed by residential subscribers as its measure of damages. It compounded that error by using that same irrational measure of damages for commercial subscribers—even though all agree that residential and commercial subscribers paid different prices under different pricing models. In effect, the jury just picked two random numbers out of the trial record and subtracted one from the other, with little regard for what those numbers had to do with the case Plaintiffs actually presented. The verdict thus leaves no doubt that the jury was hopelessly confused about Plaintiffs' theories of liability and damages—which is unsurprising given the "gobbledygook" testimony it heard from Plaintiffs' experts. Plaintiffs have not come close to showing that the district court abused its discretion by conditionally granting a new trial.

## STANDARDS OF REVIEW

This Court reviews a decision to exclude evidence for abuse of discretion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141-43 (1997). The Court "review[s] the grant of judgment as a matter of law de novo." *Morris v. W. Hayden Ests. First*

23

*Addition Homeowners Ass'n*, 104 F.4th 1128, 1139 (9th Cir. 2024). The grant of a new trial and award of remittitur are both reviewed for abuse of discretion, *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1086-87 (9th Cir. 2014), as is a "decision regarding class certification," *Hawkins v. Comparet-Cassani*, 251 F.3d 1230, 1237 (9th Cir. 2001).

This Court applies a two-part test in assessing whether a district court abused its discretion. The first step asks only "whether the trial court identified the correct legal rule to apply." *United States v. Hinkson*, 585 F.3d 1247, 1261-62 (9th Cir. 2009) (en banc). "If the trial court identified the correct legal rule," then there is no abuse of discretion unless its "application of the correct legal standard was (1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record.'" *Id*. at 1262.

## ARGUMENT

## I. The District Court Correctly Granted Judgment As A Matter Of Law To Defendants.

Rule 702 provides that expert witness testimony is admissible only if the proponent "demonstrates to the court that it is more likely than not that": (1) the witness "is qualified as an expert by knowledge, skill, experience, training, or education"; (2) the witness' "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (3) "the testimony is based on sufficient facts or data"; (4) "the testimony is the

product of reliable principles and methods"; and (5) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. Rule 702 thus codifies district courts' "longstanding responsibility to screen expert testimony, and to prevent unfounded or unreliable opinions from contaminating a jury trial." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1020 (9th Cir. 2022) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 586 (1993)).

"[T]he trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on the particular circumstances of the particular case." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014). And the trial court's obligation to assess the reliability of expert testimony and exclude unreliable testimony continues during *and after* trial. *See Hendrix ex rel. United States v. J-M Mfg. Co.*, 76 F.4th 1164, 1170, 1176 (9th Cir. 2023); *Goebel v. Denv. & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000). Indeed, seeing an expert testify at trial is the ultimate *Daubert* hearing: It is the surest way for a court to ascertain whether an expert has "ma[d]e claims that are unsupported by the expert's basis and methodology." Fed. R. Evid. 702 advisory committee's note 2 to 2023 amendment.

The district court faithfully discharged its duty to exclude Rascher's and Zona's unreliable opinions. The court gave Plaintiffs every opportunity to prove

their claims, permitting the case to proceed to trial and allowing their experts to testify. But after listening to Rascher and Zona for nearly a day and a half, the court concluded that their testimony was "based on … flawed methodologies." 1-ER-12. As the court explained, Rascher's testimony amounted to "*ipse dixit* opinion untethered to an economic analysis of what would have likely occurred in the but-for world." 1-ER-16. And Zona's testimony failed to presume economically rational behavior and rested on unsupported assumptions. 1-ER-18-19. Despite Plaintiffs' contrary suggestion, *see* Blue.Br.38, those rulings are subject to abuse-of-discretion review. *See, e.g.*, *Reed v. Lieurance*, 863 F.3d 1196, 1204 (9th Cir. 2017). Plaintiffs come nowhere close to showing grounds for reversal under that deferential standard.

Without Rascher's and Zona's unreliable testimony, Plaintiffs' case fell apart. As the court explained, Plaintiffs had the burden to submit "evidence from which a reasonable jury could make a finding of injury and an award of actual damages." 1-ER-20. Without admissible expert testimony, however, it became "impossible for a jury to determine on a class-wide basis that Sunday Ticket subscribers would have indeed paid less in the absence of Defendants' anticompetitive conduct." 1-ER-20. And any quantum of damages a jury might award would be "purely speculative," "totally unfounded," or otherwise "erroneous as a matter of law." 1-ER-20. In short, Plaintiffs failed to produce competent evidence on essential elements of their case,

despite every opportunity to do so. The district court thus correctly granted Defendants judgment as a matter of law.

### A. The District Court Acted Well Within Its Discretion in Excluding Rascher's Testimony.

Rascher was Plaintiffs' lead witness on antitrust injury and damages. He tried to homogenize classwide injury and maximize damages with the implausible assertion that, in a "but-for world" without Defendants' allegedly anticompetitive conduct, *all* putative class members would have had access to *all* out-of-market NFL games without "pay[ing] anything extra above what they were already paying" for basic DirecTV service (without Sunday Ticket). 7-ER-1176-77. Based on Rascher's remarkable it-would-all-be-free theory, calculating damages for the 11-year class period was straightforward. It required only adding up the "total payments for Sunday Ticket" throughout the class period—roughly $5.6 billion for residential customers and $1.3 billion for commercial customers. 7-ER-1177.

Rascher tried to support this unlikely theory by "us[ing] college football as his model." 1-ER-13; *see* 7-ER-1145-46. He asserted that, "prior to 1984, college football looked a little bit like the NFL in that the NCAA had all of the [broadcast] rights of the major colleges" and would "sell their rights … to a single channel," so any consumer would see "one or maybe sometimes two games on a Saturday." 7-ER-1145, 7-ER-1147. After 1984, however, "the rules changed": "Individual colleges could sell their own rights"; "they often sold them through … conferences,"

which "compet[e] to sell their games into the media market"; and there are now "a plethora of college football games being shown on Saturdays." 7-ER-1147. Rascher purported to identify "many parallels" between college football and NFL football: "They're both football"; "[t]hey play during the same season"; they are both "very popular"; and the way they "play the game and … get the wins and things like that" is "similar." 7-ER-1146. Based on these asserted similarities, Rascher testified that, in the but-for world, all NFL games would "become available, just like on Saturday, on over-the-air channels and on … basic sports cable channels," so putative class members would "get all [NFL] games for zero dollars." 7-ER-1176.

1. **The district court correctly concluded that Rascher's "college football but-for world" was based on "speculation and *ipse dixit*," not reliable economic principles.**

The district court correctly determined that Rascher's testimony lacked "a reliable basis in the knowledge and experience of the relevant discipline," *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (brackets omitted) (quoting *Daubert*, 509 U.S. at 592), and was instead "*ipse dixit* opinion untethered to an economic analysis of what would have likely occurred in the but-for world." 1-ER-16.

Instead of offering "a coherent model" of the but-for world, Rascher posited an undefined (but "very high") number of potential but-for worlds with starkly divergent features. 1-ER-14, 1-ER-16. First, he equivocated on whether the NFL's

28

existing arrangements with CBS and FOX—which involve pooling of all 32 teams'
telecast rights and are undisputedly protected by the SBA—would continue to exist.
7-ER-1297. Those existing arrangements are a critical feature of the actual market
for NFL telecasts and a critical differentiator between the college and NFL markets.
Nonetheless, Rascher hedged. Even as he asserted that "[t]he most likely but-for
world" would still include the CBS and FOX agreements, he hypothesized another
"core … but-for world[]" without them. 7-ER-1284. Rascher similarly declined to
opine on whether the NFL teams would have negotiated media agreements
individually or in groups, describing both as "likely but-for world[s]." 7-ER-1280.
He further opined that if the teams had negotiated in groups, the groupings could
take virtually any form—e.g., eight groups of four teams, four groups of eight teams,
or five groups of six teams with two teams left out. 7-ER-1261-62. And he "could
not answer how the production, distribution, advertising, or revenue sharing for the
out-of-market telecasts would have worked in his most likely but-for world—where
the CBS and FOX deals still existed." 1-ER-14; *see* 7-ER-1259, 7-ER-1266-67, 7-
ER-1291-94, 7-ER-1305-06.

Rascher dismissed all these key differences as immaterial. In his view, in
*every* hypothetical world that eliminated the combination of pooling and exclusivity,
*all* Sunday afternoon NFL games "would appear on over-the-air networks and … on
the major cable stations." 7-ER-1297; *see, e.g.*, 7-ER-1295 ("[W]e're lucky in this

case because all these different but-for worlds lead to the same thing."). As the district court pointed out, Rascher grounded this improbable assertion on his "assumption that Defendants would figure it out" because NFL games are some of "the most popular programming on television." 1-ER-15 (quoting 7-ER-1296). But it is the expert's job to figure out how the market would adjust; simply assuming that the market would incorporate 32 additional rights holders, each of which would make its highly valuable programming available for free—without any effect on the price of basic cable or satellite television packages—strains credulity. And whatever else can be said about it, "that assumption is not a reliable methodology nor does it substitute for a model of a but-for world grounded in economic analysis showing how the Defendants and their broadcasting partners would have arrived at the spot where every out-of-market game was available" on basic cable or standard DirecTV. 1-ER-16; see *Joiner*, 522 U.S. at 146 (courts may exclude "evidence that is connected to existing data only by the *ipse dixit* of the expert").

Rascher's assertion that "they figured it out in college sports, [so] they would certainly figure it out at the NFL," 7-ER-1295, does not begin to fix the problem. As he conceded, any viable model of a but-for world must eliminate only "the conduct that's being challenged" while otherwise mirroring the real world as closely as possible. 7-ER-1231. But, as the district court explained, Rascher's many but-for worlds bear little resemblance to the real world because they do not

30

acknowledge—let alone attempt to correct for—myriad differences between college football and the NFL. *See* 1-ER-16. Rascher instead cherry-picked isolated elements of college football while ignoring key distinguishing features that render it an inapposite comparison for NFL games.

For instance, Rascher ignored the crucial difference that only the NFL—not college football—enjoys protection under the SBA. The SBA undisputedly permits all 32 NFL teams to pool their rights to over-the-air broadcasts and allows the NFL to negotiate exclusive arrangements for over-the-air broadcasts of in-market games, as it has done for decades with CBS and FOX. 7-ER-1207. As a result, all NFL games are available *for free* in the relevant local markets, while many college football games—including those between top-ranked teams—are available only with a paid subscription that includes cable channels such as ESPN. 7-ER-1147-48, 7-ER-1241, 15-ER-3062. There is no reason to think the NFL would jettison its highly successful, SBA-protected arrangements for over-the-air broadcasts, which is why Rascher agreed that, in "[t]he most likely but-for world," Defendants would "continue to sell … the over-the-air games" to CBS and FOX. 7-ER-1284.

That continuing feature renders the college football model entirely inapposite. If ABC and NBC were to purchase the rights to out-of-market games, as Rascher suggested, they would be left at the mercy of CBS's and FOX's decisions about "what game, what window, and what markets" they would receive on any given

31

Sunday. 11-ER-2168-69. And CBS and FOX would undoubtedly claim all the most popular games. For example, FOX may designate a highly anticipated matchup between the Dallas Cowboys and the San Francisco 49ers, which have relatively large and dispersed fan bases, as "in-market" for more than 80 percent of the country. 7-ER-1285-89; *see* 7-ER-1197-98; 7-ER-1257-59. At the same time, CBS and FOX air *all* Sunday afternoon games in the regional markets where the participating teams are most popular; for example, all Jacksonville Jaguars games are shown in the Jacksonville market, where approximately 70 percent of Jaguars fans reside. 7-ER-1197. With the CBS and FOX deals in place, it is hard to imagine a major network or cable channel signing a standalone, "national deal" with the Jaguars, 7-ER-1259 (Rascher), as any such deal would necessarily (i) exclude the Jacksonville market and (ii) include only out-of-market telecasts (e.g., a Jaguars vs. Tennessee Titans game on the West Coast) that would compete against in-market games on CBS and FOX featuring local teams. That bears no resemblance to the college football market.

Rascher further acknowledged that each major college football conference acts like "a sports league in and of itself," pooling and collectively licensing its members' telecast rights. 7-ER-1219. Yet some of Rascher's but-for worlds involved each NFL team selling its own rights. 7-ER-1255. And while Rascher suggested that NFL teams could have negotiated in groups, 7-ER-1261-62, a world

32

in which the NFL negotiates over-the-air deals for some of all teams' games, while unspecified groups of NFL teams negotiate separate arrangements for other games in unspecified regions, is nothing like what happens in college football. A but-for world that deviates on so many "salient factors" does not "provide a rational basis" for a liability finding. *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998). The district court was thus eminently correct, and certainly well within its discretion, to exclude Rascher's testimony under Rule 702. *See McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 807 (9th Cir. 1988) (affirming exclusion of expert testimony that "rest[ed] on unsupported assumptions and ignore[d] distinctions crucial to arriving at a valid conclusion").

### 2. Plaintiffs' contrary arguments lack merit.

Unable to show any abuse of discretion, Plaintiffs try to evade that deferential standard by accusing the district court of legal error. *See* Blue.Br.40. That argument falls flat. The district court expressly (and undisputedly) "identified the correct legal rule." *Hinkson*, 585 F.3d at 1261-62. It walked through the Rule 702 standard, cited *Daubert* and its progeny, and made clear that its role was not to assess the correctness of Rascher's conclusions, but to ensure that his testimony "ha[d] 'a reliable basis in the knowledge and experience of the relevant discipline,'" i.e., economics. 1-ER-11-12 (brackets omitted) (quoting *Kumho Tire*, 526 U.S. at 149). And nothing about the court's application of that well-established standard was an abuse of discretion,

33

i.e., (1) illogical, (2) implausible, or (3) without record support. *Cf. Hinkson*, 585 F.3d at 1262.

a. Plaintiffs' lead argument—that "the district court erred by demanding 'definitive' answers from Rascher about the but-for world," Blue.Br.40 (emphasis and capitalization altered)—grossly mischaracterizes the court's analysis. The court acknowledged that Rule 702 "does not require a but-for world to perfectly reflect what the real world would have been." 1-ER-14. It found Rascher's testimony deficient because he failed to provide *any* "analysis of how … economically rational actors would have acted" in a world where the NFL continued to avail itself of the SBA's protection for pooling of rights to over-the-air broadcasts, in light of the various possibilities for teams to license games and the complexities of production, distribution, advertising, and revenue sharing. 1-ER-16. Rule 702 may not require exactitude, but "it requires more than just saying market participants would have figured it out." 1-ER-14.

While Plaintiffs quote the word "definitive" seven times in the span of two pages, Blue.Br.40-41, the court used it just once when discussing Rascher's testimony. And even there, the court did not demand "'definitive' prognostication" about various "aspects of the but-for world," Blue.Br.40; it merely observed (correctly) that Rascher "could not definitively answer how [the NFL teams] would have shared revenues" absent the challenged conduct, 1-ER-15. The court plainly

34

did not fault Rascher for failing to "specif[y]" every "feature[]" of his but-for world. Blue.Br.43. It found Rascher's testimony unreliable because he could not answer basic questions, and instead insisted that none of those features mattered. 1-ER-14.

Plaintiffs' invocation of the "relaxed legal standard for proving antitrust damages," Blue.Br.42, is equally unavailing. For one thing, the "relaxed proof requirements" that Plaintiffs reference apply only to "the *damages* issue in antitrust cases"—not the "distinct issue" of antitrust *injury*. *In re W. Liquid Asphalt Cases*, 487 F.2d 191, 196 n.5 (9th Cir. 1973). In any event, the district court expressly recognized that a "precise computation" of damages is not required, 1-ER-24 (quoting *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946)), and that a reasonable "average or estimate" may suffice, 1-ER-23.

Unlike the testimony held admissible in *Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034, 1043 (9th Cir. 1987) (cited at Blue.Br.41), Rascher did not offer a menu of "economic projections based on different underlying assumptions." He offered only a single, extreme, and highly implausible projection—that *all* class members "would have paid zero," 7-ER-1177—based on a series of unjustified assumptions underlying his conclusion that *all* NFL games would "find their way on to the[] major networks and … major cable stations" for free, 7-ER-1296. *See Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002) (affirming expert's exclusion where "reasoning between steps in a theory" was not "based on objective, verifiable

35

evidence and scientific methodology"). The court was well within its rights to exclude that testimony as "*ipse dixit* … untethered to an economic analysis of what would have likely occurred in the but-for world." 1-ER-16.

b. Plaintiffs' next argument—that the district court "invaded the province of the jury" by supposedly "evaluating whether [Rascher's testimony] is corroborated by other evidence in the record," Blue.Br.45-46—is weaker still. It rests entirely on a single footnote in the court's order that flagged two ways in which Rascher's claims about the but-for world "were contradicted by the record." 1-ER-15 n.6 (cited at Blue.Br.45, 46, 47). The district court did not "exclude Rascher based on" that lone footnote. *Contra* Blue.Br.46. As one would expect for a footnote, it simply flags contradictions in the record to buttress the conclusion that Rascher's testimony "was not the product of sound economic methodology." 1-ER-14; *see* 1-ER-15-17.

In any event, that footnote does not impermissibly "credit Defendants' fact witnesses over Plaintiffs' experts." *Contra* Blue.Br.46. While genuine disputes of fact must be resolved by the jury, "Rule 702 instructs a district court judge to determine whether an expert 'had sufficient factual grounds on which to draw conclusions.'" *Elosu*, 26 F.4th at 1025-26; *accord Guidroz-Brault v. Mo. Pac. R.R. Co.*, 254 F.3d 825, 830-31 (9th Cir. 2001); *McGlinchy*, 845 F.2d at 807; *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 924 (9th Cir. 2015).

The court was well within its rights to note that Rascher's assertion that "CBS and FOX could have shared their feeds of NFL games with their rivals NBC and ABC" was not just unsupported, but affirmatively contradicted, by the record, 1-ER-15 & n.6, as it was flatly at odds with the testimony of CBS's former chairman, Sean McManus, 11-ER-2069. That the NFL owns the rights to CBS's and FOX's feeds *in the real world*—thanks to the SBA's protections—is irrelevant, as both Rascher and McManus were discussing a hypothetical world in which CBS was assessing whether and on what terms to do business with the NFL. And Plaintiffs' submission that CBS's feeds "were shared with DirecTV" and "are now shared with Google," Blue.Br.46, does not remotely undermine McManus' testimony that CBS would not share feeds with *rival broadcasting networks*—i.e., "ABC, FOX, and NBC," 11-ER-2069.

Rascher's claim that each NFL division could sell out-of-market games to ABC and NBC in a world where the NFL was "still selling [in-market games to] CBS and FOX," 7-ER-1151-52, is likewise impossible to square with Cathy Yancy's detailed account of why such a system would be "absurd." 11-ER-2168-69. Yancy did not "fret[] that changing the schedule of Sunday afternoon games would complicate the networks' efforts to plan in advance." *Contra* Blue.Br.47. She instead explained that, in Rascher's most likely but-for world, CBS and FOX would have their pick of the most popular games each week and could designate the bulk

37

of the country as "in-market." 11-ER-2167-68. Yet Rascher irrationally assumed that "NBC and ABC" would "block out seven hours on their programming schedule every Sunday of the season" with no assurance of "what game, what window, and what markets" they would receive until after CBS and FOX determined their "in-market" coverage just a few days before gameday. 11-ER-2167-69. The district court was not required to blind itself to Yancy's explanation in assessing whether Rascher had an adequate foundation for his fantastical it-would-all-be-free theory. Indeed, "[w]here, as here, the relevant evidence is contrary to a critical fact upon which the expert relied, the district court fails to fulfill its responsibility as gatekeeper by allowing the expert to testify at trial." *EcoFactor Inc. v. Google LLC*, 2025 WL 1453149, at *9-10 (Fed. Cir. May 21, 2025) (en banc).

c. Plaintiffs fare no better with their contention that "the district court usurped the jury's role" by pointing out "significant differences" between Rascher's but-for world and the college football landscape. *See* Blue.Br.48-52 (emphasis and capitalization altered). While it is the jury's job to weigh evidence and assess witnesses' credibility, it is the court's job to make a threshold determination of whether an expert witness' proffered "yardstick" is "too speculative to support a verdict." *Eleven Line, Inc. v. N. Tex. State Soccer Ass'n*, 213 F.3d 198, 207 (5th Cir. 2000); *accord Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056 (8th Cir. 2000); *EcoFactor Inc.*, 2025 WL 1453149, at *3-10. And courts are "vested

38

with 'broad latitude' to 'decide how to test an expert's reliability' and 'whether or not an expert's relevant testimony is reliable.'" *Murray v. S. Route Mar. SA*, 870 F.3d 915, 923 (9th Cir. 2017) (alterations omitted) (quoting *Kumho Tire*, 526 U.S. at 152-53); *see also* Fed. R. Evid. 702 advisory committee's note 1 to 2023 amendment (explaining that decisions leaving "questions of the sufficiency of an expert's basis, and the application of the expert's methodology" to the jury "are an incorrect application of Rules 702 and 104(a)").

The district court thus had ample authority to consider not only "Rascher's failure to produce a coherent model," but also the "significant differences" between college football and his multitude of but-for worlds, in assessing whether his testimony was based on a reliable methodology. 1-ER-16. Again, "nothing in … *Daubert* … requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146; *see also City of Pomona*, 750 F.3d at 1049 ("*Joiner* requires an expert to justify a foundational assumption or refute contrary record evidence."). The district court's "analysis d[id] not usurp the province of the jury"; rather, it properly "ensure[d] that there [we]re sufficient facts or data for" the proffered opinions. *EcoFactor Inc.*, 2025 WL 1453149, at *7.

Plaintiffs' substantive criticisms of the court's analysis also fall well short of showing any abuse of discretion. Plaintiffs do not (and could not credibly) dispute

the court's observation that "not all college football games are available on over-the-air networks and on the major cable stations." 1-ER-16. And while they emphasize that it is relatively "rar[e]" for "games played between *top-ranked* college teams" to "require[] a premium subscription," Blue.Br.50, the court certainly did not abuse its discretion by pointing to such games as one of its many reasons for rejecting Rascher's model, 1-ER-16. Nor can Plaintiffs dispute that college football has nothing remotely analogous to Defendants' SBA-protected pooling of rights and "distribution of in-market games on CBS and FOX," which was part of the "most likely version of [Rascher's] but-for world." Blue.Br.51. Again, the court was well within its rights to cite this crucial difference as one of its many reasons for excluding Rascher's model. *See* 1-ER-16. And the jury ratified that choice when it ultimately ignored Rascher's damages model altogether in calculating its damages award.

## B. The District Court Acted Well Within Its Discretion in Excluding Zona's Testimony.

While Plaintiffs primarily relied on Rascher's but-for worlds, which purported to eliminate both pooling and exclusivity, they also offered Zona to testify about a but-for world that purported to eliminate *only* exclusivity.[3] That is not a valid but-

---

[3] Zona's expert report discussed two versions of this no-exclusivity model—one using viewership and sales data from DirecTV and another using "totally different" data from a survey conducted by another Plaintiffs' expert in 2020-2021. *See* 9-ER-1666-68; 17-ER-3422, 17-ER-3434. At trial, however, Plaintiffs elicited testimony about only the first model, *see* 9-ER-1573-76; 9-ER-1729-30, and that is the only

for world because it does not eliminate the allegedly anticompetitive conduct, which is pooling *and* exclusivity, which Plaintiffs themselves have insisted must be viewed "holistically." *Sunday Ticket*, 933 F.3d at 1152-53. In any event, Zona's testimony was no more reliable than Rascher's.

### 1. The district court correctly concluded that Zona's efforts to model a but-for world without exclusivity were unreliable.

Zona's basic theory was that having two distributors would reduce the price consumers paid for Sunday Ticket. *See* 9-ER-1581. He thus attempted to model a but-for world in which Sunday Ticket was offered by both DirecTV and a second distributor, which he described as a "direct-to-consumer" competitor available (for a price) to "[e]very household." 9-ER-1626-27.

a. The district court correctly excluded Zona's modeling because it was based on a "flawed metholog[y]." 1-ER-12. It is well settled that experts "must presume the existence of rational economic behavior" in a but-for world. *Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506, 1511 (9th Cir. 1985); *accord Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256, 1262 (9th Cir. 1981). But Zona's modeling predicted that DirecTV and the hypothetical competitor would charge wildly different prices for the same product: $52 per season on DirecTV and $178 per season on the (undefined) competitor. 9-ER-1746. More puzzling still, Zona

---

version of the so-called "Single Competitor" model at issue in this appeal. *See* Blue.Br.27-28.

predicted that nearly *one third* of DirecTV subscribers who received Sunday Ticket would opt for the far more expensive non-DirecTV alternative while keeping their DirectTV subscription.  9-ER-1748-49; *see* 3-SER-340-42, 3-SER-377-79.  That alone is an ample basis for concluding that Zona's models were irrational.

Making matters worse, Zona offered no evidence that a potential competitor would have been able (let alone likely) to offer a standalone version of Sunday Ticket to all consumers nationwide during the entire class period.  He acknowledged that he could not "identify any technological way to transmit the NFL Sunday Ticket product for out-of-market games to a consumer other than through Internet streaming that would fit the" direct-to-consumer option his model required.  9-ER-1627; *accord* 9-ER-1630.  And Zona admitted that he did not consider "whether an Internet streaming option would have even been feasible technology" when the class period began back in 2011.  9-ER-1627-28.  His model simply "assumed" that "[e]very household" would have had access to a direct-to-consumer alternative to DirecTV during the entire class period, without making any effort to assess whether that assumption was realistic.  9-ER-1627-28, 9-ER-1630.

The district court acted well within its discretion in finding that this unsupported assumption rendered Zona's testimony unreliable.  "Rule 702's 'sufficient facts or data' element … instructs a district court judge to determine whether an expert 'had sufficient factual grounds on which to draw conclusions.'"

*Elosu*, 26 F.4th at 1025-26; *see Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993). Accordingly, "Plaintiffs needed to offer evidence that *another* distributor—outside DirecTV—existed that could have provided live streaming of Sunday Ticket" during the entire class period. 1-ER-19; *accord* 9-ER-1630. Instead, Zona conceded that he did *not* know of any direct-to-consumer service that could have streamed NFL games during much of the class period, 9-ER-1627-28, and the court found "no evidence" to support this foundational assumption of Zona's modeling. 1-ER-19; *see also* 10-ER-1862-63 (uncontroverted testimony that live-streaming technology in 2015 was not capable of delivering live NFL games to a large audience); 8-ER-1482-83 (uncontroverted testimony that live-streaming was still in a "nascent" phase as of 2018).

The district court also acted well within its discretion in finding Zona's methodology unreliable for the independent reason that he failed to coherently "define what 'direct-to-consumer meant' in his models." 1-ER-18-19. On the one hand, Zona asserted that his hypothetical competitor would allow consumers to get Sunday Ticket without paying any underlying subscription fee to a "multichannel video programming distributor," such as DirecTV, DISH Network, or cable. 9-ER-1626-27, 9-ER-1763. On the other hand, Zona asserted that the direct-to-consumer option "could be" the same as "cable" or "ESPN"—even though these services

43

require an underlying subscription. 9-ER-1622-24.[4] When pressed, he equivocated, insisting that he did not "rely on anything specific" for the "additional competitor" in his model. 9-ER-1627. The court thus had ample reason to find that Zona's failure to define "what a 'direct-to-consumer' product entailed" made it "impossible to determine" whether his no-exclusivity model was the product of reliable economic methodology. 1-ER-19.

b. As they did in challenging the exclusion of Rascher's testimony, Plaintiffs try to evade the abuse-of-discretion standard by accusing the district court of committing "legal error." Blue.Br.53-54. This time, they claim that the court demanded not definitive answers, but "'conclusive' evidence" "that a direct-to-consumer competitor to DirecTV could have arisen" as early as 2011. Blue.Br.53-54. Again, Plaintiffs mischaracterize the court's decision. Zona did not just fail to provide *conclusive* evidence; he provided *no evidence* to support a foundational assumption of his model. *See McGlinchy*, 845 F.2d at 806-08 (affirming exclusion of expert opinions that rested on "unsupported assumptions" and "unsound

---

[4] Zona's assertion that some consumers "already have" cable and ESPN, 9-ER-1632-23, 9-ER-1626, does not fix the problem; after all, some consumers already have DirecTV. Indeed, treating DirecTV as a "direct-to-consumer" option for those who "already have it" eliminates any possible explanation of why Zona's model shows nearly one-third of DirecTV subscribers switching from DirecTV's $52-per-season version of Sunday Ticket to the hypothetical $178-per-season option. Moreover, the fact that *some* consumers have cable or ESPN does not explain Zona's assumption that *all* consumers could access his hypothetical direct-to-consumer option.

extrapolation"). Regardless, the court expressly found Zona's testimony unreliable "*regardless of* whether a competitive live streaming service" "could have provided live streaming of Sunday Ticket since 2011." 1-ER-19 (emphasis added). Because the emergence of a "direct-to-consumer" option was central to his modeling, Zona's inconsistent statements about "what a 'direct-to-consumer' product entailed" rendered his models unreliable. 1-ER-19.

Plaintiffs cursorily assert that the court "lacked authority to enter JMOL on this basis," supposedly because "Defendants failed to argue it." Blue.Br.55. Not so. Defendants expressly argued that Zona's model was inadmissible because he "failed to substantiate his critical presumption that all class members could have obtained Sunday Ticket from a [direct-to-consumer] service." 2-ER-262. The district court concluded that this criticism "[wa]s correct," including because Zona failed to "decid[e] what a 'direct-to-consumer' product entailed." 1-ER-19. That is a far cry from the type of *sua sponte* JMOL ruling that courts have found problematic. *Cf. Murphy v. City of Long Beach*, 914 F.2d 183, 185-86 (9th Cir. 1990).

The court's conclusion that Zona failed to adequately define "direct-to-consumer" was also substantively sound. *Contra* Blue.Br.56. Plaintiffs emphasize Zona's testimony that "a 'Netflix-like service' could fit that definition," Blue.Br.56 (quoting 9-ER-1676), but ignore that he said the same about cable TV and ESPN, 9-ER-1622-24. Zona thus refused to define direct-to-consumer beyond "[s]omeplace

45

where you didn't have to pay for the [underlying] platform," yet simultaneously insisted that it *included* a multichannel video programming distributor (like DirecTV or DISH Network) for consumers who "already have [it]." 9-ER-1622-23, 9-ER-1626, 9-ER-1631-32. The court did not abuse its discretion in holding that Zona's refusal to "be[] specific" about the nature of the "direct-to-consumer" competitor, 9-ER-1624, precluded it from finding the requisite factual basis for Zona's assertion that such a competitor would have emerged and been able to offer Sunday Ticket to every consumer nationwide throughout the class period. 1-ER-19.

Plaintiffs also identify no error in the district court's holding that, assuming "direct-to-consumer" referred only to a standalone Internet-streaming competitor, Zona supplied no basis for assuming such a competitor could have existed during the whole class period. Again, courts must ensure that "an expert 'ha[s] sufficient factual grounds on which to draw conclusions.'" *Elosu*, 26 F.4th at 1025-26. Zona openly admitted that he failed to consider "whether an Internet streaming option would have even been feasible technology back in 2011." 9-ER-1627; *accord* 9-ER-1630. Unable to dispute that reality, Plaintiffs insist that *other* "evidence in the record proves that a competitor to DirecTV could have live-streamed NFL telecasts directly to consumers during the class period," citing snippets of testimony suggesting that live-streaming of sports was emerging early in the class period. Blue.Br.54-55. As the court explained, however, neither Zona nor any of the

evidence Plaintiffs cite assessed whether "*another* distributor—outside DirecTV" could have emerged, 1-ER-19, much less whether it could have made a standalone version of Sunday Ticket available to *all U.S. households*, as Zona's model assumed, 9-ER-1627-28, 9-ER-1630. The court did not abuse its discretion in finding an insufficient foundation for that assumption.

>    **2.  The district court correctly rejected Zona's "NFL tax" calculation, which Plaintiffs abandoned in their post-trial briefing.**

In attempting to test the reliability of his no-exclusivity model, Zona compared the price that DirecTV actually charged for Sunday Ticket with the price that his model suggested DirecTV should have charged. 9-ER-1581-82; *see* 17-ER-3457-59. Zona's model predicted prices that were significantly lower than the observed prices for Sunday Ticket—34 percent lower assuming no marginal cost to supply Sunday Ticket (an assumption that Zona believed was reasonable), and "about 25 percent lower" assuming a marginal cost of $13.79 per customer. 9-ER-1571; *see* 9-ER-1637, 17-ER-3456-58. This mismatch between the real-world price and Zona's projected price strongly suggested that his model was deficient. 9-ER-1744-45. In an attempt to explain away this problem, Zona asserted that DirecTV was "influenced by the NFL" to charge a higher price than the profit-maximizing (or market-clearing) price—a difference that Zona dubbed "the 'NFL tax.'" 9-ER-1582-83.

Although none of Zona's (or Rascher's) expert reports treated this so-called "NFL tax" as a freestanding measure of damages (as opposed to a proffered response to a flaw with Zona's model), Plaintiffs elicited testimony from Zona at trial that "the optimal price" for DirecTV to charge would have been about "24.6 percent less" than what it actually charged. 9-ER-1581-82; *see* 9-ER-1571. He went on to claim—over Defendants' objection—that "[r]esidential class members would have paid 1.39 billion less," and commercial subscribers would have paid "[a]bout $330 million, or .33 billion less," "had DirecTV not charged more than their optimum price during the class period." 9-ER-1589.

As Defendants explained in their Rule 50(b) motion, Zona's purported "NFL tax" damages calculations were both untimely—offered for the first time on the seventh day of trial—and legally invalid. 2-ER-262. It is well settled that "a model purporting to serve as evidence of damages … must measure only those damages attributable to [the plaintiff's] theory" of liability. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). The "NFL tax" model does not fit the bill, as it concededly is not tethered to *either* the NFL teams' pooling of telecast rights *or* the exclusivity of the NFL-DirecTV agreement. *See* Blue.Br.52. In other words, assuming *arguendo* that Zona's testimony provided competent evidence of an "NFL tax," that so-called tax was not evidence of "antitrust injury" because it did not "flow from that which" Plaintiffs alleged "ma[de] [D]efendants' acts unlawful." *Am. Ad Mgmt., Inc. v. Gen.*

48

*Tel. Co. of Cal.*, 190 F.3d 1051, 1056 (9th Cir. 1999) (brackets omitted). So, even if Plaintiffs had timely offered Zona's "NFL tax" calculation as a measure of damages, it would have failed under *Comcast*.

Plaintiffs accuse the district court of "ignor[ing]" the "NFL tax" calculation. Blue.Br.56-57. But the court expressly acknowledged and rejected Zona's eleventh-hour "calculation and presentation of an 'NFL tax,'" because it was dependent on his unreliable model of "the but-for world without exclusivity." 1-ER-18-19; *accord* 1-SER-198 (Plaintiffs' brief referencing "Zona's discovery of an 'NFL Tax' *through his modeling*" (emphasis added)). In any event, the court would have been justified if it had ignored the "NFL tax" calculation because Plaintiffs expressly abandoned it in their post-trial briefing.[5] Plaintiffs' response to Defendants' motion for judgment mentioned that so-called "tax" just once, 1-SER-198, and offered no response to Defendants' argument that it "cannot be the basis for damages" because it "is not predicated on removing any aspect of the challenged conduct," 2-ER-262; *accord* 2-ER-103 (district court explaining that the but-for world must "address the [allegedly] anti-competitive behavior"). And Plaintiffs' response to Defendants' renewed motion affirmatively disclaimed Zona entirely, telling the court that "his analysis is

---

[5] By simultaneously complaining that a district court improperly reweighs the evidence it considers on a Rule 50(b) motion and improperly "ignores" the evidence it does not expressly discuss, Plaintiffs would leave no post-trial role for the court. That plainly is not the law. *See, e.g.*, *Cone*, 330 U.S. at 215-16.

no longer at issue." 1-SER-232 n.15. The court had no obligation to address an argument that Plaintiffs did not press. *See, e.g.*, *Cold Mountain v. Garber*, 375 F.3d 884, 891 (9th Cir. 2004).[6]

### 3. The district court did not err in excluding Rascher's and Zona's testimony in its entirety.

Finally, Plaintiffs accuse the district court of abusing its discretion by excluding all of Rascher's and Zona's testimony instead of excluding only their unreliable models and salvaging some "background information." Blue.Br.57. This argument is both forfeited and meritless. The parties briefed the exclusion issues as binary questions. Defendants repeatedly asked the court to exclude all of Rascher's and Zona's testimony, *see, e.g.*, 2-ER-66, 2-ER-155, 2-ER-177, 1-SER-285, and Plaintiffs never suggested partial exclusion was an option, *see* 1-SER-176-206; 1-SER-243-78. The court was amply justified in confining itself to the arguments raised by the parties—particularly since the general rule is that an expert who fails the *Daubert* test is barred from offering *any* testimony at trial. *See, e.g.*, *Kumho Tire*, 526 U.S. at 145, 153; *accord Weisgram*, 528 U.S. at 456 (expert's testimony deemed inadmissible, in its entirety, after trial); *Concord Boat*, 207 F.3d at 1057 (same).

---

[6] Plaintiffs' request for reversal of "the *remittitur* amount—of 'nominal damages'—for the residential class," Blue.Br.72, turns entirely on their argument that Zona's testimony was improperly excluded. It therefore fails for the same reasons.

In all events, the court thoroughly explained why their testimony was unreliable—in stark contrast to the cases on which Plaintiffs rely. *Compare* 1-ER-13-19, *with Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 814 (9th Cir. 2014) ("In two conclusory sentences and without analysis or explanation, the district court held that Spiegel was not a qualified expert[.]"). And the court had no obligation to provide an additional, *sua sponte* analysis of the handful of passages that Plaintiffs have flagged for the first time in their appellate brief. In sum, there is no basis for disturbing the decision to exclude Rascher's and Zona's testimony *in toto*. And even if the so-called "background information" were admitted, Blue.Br.57, it would provide no basis for class certification or classwide damages. *See infra* Part II.

### C. The District Court Correctly Concluded That the Exclusion of Rascher's and Zona's Testimony Was Fatal to Plaintiffs' Case.

The district court also correctly held that Plaintiffs' claims could not succeed without Rascher's and Zona's testimony. Under Federal Rule of Civil Procedure 50, a defendant is entitled to judgment as a matter of law when, after "excision of testimony erroneously admitted, there remains insufficient evidence" to support a finding of liability. *Weisgram*, 528 U.S. at 457; *see United States v. Bacon*, 979 F.3d 766, 769 (9th Cir. 2020) (en banc). That is precisely what happened here. Plaintiffs depended entirely on Rascher and Zona to prove essential elements of their case, including antitrust injury and damages. *See* 1-ER-12. So, as the district court

observed during trial, if "you grant the *Daubert*[]" motions, "there's nothing left." 11-ER-2024. Accordingly, "judgment as a matter of law for the Defendants [wa]s appropriate." 1-ER-12.

1. To establish liability under the Sherman Act, Plaintiffs needed to show, among other things: "(1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition" and (4) antitrust injury. *Sunday Ticket*, 933 F.3d at 1150.[7] The fourth element requires proof that Plaintiffs "were harmed by the defendants' contract, combination, or conspiracy, and the harm they suffered was caused by the anti-competitive aspect of the defendants' conduct." *Id.*

As the district court explained, with Rascher and Zona excluded, "Plaintiffs failed to provide evidence from which a reasonable jury could make a finding of [antitrust] injury." 1-ER-20. "The injury for which Plaintiffs seek compensation is the amount that they paid for Sunday Ticket less the price that would have been charged in the absence of" pooling and exclusivity. 1-SER-100; *accord* 3-ER-367 (complaint); 4-ER-536 (opening statement at trial). Rascher's and Zona's testimony

---

[7] Plaintiffs do not differentiate their claims under §1 and §2 of the Sherman Act, and both claims require all these elements. *See Nova Designs, Inc. v. Scuba Retailers Ass'n,* 202 F.3d 1088, 1092 (9th Cir. 2000); *FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020).

was designed to show just that, i.e., that in a world without the allegedly anticompetitive conduct, class members would have been able to watch out-of-market NFL games at a lower cost. *See, e.g.*, 1-SER-194-94, 1-SER-199 (acknowledging Plaintiffs' reliance on Rascher and Zona to prove antitrust injury); 1-SER-100-01 (same). Without valid expert testimony about *any* but-for world, however, the record does not contain sufficient evidence for a reasonable jury to make that finding.

To obtain monetary relief, Plaintiffs also had to "show actual, quantifiable damages 'by reason of' the [alleged] antitrust violation." *In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 60 (1st Cir. 2016) (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 543 (1983)). Courts readily award judgment as a matter of law to defendants when an antitrust plaintiff fails to provide a viable method of calculating damages. *See, e.g.*, *Ezzo's Invs., Inc. v. Royal Beauty Supply, Inc.*, 243 F.3d 980, 989, 991 (6th Cir. 2001) (affirming JMOL for defendants because expert's "model for calculating damages did not adequately allow the jury to assess damages" stemming from "alleged price-fixing conspiracy"); *Concord Boat*, 207 F.3d at 1057 (awarding judgment to defendants because "the basis of the [plaintiffs'] damage case" was an "expert opinion [that] should not have been admitted"). Just so here.

Plaintiffs offered three methods of calculating damages—each of which depended entirely on Rascher's and Zona's excluded testimony. *See* 15-ER-3106. Plaintiffs requested $7.01 billion based on Rascher's "college football" model, *see* 15-ER-3085, 7-ER-1177; $3.48 billion based on Zona's "Single Competitor" model, *see* 15-ER-3089, 9-ER-1589-91, 7-ER-1181; and $1.72 billion based on Zona's so-called "NFL tax" calculation. 9-ER-1589. With Rascher and Zona excluded, however, the jury had no basis to award any of these amounts or any other amount. The district court was therefore eminently correct to hold that Plaintiffs "failed to provide evidence from which a reasonable jury could" award "actual damages that would not be erroneous as a matter of law, be totally unfounded and/or be purely speculative." 1-ER-20.

2. Plaintiffs' counterarguments lack merit. First, Plaintiffs assert that the record contains sufficient evidence of antitrust injury even without Rascher's and Zona's testimony. *See* Blue.Br.58-61. As support, they cite testimony containing "rudimentary principle[s]," such as "more competition leads to lower prices." Blue.Br.60. Such general principles come nowhere close to establishing that Plaintiffs suffered "harm … caused by the [allegedly] anti-competitive aspect of the defendants' conduct" (i.e., pooling and exclusivity). *Cf. Sunday Ticket*, 933 F.3d at 1150. As this Court previously observed, Plaintiffs had to show that "prices for out-of-market games [were] higher than they would be in the absence of the" challenged

conduct. *Id.* at 1157. While this Court held that Plaintiffs adequately *alleged* such an injury, *see id.*, Rascher's and Zona's efforts to substantiate those allegations fell flat. And Plaintiffs cannot make up for their experts' failure by invoking "common-sense economic principle[s]," Blue.Br.59—particularly given the complexities of a but-for world in which the NFL would remain free to pool all 32 teams' telecasts for over-the-air broadcasts and to retain its existing arrangements with CBS and FOX.

Indeed, Plaintiffs could well have been worse off in the but-for world, without any viable means to view some—let alone all—out-of-market games. Notably, the former chairman of CBS Sports testified that CBS would not "have been interested in the Sunday afternoon in-market over-the-air package" if individual NFL teams had been "negotiating their own out-of-market rights." 11-ER-2068-69. As he explained, allowing teams to "negotiate[] out of market with other networks" would have "drastically diminished" the value of CBS's (and FOX's) deal with the NFL. 11-ER-2070. Thus, in the but-for world, Defendants might well have preserved their longstanding agreements to broadcast local and regional games on CBS and FOX by agreeing not to offer anything comparable to Sunday Ticket, or any access to out-of-market games at all. Viewing "the entire evidentiary record," Blue.Br.61, thus undermines Plaintiffs' assertion that they can establish antitrust injury through basic economic principles.

55

Next, Plaintiffs point to a handful of statements by NFL and DirecTV employees suggesting that DirecTV needed to market Sunday Ticket as a "premium" product. Blue.Br.58-59. These statements do not show antitrust injury because they do not suggest any injury "caused by" the conduct that Plaintiffs allege was anticompetitive. *See Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995) ("[A] plaintiff must prove that his loss flows from an anticompetitive aspect or effect of the defendant's behavior[.]"); *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013) (similar). To the contrary, like Zona's "NFL tax" calculation, they suggest that Plaintiffs paid a premium price for reasons unrelated to pooling and exclusivity.

Plaintiffs' reliance on the NFL's "New Frontier" documents suffers from similar flaws. *See* Blue.Br.59. As the district court explained, those documents discuss a hypothetical scenario that "involved the NFL Teams continuing to pool their rights with the NFL." 1-ER-17. They did not speak to whether Plaintiffs were injured by the supposedly anticompetitive combination of pooling and exclusivity. As the district court thus aptly put it, "New Frontier didn't address the [allegedly] anti-competitive behavior that was being complained about in this case." 2-ER-103 (emphasis omitted); *accord* 2-ER-59-60, 2-ER-102.[8]

---

[8] Plaintiffs also accuse the district court of "ignor[ing]" purported "*non-monetary* antitrust injuries," Blue.Br.60-61. But they failed to raise this argument below and,

Plaintiffs also seize on the district court's remark that there was "evidence in the record[] … to support a reasonable jury's finding of an unreasonable restraint of trade at each step of the rule of reason." Blue.Br.60 (quoting 1-ER-20). But—as the court itself recognized—that does not mean that there was enough evidence for a reasonable jury to find antitrust injury. "[T]he existence of an antitrust violation" is distinct from "antitrust injury"; while both are necessary for an antitrust plaintiff to prevail, a court may find the former without finding the latter. *Nexium*, 842 F.3d at 60. That is just what the district court did here. Plaintiffs' contrary claim is hard to take seriously, as it tries to elevate an off-hand comment over the grant of JMOL. The violation/injury dichotomy makes clear that there is no inconsistency between the district court's statement about the "rule of reason" and its conclusion (in the very next paragraph) that "Plaintiffs failed to provide evidence from which a reasonable jury could make a finding of injury." 1-ER-20. But even if there were some tension, it would make little sense to resolve it in favor of a passing remark, while ignoring the court's thorough analysis and entry of final judgment over Plaintiffs' objection. *See* 1-ER-7 (rejecting Plaintiffs' arguments at 2-ER-29-30).

---

even now, cite no record evidence of these purported injuries. *See id.* Moreover, they offer no basis for concluding that non-monetary injury is capable of common, classwide proof, so this argument would just lead to class decertification. *See infra* Part II.

3. Plaintiffs do not—and cannot—meaningfully dispute that, without Rascher's and Zona's testimony, any attempt to quantify damages would be "purely speculative," 1-ER-20. Nor do they have any answer for cases like *Ezzo*, which holds that an antitrust plaintiff's failure to produce sufficient evidence to enable a reasonable jury to determine "what amount of damage might have been suffered" is "a sufficient basis for upholding [a] district court's entry of judgment as a matter of law" for the defendant. 243 F.3d at 989; *accord Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665-66 (9th Cir. 2022) (en banc) (describing "measurable damages" as an "element[] of a claim" under §1 of the Sherman Act). Plaintiffs have no answer because there is none. It is well established that it is Plaintiffs' burden to prove damages, and "[a] jury may not render a verdict based on speculation or guesswork." *Bigelow*, 327 U.S. at 264.

Plaintiffs ask for a do-over, seeking "the opportunity to submit supplemental expert reports from Rascher, Zona, and others." Blue.Br.63. But the district court acted well within its discretion in declining to give Plaintiffs a second bite at the apple. *Contra* Blue.Br.62. From when they filed their complaint in 2015 to when this case went to trial in 2024, Plaintiffs knew they would need to produce reliable evidence of antitrust injury. Despite nine years of notice, they swung for the fences and missed. Plaintiffs now claim that if they had "known before trial that their experts' damages opinions would be excluded, they would have presented their case

58

differently." Blue.Br.62. While that sentiment is likely shared by every party whose experts fall short, few parties are in a worse position to complain. The district court warned Plaintiffs, mid-trial, that it had serious concerns with Rascher and Zona and was actively considering excluding them. 11-ER-2022-24; *see* 8-ER-1325, 11-ER-2027. Yet even though Plaintiffs had another expert (Leonard F. DeLuca) waiting in the wings—who they now claim "would have testified in detail about how NFL telecasts likely would have been distributed in the but-for world," Blue.Br.62—they declined to call him. 12-ER-2251. After nearly a decade of litigation, Plaintiffs must live with the results of their strategic choices.

Indeed, courts routinely decline to give plaintiffs a new trial on damages under circumstances like this. *See, e.g.*, *Versata Software, Inc. v. Ford Motor Co.*, 2023 WL 3175427, at *8-11 (E.D. Mich. May 1, 2023) (reversing $104.5 million jury award due to "[t]he failure of [the plaintiff's] damages model" and awarding $3 in nominal damages); *MSW Corpus Christi Landfill, Ltd. v. Gulley-Hurst, LLC*, 664 S.W.3d 102, 106-07, 109 (Tex. 2023) (per curiam) (reversing $372 million jury award and rendering take-nothing judgment for plaintiff). For good reason: As the Supreme Court has explained, "[i]t is implausible to suggest, post-*Daubert*, that parties will initially present less than their best expert evidence in the expectation of a second chance should their first try fail." *Weisgram*, 528 U.S. at 455-56. And the "fairness" of entering judgment as a matter of law after excluding expert testimony

59

"is only amplified in a case like this, where" Plaintiffs were "on notice every step of the way" that Defendants were challenging Rascher and Zona—and that the district court had serious doubts about whether their testimony was admissible—yet "made no attempt to add or substitute other evidence." *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 299 (4th Cir. 2021).

4. Near the very end of their overlength brief, Plaintiffs argue that even if Rascher's and Zona's testimony was properly excluded (and it was), "[t]he district court erred by summarily dismissing [their] claims for equitable relief without … articulat[ing] any basis for" doing so. Blue.Br.73-74. The court did no such thing. As explained, the court correctly held that Plaintiffs failed to prove antitrust injury, which is just as fatal to their equitable and declaratory claims as their legal ones. *See Catlin v. Wash. Energy Co.*, 791 F.2d 1343, 1349-50 (9th Cir. 1986) (antitrust plaintiffs cannot obtain injunctive relief under §16 of the Clayton Act without showing "antitrust injury"); *Van Dyk Rsch. Corp. v. Xerox Corp.*, 631 F.2d 251, 255 n.2, 256 (3d Cir. 1980) ("the failure to prove the fact of injury is conclusive as to both" damages and injunctive relief); *Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666, 668 n.2, 670 n.14 (D.C. Cir. 1977) (similar).

Plaintiffs resist this conclusion, arguing that their equitable claims "do[] not require proof of *past* injury" but "only a showing of *threatened, future* injury." Blue.Br.74; *see also* United.States.Amicus.Br.17-25. At the outset, that argument

faces the insurmountable obstacle that Plaintiffs' claims for equitable relief are moot. This litigation was brought on behalf of former DirecTV subscribers to challenge an NFL-DirecTV agreement that expired more than a year before trial. *See, e.g.*, 7-ER-1120; 8-ER-1368-69; 8-ER-1399. The NFL no longer offers Sunday Ticket to residential customers through DirecTV, *see, e.g.*, 8-ER-1423, 10-ER-1866, and there is no basis for granting DirecTV subscribers a forward-looking injunction against a now-defunct telecasting arrangement.

That aside, without Rascher's and Zona's testimony, Plaintiffs can no more show threatened future injury than past injury: Absent competent evidence about a but-for world, they cannot show any harm at all. Indeed, a claim that conduct that has not yet caused any antitrust injury is likely to do so in the future makes especially little sense "where," as here, "the programs in question have been in existence long enough for their potential effects on [the plaintiffs] to manifest themselves." *Merit Motors*, 569 F.2d at 670 n.14; *accord Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp.*, 2007 WL 4526618, at *13 (E.D.N.Y. Dec. 20, 2007). Thus, even setting aside the fatal mootness problem, Plaintiffs' failure to prove that they suffered any antitrust injury over the decade-long class period "militates strongly against injunctive relief." *Cash & Henderson Drugs, Inc. v. Johnson & Johnson*, 799 F.3d 202, 215 (2d Cir. 2015).

Plaintiffs' procedural complaints are equally unavailing. *See* Blue.Br.74. They had every opportunity to establish antitrust injury, and they failed to do so. Any additional evidence they might have submitted regarding the propriety of equitable relief would have been immaterial given their failure to provide sufficient evidence to prove liability. *See Catlin*, 791 F.2d at 1350. And their contention that "[t]he court … precluded [them] from introducing any evidence or argument regarding injunctive relief at the trial," Blue.Br.74, rings hollow since they expressly agreed that "the injunctive relief phase" should occur after trial—but only "if necessary," 2-ER-289. It is the failure of proof on liability, not any deprivation of Plaintiffs' procedural rights, that made consideration of injunctive relief unnecessary. And "[h]aving failed to submit evidence sufficient to demonstrate that they have sustained an actual antitrust injury," "Plaintiffs cannot now seek a second bite at the proverbial apple under the guise of equitable relief." *Drug Mart*, 2007 WL 4526618, at *14.

### D. There Are Alternative Grounds for Affirming the District Court's Grant of Judgment as a Matter of Law.

Defendants also respectfully preserve the legal arguments they raised in the prior appeal. As Justice Kavanaugh has observed, these are "substantial arguments." *Ninth Inning*, 141 S. Ct. at 57 (statement respecting denial of certiorari). "The NFL and its member teams operate as a joint venture," and Plaintiffs' effort to challenge the core activities of that joint venture is "in substantial tension with antitrust

principles and precedents." *Id.* In addition, Plaintiffs "did not purchase a product from the NFL or any team, and may therefore be barred from bringing suit against the NFL and its teams under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977)." *Id.* Each argument presents an alternative legal basis for affirming the district court's grant of JMOL, and Defendants accordingly reserve the right to "raise th[em] again in a new petition for certiorari" (or petition for rehearing en banc) if necessary. *Id.*

## II. If This Court Does Not Affirm The Award Of Judgment As A Matter Of Law, It Should Reverse The District Court's Class Certification Order.

If, despite all the arguments above, this Court does not affirm the district court's JMOL order, it would need to reach the issue presented by Defendants' conditional cross-appeal—namely, whether Plaintiffs satisfied the requirements for litigating this case as a class action. *See* Fed. R. Civ. P. 23. They did not. The district court certified two classes of Sunday Ticket purchasers, one for residential subscribers and one for commercial subscribers, under both Rule 23(b)(2) and Rule 23(b)(3). 3-ER-332. Plaintiffs' arguments in support of certification rested entirely on Rascher and Zona, whose testimony was properly excluded for all the reasons just discussed. And even if other evidence could still salvage a liability finding, *but see supra* pp.51-62, one thing is clear beyond cavil: Without Rascher and Zona, this case cannot proceed as a class action.

"[P]laintiffs wishing to proceed through a class action must actually *prove*— not simply plead—that their proposed class satisfies each requirement of Rule 23."

63

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275-76 (2014); *see also Comcast*, 569 U.S. at 33 ("[A] party seeking *to maintain* a class action 'must affirmatively demonstrate his compliance' with Rule 23." (emphasis added)). Rule 23(b)(3) demands a showing that "questions of law or fact common to class members predominate over any questions affecting only individual members." *Olean*, 31 F.4th at 663-64 (quoting Fed. R. Civ. P. 23(b)(3)). To establish predominance in an antitrust case, the plaintiff generally must offer reliable classwide evidence of antitrust injury and damages. *Id.* at 666; *see Comcast*, 569 U.S. at 30, 34; *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252-53 (D.C. Cir. 2013); *In re High-Tech Emp. Antitrust Litig.*, 289 F.R.D. 555, 566 (N.D. Cal. 2013) (collecting cases).

Here, as is "frequently" the case, *Olean*, 31 F.4th at 665, Plaintiffs' efforts to establish predominance were wholly dependent on expert testimony. *See* 3-ER-322-26. That raises the bar as to that testimony even higher, as "the 'rigorous analysis' standard" that applies to class certification is even more demanding than the *Daubert* standard. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011); *see also, e.g.*, *Olean*, 31 F.4th at 666 ("The determination whether expert evidence is capable of resolving a class-wide question in one stroke *may* include 'weighing conflicting expert testimony' and 'resolving expert disputes.'" (brackets omitted)). Even when (unlike here) expert evidence is "admissible under *Daubert*," it "[i]s

inadequate to satisfy the prerequisites of Rule 23" if it "contain[s] unsupported assumptions," is "not consistent with the plaintiffs' theory of liability," or "demonstrate[s] nonsensical results." *Olean*, 31 F.4th at 666 n.9.

In granting class certification, before watching Plaintiffs' experts unravel during live testimony, the district court tentatively found their models "capable of establishing antitrust impact and damages on a class wide basis." 3-SER-324. At the time, the court thought that "a reasonable jury" would be able to conclude, based on Zona's anticipated testimony, that all putative class members would have received "significant price discounts" but for the challenged conduct. 3-ER-324-25. The court likewise thought that a reasonable jury would be able to rely on Rascher's "college football" model to find that all class members had been injured and suffered damages in "the amount each class member paid for Sunday Ticket." 3-ER-325. But the court made clear that it deemed predominance established at that juncture only because it "d[id] not accept Defendants' challenges to the models," 3-ER-324-25, which were the key to trying to prove that all class members had suffered a common injury and measure of damages. Thus, when, after hearing the testimony, the court credited Defendants' challenges and excluded Rascher and Zona, Plaintiffs were left with no way to satisfy the predominance requirement for a Rule 23(b)(3) class. As the D.C. Circuit has aptly put it: "No damages model, no predominance, no class certification." *Rail Freight*, 725 F.3d at 253.

That result is owing not just to a failure of proof, but to the same complications that ultimately doomed Rascher's testimony. If "figuring out whether each individual putative class member was harmed would involve an inquiry specific to that person," then "common questions do not predominate." *Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134, 1139 (9th Cir. 2022). That posed a serious problem for certification, as under any rational understanding of a world without pooling and exclusivity, competing telecasts from teams or divisions would have very different impacts on subscribers depending on where they lived, what games were otherwise available, and what team(s) they wanted to watch. Consequently, some class members would likely have been *worse* off in a world without Sunday Ticket. Rascher tried to get around that by simply positing that all out-of-market games would have been available for free in all of his but-for worlds. *See, e.g.*, 7-ER-1295. But when forced to identify a factual basis for that unlikely claim, he offered nothing more than "speculation and *ipse dixit*." 1-ER-17. Similarly, Zona suggested that Sunday Ticket would be cheaper for everyone, but through a model that was likewise based on unsupported assumptions and had its own set of incoherent predictions. In reality, eliminating pooling and exclusivity could just as easily have *increased* prices or *reduced* access to out-of-market games, especially those involving less popular teams based in smaller markets. *See supra* pp.6-7, 32, 55. Plaintiffs tried to mask the problems with their classes by promising to produce an expert who could make

them all go away. Their failure to do so requires decertification of the 23(b)(3) classes. *See Nichols v. Mobile Bd. of Realtors, Inc.*, 675 F.2d 671, 678-79 (5th Cir. 1982) (affirming decertification on predominance grounds when class of homebuyers failed for lack of classwide proof of antitrust injury).

The 23(b)(2) classes fare no better. Rule 23(b)(2) requires a showing that the challenged conduct "can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011). "In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *B.K. ex rel. Tinsley v. Snyder*, 922 F.3d 957, 970-71 (9th Cir. 2019). In its class-certification order, the district court was "satisfied that [Rascher's and Zona's] models [would] show that all class members suffered some injury," and thus that all would "benefit" from "an injunction restraining [the challenged] conduct." 3-ER-326, 3-ER-238. Without Rascher's and Zona's testimony, however, there is *zero* "evidence that all class members were injured and damaged by the challenged conduct." 1-ER-12. And even if this Court were to conclude that the rest of the record contains sufficient evidence to support a finding of antitrust injury with respect to *some* putative class members, *but see supra* pp.51-62, it certainly does not establish that an injunction "would provide relief to *each member* of the class," *Wal-Mart Stores*, 564 U.S. at 360 (emphasis added); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 431

(2021) ("Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not."); *Lab'y Corp. of Am. Holdings v. Davis*, 2025 WL 1583302, at *3 (U.S. June 5, 2025) (Kavanaugh, J., dissenting from dismissal of writ of certiorari as improvidently granted) ("Federal courts may not certify a damages class under Rule 23 when, as here, the proposed class includes both injured and uninjured class members.").

That is particularly so given that the NFL-DirecTV agreement that Plaintiffs challenged expired more than two years ago, rendering their claims for injunctive relief moot. *Cf. Smith v. Univ. of Wash., L. Sch.*, 233 F.3d 1188, 1195 (9th Cir. 2000) (affirming decertification of 23(b)(2) class after request for injunctive relief became moot), *overruled in part on other grounds by Bd. of Trs. of the Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195 (9th Cir. 2019) (en banc). The court nevertheless held that "certification under Rule 23(b)(2) [wa]s appropriate for both classes," on the theory that the challenged conduct "remains ongoing." 3-SER-328. The court was mistaken. Sunday Ticket is now offered to residential customers under an entirely separate (and materially different) agreement between the NFL and YouTube, and to commercial customers through a separate (and materially different) agreement involving EverPass Media. *See supra* n.1. Moreover, many class members—defined as *DirecTV subscribers* who purchased Sunday Ticket sometime between 2011 and 2023—do not currently (and may not even wish to) subscribe to

the present-day version of Sunday Ticket, so even with Rascher and Zona there would be no basis whatsoever to conclude that "each class member" faces a threat of future harm from the NFL's current agreements with YouTube and EverPass Media. *Cf. Wal-Mart Stores*, 564 U.S. at 360-61.

In sum, although the JMOL order obviated the need for the district court to revisit class certification, Rascher's and Zona's testimony was the cornerstone of its certification order. Without that testimony, there is no valid basis for this case to proceed as a class. Accordingly, if the Court does not affirm the award of judgment to Defendants, it should order decertification of both classes.[9]

## III. The District Court Properly Exercised Its Discretion By Holding, In The Alternative, That Defendants Are Entitled To A New Trial.

Consistent with Federal Rule of Civil Procedure 50(c)(1), the district court issued an alternative holding: If Defendants were not entitled to judgment as a matter of law, then they would be entitled to a new trial on all issues because the

---

[9] Plaintiffs argue that the district court erred in excluding certain orphan documents that Plaintiffs sought to admit as "impeachment" of deposition testimony under Rule 806. *See* Blue.Br.17, 75-76. Plaintiffs' theory of admission was nonsensical; they argued that they should be allowed to play snippets of deposition video and then introduce documents *from other witnesses* to impeach the evidence that they themselves introduced. *See* 7-ER-1308-12, 9-ER-1559-62. Plaintiffs' opening brief offers no coherent legal support for this gambit and or explanation for how the district court's evidentiary ruling could be deemed an abuse of discretion. And while Plaintiffs vaguely suggest that these documents might "prove relevant in response to Defendants' cross-appeal," Blue.Br.75, they fail to explain how those stray documents could have any bearing on class (de)certification.

jury's verdict was wholly irrational with respect to antitrust injury and damages. *See* 1-ER-20. *Contra* Blue.Br.63 (incorrectly describing the district court's decision as ordering a new trial on damages only).[10] That holding was likewise well within the court's broad discretion.

A district court may grant a motion for a new trial "for any reason for which a new trial has [historically] been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). A new trial is warranted "if, weighing the evidence as he saw it, [the judge] concludes that the verdict, even though supported by substantial evidence is contrary to the clear weight of the evidence, or is based upon evidence which is false, or that a new trial is necessary to prevent, in the sound discretion of the trial judge, a miscarriage of justice." *Morris*, 104 F.4th at 1151-52 (brackets altered, ellipsis and quotation marks omitted). Owing to the critical role that the trial court plays in presiding over the entire trial and hearing testimony live, "[t]he authority to grant a new trial … is confided almost entirely to the exercise of discretion on the part of the trial court." *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980) (per curiam).

---

[10] Defendants moved for a new trial on all issues, *see, e.g.*, 2-ER-143, and the district court granted that motion without cabining it to damages, *see* 1-ER-7, 1-ER-10-11, 1-ER-20. Assuming *arguendo* that Plaintiffs' contrary interpretation of the district court's opinion is correct, Defendants cross-appeal on that issue.

Here, the district court came nowhere close to abusing its discretion in setting aside the jury's irrational verdict and ordering a new trial, as the verdict confirmed the district court's misgivings about Plaintiffs' experts and underscored the incoherence of Plaintiffs' entire case.

### A.    The District Court Correctly Held That the Jury's Verdict Was "Clearly Not Supported by the Evidence."

At trial, "Plaintiffs' only evidence that all class members were injured and damaged by [Defendants'] challenged conduct" came from Rascher and Zona, 1-ER-12, who offered three distinct theories of antitrust injury and damages.  In Rascher's college-football-based, it-would-all-be-free world, DirecTV subscribers would have gained access to all out-of-market NFL games for free, which implies antitrust injury and damages for the total amount that all subscribers paid for Sunday Ticket, i.e., $7.01 billion.  7-ER-1177; *see* 15-ER-3085.  Zona's "Single Competitor" model, by contrast, posits that subscribers were harmed to the tune of $3.48 billion in overpayments.  *See* 9-ER-1589-91; 15-ER-3089.  And Zona's so-called "NFL tax" calculation suggests that subscribers overpaid by $1.72 billion.  9-ER-1589-90.  The one common thread among all three models is that they suggest commercial subscribers paid substantially higher prices per subscription than residential subscribers paid, implying that commercial subscribers suffered greater damages per subscription.

The jury plainly rejected all of Plaintiffs' theories. It declined to award any of the proffered sums or anything close to them. And it did not compromise by awarding some fixed proportion of one of Plaintiffs' proposed amounts, or a round number within the range of the three proposals. The jury instead awarded two strikingly precise sums—$4,610,331,671.74 to the residential class and $96,928,272.90 to the commercial class. 2-ER-241. Although those figures were neither "proposed by Plaintiffs [n]or found in the record," the court had "no doubt" where they came from. 1-ER-21. The jury heard two numbers—neither of which corresponded to any of Plaintiffs' theories of antitrust injury or damages—that explain its award down to the penny.

First, the jury was informed that the *list* price for residential Sunday Ticket Basic subscriptions in 2018 and 2019 was $294. 1-ER-21; *see* 20-ER-4280. The record made clear, however, that many residential subscribers paid far less; "a bunch of people g[o]t the product for free" as part of a promotion, 9-ER-1726, and many others received substantial discounts, 7-ER-1178. Second, the jury heard that the average price that residential subscribers actually *paid* for Sunday Ticket during the class period, factoring in all discounts and promotions, was $102.74.[11] 9-ER-1725-

---

[11] As the district court recognized, this average price—not the $294 sticker price—reflected the actual cost to residential Sunday Ticket subscribers. 14-ER-2895 (remarking, in response to a jury note requesting the "price" of Sunday Ticket subscriptions, "I'm not going to give them the list price, that's for sure.").

26.  Those numbers are apples and oranges.  The list price covers only two years, while the average price covers the entire eleven-and-a-half-year class period.  And both numbers pertain only to residential customers, not members of the commercial-subscriber class.  Nonetheless, these two numbers perfectly account for the jury's award (while rendering the entire verdict wholly irrational).  Subtracting the average price paid ($102.74) during the class period from the 2018/2019 list price ($294) yields $191.26.  1-ER-21-22.  "The jury then multiplied $191.26 by the number of subscriptions" in each class—24,105,049 for the residential class and 506,788 for the commercial class, 1-ER-21-22—without accounting for the obvious and undisputed differences between the two classes, to arrive at an award of $4,610,331,671.74 for the residential class and $96,928,272.90 for the commercial class.  1-ER-22.

As the district court explained, these awards are "clearly not supported by the evidence." 1-ER-24.  Indeed, given that the jury appears to have used a number that approximates (albeit imperfectly) the average *discount* enjoyed by residential subscribers to measure the *damages* suffered by all subscribers, these awards evince a jury at sea about how, why, and to what extent Defendants' conduct violated the antitrust laws and injured members of the two distinct classes.  The court had instructed the jury that "the 'proper way to calculate the amount of damages to award to Plaintiffs is to determine the difference between the prices Plaintiffs *actually paid*

for Sunday Ticket and the prices Plaintiffs *would have paid*'" in a but-for world without the challenged agreements.  1-ER-23 (emphasis added, brackets omitted). But "[t]he jury did not follow the [c]ourt's instructions."  1-ER-24.  Instead of estimating purported "overcharges," the jury's calculation—list price minus average price actually paid—approximates "the average 'discount' a residential customer received." 1-ER-24.  "Awarding discounts as damages is nonsensical." 1-ER-24. This discounts-as-damages verdict, which suggests a jury that was fundamentally confused about the basics of this case, fully supported—indeed, all but compelled— a conditional grant of a new trial.

In fact, the jury's verdict is clearly unsupported by the evidence and betrays fundamental confusion about the entire case for at least two reasons beyond its conflation of discounts and damages.  First and foremost, as already noted, the one thing that is undeniable about the jury's verdict is that it treated *residential* and *commercial* subscribers exactly the same.  But the trial record shows that there are the substantial differences between the two groups, as commercial enterprises using the programming as a draw for paying customers had a different demand curve and "commercial customers paid different prices and had a different discount structure." 1-ER-24; *see, e.g.*, 9-ER-1618 (Zona describing commercial pricing as "quite different" from residential pricing); 9-ER-1757 (noting "different prices" and "different demand curve" for commercial class).  Nothing in any of Plaintiffs' three

74

models justified, or even encouraged, ignoring those substantial differences. It was thus manifestly irrational for the jury to treat residential and commercial class members identically—and beyond irrational to award damages to commercial class members based on an average discount received by residential subscribers. The jury's failure to appreciate the fundamental differences between the two classes alone would justify a new trial.

Second, as noted, the jury's calculations were based on comparing a list price from 2018 and 2019 ($294) with the average price that residential subscribers actually paid from 2011 to 2023 ($102.74). For much of the class period, the list price was substantially lower than $294, sometimes by nearly a hundred dollars. 20-ER-4280. By contrast, the list price exceeded $294 in just one year of the class period. 20-ER-4280. By arbitrarily pegging its damages calculation to an unusually high list price and comparing it to the average price paid during the whole class period, the jury inflated the amount of the discount it then re-purposed as a misguided measure of damages. That reinforces the district court's finding that the jury's verdict was "not based on the 'evidence and reasonable inferences'" but instead reflected "'guesswork or speculation.'" 1-ER-23; *see In re First All. Mortg. Co.*, 471 F.3d 977, 1001 (9th Cir. 2006).

Given all these defects, the district court aptly described the jury's verdict as "nonsensical." 1-ER-24. A verdict that conflated residential and commercial

75

customers and discounts and damages reflects a jury that was fundamentally confused about the basic elements of the case. Allowing that verdict to stand would be a travesty. *A fortiori*, granting a conditional new trial was well within the court's discretion.

## B. Plaintiffs' Contrary Arguments Lack Merit.

### 1. District courts are permitted to assess whether a jury's damages award is supported by the evidence.

With little to say in defense of what the jury did, Plaintiffs make the extraordinary argument that courts are categorically barred from vacating a jury verdict so long as the jury's award of damages falls somewhere between the plaintiff's highest and lowest proposed awards. *See* Blue.Br.63-67. That is not the law, nor should it be. Trial courts have considerable discretion to identify when a jury verdict reflects deeper problems with the plaintiffs' case and the jury's evaluation of the evidence, and to order a new trial in the interests of justice when that happens. *See, e.g., Allied Chem.*, 449 U.S. at 36; *Morris*, 104 F.4th at 1151-52.

This Court's precedent is clear: For a jury verdict to stand, it must *both* "find substantial support in the record" *and* "lie within the range sustainable by the proof." *L.A. Mem'l Coliseum Comm'n v. NFL*, 791 F.2d 1356, 1366 (9th Cir. 1986). It is not enough for the jury's verdict simply to be below the upper range of damages awards proposed by plaintiffs. It must also be a value that is "substantial[ly] supported" by evidence introduced at trial, and that is consistent with the law governing plaintiffs'

case.  *Id*.; *cf. Comcast*, 569 U.S. at 35 (theory of damages must match theory of liability).  And even then, the trial judge retains discretion to order a new trial if the verdict reflects juror confusion or the rejection of evidence critical to sustaining plaintiffs' case.  *See Associated Diesel Serv. & Equip. Co. v. Terex Corp.*, 1995 WL 23583, at *2 (9th Cir. 1995).  Here, it is crystal clear that the jury's verdict reflects both a rejection of Plaintiffs' experts and fundamental confusion by, among other things, conflating discounts and damages and treating wholly different residential and commercial subscribers alike.

None of the scattered remarks Plaintiffs pluck from disparate cases supports their contrary view.  For example, Plaintiffs rely heavily on statements that a jury's verdict must be "within a range supported by the record," *Brewer v. Hustler Mag., Inc.*, 749 F.2d 527, 529 (9th Cir. 1984), or "within the bounds of reason," *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000).  But that is a necessary condition for a jury's verdict, not a sufficient basis to insulate it from a new-trial order.  None of Plaintiffs' cases undermines (much less purports to overrule) what this court held in *Los Angeles Memorial Coliseum Commission*—i.e., that a jury's damages award must not only fall "within the range sustainable by the proof," but *also* "find substantial support in the record."  791 F.2d at 1366.  To the contrary, *First Alliance* reaffirms the well-settled rule that a jury's verdict may be vacated if "it is 'clearly not supported by the evidence' or 'only based on speculation

or guesswork.'" 471 F.3d at 1001 (quoting *L.A. Mem'l Coliseum Comm'n*, 791 F.2d at 1360). Accordingly, a verdict cannot stand when "there is 'no other plausible explanation'" except that "the jury did not follow the law according to its instructions." *Id*. at 1002-03; *see Experience Hendrix LLC v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 846 (9th Cir. 2014). As the district court persuasively explained, that is exactly what happened here. 1-ER-21-24.

Plaintiffs' efforts to transform the district court's well-reasoned application of "the correct legal rule," *Hinkson*, 585 F.3d 1261-62, into "legal error," Blue.Br.67, are unavailing. Their claim that this Court "rejected a similar attack on [a] damages award" in *In re the Exxon Valdez*, 270 F.3d 1215 (9th Cir. 2001), *see* Blue.Br.65, is triply wrong. First and most fundamentally, *Exxon* did not involve the review of a trial court's grant of a new trial for an abuse of discretion; it involved an effort to overturn a jury verdict that the trial court sustained as consistent with the evidence. Second, *Exxon* recites the exact same legal rule as the district court applied: Courts may reject a jury's damages award when the award is "clearly unsupported by the evidence." 270 F.3d at 1247-48. Third, the analysis in *Exxon* is readily distinguishable. The jury in that case had to assess "unknown factors" to determine the damages award, and had appeared to exercise "reasonable judgment" in doing so. *Id.* at 1248. On those facts, the court could not say with confidence that the jury had "not follow[ed] the law," *First Alliance*, 471 F.3d at 1003, or that its award was

78

not "substantial[ly] support[ed] [by] the record," *L.A. Mem'l Coliseum Comm'n*, 791 F.2d at 1366. Here, by contrast, the extreme precision of the jury's irrational award left the court "sufficiently certain that the jury award was not based on proper consideration of the evidence." *First Alliance*, 471 F.3d at 1001.

None of Plaintiffs' other cases is on point. *Celador International Ltd. v. Walt Disney Co.*, an unpublished district court decision, simply rejected the notion that a jury's damages award must "correspond precisely" to one of the plaintiff's "damages scenarios." 2010 WL 11505709, at *23 (C.D. Cal. Dec. 21, 2010). Both *In re Urethane Antitrust Litigation* and *In re Scrap Metal Antitrust Litigation* likewise hold only that a jury's verdict cannot be thrown out merely because it deviates from the awards proposed by the plaintiffs, if variations are minor and the awards are within the range supported by record evidence. *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1268 (10th Cir. 2014); *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 533 (6th Cir. 2008). Again, this case is not a matter of the jury making minor adjustments to Plaintiffs' theory of damages and injury. The jury plainly rejected Plaintiffs' theories wholesale and instead created its own model, which conflated damages and discounts, did not even distinguish between residential and commercial subscribers, and was entirely unsupported by the record. Under those circumstances, the district court was entirely correct—and certainly did not abuse its discretion—in refusing to rubber-stamp an irrational verdict.

Perhaps recognizing that their legal arguments fall short, Plaintiffs resort to mischaracterizing Defendants' position. To be clear, Defendants are not "argu[ing]" to uphold vacatur of the jury verdict because it was "'*too small to make sense*.'" *Contra* Blue.Br.64. The problem with the jury's award is not that it is too small, but that it is utterly irrational. It is so divorced from the record evidence that it reveals that "[t]he jury did not follow the [c]ourt's instructions and instead relied on inputs not tied to the record." 1-ER-24. Worse still, by conflating discounts and damages and equating residential and commercial customers, the verdict reflects a jury that was fundamentally confused about the basic elements of Plaintiffs' case and their theory of liability. Rules 50 and 59 sensibly empower courts to step in and vacate (or reverse) such irrational jury verdicts, and the district court appropriately exercised that power here.

### 2. Plaintiffs' countertheory of how the jury arrived at its verdict is nonsensical.

Plaintiffs' strained effort to rationalize the jury's verdict, *see* Blue.Br.67-72, is weaker still. Recognizing that the appropriate measure of damages must be the difference between the actual price paid and the but-for price—not the difference between the list price and the actual price—Plaintiffs posit that the jury might reasonably have concluded that the $294 residential list price from 2018 and 2019 was really the actual price paid throughout the class period, and that the $102.74 average residential price during the class period was the same as the price all class

members would have paid in a but-for world. *See* Blue.Br.68-71. That theory is as irrational and divorced from the record as treating discounts as damages.

For one thing, the notion that the jury could rationally have viewed $294 per year as the actual price paid by residential Sunday Ticket subscribers during the entire class period, Blue.Br.71, is risible. The very same document that shows $294 as the 2018/2019 list price indicates that the *list price* was significantly lower during the previous six years. *See* 20-ER-4280. And the record—conspicuously including the work of Plaintiffs' own expert (Zona)—overwhelmingly demonstrates that the average residential subscriber paid *far less* than these list prices owing to numerous discounts and promotional offers. 9-ER-1601-02; *see* 5-ER-820-21, 8-ER-1448, 8-ER-1527, 9-ER-1692, 9-ER-1707, 9-ER-1725-26. No reasonable jury could have concluded that the average residential subscriber actually paid $294/year throughout the class period, and a verdict based on that assumption would not "find substantial support in the record." *L.A. Mem'l Coliseum Comm'n*, 791 F.2d at 1366.

Plaintiffs' claim that the jury treated the average actual price paid by residential subscribers ($102.74) as the prevailing price in the but-for world is equally divorced from the record. To be sure, Defendants elicited testimony suggesting that charging $102.74 (on average) was reasonable, and rejected Plaintiffs' contention that consumers would have paid far less (or been better off *at all*) in a world without pooling and exclusivity. 9-ER-1608-09, 9-ER-1669-70. But

Defendants' counsel never "impl[ied]" that $102.74 might represent the "but-for price." *Contra* Blue.Br.68-69. Defendants instead maintained—and Plaintiffs *agreed*—that $102.74 was the real-world "average price DirecTV was willing to accept for Sunday Ticket from all customers." Blue.Br.69; *accord* 9-ER-1584 (Plaintiff's counsel describing $102.74 as "th[e] average revenue per subscription"); 9-ER-1666 (similar testimony from Zona). If the jury really had decided to treat what subscribers *actually* paid as the but-for price that they *should* have paid, then the undisputed record evidence would compel the conclusion that Plaintiffs were entitled to nothing.

Finally, Plaintiffs' speculation that the jury could have adopted this extremely precise figure not because it was a figure they had been given as the agreed-upon average price, but simply because it was a number that fell somewhere between proposals to price a new version of Sunday Ticket at $70 or $75 and the roughly $149 per year charged in Canada, *contra* Blue.Br.70, strains credulity. Even when applying a standard of review far less deferential than what applies here, courts are "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). And none of Plaintiffs' arguments explains how the jury could rationally calculate actual and but-for prices that were exactly the same for residential and commercial subscribers, even though Plaintiffs never suggested that was the case, all evidence indicated otherwise, and all three

82

models showed a large gap between damages per commercial subscription versus per residential subscription.

In sum, the jury's verdict was plainly based on impermissible "guesswork or speculation," 1-ER-23, and Plaintiffs cannot cure that fatal defect by supplying additional speculation of their own—especially when that speculation is equally divorced from the record evidence. The district court did not remotely abuse its discretion in concluding that the evidence cannot sustain treating $294 (a list price) as the actual price and $102.74 (an average actual price) as the but-for price, and that it makes no sense to assess injury to commercial subscribers using data that is germane only to residential subscribers. 1-ER-24. There is simply no legally justifiable way to calculate classwide damages of $191.26 per subscription based on the record evidence in this case.

# CONCLUSION

This Court should affirm the judgment of the district court.

Respectfully submitted,

s/Paul D. Clement

THEODORE J. BOUTROUS, JR.
DANIEL G. SWANSON
CHRISTOPHER D. DUSSEAULT
GIBSON, DUNN &
CRUTCHER, LLP
333 S. Grand Avenue
Suite 5300
Los Angeles, CA 90071-3197
tboutrous@gibsondunn.com

CYNTHIA RICHMAN
GIBSON, DUNN &
CRUTCHER, LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504

DOLORES F. DIBELLA
NATIONAL FOOTBALL LEAGUE
345 Park Avenue
New York, New York 10154
(212) 450-2000

PAUL D. CLEMENT
 *Counsel of Record*
ERIN E. MURPHY
JOSEPH J. DEMOTT
NICCOLO A. BELTRAMO
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

BETH A. WILKINSON
BRIAN L. STEKLOFF
RAKESH N. KILARU
JENNA H. PAVELEC
WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036

*Counsel for Defendants-Appellees / Conditional Cross-Appellants*

June 10, 2025

## STATEMENT OF RELATED CASES

Pursuant to Federal Rules of Appellate Procedure 28-2.6, Appellees state that they are not aware of any other cases pending in this Court that are related to the present case.

June 10, 2025

<u>s/Paul D. Clement</u><br>
Paul D. Clement

## CERTIFICATE OF COMPLIANCE

1. This brief contains 19,676 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). It is therefore accompanied by an unopposed motion to file a brief that exceeds the default word-limitation of Circuit Rule 32-1. *See* Cir. R. 32-2(a).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman type.

June 10, 2025

<u>s/Paul D. Clement</u>
Paul D. Clement

## CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system.  I certify that all participants in this case are registered ACMS users and that service will be accomplished by the ACMS system.

<u>s/Paul D. Clement</u>
Paul D. Clement