Nos. 24-5493, 24-5691

# In the United States Court of Appeals for the Ninth Circuit

---

IN RE NATIONAL FOOTBALL LEAGUE'S SUNDAY TICKET
ANTITRUST LITIGATION

NINTH INNING, INC., *et al.*,
*Plaintiffs–Appellants*

*v.*

NATIONAL FOOTBALL LEAGUE, INC., *et al.*,
*Defendants–Appellees*

---

*On Appeal from the United States District Court for the
Central District of California,
No. 2:15-ml-02668-PSG-SK, Hon. Philip S. Gutierrez*

---

## BRIEF OF NFL MEDIA PARTNERS AS AMICI CURIAE IN SUPPORT OF APPELLEES

---

LISA S. BLATT
CHARLES L. MCCLOUD
CHRISTIAN J. GLADDEN-SORENSEN
CHRISTOPHER J. BALDACCI
WILLIAMS & CONNOLLY LLP
 680 Maine Avenue SW
 Washington, DC 20024
 (202) 434-5000
 lblatt@wc.com

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1(a) and 29(a)(4)(A), amici Fox Corporation, CBS Broadcasting Inc., NBCUniversal Media, LLC, ESPN, Inc., and the American Broadcasting Companies, Inc., state as follows:

1. Fox Corporation is a publicly held corporation. To Fox Corporation's knowledge, no publicly held corporation owns 10% or more of the stock of Fox Corporation.

2. CBS Broadcasting Inc. is a wholly owned indirect subsidiary of Paramount Global, a publicly traded corporation. No other publicly held corporation owns 10% or more of the stock of CBS Broadcasting Inc.

3. NBCUniversal Media, LLC, is indirectly owned by Comcast Corporation, a publicly held corporation. No other publicly held corporation owns 10% or more of the stock of NBCUniversal Media, LLC.

4. ESPN, Inc., is a subsidiary of The Walt Disney Company, a publicly held corporation that holds an indirect shareholder interest in eighty percent (80%) of ESPN, Inc. The Hearst Corporation indirectly holds the remaining twenty percent (20%) shareholder interest in ESPN, Inc.

5. The American Broadcasting Companies, Inc., is a wholly owned indirect subsidiary of The Walt Disney Company. No other publicly held

corporation owns 10% or more of the stock of the American Broadcasting Companies, Inc.

/s/ Lisa S. Blatt
LISA S. BLATT
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
(202) 434-5000
lblatt@wc.com

JUNE 17, 2025

ii

# TABLE OF CONTENTS

Page

STATEMENT OF INTEREST ............................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 2

BACKGROUND ................................................................................ 5

ARGUMENT .................................................................................. 10

I.     The District Court Properly Excluded Dr. Rascher's Testimony ......... 11

       A.     Competitors Would Never Have Agreed to the Sharing of
              Broadcast Feeds Required by Dr. Rascher's But-For
              World. ................................................................... 12

       B.     Out-of-Market Games Would Never Have Been Made
              Available for No Additional Charge. ............................... 19

       C.     Dr. Rascher's But-For World Is Incompatible with NFL
              Broadcasting Negotiations and Game Scheduling ............... 21

II.    The District Court Properly Excluded Dr. Zona's Unreliable
       Testimony. ........................................................................ 25

       A.     Dr. Zona Wrongly Assumed That a Competitor Could
              Live-Stream NFL Games During the Entire Class Period. ....... 26

       B.     Dr. Zona Wrongly Assumed That All Class Members Were
              Able to Stream Live Sports for the Entire Class Period. ......... 31

CONCLUSION ................................................................................ 32

iii

# TABLE OF AUTHORITIES

Page

## CASES

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) .......................................11

*Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998 (9th Cir. 2004) ....................................................................................................10

*Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053 (9th Cir. 2002) ..........10

*Olympia Equip. Leasing Co. v. W. Union Telegraph Co.*, 797 F.2d 370 (7th Cir. 1986) ..................................................................................11

*Teradata Corp. v. SAP SE*, 124 F.4th 555 (9th Cir. 2024) ...............................11

## STATUTES AND RULES

Sports Broadcasting Act, Pub. L. No. 87-331, 75 Stat. 732 (1961) .....................5

Federal Rule of Appellate Procedure 29 ................................................1

## OTHER AUTHORITIES

Brad Adgate, *NFL Games Made up 93% of the Most Watched TV Programs in 2023*, Forbes (Jan. 5, 2024), https://tinyurl.com/3fy39nus ........................................................28

Claire Atkinson, *ESPN's Much-Anticipated Streaming Service Is Finally Here*, NBC News (Apr. 12, 2018), https://tinyurl.com/yc6su8sa ............................................................29

ESPN, *College Football Scoreboard* (2015), https://tinyurl.com/y25kc84e ..............................................................15

6 Newberg & Rubenstein on Class Actions § 20:59 (6th ed.), Westlaw (last updated June 2025) ....................................................................11

Todd Spangler, *YouTube Unveils Live TV Bundle for $35 per Month with 40 Channels*, Variety (Feb. 28, 2017), https://tinyurl.com/mrx6abfx ..........................................................29

Lars A. Stole, *Price Discrimination and Competition*, *in* 3 Handbook of Industrial Organization 2221 (M. Armstrong & R. Porter eds., 2007) ............................................................................................21

iv

Page

Other Authorities, continued:

Brian Steinberg, *Netflix Launches First Live Sports Event with 'Netflix Cup' Golf Tournament*, Variety (Oct. 17, 2023), https://tinyurl.com/yc6d9ewe ........................................................... 29

Pew Rsch. Ctr., *Internet, Broadband Fact Sheet* (Nov. 13, 2024), https://tinyurl.com/ywfb8etu ........................................................... 31

## STATEMENT OF INTEREST[1]

Amici Fox Corporation ("FOX"), CBS Broadcasting Inc. ("CBS"), NBCUniversal Media, LLC ("NBCU"), ESPN, Inc. ("ESPN"), and the American Broadcasting Companies, Inc. ("ABC") partner with the National Football League ("NFL") to produce and televise the vast majority of NFL games. During the class period of 2011-2023, FOX and CBS owned the rights to broadcast regular-season NFL games on Sunday afternoons as well as other nationally televised games, NBCU owned the rights for Sunday Night Football and other nationally televised games, and ESPN (and, beginning in 2021, ABC) owned the rights to produce and broadcast Monday Night Football. Amici have a significant interest in this litigation's outcome because the exclusivity of their production and broadcast rights is a lynchpin of their respective business models. To offset the considerable fees each Amicus paid for these exclusive rights, they must generate revenue from advertising sales and affiliate and distributor retransmission fees. Those revenues in turn largely depend on the exclusivity of the production and broadcast rights, without which viewership would not be high enough to make it economically feasible for Amici to continue broadcasting NFL games. Accordingly, Amici support the NFL's

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), Amici certify that no person or entity, other than amici curiae, their members, or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part.

position that its exclusive contracts for Sunday afternoon broadcasting did not violate any antitrust laws, particularly in light of the protection the Sports Broadcasting Act affords.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Professional football is not just America's most popular televised sport; it is the most popular programming on America's televisions, period. In 2023, 93 of the 100 most-watched television broadcasts in the United States were NFL games. More people watched a regular-season matchup between the Buffalo Bills and Philadelphia Eagles in November 2023 than watched that year's State of the Union Address.

Although the right to broadcast NFL games in a particular market is both invaluable and expensive, the NFL is unique among professional sports because fans in each television market have guaranteed access to their local team's Sunday afternoon games, either through free over-the-air broadcasts or without any surcharge as part of a basic cable, satellite, or other television service subscription. Fans who want to watch games not broadcast in their area—commonly referred to as "out of market games"—have the option of purchasing NFL Sunday Ticket, a service that the NFL licensed to DirecTV for distribution for many years.

In this case, Plaintiffs allege that the NFL's and its teams' contracts surrounding NFL Sunday Ticket violated the antitrust laws. After a three-

2

week trial, the jury returned a verdict for Plaintiffs and awarded damages of $4.6 billion to residential subscribers and $96.9 million to commercial ones even though neither amount was requested by Plaintiffs or supported by the record.[2] The district court then entered judgment for Defendants as a matter of law. The court determined that the testimony of two of Plaintiffs' expert witnesses—Dr. Daniel Rascher and Dr. Douglas Zona—had no basis in the available facts or data. Once the court determined that this speculative and error-filled expert testimony was unreliable and had to be excluded, the jury verdict became unsupportable.

Plaintiffs challenge the district court's decision to exclude their experts' testimony on numerous grounds, including the court's alleged legal error. The record does not support any of Plaintiffs' arguments and confirms that the court acted well within the bounds of its considerable discretion when it excluded expert testimony that was unfounded and did not even remotely reflect the realities of broadcasting NFL games.

*First*, contrary to Dr. Rascher's testimony, CBS and FOX—the companies filming and producing the applicable games—would never have shared their live feeds with competitors as his but-for world required. Dr. Rascher's

---

[2] As the NFL's brief explains, Red.Br.71-76, the jury's award nonsensically reflects the approximate discount enjoyed by the average residential customer rather than any alleged measure of damages. This error separately supports the district court's alternative decision to grant a new trial.

3

opinion also rested on an inapt comparison to the market for college football games. Because the NFL and college football conferences negotiate their broadcasting rights differently, it is untenable for NFL broadcasting to simulate college football. Additionally, there was no basis for Dr. Rascher's counter-intuitive conclusion that, but for Defendants' allegedly anticompetitive conduct, all NFL games would be available to consumers for free. As the evidence at trial confirmed, the consumer demand for out-of-market NFL games is simply too high for distributors to give away the product to viewers for no additional charge, and economically rational actors would not do so. Rather than explaining how his but-for world was practically possible, Dr. Rascher offered only pure speculation that the broadcasters would "figure it out."

*Second*, Dr. Zona claimed that the price of NFL Sunday Ticket would have dropped had DirecTV faced at least one competitor who could have offered NFL Sunday Ticket directly to consumers, likely via a streaming service. But Dr. Zona's model assumed that: (1) it was possible to live-stream NFL games to consumers for the entirety of the class period, and (2) every household would have had access to such a streaming service. Neither assumption withstands scrutiny. For much of the class period, the technology to broadly stream NFL games was not well developed, and many households did not have access to the high-speed internet necessary to stream live games.

## BACKGROUND

1. The NFL negotiates broadcasting rights on behalf of the thirty-two professional football teams that make up the NFL. 13-ER-2528 (Tr.2125:14-16); 6-ER-1052 (Tr.656:11-13). This "pooling" of broadcast rights is authorized and protected by the Sports Broadcasting Act ("SBA"). Pub. L. No. 87-331, 75 Stat. 732 (1961).[3] Within the class period (2011-2023), the NFL negotiated agreements with CBS and FOX under which CBS would broadcast the "AFC Package"—Sunday afternoon NFL games generally involving the American Football Conference teams—and FOX would broadcast the "NFC Package"—Sunday afternoon NFL games generally involving the National Football Conference teams. 10-ER-1850 (Tr.1450:8-13); 11-ER-2051 (Tr.1650:4-8); 7-ER-1097-98 (Tr.700:25-701:9); 4-ER-586-87 (Tr.192:23-193:16). These sponsored telecasts are available for free over the air (*i.e.*, for viewers with an antenna) and for no additional fee to viewers with a basic television subscription. 6-ER-886 (Tr.490:3-17); 11-ER-2053 (Tr.1652:12-16).

On a typical Sunday afternoon, there are around 10 to 12 NFL games, with CBS and FOX each broadcasting between two and four games at both the 1pm time slot and the 4pm time slot. 9-ER-1689 (Tr.1290:8-16); 6-ER-

---

[3] Plaintiffs did not challenge this protection below.

1017-20 (Tr.621:14-624:25). The collection of games available for viewing in each local market is often referred to as the "in-market games."

Because the NFL is the only sport in which local fans are guaranteed access (without an additional charge) to their local team's games, if a local market's NFL team is playing, that game *must* be shown to viewers in that local market. 6-ER-999-1000 (Tr.603:11-604:6); 6-ER-1025-26 (Tr.629:21-630:2); 7-ER-1194-95 (Tr.797:16-798:15); 12-ER-2274-75 (Tr.1872:11-1873:16). Otherwise, CBS and FOX have the freedom to choose the games they broadcast in the 1pm and/or 4pm time slots at each local station based on their judgment of which regional (*i.e.*, non-local) games will be most popular in that market. Those projections are informed by extensive research and each team's performance throughout the season. 6-ER-1019-24 (Tr.623:19-628:13); 11-ER-2056-57 (Tr.1655:13-1656:23). As Sean McManus, former Chairman of CBS Sports, explained, "it's an ongoing process throughout the entire season when [CBS is] constantly rejiggering the maps on what station gets what game"; for instance, CBS may initially project that "the Kansas City Chiefs game is most attractive for Des Moines," but if the Chiefs "lose a game the previous week," it may "turn[] out that there's another game that's more attractive for that market." 11-ER-2057 (Tr.1656:16-23).

On a given Sunday, for example, a viewer living in Washington, DC, could watch the Commanders play the Eagles on FOX at 1pm (the local game),

the Broncos play the Bengals on CBS at 1pm (a regional game selected for airing in the DC market), and the Chiefs play the Bills on CBS at 4:25pm (a regional game being aired in nearly all of the country). Each of these games would be considered "in market" because they are airing within the DC media market. As for the other Sunday afternoon games broadcast by CBS and FOX, those games would still be broadcast as in-market games by other local stations throughout the country, but not by local stations in and around Washington, DC. Such games would be "out-of-market"—inaccessible over the air or with a basic television subscription—for DC-based viewers.

2. Securing the rights to the AFC and NFC Packages does not come cheap. CBS and FOX paid upwards of $23 billion over the class period to do so. 7-ER-1112 (Tr.715:18-19); 11-ER-2089 (Tr.1688:10-22). Producing broadcasts of NFL games is also hugely capital-intensive. Each broadcast requires production facilities, cameras, graphics, audio, crew, announcers, research, planning meetings, and pre- and post-game shows. 6-ER-1032 (Tr.636:4-18); 6-ER-1037-38 (Tr.641:1-642:14). And the competition between broadcasters to create the highest-quality production possible is fierce. Many features of NFL broadcasting that now seem commonplace—like the virtual first down line—were once investment-backed innovations, driven by competition. 11-ER-2055-59 (Tr.1654:25-1658:13); 6-ER-1038-49 (Tr.642:16-653:23); 6-ER-889-91 (Tr.493:8-495:11). Mr. McManus, for example, recounted that CBS's

"many, many innovations" include "the first color" and "the first high defini-tion" NFL broadcasts; "[t]he Sky Cam, which gives an overhead view"; and "tiny cameras in the pylons on the end zone." 11-ER-2058-59 (Tr.1657:25-1658:6). Former FOX Sports senior executive Larry Jones likewise described FOX's "innovations" such as the "FOX Box" (which displays "all the infor-mation that's pertinent to th[e] game") and "parabolic mics." 6-ER-1044-49 (Tr.648:18-653:11).

To recoup these substantial investments, broadcasters rely on two key sources of revenue. The first is advertising. CBS and FOX sell both local advertisements (generally through affiliate stations) and national advertise-ments. The second source is retransmission fees, which cable and satellite companies pay to broadcasters to retransmit their network feeds, inclusive of NFL telecasts and other programming, to cable or satellite subscribers. 6-ER-885-86 (Tr.489:7-490:24); 11-ER-2051-55 (Tr.1650:22-1654:23).

Exclusivity is of paramount importance for protecting broadcasters' in-vestments and advertising revenue. CBS and FOX need as many viewers as possible within each local market watching the games available from the local CBS or FOX station and seeing the advertisements sold by those stations, as well as promotional announcements ("promos") for other CBS and FOX pro-gramming carried by that station. High viewership strengthens local affiliates and ensures that it is economically viable for CBS and FOX to continue

8

purchasing broadcast rights and producing sports broadcasts and other pro-gramming. 6-ER-892-93 (Tr.496:16-497:7); 6-ER-905-07 (Tr.509:1-511:15); 6-ER-922 (Tr.526:6-18); 6-ER-994-95 (Tr.598:12-599:14); 6-ER-1008-10 (Tr.612:7-614:18); 11-ER-2051-53 (Tr.1650:22-1652:3).

Accordingly, a key component of the AFC and NFC Packages, which the parties negotiated hard for, is that CBS and FOX are the only broadcast-ers airing their respective packages. 6-ER-1057-58 (Tr.661:2-662:23); 11-ER-2068 (Tr.1667:16-22). At 1pm on a Sunday, viewers could watch one NFC game on FOX and one AFC game on CBS. But they could not watch the AFC game on any channel other than CBS, and they could not watch any AFC matchup other than the one shown in their area, whether on CBS or elsewhere. In other words, CBS has exclusivity with respect to both the particular game being broadcast and the 1pm AFC time slot. 6-ER-1056-59 (Tr.660:24-663:18). As Mr. McManus put it, for "the [Sunday afternoon] NFL package," the "foun-dation[al]," "most important elements are exclusivity in each individual mar-ket" and "a choice in selection of high quality games." 11-ER-2068 (Tr.1667:19-22).

3. NFL Sunday Ticket was created to expand avid NFL fans' access to and address demand for out-of-market games. 6-ER-1005 (Tr.609:15-21); 10-ER-1857 (Tr.1457:2-16). The package worked like this: during the class pe-riod, CBS and FOX provided DirecTV all Sunday afternoon NFL broadcast

feeds produced.  DirecTV, in turn, showed, in each local market across the country, every NFL game that was not available in such market on the local CBS and FOX stations.  DirecTV retained the announcers, graphics, audio, pregame shows, and national advertisements of the original broadcast feeds but removed all of the local advertising, as well as a significant portion of the promos for other CBS and FOX programming.  6-ER-911-12 (Tr.515:16-516:17); 6-ER-1003-05 (Tr.607:5-609:21); 6-ER-1032-36 (Tr.636:13-640:1); 11-ER-2061-64 (Tr.1660:19-1663:2).  Subscribers to DirecTV's NFL Sunday Ticket, therefore, could watch out-of-market games in addition to—or instead of—the in-market games available on the local CBS and FOX stations.

According to Plaintiffs, however, these contractual arrangements—pursuant to which the vast majority of NFL fans received free over-the-air access to their preferred NFL matchups and avid fans could pay extra to access all other Sunday afternoon games—violated the antitrust laws.

## ARGUMENT

Because trial judges are closest to the evidence and testimony in a case, they are "entitled to broad discretion when discharging their gatekeeping function," *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) (quotation omitted), and get "broad latitude in determining whether an expert's testimony is reliable," *Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1064 (9th Cir. 2002).  The trial judge's discretion in gatekeeping

expert witnesses is especially important in antitrust class actions, where experts play a central and often case-dispositive role. *See* 6 Newberg & Rubenstein on Class Actions § 20:59 (6th ed.), Westlaw (last updated June 2025). A district court's exclusion of expert testimony may only be reversed if it constitutes an abuse of discretion. *Teradata Corp. v. SAP SE*, 124 F.4th 555, 566 (9th Cir. 2024).

The trial court properly exercised its discretion here in excluding the expert testimony of both Dr. Rascher and Dr. Zona. Courts routinely hold that expert testimony is inadmissible and unreliable when it is "connected to existing data only by … *ipse dixit*," *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997), or "ignores economic reality," *Olympia Equip. Leasing Co. v. W. Union Telegraph Co.*, 797 F.2d 370, 383 (7th Cir. 1986) (Posner, J.). This case is no different. The evidence at trial conclusively showed that both witnesses failed to ground their conclusions in the realities of sports broadcasting.

## I. The District Court Properly Excluded Dr. Rascher's Testimony.

The district court did not abuse its wide discretion when it excluded Dr. Rascher's testimony because his testimony lacked a reliable methodology and was not based on sufficient facts and data. Dr. Rascher opined that all NFL Sunday Ticket subscribers are entitled to a full refund of the money they spent within the class period because, but for the purportedly anticompetitive conduct, all out-of-market NFL games would have been available to viewers in all

11

markets either for free over the air or with a basic television subscription. 7-ER-1176-77 (Tr.779:7-780:19); 7-ER-1278-79 (Tr.881:21-882:6). But the evidence at trial demonstrated that Dr. Rascher's "core," "most likely" but-for world conflicted with the realities of NFL broadcasting.

*First*, broadcasters would never share feeds with direct competitors.

*Second*, out-of-market games would never have been available for no additional charge; they are simply too valuable to give away for free.

*Third*, Dr. Rascher's but-for world is incompatible with the way NFL broadcasting rights are negotiated and how games are scheduled. His but-for world resembles neither the college football broadcasting scheme he used as a yardstick nor, for that matter, any other form of sports broadcasting.

### A. Competitors Would Never Have Agreed to the Sharing of Broadcast Feeds Required by Dr. Rascher's But-For World.

1.     Dr. Rascher's "core," "most likely" but-for world required direct competitors to share their broadcast feeds. According to Dr. Rascher, CBS and FOX would still produce the broadcast feeds for all 10 to 12 Sunday afternoon NFL games. CBS and FOX would then hand over those feeds—which, to reiterate, require substantial investment to produce—to direct competitors like NBCU and ABC, which would then broadcast or retransmit the out-of-market games to viewers in each local market nationwide, thus competing directly against CBS's and FOX's in-market games. 7-ER-1289-92 (Tr.892:13-895:23). For instance, FOX would broadcast a Commanders-Eagles game in

12

Washington, DC, but NBCU or ABC—using the FOX-produced feed—would broadcast it in other markets such as San Francisco, where the broadcast might compete with FOX's own local broadcast of a 49ers game.

At trial, however, the NFL broadcasters testified unequivocally and without contradiction that they would never share their feeds. Mr. McManus testified that if "the individual teams [were] negotiating their own out-of-market rights," broadcasters like CBS would not "have been interested in the Sunday afternoon in-market over-the-air package." 11-ER-2068-69 (Tr.1667:16-1668:4). And even if CBS was interested, it would not have agreed to a deal pursuant to which it would "have shared [its] feeds with ABC, FOX, and NBC." 11-ER-2069 (Tr.1668:5-13). "[T]he quality of [CBS's] feeds" is "a source of pride," and CBS invests substantially in producing its broadcasts, including by "paying tens of millions of dollars" for announcers. 11-ER-2069-70 (Tr.1668:14-1669:8). It simply "would not make sense" to agree "to give away that quality, which is so tied to CBS, ... to other networks," and doing so "would significantly reduce [CBS's] ratings," "advertising sales, "promotional opportunities," and, subsequently, its ability to "afford to" "spen[d] as much on producing the games." 11-ER-2069-70 (Tr.1668:15-1669:24). The only way for broadcasters to protect their investments in the rights to NFL games and the quality of broadcasts is to maintain exclusivity, and it is hard to imagine

13

anything more injurious to exclusivity than competing against a direct competitor airing one's own broadcast.

Simply put, the district court did not abuse its considerable discretion in determining that Dr. Rascher's testimony was not the product of reliable principles and methods where his "solutions were contradicted by the record," *e.g.*, because broadcasters "would not share [their] feeds with competitors." 1-ER-15-17 (D.Ct.Op. 7 n.6, 7-9).

2.     Dr. Rascher dismissed those concerns.  He reasoned that CBS and FOX sharing their feeds with NBCU and ABC in his but-for world is no different than: (1) the model used for college football broadcasting, 7-ER-1176 (Tr.779:7-23); 7-ER-1300-01 (Tr.903:20-904:2); (2) CBS and FOX sharing their feeds with DirecTV, 7-ER-1289 (Tr.892:13-17); 7-ER-1294-95 (Tr.897:23-898:4); 7-ER-1305-06 (Tr.908:21-909:20); (3) the feed-sharing seen with non-football broadcasting, 7-ER-1289-90 (Tr.892:25-893:14); 7-ER-1292-93 (Tr.895:22-896:4); 7-ER-1306 (Tr.909:17-20); or (4) the feed-sharing envisioned by the NFL New Frontier study, 7-ER-1289-91 (Tr.892:18-894:21).  Dr. Rascher is wrong on each count.

**College Football.**  The district court did not abuse its discretion in rejecting Dr. Rascher's analogy to college football, since college football broadcasting does not use feed-sharing in the manner Dr. Rascher's but-for world required.  Because college football does not have the same rights under the

14

SBA as the NFL does, broadcasters negotiate directly with the Power Five conferences (the SEC, ACC, Big 12, Big Ten, and PAC-12) and certain universities (like Notre Dame) for exclusive rights to broadcast teams' games instead of dealing with the NCAA alone.  11-ER-2110-12 (Tr.1709:23-1711:2); 6-ER-888 (Tr.492:9-14); 6-ER-994-95 (Tr.598:21-599:6); 6-ER-1052 (Tr.656:4-13); 7-ER-1148-49 (Tr.751:22-752:12).  For instance, Big Ten and PAC-12 games could be broadcast by FOX, SEC games by CBS, and ACC and Big 12 games by ABC/ESPN.  Because there are more sources of exclusive rights, more broadcasters involved, and relatively few games involving two top-25-ranked teams each Saturday,[4] feed-sharing is unnecessary to make most such games available nationwide.[5]  FOX, therefore, would never need to share its feed of a top-25 matchup between Ohio State and Michigan with a competitor like ABC; that game would be available across the country from FOX and no one else.  Thus, Mr. McManus underscored that Dr. Rascher's but-for world is not "in

---

[4] Mathematically, there could never be more than 12 games involving two top-25-ranked teams, and there are over 60 college football teams in the Power Five conferences alone, so the actual number is inevitably much lower.  12-ER-2338-39 (Tr.1936:24-1937:4); 12-ER-2410 (Tr.2008:5-9), 7-ER-1208 (Tr.811:15-22).  There were three top-25 matchups in week 10 of the 2015 season, for instance.  ESPN, *College Football Scoreboard* (2015), https://tinyurl.com/y25kc84e.

[5] Notably, not all games involving two top-25-ranked teams are available for free.  12-ER-2410-11 (Tr.2008:20-2009:10).

15

any way comparable to what [broadcasters have] done in the past with college football" with "respect to the exclusivity." 11-ER-2112 (Tr.1711:3-10). Even Dr. Rascher testified that "[a]s I sit here, I can't think of an example" of feed-sharing in college football. 7-ER-1291-92 (Tr.894:17-895:10). The district court did not abuse its discretion in finding that "Dr. Rascher's most likely version of the but-for world" just "did not resemble college football broadcasting," which "does not involve sharing feeds," and thus "was not based on a reliable methodology." 1-ER-16 (D.Ct.Op. 8).

**DirecTV.** CBS and FOX have only shared their feeds with DirecTV when there were mechanisms to offset the harm to their exclusivity—that arrangement cannot support Dr. Rascher's opinion that CBS and FOX would have shared their feeds with their "biggest competitor[s]" absent such mechanisms. 7-ER-1289-90 (Tr.892:18-893:8); *accord* 11-ER-2070 (Tr.1669:5-8). ABC and NBCU compete with CBS and FOX far more directly than does DirecTV. ABC and NBCU are broadcasters that produce competing programming like sports broadcasts, news coverage, and TV shows, while DirecTV, as a satellite company, is more in the business of bundling and retransmitting others' programming. 7-ER-1234-35 (Tr.837:14-838:7); 9-ER-1717-18 (Tr.1318:13-1319:7); 6-ER-938-39 (Tr.542:20-543:17); 11-ER-2053 (Tr.1652:12-25); 11-ER-2062 (Tr.1661:18-25); 11-ER-2166 (Tr.1765:9-15). The harm associated with providing CBS and FOX feeds to ABC and NBCU in the but-for

world is far different in kind and degree to the harm incurred in the real world with NFL Sunday Ticket. Accordingly, CBS and FOX have agreed to broadcasting contracts with the NFL pursuant to which they would share feeds with DirecTV, but only where the harm to their exclusivity was compensated (*i.e.*, through profit-sharing) or mitigated (*i.e.*, through Sunday Ticket being priced as a complementary product for avid fans). 11-ER-2066-67 (Tr.1665:14-1666:14); 11-ER-2064 (Tr.1663:3-13); 6-ER-982-84 (Tr.586:4-588:1); 6-ER-1005-06 (Tr.609:22-610:1); 6-ER-926 (Tr.530:3-17); 6-ER-933 (Tr.537:8-14); 6-ER-1006-07 (Tr.610:10-611:15). Dr. Rascher's but-for world, by contrast, would require CBS and FOX to share their feeds with direct competitors absent compensation or mitigation—a wholesale breach of exclusivity that has never existed with NFL Sunday Ticket.

**Other Sports.** Dr. Rascher testified that his but-for world is like "the Olympics," where "NBC produces the entire Olympics and they send the feed to well over a hundred countries, and those countries take the feed and they put their announcers there, and … they put on their Olympics show." 7-ER-1290 (Tr.893:9-14). He also cited professional basketball and baseball broadcasting to justify his but-for world's feed-sharing. 7-ER-1293-94 (Tr.896:5-897:9); 7-ER-1292-93 (Tr.895:17-896:4). Dr. Rascher is flat-out wrong. NBCU pays the International Olympic Committee ("IOC") for the exclusive right to broadcast the IOC's Olympic feeds in the United States. 11-ER-2164-65

17

(Tr.1763:14-1764:14); 11-ER-2196-97 (Tr.1795:15-1796:4). NBCU never shares feeds with domestic competitors and instead exclusively airs those feeds throughout the United States. And with basketball and baseball, separate broadcast feeds are generally sent to both the home team's regional sports network and the away team's regional sports network, which each add their own announcers, graphics, and visuals and air those feeds in different parts of the country. 7-ER-1293-94 (Tr.896:5-897:9); 7-ER-1292-93 (Tr.895:17-896:4). As a result, Olympic, basketball, and baseball broadcasting do not resemble the feed-sharing in Dr. Rascher's but-for world, where ABC and NBCU would use CBS's and FOX's shared feeds to directly compete against CBS's and FOX's in-market broadcasts.

**New Frontier.** Lacking any real-world instances of the feed-sharing his but-for world required, Dr. Rascher also relied on the New Frontier study. As an initial matter, that study was a "hypothetical," "pie-in-the-sky," "brainstorming document" prepared by individuals lacking "any direct connectivity or involvement with [the NFL's] broader media licensing business," 14-ER-2948-49, not to mention, in the words of Brian Rolapp, the NFL's chief media and business officer, "a bad idea." 8-ER-1501 (Tr.1103:14). Specifically, the study never explained how "a game FOX was producing would also end up on ESPN"; the NFL "didn't have the rights to do that nor would FOX allow that" because of the "importan[ce]" of "keep[ing] exclusivity for those games and

18

maintain[ing] that regionalized model"; and there was never "any explanation … of how advertising would work." 8-ER-1500-01 (Tr.1102:24-1103:13). Plus, as the district court found, the New Frontier envisioned *the NFL* pooling out-of-market rights on behalf of all teams, 1-ER-17 (D.Ct.Op. 9), whereas in Dr. Rascher's "core," "most likely" but-for world, individual NFL teams or groups thereof would have negotiated out-of-market rights. 7-ER-1265-69 (Tr.868:6-872:19); 7-ER-1284 (Tr.887:4-21). In sum, Dr. Rascher's opinion that broadcasters would agree to share feeds is not based on any (let alone "sufficient") facts and data.

### B. Out-of-Market Games Would Never Have Been Made Available for No Additional Charge.

In Dr. Rascher's "core," "most likely" but-for world, CBS and FOX would have retained the AFC and NFC Packages with respect to in-market broadcast rights, while rival broadcasters such as NBCU and ABC would have negotiated directly with NFL teams (or groups thereof) for out-of-market broadcast rights. 7-ER-1284-92 (Tr.887:4-895:23). But in such a world, as in the real world, out-of-market games would often be highly desirable. Evidence at trial (and basic common sense) proves that it is not credible that broadcasters would have made such games available for no additional charge.

In the real world, most fans are well-served by the three or four in-market games available through their local CBS and FOX stations. 11-ER-2113 (Tr.1712:7-10). On average, around 70% of NFL fans live in or near their

team's local market. 7-ER-1197 (Tr.800:1-4); 12-ER-2273 (Tr.1871:10-23). Because in-market games must include any matchups involving the local team, the "vast majority" of viewers have access to the games they are most interested in watching. 7-ER-1198-99 (Tr.801:5-802:5); *see also* 7-ER-1191-92 (Tr.794:5-795:17).

Still, there are reasons why an avid fan in a local market might want to watch out-of-market games instead. 9-ER-1685-89 (Tr.1286:12-1290:2). For instance, an Eagles fan may live in San Francisco, and thus they naturally may want to watch the Eagles on FOX instead of the local 49ers. Or a football-loving fan living in Jacksonville with no allegiance to any particular team may want to watch whatever game is most competitive rather than their hometown Jaguars. And an avid fantasy football player might want to flip between all Sunday afternoon games to see how their fantasy team's players are performing. Indeed, out-of-market games often include high-profile games that are much more expensive to broadcast, involve the NFL's largest brands, and are highly desirable for viewers and advertisers. 6-ER-1021 (Tr.626:15-24); 6-ER-1036-37 (Tr.640:2-641:24).

Despite the demand for out-of-market games and avid fans' willingness to pay for them, Dr. Rascher speculated that broadcasters like ABC and NBCU would have given away access to all out-of-market games to fans dissatisfied with the three or four options available on CBS or FOX for no

20

additional cost.  7-ER-1176-77 (Tr.779:7-780:19).  But the idea that broadcast-ers with a base of avid NFL fans willing to pay extra to access their preferred games would have instead given away these programs for free is completely detached from basic economic principles.  *See, e.g.*, Lars A. Stole, *Price Discrimination and Competition*, *in* 3 Handbook of Industrial Organization 2221, 2224 (M. Armstrong & R. Porter eds., 2007).  It is simply not credible that ABC or NBCU—having invested substantially to acquire the right to broad-cast out-of-market telecasts for which there was overwhelming demand—would give customers access to those broadcasts for no additional charge whatsoever.  As NFL Commissioner Goodell testified, whereas "the largest percentage of fans want" NFL games "[o]n free television," for that "limited" subset of "avid" fans, Sunday Ticket "delivers different value."  10-ER-1857-58 (Tr.1457:19-1458:22).

### C. Dr. Rascher's But-For World Is Incompatible with NFL Broadcasting Negotiations and Game Scheduling.

1.    Dr. Rascher's but-for world conflicted with broadcasting realities in other fundamental ways.  In Dr. Rascher's world, Mr. McManus testified, there would be "chaos in the marketplace" in terms of "the marketing," "sell-ing," "producing," "programming," "advertising," and "scheduling" of games.  11-ER-2112 (Tr.1711:3-19).  For instance, CBS and FOX feeds have CBS and FOX logos, promos for CBS and FOX programming, and national advertise-ments sold by CBS and FOX.  11-ER-2165-67 (Tr.1764:15-1766:7).  Even if

DirecTV, a satellite company, is willing to pass through national advertisements and some promos, 11-ER-2062-63 (Tr.1661:6-1662:23), it is "flawed" to assume that ABC and NBCU, as direct competitors with different incentives, could work out with CBS and FOX what passes through and what does not, 11-ER-2165-67 (Tr.1764:15-1766:7).

Dr. Rascher's but-for world, furthermore, would render scheduling both NFL and non-NFL programming nearly impossible. Throughout the season, CBS and FOX continuously reevaluate which Sunday afternoon games to air in which time slots in each local station across the country, often revising the schedule as late in the week as Friday. 11-ER-2167-69 (Tr.1766:8-1768:13); 11-ER-2056-57 (Tr.1655:13-1656:23); 13-ER-2614-16 (Tr.2211:20-2213:5). Suppose, for example, that NBCU secured the rights to broadcast all out-of-market AFC South games. At the start of the season, CBS may intend to broadcast a week-fourteen matchup between the Jaguars and the Colts at 1pm and to roughly 20% of the country: mostly Jacksonville and Indianapolis. NBCU, therefore, would show the game in the remaining 80% of the country and would identify alternative programming for the 20% of the country where CBS is showing the game. But if by week fourteen, the Jaguars and the Colts have two of the best records in the NFL, CBS may move the game to 4:25pm and decide to show it to 80% of the country. NBCU would therefore need to, at the very last minute, not only change where and when it airs the Jaguars-Colts

game but also identify some other programming that it can air at a completely different time to a completely different swath of the country.  11-ER-2167-69 (Tr.1766:8-1768:13).

Trial testimony made clear that these kinds of adjustments would be completely unworkable.  Cathy Yancy, VP of NFL broadcasting, explained that the notion that ABC and NBCU would "block out seven hours on their programming schedule every Sunday of the season," without "even know[ing] until Friday, two days before the game, … what game, what window, and what markets they're [broadcasting] to," is "the most absurd part of" Dr. Rascher's but-for world, and "[i]t would be financially and economically irresponsible" for "any network" "to program that way."  11-ER-2168-69 (Tr.1767:1-1768:13).  Mr. McManus likewise testified that there is no "infrastructure existing in this country that could support that kind of programming," and it is impossible to "imagine how [this world] would work or how the value would be generated for the individual broadcasters."  11-ER-2112-13 (Tr.1711:20-1712:6).  The district court once more did not abuse its discretion in finding Dr. Rascher's method-ology unreliable given his failure to "account for whether competitor networks could have even created programming for such a schedule."  1-ER-15 (D.Ct.Op. 7 n.6).

2.    Faced with this evidence of the infeasibility of his but-for world, Dr. Rascher's sole response was to throw up his hands and say that none of

these details matter.  The district court did not abuse its discretion in concluding that did not suffice to clear the expert testimony bar.  When asked about whether national advertisements would "pass[] through," Dr. Rascher said it would "lead to a similar outcome" either way and so "[i]it doesn't really matter."  7-ER-1294 (Tr.897:14-24).  When asked about who precisely would negotiate out-of-market rights, Dr. Rascher again punted, stating that "it ends up in the same situation," and "these games would appear on over-the-air networks and on the … major cable stations."  7-ER-1297-99 (Tr.900:5-902:13).  When asked about whether changes to revenue sharing could have downstream effects on fundamental NFL rules like salary caps and floors, Dr. Rascher gave non-answers: he said "it sort of doesn't matter" because "you're still going to have the 32 teams competing in the marketplace, being on TV, satisfying their fans," and that "the salary cap and the salary floor … may have changed, but it wouldn't have mattered," because "all of the teams are selling their product just like on Saturdays," "[f]ans are watching," and "[t]he owners have the same incentives."  7-ER-1299-1305 (Tr.902:14-908:15).  He ultimately testified that "these are sophisticated entities," "they figured it out in college sports," "they would certainly figure it out at the NFL," and "all these different but-for worlds lead to the same thing."  7-ER-1295 (Tr.898:15-23).

But Dr. Rascher disregarded that college football broadcasters "figured it out" precisely because the details of his but-for world and real-world college

football broadcasting differ. Most saliently: there is *no feed-sharing* (as required by Dr. Rascher's but-for world) *and no SBA in college*. Given these differences, the district court did not abuse its discretion in determining that Dr. Rascher's "assumption that Defendants would figure it out … is not a reliable methodology" and "does [not] substitute for a model of a but-for world grounded in economic analysis." 1-ER-14-16 (D.Ct.Op. 6-8). "While FRE 702 certainly does not require a but-for world to perfectly reflect what the real world would have been, it requires more than just saying market participants would have figured it out." 1-ER-14 (D.Ct.Op. 6). The district court was in the best position to see Dr. Rascher's testimony come apart at the seams and determine that it was based on little more than *ipse dixit*.

## II.    The District Court Properly Excluded Dr. Zona's Unreliable Testimony.

The district court likewise did not abuse its broad discretion in excluding testimony from Plaintiffs' other expert, Dr. Zona. A key piece of Dr. Zona's testimony was that the price of DirecTV's NFL Sunday Ticket would have decreased if there was at least one competitor who could deliver NFL Sunday Ticket direct to consumers during the class period. But his calculations relied on two critical and unsubstantiated assumptions. *First*, Dr. Zona assumed that a competitor could deliver live NFL games to consumers via streaming, even though the major industry players did not have the capability to live-stream NFL games for much of the class period. *Second*, even if a streaming

25

service existed, Dr. Zona assumed each class member would have been able to access it, even though many subscribers did not have the high-speed internet necessary for streaming.

### A. Dr. Zona Wrongly Assumed That a Competitor Could Live-Stream NFL Games During the Entire Class Period.

First, Dr. Zona assumed that from 2011 until 2023—the entirety of the class period—a DirecTV competitor could have offered NFL Sunday Ticket via a streaming service. 9-ER-1572 (Tr.1173:7-10); 9-ER-1622 (Tr.1223:15-17); 9-ER-1630 (Tr.1231:21-25); 9-ER-1623 (Tr.1224:16-20). In the economic models Dr. Zona presented to the jury, "the underlying assumption" was that one or more alternative distributors would compete with DirecTV by offering NFL Sunday Ticket "direct to consumer[s]." 9-ER-1622 (Tr.1223:15-17). Dr. Zona was not always clear about what he meant by a "direct-to-consumer" competitor—indeed, the district court found that Dr. Zona's failure to adequately define this concept was his "main flaw." 1-ER-19 (D.Ct.Op. 11). But to the extent Dr. Zona took a firm position, he conceded that a "direct-to-consumer" competitor needed to offer NFL Sunday Ticket as a standalone service, without an underlying subscription and without the need to purchase a satellite or other installation. 9-ER-1622-23 (Tr.1223:12-1224:6); 9-ER-1624-

26

25 (Tr.1225:23-1226:9). In other words: streaming. 1-ER-18 (D.Ct.Op. 10).[6] And the DirecTV competitor would have needed to offer live-streamed NFL games as early as 2011. Dr. Zona's models depended on this assumption. 9-ER-1626 (Tr.1227:13-16); 9-ER-1630-31 (Tr.1231:21-1232:8).

Dr. Zona, however, utterly failed to substantiate that it was technologically or economically feasible to live-stream the full slate of NFL games to massive NFL audiences during the entire class period. When asked if "an Internet streaming option would have even been feasible technology back in 2011," he answered that he "didn't consider that," agreeing he was "not a technical expert." 9-ER-1627 (Tr.1228:15-20). He had "[no] opinion about" whether "any direct-to-consumer streaming service … was available to consumers back in 2011 for live streaming of NFL football." 9-ER-1628

---

[6] Dr. Zona testified that "[his] model doesn't rely on any[] specific … product that's direct to consumer." 9-ER-1627 (Tr.1228:1-8). And Plaintiffs' counsel argued that Dr. Zona's model "wasn't based upon a streaming alternative at all" and "could've been by cable, by satellite, … by anything." 2-ER-127 (Tr.82:1-11). Again, however, Dr. Zona equivocated mightily when defining "direct to consumer." But when pressed, he defined the assumption of his model very narrowly: a direct-to-consumer competitor needed to provide NFL Sunday Ticket *without* requiring an additional subscription or service, and without going through "cable" or a "DISH Network." 9-ER-1622-23, 1626 (Tr.1223:2-1224:6, 1227:2-25). When asked if there was "*any* technological way to transmit the NFL Sunday Ticket product for out-of-market games to a consumer other than through Internet streaming that would fit the definition … in [his] model," Dr. Zona answered: "I don't have an opinion about that." 9-ER-1627 (Tr.1228:10-14) (emphasis added). He proffered no other alternative.

(Tr.1229:5-8). It was "not something [he] looked at." 9-ER-1628 (Tr.1229:9-11). He could not even testify about when industry-leading services started streaming live sports. 9-ER-1628-31 (Tr.1229:25-1232:22).

In fact, live-streamed NFL games were not regularly available to massive audiences in the early years of the class period because streaming live sports requires significant technology, infrastructure, and capital investment. Streaming live sports is different than streaming movies. 9-ER-1681 (Tr.1282:6-8). Streaming the NFL is also more complicated than other sports, in large part because the more people that stream a sporting event, the harder it is to stream. 10-ER-1862-63 (Tr.1462:18-1463:6). And the NFL draws more eyeballs to its telecasts than any other professional sport. 10-ER-1878-79 (Tr.1478:9-1479:14). For example, of the top 100 most-watched events on television in 2023, 93 were NFL games.[7] Indeed, in 2015, the NFL explored streaming games with Yahoo, but as Commissioner Goodell explained, "[t]he technology at that point in time … for a live event[] was not sufficient to be able to handle" the traffic. 10-ER-1862-63 (Tr.1462:18-1463:6). NFL games "*average* … 12 or 13 million people watching a game," and "the broadband couldn't handle that type of concurrent users at one time." 10-ER-1862-63 (Tr.1462:25-1463:4) (emphasis added). As late as 2019, the NFL did not think

---

[7] Brad Adgate, *NFL Games Made up 93% of the Most Watched TV Programs in 2023*, Forbes (Jan. 5, 2024), https://tinyurl.com/3fy39nus.

"that … streaming had advanced enough" to offer NFL Sunday Ticket via live-streaming. 10-ER-1865 (Tr.1465:20-25). In Commissioner Goodell's words, streaming was just "not ready for prime time." 10-ER-1919-20 (Tr.1519:24-1520:2).

It is no surprise, then, that the major players in the streaming industry only began live-streaming sports late in the class period. YouTube TV started in 2017.[8] ESPN+ started offering customers a limited menu of live sports in 2018.[9] And Netflix joined the fray in 2023.[10]

True, as Plaintiffs pointed out, some other sports—such as baseball—could be live-streamed during the class period. 9-ER-1767-68 (Tr.1368:15-1369:17). But the viewership of an average NFL game outstrips all other sports by orders of magnitude. 10-ER-1863 (Tr.1463:1-4); 7-ER-1244-45 (Tr.847:3-848:2). Thus, notwithstanding the streaming of some less-watched sports, Mr. Rolapp testified that the league did not pursue a streaming option

---

[8] Todd Spangler, *YouTube Unveils Live TV Bundle for $35 per Month with 40 Channels*, Variety (Feb. 28, 2017), https://tinyurl.com/mrx6abfx; 9-ER-1629 (Tr.1230:13-25).

[9] Claire Atkinson, *ESPN's Much-Anticipated Streaming Service Is Finally Here*, NBC News (Apr. 12, 2018), https://tinyurl.com/yc6su8sa; 9-ER-1628-29 (Tr.1229:25-1230:6).

[10] Brian Steinberg, *Netflix Launches First Live Sports Event with 'Netflix Cup' Golf Tournament*, Variety (Oct. 17, 2023), https://tinyurl.com/yc6d9ewe; 9-ER-1680-81 (Tr.1281:24-1282:11).

29

for NFL Sunday Ticket because "the quality of video delivery" in 2013 was not up to NFL standards and "the Internet was [not] quite ready to do" mass streaming of NFL games. 8-ER-1477-78 (Tr.1079:8-1080:1).[11] And again, even by 2019, the NFL thought there were still "technical" reasons "streaming was[n't] ready." 8-ER-1513 (Tr.1115:20-25).

Nor is the hole in Dr. Zona's testimony filled by the fact that streaming services generally existed during the class period—Netflix, for example, started streaming by 2011. 9-ER-1676 (Tr.1277:20-24). Streaming on-demand movies is no comparison to simultaneously streaming a dozen live NFL games to tens of millions of customers, as Commissioner Goodell made clear. 10-ER-1863 (Tr.1463:21-23); *accord* 9-ER-1681 (Tr.1282:6-8).

Thus, the district court's initial impression of Plaintiffs' expert witnesses was spot on: "during the class period, [Plaintiffs] want to just pretend that live streaming was a real option, and it wasn't." 11-ER-2027 (Tr.1626:16-19). Without even a realistic possibility of a streaming alternative to DirecTV for

---

[11] Although DirecTV was able to stream some NFL games at the start of the class period, Dr. Zona indicated this was not a direct-to-consumer product as he defined it because it required a base subscription. 9-ER-1631-32 (Tr.1232:9-1233:3). Furthermore, when DirecTV offered an NFL streaming service in Canada it had "serious buffering issues." 10-ER-1824 (Tr.1424:1-13).

the full span of 2011-2023, Dr. Zona's but-for world could never have been and none of his calculations hold.

### B. Dr. Zona Wrongly Assumed That All Class Members Were Able to Stream Live Sports for the Entire Class Period.

Even if there was some evidentiary basis for Dr. Zona to assume that an alternative distributor could have live-streamed NFL games direct to consumers as early as 2011, not every class member could have taken advantage of such a service. Dr. Zona admitted his calculations depended on the assumption that "[e]very household" could access a direct-to-consumer version of NFL Sunday Ticket. 9-ER-1627 (Tr.1228:22-25). Again, however, he denied any knowledge about "when class members could have even gotten access to streaming during this class period." 9-ER-1630 (Tr.1231:16-20). Live-streaming sporting events typically requires a high-speed internet connection. 9-ER-1691 (Tr.1292:14-22). But in 2011, 38% of American adults did not have high-speed internet access in their homes. Pew Rsch. Ctr., *Internet, Broadband Fact Sheet* (Nov. 13, 2024), https://tinyurl.com/ywfb8etu. That number improved over the course of the class period, but even by 2019, a full quarter of American adults still lacked in-home high-speed internet. *Id.* Plaintiffs' own class representative testified that they "just got[]" high-speed internet in 2019, and "[b]efore that, we'd only had DSL. And that's just not very fast. You can't really stream much over a DSL line." 9-ER-1691 (Tr.1292:2-19). Dr. Zona offered no justification for assuming that DirecTV subscribers could uniformly

31

switch to a direct-to-consumer streaming alternative for NFL games from 2011-2023.

## CONCLUSION

Dr. Rascher's and Dr. Zona's testimony was not based on sufficient data and fundamentally conflicted with the realities of NFL broadcasting. The district court did not abuse its discretion in exercising its gatekeeping function and excluding their unreliable testimony.

Respectfully submitted,

*/s/ Lisa S. Blatt*
LISA S. BLATT
CHARLES L. MCCLOUD
CHRISTIAN J. GLADDEN-SORENSEN
CHRISTOPHER J. BALDACCI
WILLIAMS & CONNOLLY LLP
  *680 Maine Avenue SW*
  *Washington, DC 20024*
  *(202) 434-5000*
  *lblatt@wc.com*

JUNE 17, 2025

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Lisa S. Blatt, counsel for amici FOX, CBS, NBCU, ESPN, and ABC and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32 and Ninth Circuit Rule 32, that the attached Brief of Amici FOX, CBS, NBCU, ESPN, and ABC is proportionately spaced, has a typeface of 14 points or more, and contains 6,986 words.

*/s/ Lisa S. Blatt*
LISA S. BLATT
WILLIAMS & CONNOLLY LLP

JUNE 17, 2025

## CERTIFICATE OF SERVICE

I, Lisa S. Blatt, counsel for amici FOX, CBS, NBCU, ESPN, and ABC and a member of the Bar of this Court, certify, that, on June 17, 2025, a copy of the attached Brief of Amici FOX, CBS, NBCU, ESPN, and ABC was filed with the Clerk through the Court's electronic filing system.  I further certify that all parties required to be served have been served.

*/s/ Lisa S. Blatt*

LISA S. BLATT
WILLIAMS & CONNOLLY LLP

JUNE 17, 2025