**Nos. 24-5493 & 24-5691**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

*IN RE NATIONAL FOOTBALL LEAGUE'S SUNDAY TICKET ANTITRUST LITIGATION,*

NINTH INNING, INC., *ET AL.*,

*Plaintiffs-Appellants,*

v.

NATIONAL FOOTBALL LEAGUE, INC., *ET AL.*,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Central District of California
No. 2:15-ml-02668-PSG-SK

Hon. Philip S. Gutierrez

---

**PLAINTIFFS-APPELLANTS' OPPOSITION TO THE MOTION FOR LEAVE TO FILE A BRIEF AS *AMICI CURIAE* BY THE "NFL MEDIA PARTNERS" AND, IN THE ALTERNATIVE, MOTION FOR LEAVE TO FILE SEPARATE RESPONSE**

**<u>PROVISIONALLY FILED UNDER SEAL</u>**

---

Marc M. Seltzer
SUSMAN GODFREY LLP
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Telephone: (310) 789-3100

Howard Langer
LANGER GROGAN & DIVER, P.C.
1717 Arch Street, Suite 4130
Philadelphia, PA 19103
Telephone: (215) 320-5660

Scott Martin
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Telephone: (646) 357-1100

Jeffrey A. Lamken
MOLOLAMKEN LLP
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
Telephone: (202) 556-2000

*Counsel for Plaintiffs-Appellants*

## **<u>TABLE OF CONTENTS</u>**

Introduction ................................................................................................1

Background ................................................................................................4

Legal Standard .........................................................................................7

Argument...................................................................................................8

    I.    The Would-Be *Amici* Are Highly Partisan Co-Conspirators Who Seek to Preserve the Ongoing, Anti-Competitive Conspiracy that Has Long Enriched Them ..........................................8

        a.    *Amici* Are Not Permitted to "Present Highly Partisan Accounts of the Facts" .............................................9

        b.    The Would-Be *Amici* Are Directly Interested in the Outcome of this Case and Highly Partisan ..............................11

    II.    The Proposed Brief Makes Many Unsupported Factual Assertions that Are Contrary to the Trial Record and the Jury's Verdict ..........................................................................12

        a.    The Partners' Attacks on Dr. Rascher Rely on Novel and Unsupported "Facts" .........................................13

        b.    The Partners' Attacks on Dr. Zona Overtly Rely on Extra-Record Materials .............................................15

    III.    The Proposed Brief Simply Repeats Arguments Already Made In the NFL Defendants' 20,000-Word Red Brief ....................18

Conclusion ..............................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Banerjee v. Bd. of Trs. of Smith Coll.*,
    648 F.2d 61 (1st Cir. 1981) ...................................................................10

*Feld Ent., Inc. v. Arena Grp. 2000, LP*,
    2006 WL 8455518 (S.D. Cal. June 2, 2006) .......................................9

*Funbus Sys., Inc. v. State of Cal. Pub. Utilities Comm'n.*,
    801 F.2d 1120 (9th Cir. 1986) ................................................8, 9, 13

*Good George LLC v. Cincinnati Ins. Co.*,
    2021 WL 5305854 (D. Or. Nov. 15, 2021) ....................................9, 10

*Harper v. Wright*,
    744 F. App'x 533 (9th Cir. 2018) (unpublished) ...............................19

*In re Halo Wireless, Inc.*,
    684 F.3d 581 (5th Cir. 2012) ...........................................................7, 19

*Jones v. Becerra*,
    2020 WL 8920621 (S.D. Cal. Jan. 14, 2020) .......................................9

*Nat'l Org. for Women, Inc. v. Scheidler*,
    223 F.3d 615 (7th Cir. 2000) ..............................................................19

*New England Patriots Football Club, Inc. v. University of Colorado*,
    592 F.2d 1196 (1st Cir. 1979) .............................................................10

*Picard v. Greiff*,
    797 F. Supp. 2d 451 (S.D.N.Y. 2011) ..................................................8

*Prairie Rivers Network v. Dynegy Midwest Generation, LLC*,
    976 F.3d 761 (7th Cir. 2020) ..............................................................19

*Pub. Serv. Co. of Colorado v. Kempthorne*,
    2005 WL 8165547 (D. Idaho Apr. 14, 2005) ......................................9

*Ryan v. Commodity Futures Trading Comm'n*,
    125 F.3d 1062 (7th Cir. 1997) (Posner, C.J., in chambers)................10

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    550 B.R. 241 (Bankr. S.D.N.Y. 2016).................................................8

*United States v. Michigan*,
    940 F.2d 143 (6th Cir. 1991) ................................................10

**Statutes**

15 U.S.C. §§ 1 & 2................................................................4

15 U.S.C. § 1291...............................................................20

**Rules**

9th Cir. R. 29-1 Circuit Advisory Comm. Note ...............................8, 19

**Other Authorities**

4 Am. Jur. 2d Amicus Curiae § 3 (West 2025)...............................7, 8

Complaint, *Trilogy Holding, LLC v. Nat'l Football League, Inc.*, No.
    15-cv-8188 (S.D.N.Y. Oct. 16, 2015)......................................5

DeMatteo et al., *When Amicus Curiae Briefs Are Inimicus Curiae
    Briefs: Amicus Curiae Briefs and the Bypassing of Admissibility
    Standards* ........................................................10, 11

Joe Flint, *Netflix Taps CBS Sports to Produce Its Christmas NFL
    Games*, Wall St. J. (Aug. 9, 2024), https://tinyurl.com/296z7bas.............15

*NFL Makes Play for Live Webcasts*, Hollywood Rep.
    (Nov. 30, 2006), https://tinyurl.com/5t3xsz6 ................................18

*NFL & Yahoo! to Offer Live Game Webcasts Outside of North
    America*, Nat'l Football League
    (Sept. 8, 2006), https://tinyurl.com/46p99u3y...............................18

*Super Bowl XLVI Live Stream Sets Traffic Records*, NBC Sports (Feb.
    7, 2012), https://tinyurl.com/3v476yzp ....................................18

Plaintiffs-Appellants oppose the motion for leave to file a brief as *amici curiae*, Dkt. 119.1, filed by five television networks: Fox Corporation ("Fox"); CBS Broadcasting Inc. ("CBS"); NBCUniversal Media, LLC ("NBC"); ESPN, Inc. ("ESPN"); and the American Broadcasting Companies, Inc. ("ABC"), which collectively style themselves as the "NFL Media Partners." If the Partners' motion is granted, then Plaintiffs respectfully move for leave to file a 7,000-word response brief.

## INTRODUCTION

This is an appeal from a jury verdict following a three-week trial. The jury found that the National Football League ("NFL") and its 32 independently owned and managed teams (together, the "NFL Defendants") conspired to restrict distribution of, and fix prices for, telecasts of "out-of-market" NFL games, which, pursuant to the conspiracy, were made available exclusively from DirecTV in a premium-priced subscription package called "Sunday Ticket." The jury found that this conspiracy violated the antitrust laws and caused Plaintiffs, who paid the artificially inflated prices for these telecasts, more than $4.7 billion in damages. It was the very object of the conspiracy to charge subscribers to Sunday Ticket—the members of the Plaintiffs' classes—these inflated prices to protect CBS and Fox from competition from these NFL game telecasts. The conspiracy continues today.

Out-of-market game telecasts are now available, by design, to residential consumers, for $349/year, from just one exclusive distributor: Google.

Two of the proposed *amici*—CBS and Fox—have been and are the NFL Defendants' co-conspirators. Those networks paid the NFL Defendants more than $23 billion during the class period, and they currently pay more than ███████████ ███ for the right to air "in-market" NFL games on these networks' television stations. Part of what they are paying for is the NFL Defendants' ongoing suppression of competition that CBS and Fox would otherwise face from out-of-market game telecasts. The jury heard testimony from senior executives of both CBS and Fox who admitted on the witness stand that the NFL Defendants promised CBS and Fox to suppress competition by requiring DirecTV to charge Plaintiffs artificially inflated, "premium" prices to receive out-of-market game telecasts, which were available to Plaintiffs exclusively through DirecTV's "Sunday Ticket" package.

CBS and Fox, now styling themselves as the NFL's "Media Partners," ask this Court for leave to present, for the first time on appeal, brand new evidence that the jury and district court did not consider and that is belied by the record itself. This Court should deny their motion for three reasons.

*First*, the NFL Media Partners are not proper *amici*. CBS and Fox are highly partisan, ongoing *participants* in the continuing conspiracy to suppress competition.

2

The other proposed *amici* are, as they describe themselves, "Media Partners" of the NFL, who are also financially vested in the outcome of this case. Their one-sided presentation of highly contested facts is driven by their desire to continue to be sheltered from competition. Their own motion for leave admits that is their goal. And their one-sided recitation of their executives' testimony at trial presumes that what those executives said must be taken as true, even though the jury was free to disbelieve them.

*Second*, even if these networks were proper *amici*, their motion should still be denied for a second, independent reason: The proposed brief makes several new factual assertions, outside the voluminous trial record, regarding issues that were the subject of extensive witness testimony and expert reports. It is inappropriate for interested parties, like these would-be *amici*, to expand the factual record on appeal when no opportunity remains for cross-examination or the introduction of rebuttal evidence.

*Third*, the proposed brief should also be rejected because it contains no new or helpful arguments beyond its improper attempt to introduce new facts. Instead, it repeats the arguments already made at length in the NFL Defendants' 20,000-word Red Brief. Regurgitating a party's arguments is not a proper role for an *amicus* brief.

## BACKGROUND

Last summer, a jury unanimously found that the NFL, its 32 teams, and DirecTV conspired to violate Sections 1 and 2 of the Sherman Antitrust Act by suppressing competition and inflating prices in the market for telecasts of out-of-market NFL games. This conspiracy involved an interlocking web of agreements. First, the NFL's 32 teams agreed not to compete with one another in selling telecasts of their games; instead, each team transferred its telecast rights to the NFL to act as sole selling agent for all 32 teams. *See* Blue Br. 23-24 (describing the "Teams-NFL Agreement"). Second, the NFL sold to DirecTV the exclusive rights to telecast out-of-market games in a package called "Sunday Ticket." *Id.* at 24-28 (describing the "NFL-DirecTV Agreements"). Third, the NFL promised CBS and Fox that the NFL would ensure that DirecTV charged Plaintiffs a "premium" price for Sunday Ticket. *Id.* at 28-30 (describing the "NFL-Network Agreements").

The NFL Defendants, CBS, and Fox all agreed to this "premium" price requirement explicitly to ensure that CBS and Fox did not face meaningful competition from DirecTV's Sunday Ticket telecasts of out-of-market games. 20-ER-4328 (TX-750, at 2) (CBS: "[t]he concept here has always been that these [Sunday Ticket] packages are sold at a premium, thereby limiting distribution"); 20-ER-4276 (TX-257, at 9) (Fox: "the agreed principle" is "that Sunday Ticket would

remain a complementary, premium product that would not materially compete with Fox's in-market games").

In exchange for the NFL Defendants' promise to make sure that out-of-market games were only made available for a "premium" price, CBS and Fox together paid more than $23 billion to the NFL Defendants over the twelve-year class period for the rights to telecast in-market NFL games over-the-air. *Id.* These networks' current contracts with the NFL Defendants continue to require each network to pay more than ███████████ for the exclusive rights to telecast in-market NFL games on their over-the-air affiliate stations.[1] Those contracts last until 2033 (for CBS)[2] and ████████████████[3]

The proposed *amici* have been directly involved in this litigation since it began in 2012. CBS and Fox were named as defendants in Plaintiffs' original complaint.[4] Although the operative, consolidated complaint does not name these would-be *amici* as defendants, it describes their participation in the conspiracy in detail.[5] Employees

---

[1] 20-ER-4121 (TX-146A, at 5 ¶2(a)); 20-ER-4138 (TX-146D, at 7 ¶ 2(a)).

[2] 20-ER-4121 (TX-146A, at 5 ¶ 1(a)).

[3] 20-ER-4137 (TX-146D, at 6 ¶ 1(a)).

[4] *See* Complaint at 1, *Trilogy Holding, LLC v. Nat'l Football League, Inc.*, No. 15-cv-8188 (S.D.N.Y. Oct. 16, 2015).

[5] *See, e.g.*, 4-ER-492-493, 514-515, 532 (Plaintiffs' Opening Statement) (Tr. 98:25-99:6, 120:8-121:9, 138:12-14;); 4-ER-552-554, 560-561, 565 (Defendants' Opening Statement) (Tr. 158:20-160:19, 166:11-167:16, 171:11-18); 14-ER-2782-2783, 2790, 2792, 2793-2796 (Plaintiffs' Closing Statement) (Tr. 2378:1-2379:25, 2386:4-18; 2388:7-13; 2389:12-2392:5); 14-ER-2864, 2868-2869 (Defendants' Closing Statement) (Tr. 2460:1-15, 2464:14-2465:11).

of all five proposed *amici* were deposed during discovery. These networks also produced critical documents, many of which were introduced as exhibits at trial.

These *amici* were discussed extensively during the jury trial. Each network was mentioned by name nearly 100 times on the record (some, much more). They featured prominently in the opening and closing statements of both parties.[6] CBS and Fox's executives also testified at length, and confirmed what their networks' documents stated: the NFL Defendants promised to set "a premium price for Sunday Ticket which limits distribution of Sunday Ticket." 11-ER-2078 (Tr. 1677:16-19) (CBS Sports' former Chairman, Sean McManus); *see* 6-ER-915-16, 923 (Tr. 519:18-520:3, 527:1-9) (Larry Jones, senior Fox executive, testifying that "Sunday Ticket would be a premium product for avid fans," and that a "premium product" was one that sold for "a premium fee").

Indeed, at least two *amici*—CBS and Fox—*still* profit from the conspiracy, as the premium pricing for Sunday Ticket continues to shield them from competition to this day. Because of their extensive involvement, and consistent with the joint and several liability of antitrust conspirators, the jury was specifically instructed that it

---

[6] *See, e.g.*, 4-ER-492–493, 514–515, 532 (Plaintiffs' Opening Statement) (Tr. 98:25–99:6, 120:8–121:9, 138:12–14;); 4-ER-552–554, 560–561, 565 (Defendants' Opening Statement) (Tr. 158:20–160:19, 166:11–167:16, 171:11–18); 14-ER-2782–2783, 2790, 2792, 2793–2796 (Plaintiffs' Closing Statement) (Tr. 2378:1–2379:25, 2386:4–18; 2388:7–13; 2389:12–2392:5); 14-ER-2864, 2868–2869 (Defendants' Closing Statement) (Tr. 2460:1–15, 2464:14–2465:11).

could not consider that CBS and Fox were not named defendants. 2-ER-202.

On June 17, 2025, these five television networks—now calling themselves the "NFL Media Partners"—filed a motion seeking leave to participate in this appeal as friends of the Court. Dkt. 119.1. Their motion asserts that their 7,000-word *amicus* brief will "aid the Court by leveraging amici's unique knowledge of the market for televised NFL games," Dkt. 119.1 at 5, which is of course the very subject of the lengthy jury trial and voluminous expert reports that this appeal concerns. Essentially, these five television networks are seeking to file a lengthy brief dedicated to a one-sided presentation of highly disputed facts, which includes numerous factual assertions that have no support in the record and are in fact contradicted by the testimony that the jury actually heard—including testimony of the NFL Defendants' own experts.

Plaintiffs have consented to the filing of briefs by all other *amici* who support the NFL Defendants. But these proposed "*amici*" are different. They include members of the very conspiracy at issue and have gone outside the record to advance their own interests.

## LEGAL STANDARD

Participating as an *amicus* is a "privilege," not a "right." 4 Am. Jur. 2d Amicus Curiae § 3 (West 2025). That privilege is dispensed as "a matter of judicial grace." *In re Halo Wireless, Inc.*, 684 F.3d 581, 596 (5th Cir. 2012) (quoting *Nat'l Org. for*

*Women, Inc. v. Scheidler*, 223 F.3d 615, 616 (7th Cir. 2000) (Posner, C.J., for the court)). *Amici* must "demonstrat[e] that they specifically could contribute expertise and arguments not presented by the parties," 4 Am. Jur. 2d Amicus Curiae § 3, and their briefs "should not repeat arguments or factual statements made by the parties," 9th Cir. R. 29-1 Circuit Advisory Comm. Note. Nor should *amici* be allowed to present "a highly partisan accounts of the facts." *Funbus Sys., Inc. v. State of Cal. Pub. Utilities Comm'n.*, 801 F.2d 1120, 1125 (9th Cir. 1986) (cleaned up); *Picard v. Greiff*, 797 F. Supp. 2d 451, 452 (S.D.N.Y. 2011) (denying motion for leave to file as *amicus* because would-be *amicus* "could not provide the Court with 'neutral assistance in analyzing the issues before it'") (citation omitted); *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 550 B.R. 241, 256 (Bankr. S.D.N.Y. 2016) (similar).

The burden is on the would-be *amici* to demonstrate that they should be permitted to participate under these standards. 4 Am. Jur. 2d Amicus Curiae § 3. The NFL Media Partners have not met that burden.

## ARGUMENT

### I.   The Would-Be *Amici* Are Highly Partisan Co-Conspirators Who Seek to Preserve the Ongoing, Anti-Competitive Conspiracy that Has Long Enriched Them

The first reason this Court should deny the NFL Media Partners' motion is their overwhelming, direct personal interest in the outcome of this case. Their

proposed brief's one-sided presentation of the facts is exceptionally partisan.

### a. *Amici* Are Not Permitted to "Present Highly Partisan Accounts of the Facts"

Although there is "no rule that amici must be totally disinterested" in the outcome of the appeal, *amici* should not be allowed to "present highly partisan accounts of the facts." *Funbus Sys.*, 801 F.2d at 1125 (cleaned up). District courts in this circuit heed that warning, routinely excluding *amicus* briefs that display "obvious partisanship." *E.g.*, *Jones v. Becerra*, 2020 WL 8920621, at *1 (S.D. Cal. Jan. 14, 2020) (denying leave to file a partisan *amicus* brief because it allowed the "Defendant to have a proverbial 'another bite of the apple'").[7] The partisanship of a would-be *amicus* is especially problematic where, as here, the proposed brief is devoted to factual issues. *See Good George LLC v. Cincinnati Ins. Co.*, 2021 WL 5305854, at *3 (D. Or. Nov. 15, 2021) (denying leave to file *amicus* brief). "*Amici* should not concentrate on, or even address, the facts offered by the parties and properly before the court." *Id.*

Federal courts of appeals agree: Highly partisan *amicus* briefs should be excluded. Then-Chief Judge Posner, for example, observed that *amicus* briefs "filed by allies of litigants" which "duplicate the arguments made in the litigants' briefs"

---

[7] *See also Feld Ent., Inc. v. Arena Grp. 2000, LP*, 2006 WL 8455518, at *2 (S.D. Cal. June 2, 2006) (denying leave to file where *amicus* "made patently clear its partisan interest in the matter"); *Pub. Serv. Co. of Colorado v. Kempthorne*, 2005 WL 8165547, at *2 (D. Idaho Apr. 14, 2005) (similar).

"are an abuse" and "should not be allowed." *Ryan v. Commodity Futures Trading Comm'n*, 125 F.3d 1062, 1063 (7th Cir. 1997) (Posner, C.J., in chambers). The First Circuit has stated that an *amicus* brief should not "assist[]" any "party with its evidentiary claims." *Banerjee v. Bd. of Trs. of Smith Coll.*, 648 F.2d 61, 65 n.9 (1st Cir. 1981) (finding *amicus* brief "improper" where "over half" of the brief "is directed to discussing the facts favorable to plaintiff"); *see New England Patriots Football Club, Inc. v. University of Colorado*, 592 F.2d 1196, 1198 n.3 (1st Cir. 1979) (disapproving *amicus* brief that "gives a highly partisan … account of the facts"). The Sixth Circuit has likewise observed that, "[h]istorically," the purpose of an *amicus* brief was "to provide *impartial* information on matters of law about which there was doubt, especially in matters of public interest"; the role of an *amicus* "was not to provide a highly partisan account of the facts." *United States v. Michigan*, 940 F.2d 143, 164-65 (6th Cir. 1991).

"[S]cholars have also expressed concern that amicus curiae briefs may mislead courts for partisan purposes." DeMatteo et al., *When Amicus Curiae Briefs Are Inimicus Curiae Briefs: Amicus Curiae Briefs and the Bypassing of Admissibility Standards*, 72 Am. Univ. L. Rev. 1871, 1876 (2023). This risk is particularly acute where, as here, the would-be *amicus* files a brief that attempts to function like an expert report or argument to the jury—but without all the checks on such evidence

that would be available during discovery, starting with cross-examination of the *amicus* on its factual assertions about how the world works. *Id.* at 1915-18.

### b. The Would-Be *Amici* Are Directly Interested in the Outcome of this Case and Highly Partisan

These five would-be *amici* do not claim to have any interest in the principles of law or policy that are at issue in this appeal. Their interest, instead, is entirely in the *outcome* of this appeal, since the *outcome* could drastically affect their own bottom lines. CBS and Fox, in particular, want to continue to enjoy the massive financial benefits that accrue to them from their participation in the NFL Defendants' ongoing conspiracy. If the jury's verdict were reinstated, these networks would lose money because the NFL Defendants could no longer collude with each other and the networks to protect them from competition. The networks are here to try to prevent that from happening.

One reason Fox and CBS are each currently paying the NFL Defendants more than ███████████ is that the NFL Defendants promised to suppress competition for Fox and CBS's in-market game telecasts—that is, the NFL Defendants promised to ensure that the out-of-market game telecasts in the Sunday Ticket package are sold at a "premium" subscription price. That premium price ensures that few people can watch out-of-market telecasts, meaning that Fox and CBS face no meaningful competition from those telecasts. *See* Blue Br. at 28-30 (summarizing the evidence of these repeated promises to Fox and CBS).

11

These would-be *amici* actually admit that preserving this benefit of their bargain with the NFL Defendants is their interest in this appeal. They write, on page 2 of their motion: "Amici have a significant interest in this litigation's outcome because the exclusivity of their respective production and broadcast rights is a lynchpin of their respective business models." Dkt. 119.1 at 5. In other words: having agreed to pay to be free from meaningful competition from Sunday Ticket and obtain billions of dollars in advertising revenue from their broadcasts, these networks now seek to preserve the suppression of competition they bargained for.

## II. The Proposed Brief Makes Many Unsupported Factual Assertions that Are Contrary to the Trial Record and the Jury's Verdict

Far worse, these partisan co-conspirators do not limit themselves to legal or policy arguments. Indeed, their proposed brief makes no new legal or policy argument whatsoever. The brief cites just five cases, all of them in the standard of review section, and none for any substantive proposition. Dkt. 119.2, at 16-17. Rather than offer any new or helpful legal or policy argument, their proposed brief is instead dedicated to a one-sided factual presentation that seeks to *expand and augment* the existing trial record.

In an attempt to justify the District Court's post-trial decision to retroactively exclude the testimony of Plaintiffs' experts, Drs. Rascher and Zona, the Partners offer a series of unsupported and far-reaching claims cloaked as "facts." This "highly

12

partisan account[]," which was never presented to the jury or the District Court, should not be permitted in an *amicus* brief. *Funbus Sys.*, 801 F.2d at 1125.

### a. The Partners' Attacks on Dr. Rascher Rely on Novel and Unsupported "Facts"

The Partners start by attacking Dr. Rascher, claiming that his expert opinions failed to account for "the realities of NFL broadcasting." Dkt. 119.2 at 18. That contention rests on several inaccurate factual statements made in the Partners' brief—and only the Partners' brief—about their conduct in this case and what their conduct would have been in Dr. Rascher's "but-for" world where the NFL Defendants did not violate the antitrust laws.

*First*, the Partners claim that they "would ***never*** share" audio and video "feeds" of NFL games "with direct competitors." Dkt. 119.2 at 18 (emphasis added). But the networks did not have the power to decide whether to share feeds. The NFL teams did. *See* Blue Br. 57 & n.16.

Aside from their brief's say-so about "never sharing" feeds, the Partners have no evidence to support that assertion—certainly no evidence presented to the jury in this case. *See* Dkt. 119.2 at 19 (omitting evidence about Fox, ESPN, ABC, and NBC). The sole trial witness on whom the Partners' brief relies—CBS's Sean McManus—didn't testify that CBS would never share its feeds. He actually testified that he could not offer the jury any "conjecture" on whether CBS would share feeds with other broadcasters in the but-for world. 11-ER-2093 (Tr. 1692:2-20).

McManus's refusal to make any such "conjecture" was warranted. CBS, Fox, and NBC have ***all*** shared football game feeds before. *See* D. Ct. Dkt. 705-1, at 16-17 (Defendants representing to the District Court that CBS, Fox, and NBC had previously shared feeds of NFL games with Amazon, Twitter, and the NFL Network); 8-ER-1489-1490 (Tr. 1091:13–1092:8) (similar testimony from the NFL's Chief Media Officer).

*Second,* the Partners' proposed brief would also tell this Court that the "***only way*** for broadcasters to protect their investments in the rights to NFL games" is to refuse to share game feeds. Dkt. 119.2 at 19 (emphasis added). But the Partners identify no witness who testified to that effect, nor could they. The networks could "protect[] their investments" by, among other things, "pay[ing] less money in order to get those rights" from the NFL in the first instance. 7-ER-1289-96 (Tr. 892:13-899:6) (Rascher); *see* 13-ER-2556-58 (Tr. 2153:21-2155:24) (corroborating testimony by Plaintiffs' expert Professor Elhauge).

The Partners should not now be heard to make self-serving assertions about what they would have done (shared feeds, or not) in the "but for" world—that is, in the world where the NFL Defendants didn't conspire to suppress competition and fix prices for the distribution of out-of-market telecasts. For example, the factual claim that the Partners would not have wanted to broadcast any NFL games without the restriction of competition from out-of-market games is not only unsupported by

the record, it is preposterous. This kind of factual question, about what the networks would have done, was for the jury to decide based on the evidence received at trial.

If the trial record *were* to be re-opened on appeal, so that these *amici* could regale this Court with what is, in effect, a written witness statement about their feed-sharing preferences, then Plaintiffs should be permitted to respond by pointing out that one of these *amici*, just last Christmas, produced two NFL games for its rival Netflix to air.[8] For some reason, CBS wasn't able to find space in its 7,000-word proposed *amicus* brief to alert this Court to that recent and high-profile instance of sharing feeds with a rival.

### b. The Partners' Attacks on Dr. Zona Overtly Rely on Extra-Record Materials

The Partners seek to discredit one of Dr. Zona's models by making yet another unsupported factual assertion, namely, that a direct-to-consumer competitor to DirecTV would not have been able to "stream" NFL telecasts to consumers in the beginning of the class period.[9] The Partners assert that "major industry players did

---

[8] Joe Flint, *Netflix Taps CBS Sports to Produce Its Christmas NFL Games*, Wall St. J. (Aug. 9, 2024), https://tinyurl.com/296z7bas (reporting that CBS will produce two NFL games for Netflix to broadcast on Christmas Day in exchange for "a production fee" and "promotional spots" for its own programming); *id.* (reporting that this arrangement "isn't unusual," because "CBS also produces games carried by the NFL Network" while "Amazon Prime Video uses NBC crew members in the production of its [Thursday Night] games").

[9] Zona's model, however, did *not* depend on the presence of a "streaming" competitor. Any direct-to-consumer competitor would suffice, and a Netflix-like streaming service was simply an example of such a competitor. *See* Blue Br. 66-67.

not have the capability to livestream NFL games" during that period, and that "many subscribers did not have the high-speed internet necessary for streaming." Dkt. 119.2 at 31-32. The Partners do not explain what entitles them to make those factual assertions. They do not claim to have been "major industry players" in streaming during much of the class period, nor do they claim any expertise in the home broadband market.

Perhaps as a result of their own lack of technical knowledge or expertise, the Partners repeatedly rely on materials that they, or their outside counsel, managed to scrounge up online. For instance, the Partners' proposed brief would cite several op-ed articles in *Variety* and *NBC News* asserting that sports streaming emerged later in the class period. *See* Dkt. 119.2 at 35 nn. 8-10.

Considering such media reports for the first time on appeal is plainly improper. The Partners do not suggest these materials are appropriate for judicial notice. They were not considered below. They are obvious hearsay, not made under oath, and of course their authors were not subjected to cross-examination. Nor is it possible for any of the Partners' new-found online sources to be meaningfully challenged at this late stage, during appellate briefing.

The consideration of these materials would be especially troubling because, as with the Partners' other extra-record arguments, these new online sources are contradicted by the record that was actually presented to the jury. For instance, in

2012, NBC live-streamed the very first Super Bowl that occurred during the class period. 11-ER-2199 (Tr. 1798:12-18). Also in 2012, DirecTV began live-streaming Sunday Ticket games. 11-ER-2182-88 (Tr. 1781:9-1787:21).

Most telling of all, the NFL's own expert in media economics conceded under oath that live-streaming NFL games was feasible during *and before* the class period. When asked whether "live sports streaming existed during the class period," his answer was unequivocal: "Yes." 9-ER-1767 (Tr. 1368:15-17) (Yurukoglu). When asked whether "there were streamed live sports games even before the class period," he testified: "I bet there were." *Id.* (Tr. 1368:18-21). And when asked if "the NFL streamed live games as early as 2006," he said that "doesn't surprise me." *Id.* (Tr. 1368:22-25).

Of course it didn't surprise him. If the NFL Defendants' media expert had claimed surprise, then Plaintiffs could have confronted him with widespread media reports showing that NFL games were successfully live-streamed over the internet in 2006, five years before the class period began.[10] What would be the point of a jury verdict based on sworn in-court testimony, if that testimony could later be contradicted on appeal by a partisan *amicus* brief based on cherry-picked internet sources, free from any adversarial testing?

---

[10] *See NFL & Yahoo! to Offer Live Game Webcasts Outside of North America*, Nat'l Football League (Sept. 8, 2006), https://tinyurl.com/46p99u3y; *NFL Makes Play for Live Webcasts*, Hollywood Rep. (Nov. 30, 2006), https://tinyurl.com/5t3xsz6.

If this kind of *amicus* brief were allowed, and its cherry-picked sources were considered, then in fairness Plaintiffs should be permitted to rebut this *amicus* brief by pointing out that the livestream of the Super Bowl in 2012, at the outset of the class period, was watched online by 2.1 million viewers.[11] That is significantly *more* viewers than the *entire number* of Sunday Ticket residential subscribers in 2012. *See* 20-ER-4280.

But the simpler solution is for this Court to deny the motion. It is one thing for an *amicus* to offer a new perspective on the legal issues presented by the appeal. It is another thing entirely for a would-be friend of the Court to distort a trial record closed long ago by offering sweeping factual claims based on cherry-picked sources which contradict that record and can no longer be subject to meaningful scrutiny. This should not be permitted.

## III. The Proposed Brief Simply Repeats Arguments Already Made In the NFL Defendants' 20,000-Word Red Brief

Aside from its new factual assertions, the proposed *amicus* brief is entirely duplicative of the NFL Defendants' Red Brief. That is the third reason why the Partners' motion should be denied.

"[A]mici briefs should not repeat arguments or factual statements made by the parties." 9th Cir. R. 29-1 Circuit Advisory Comm. Note. "[A]n *amicus curiae* brief

---

[11] *Super Bowl XLVI Live Stream Sets Traffic Records*, NBC Sports (Feb. 7, 2012), https://tinyurl.com/3v476yzp.

should be additive—it should strive to offer something different, new, and important" to the parties' merits briefs. *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 976 F.3d 761, 763 (7th Cir. 2020). *Amicus* briefs that merely repeat one party's arguments are routinely—and appropriately—rejected for that reason alone. *E.g.*, *In re Halo*, 684 F.3d at 596 (denying motion for leave to file an *amicus* brief that did not "add[] anything consequential" to the parties' briefs); *Scheidler*, 223 F.3d at 617 (denying permission to file *amicus* briefs that did not present any "considerations of fact, law, or policy overlooked by the appellants"); *Harper v. Wright*, 744 F. App'x 533, 534 (9th Cir. 2018) (unpublished) (denying motion for leave to file *amicus* brief that was "substantively identical to the opening brief").

The proposed brief here adds no new arguments. Rather, it offers only a "do over" of arguments already made at great length in the Red Brief filed by the NFL Defendants. The proposed brief even copies the Red Brief's examples. *Compare* Red. Br. 46 (extended analogy concerning the San Francisco 49ers and Jacksonville Jaguars) *with* Dkt. 119.2 at 26 (same). In addition, both briefs:

- contend that the Networks would not share feeds based on the testimony of CBS's former chairman McManus[12];

---

[12] *Compare* Dkt. 119.2 at 19 (claiming that "the NFL broadcasters [plural] testified unequivocally and without contradiction that they [plural] would never share their feeds," but citing only the testimony of CBS's McManus) *with* Red. Br. 51 (likewise relying exclusively on McManus's testimony).

- ground their criticisms of Dr. Rascher's use of the college football yardstick on the Sports Broadcasting Act[13] and the purported differences between college football and the NFL[14];

- claim the networks' longstanding provision of feeds with DirecTV is somehow irrelevant[15];

- argue the "New Frontier" study considered by the NFL's senior leaders should be disregarded because it was "hypothetical"[16];

- dispute Dr. Rascher's conclusion that out-of-market broadcasts would be available at no additional charge in the but-for world[17];

- assert Dr. Rascher misapprehended how NFL game telecasts were scheduled[18];

- declare Dr. Rascher relied on "*ipse dixit*"[19]; and

- claim Zona's model required the feasibility of live-streaming and dispute the feasibility of that technology during the early years of the class period.[20]

## CONCLUSION

The NFL Media Partners' proposed brief offers a highly partisan factual

---

[13] *Compare* Dkt. 119.2 at 20-21 (distinguishing college football because it "does not have the same rights under the SBA as the NFL does") *with* Red. Br. 45 (distinguishing college football because "only the NFL—not college football—enjoys protection under the SBA").

[14] *Compare* Dkt. 119.2 at 21-22 *with* Red. Br. 42-47.

[15] *Compare* Dkt. 119.2 at 22-23 *with* Red. Br. 51.

[16] *Compare* Dkt. 119.2 at 24 *with* Red. Br. 70.

[17] *Compare* Dkt. 119.2 at 25-27 ("simply not credible") *with* Red. Br. 44 ("strains credulity").

[18] *Compare* Dkt. 119.2 at 27-29 *with* Red. Br. 51-52.

[19] Dkt. 119.2 at 29-31 ("Dr. Rascher's sole response was to throw up his hands and say that none of these details matter.") *with* Red. Br. 43 ("Rascher dismissed all these key differences as immaterial.").

[20] *Compare* Dkt. 119.2 at 32-38 *with* Red. Br. 56-60.

account that contradicts the record. The proposed brief otherwise duplicates arguments the NFL Defendants have already made in their 84-page brief. Plaintiffs therefore respectfully request that the Court deny the Partners' motion. If the motion is granted, Plaintiffs request that the Court grant Plaintiffs leave to file an additional 7,000-word supplemental brief to respond to the NFL Media Partners.

Dated: June 27, 2025                 Respectfully submitted,

                                     /s/ Steven M. Shepard

                                     SUSMAN GODFREY LLP
                                     William Christopher Carmody
                                     Steven M. Shepard
                                     Seth Ard
                                     Samir Doshi
                                     One Manhattan West, Fl. 50
                                     New York, NY 10001
                                     Tel: (212) 336-8330
                                     Fax: (212) 336-8340
                                     bcarmody@susmangodfrey.com
                                     sshepard@susmangodfrey.com
                                     sard@susmangodfrey.com
                                     sdoshi@susmangodfrey.com

                                     Marc M. Seltzer
                                     Kalpana Srinivasan
                                     Amanda Bonn
                                     Eliza Finley
                                     1900 Avenue of the Stars, Suite 1400
                                     Los Angeles, CA 90067
                                     Tel: (310) 789-3100
                                     Fax: (310) 789-3150
                                     mseltzer@susmangodfrey.com
                                     ksrinivasan@susmangodfrey.com
                                     abonn@susmangodfrey.com
                                     efinley@susmangodfrey.com

                                     Ian M. Gore
                                     401 Union Street, Suite 3000
                                     Seattle, WA 98101
                                     Tel: (206) 516-3880
                                     Fax: (206) 516-3883
                                     igore@susmangodfrey.com

                                     LANGER GROGAN & DIVER, P.C.
                                     Howard Langer

Edward Diver
Peter Leckman
Kevin Trainer
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703
hlanger@langergrogan.com
ndiver@langergrogan.com
pleckman@langergrogan.com
ktrainer@langergrogan.com

HAUSFELD LLP
Scott Martin
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322
smartin@hausfeld.com

Michael P. Lehmann
Christopher L. Lebsock
Samuel Maida
600 Montgomery St., Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 633-4980
mlehmann@hausfeld.com
clebsock@hausfeld.com
smaida@hausfeld.com

Sathya S. Gosselin
Farhad Mirzadeh
888 16th Street, N.W., Suite 300
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201
sgosselin@hausfeld.com
fmirzadeh@hausfeld.com

MOLOLAMKEN LLP
Jeffrey A. Lamken
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
Tel: 202.556.2000
jlamken@mololamken.com

*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE
## WITH WORD-COUNT, PAGE-COUNT, AND TYPEFACE LIMITATIONS

I, Marc M. Seltzer, counsel for Plaintiffs-Appellants, and a member of the Bar of this Court, certify that:

1. This response brief complies with the type-volume limitations of Circuit Rules 27-1 and 32-3 because it has been prepared in a proportionally spaced font and the total number of words—excluding the parts of the motion exempted by Federal Rules of Appellate Procedure 27(a)(2)(B) and 32(f)—is 4,914. That word count, "divided by 280" equals 17.5, which "does not exceed" the number of pages prescribed by Circuit Rule 27-1 (*i.e.*, 20).

2. This response brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it is proportionally spaced and has a typeface of 14 points or more.

Signature:  */s/ Marc M. Seltzer*          Date:  June 27, 2025