**Nos. 24-5493 & 24-5691**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

*IN RE NATIONAL FOOTBALL LEAGUE'S SUNDAY TICKET ANTITRUST LITIGATION,*

NINTH INNING, INC., *ET AL.*,

*Plaintiffs-Appellants,*

v.

NATIONAL FOOTBALL LEAGUE, INC., *ET AL.*,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Central District of California
No. 2:15-ml-02668-PSG-SK
Hon. Philip S. Gutierrez

---

### APPELLANTS' REPLY BRIEF
### AND CROSS-APPEAL RESPONSE BRIEF
### <u>REDACTED</u>

---

Marc M. Seltzer
SUSMAN GODFREY LLP
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Telephone: (310) 789-3100

Scott Martin
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Telephone: (646) 357-1100

Howard Langer
LANGER GROGAN & DIVER, P.C.
1717 Arch Street, Suite 4130
Philadelphia, PA 19103
Telephone: (215) 320-5660

Jeffrey A. Lamken
MOLOLAMKEN LLP
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
Telephone: (202) 556-2000

*Counsel for Plaintiffs-Appellants*

## **TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................1

ARGUMENT ........................................................................................4

I.     The District Court Erred in Excluding Both Economists...............................4

      A.     The District Court's Rationale for Excluding Professor Rascher's Testimony Does Not Withstand Scrutiny ...............................4

            1.     The District Court Disregarded What This Court and the Field of Economics Require for Yardstick Methodologies.........6

            2.     The Market for Top-25 College Football Telecasts Is Very Similar to the Market for NFL Telecasts......................................8

            3.     Rascher Considered Any Putative Differences Between the Markets.................................................................11

            4.     The District Court's Reliance on Supposed "Contradictions" Usurped the Jury's Factfinding Role ............16

            5.     Trial Is Not the "Ultimate *Daubert* Hearing" ...........................21

      B.     The Exclusion of Dr. Zona's Testimony Cannot Be Sustained...........22

            1.     The District Court's Rationale for Excluding Zona's Single Competitor Model Was an Abuse of Discretion............23

            2.     The NFL's Efforts To Invent New Rationales Fail As Well ........................................................................29

            3.     The District Court's Failure To Address Zona's "NFL Tax" Model Independently Requires Reversal.................................31

      C.     The District Court Erred by Excluding *All* of the Experts' Testimony ...............................................................37

II.     JMOL Must Be Reversed Regardless.........................................................39

i

A.    The Jury Had Ample Non-Expert Evidence of Antitrust Injury .........39

B.    Exclusion of Rascher's and Zona's Testimony at Most Would Require a Retrial, Not JMOL ...................................................42

III.    The Conditional Grant of a New Trial on Damages Should Be Reversed and the Jury's Verdict Reinstated ..................................................43

A.    The Damages Award Was Substantially Supported by the Evidence and Consistent with the Court's Instructions ......................43

B.    Defendants' Counterarguments Fail.......................................45

C.    The Conditional New Trial Was Limited to Damages Only ...............48

IV.    Defendants' Joint-Venture and Indirect-Purchaser Arguments Are Waived ...................................................................49

V.    Plaintiffs' Claims for Injunctive Relief Should Be Reinstated ....................50

CONCLUSION..................................................................53

CROSS-APPEAL RESPONSE...............................................54

INTRODUCTION AND SUMMARY OF ARGUMENT.......................................54

ISSUES PRESENTED...........................................................55

STATEMENT....................................................................55

STANDARDS OF REVIEW ....................................................56

ARGUMENT....................................................................57

I.    The District Court Did Not Abuse Its Discretion by Finding That Common Issues "Predominate" Under Rule 23(b)(3)..................................57

A.    Ample Evidence Apart from Rascher and Zona Supported the District Court's Finding of Predominance—and the Jury's Verdict Renders That Finding Virtually Incontestable........................57

B.    Defendants' Contrary Arguments Fail..................................59

II.     The District Court Did Not Abuse Its Discretion by Certifying the Injunctive-Relief Classes ................................................................61

III.    Defendants Have Waived Any Challenge to the Order Denying Their Motion for a New Trial on Liability ...............................................63

CONCLUSION .............................................................64

iii

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
738 F.3d 960 (9th Cir. 2013) ..........................................................................*passim*

*Animal Prot. Inst. of Am. v. Hodel*,
860 F.2d 920 (9th Cir. 1988) ...................................................................13

*Ashby v. McKenna*,
331 F.3d 1148 (10th Cir. 2003) ...............................................................30

*Assoc. Diesel Serv. & Equip. Co. v. Terex Corp.*,
46 F.3d 1138 (9th Cir. 1995) ...................................................................44

*Bigelow v. RKO Radio Pictures, Inc.*,
327 U.S. 251 (1946)..................................................................................45

*Buffington v. Progressive Advanced Ins. Co.*,
342 F.R.D. 66 (S.D.N.Y. 2022) ...............................................................58

*Burnett v. Nat'l Ass'n of Realtors*,
No. 19-cv-00332, 2022 WL 1203100 (W.D. Mo. Apr. 22, 2022) .....................10

*City of Oakland v. Oakland Raiders*,
20 F.4th 441 (9th Cir. 2021) .........................................................3, 34, 39

*City of Pomona v. SQM N. Am. Corp.*,
750 F.3d 1036 (9th Cir. 2014) .................................................................25

*Concord Boat Corp. v. Brunswick Corp.*,
207 F.3d 1039 (8th Cir. 2000) .................................................................11

*Crabar/GBF, Inc. v. Wright*,
142 F.4th 576 (8th Cir. 2025) ............................................................24, 26

*D & S Redi-mix v. Sierra Redi-mix*,
692 F.2d 1245 (9th Cir. 1982) .................................................................46

*Davis v. Sig Sauer, Inc.*,
126 F.4th 1213 (6th Cir. 2025) ................................................................24

iv

*Desrosiers v. Flight Int'l of Fla. Inc.*,
156 F.3d 952 (9th Cir. 1998) ...............................................................57, 63

*Dickey v. Advanced Micro Devices, Inc.*,
No. 15-cv-04922, 2019 WL 251488 (N.D. Cal. Jan. 17, 2019) ........................58

*Dorn v. Burlington N. Santa Fe R.R.*,
397 F.3d 1183 (9th Cir. 2005) ..............................................................23, 24

*DSPT Int'l, Inc. v. Nahum*,
624 F.3d 1213 (9th Cir. 2010) ..............................................................41, 42

*Dupree v. Younger*,
598 U.S. 729 (2023).................................................................................49

*Eberle v. City of Anaheim*,
901 F.2d 814 (9th Cir. 1990) ....................................................................64

*EcoFactor, Inc. v. Google LLC*,
137 F.4th 1333 (Fed. Cir. 2025) ..........................................................11, 20

*Eleven Line, Inc. v. N. Tex. State Soccer Ass'n*,
213 F.3d 198 (5th Cir. 2000) ...............................................................10, 11

*Elosu v. Middlefork Ranch Inc.*,
26 F.4th 1017 (9th Cir. 2022) .....................................................17, 20, 21, 22

*In re Exxon Valdez*,
270 F.3d 1215 (9th Cir. 2001) ...................................................................43

*Ezzo's Invs., Inc. v. Royal Beauty Supply, Inc.*,
243 F.3d 980 (6th Cir. 2001) .....................................................................41

*Fox W. Coast Theatres Corp. v. Paradise T. Bldg. Corp.*,
264 F.2d 602 (9th Cir. 1958) .....................................................................49

*Glen Holly Ent., Inc. v. Tektronix, Inc.*,
352 F.3d 367 (9th Cir. 2003) .....................................................................31

*Gov't Emps. Ins. Co. v. Dizol*,
133 F.3d 1220 (9th Cir. 1998) ...................................................................51

*Greenwood v. F.A.A.*,
   28 F.3d 971 (9th Cir. 1994) ...................................................................49

*In re HIV Antitrust Litig.*,
   No. 19-cv-02573, 2022 WL 22609107 (N.D. Cal. Sept. 27, 2022) ...................10

*Hyer v. City & Cty. of Honolulu*,
   118 F.4th 1044 (9th Cir. 2024) ......................................................*passim*

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977)...........................................................................49

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1997) .......................................................*passim*

*In re Joint E. & S. Dist. Asbestos Litig.*,
   52 F.3d 1124 (2d Cir. 1995) ................................................................21

*Jackson v. E. Bay Hosp.*,
   246 F.3d 1248 (9th Cir. 2001) ..............................................................49

*Knutson v. Daily Rev., Inc.*,
   548 F.2d 795 (9th Cir. 1976) ...............................................................41

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999)............................................................................7

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,
   791 F.2d 1356 (9th Cir. 1986) ...............................................43, 44, 45

*Lab'y Corp. of Am. Holdings v. Davis*,
   605 U.S. 327 (2025)..........................................................................62

*Lara v. First Nat'l Ins. Co. of Am.*,
   25 F.4th 1134 (9th Cir. 2022) ...............................................................59

*Larez v. Holcomb*,
   16 F.3d 1513 (9th Cir. 1994) ...............................................................64

*Laumann v. Nat'l Hockey League*,
   105 F.Supp.3d 384 (S.D.N.Y. 2015) ......................................................62

vi

*Leyva v. Medline Indus. Inc.*,
    716 F.3d 510 (9th Cir. 2013) ......................................................................58

*Lytle v. Nutramax Lab'ys, Inc.*,
    114 F.4th 1011 (9th Cir. 2024) ..................................................................58

*McGlinchy v. Shell Chem. Co.*,
    845 F.2d 802 (9th Cir. 1988) ......................................................................25

*Miller v. Gammie*,
    335 F.3d 889 (9th Cir. 2003) ......................................................................25

*Mountain Valley Pipeline, LLC v. 9.89 Acres of Land*,
    127 F.4th 437 (4th Cir. 2025) .....................................................................20

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
    933 F.3d 1136 (9th Cir. 2019) ............................................................*passim*

*Nat'l Farmers' Org., Inc. v. Assoc. Milk Prods., Inc.*,
    850 F.2d 1286 (8th Cir. 1988) ...................................................................10

*NCAA v. Bd. of Regents of Univ. of Okla.*,
    468 U.S. 85 (1984) ......................................................................................19

*Nichols v. Mobile Bd. of Realtors, Inc.*,
    675 F.2d 671 (5th Cir. 1982) ................................................................59, 60

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022) ...............................................56, 57, 60, 61

*Ortiz v. Jordan*,
    562 U.S. 180 (2011) ...............................................................................49, 50

*Parsi v. Daioleslam*,
    778 F.3d 116 (D.C. Cir. 2015) ...................................................................30

*Parsons v. Ryan*,
    754 F.3d 657 (9th Cir. 2014) ................................................................55, 61

*Primiano v. Cook*,
    598 F.3d 558 (9th Cir. 2010) ......................................................................29

*Pulaski & Middleman, LLC v. Google, Inc.*,
　802 F.3d 979 (9th Cir. 2015) ...................................................................61

*In re Rail Freight Fuel Surcharge Antitrust Litig.*
　725 F.3d 244 (D.C. Cir. 2013) ......................................................58, 59, 60

*Richfield Oil Corp. v. Karseal Corp.*,
　271 F.2d 709 (9th Cir. 1959) ...................................................................46

*Roth v. Foris Ventures, LLC*,
　86 F.4th 832 (9th Cir. 2023) ...................................................................53

*S. Cal. Edison Co. v. Lynch*,
　307 F.3d 794 (9th Cir. 2002) ...................................................................36

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
　282 U.S. 555 (1931)................................................................................28

*Swan v. Peterson*,
　6 F.3d 1373 (9th Cir. 1993) .....................................................................26

*Syufy Enters. v. Am. Multicinema, Inc.*,
　793 F.2d 990 (9th Cir. 1986) ..............................................................6, 8, 9

*Tawfils v. Allergan, Inc.*,
　No. 15-cv-00307, 2017 WL 3084275 (C.D. Cal. June 26, 2017) ......................10

*TransUnion LLC v. Ramirez*,
　594 U.S. 413 (2021)................................................................................62

*True Health Chiropractic, Inc. v. McKesson Corp.*,
　896 F.3d 923 (9th Cir. 2018) ...................................................................61

*Tyson Foods, Inc. v. Bouaphakeo*,
　577 U.S. 442 (2016)..........................................................................56, 59

*United States v. Bacon*,
　979 F.3d 766 (9th Cir. 2020) ...................................................................29

*In re Urethane Antitrust Litig.*,
　768 F.3d 1245 (10th Cir. 2014) ................................................................60

*Van v. LLR, Inc.*,
    61 F. 4th 1053 (9th Cir. 2023) ...............................................................61

*W. Radio Servs. Co. v. Qwest Corp.*,
    678 F.3d 970 (9th Cir. 2012) ...............................................................63

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ...............................................................................62

*Wallace v. City of San Diego*,
    479 F.3d 616 (9th Cir. 2007) ...............................................21, 39, 40

*William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*,
    668 F.2d 1014 (9th Cir. 1981) .............................................................40

*Woods v. Kijakazi*,
    32 F.4th 785 (9th Cir. 2022) ................................................................25

## STATUTES AND RULES

Fed. R. Civ. P. 50(a)(1) ...............................................................................21

Fed. R. Evid. 702 ........................................................................................20

## OTHER AUTHORITIES

ABA Antitrust Law Section, *Antitrust Law Developments*
(9th ed. 2022) ...............................................................................................6

Moshe Ben-Akiva & Steven R. Lerman, *Discrete Choice Analysis*
    (1985) ......................................................................................................30

*Super Bowl XLVI Live Stream Sets Traffic Records*, NBC Sports (Feb.
    7, 2012), https://tinyurl.com/2tntpa87 ...............................................27

## INTRODUCTION

The NFL Defendants urge that, despite their decades-long antitrust conspiracy—which expressly sought to raise prices and restrict competition—they are entitled to judgment as a matter of law. They nowhere dispute the jury's finding that they "unreasonably restrained trade" in professional football telecasts. 2-ER-237. They offer no reason to doubt the district court's determination that the evidence amply supported that finding. 1-ER-20. And they nowhere dispute overwhelming proof that, through interlocking agreements, unlawful pooling of telecast rights, and an exclusive distribution agreement with DirecTV, they ensured DirecTV charged *more* for Sunday Ticket than it otherwise would have. Indeed, when other distributors sought to replace DirecTV, Defendants rejected their proposals because they would charge *too little*, drawing viewers from the Fox and CBS telecasts Defendants wanted to protect from competition.

Defendants nonetheless demand judgment in their favor, so they pay nothing, because the district court reversed course after trial and excluded Plaintiffs' economists. But the court conflated its role as evidentiary gatekeeper under *Daubert* with the jury's Seventh-Amendment-protected role as trier of fact. The court excluded the experts based on its own belief that some evidence "contradicted" their testimony or failed to provide "conclusive" support for it. 1-ER-14-19. That is not

the relevant standard. And the court ignored mountains of non-expert evidence that Defendants' anticompetitive restraints raised prices and limited consumer choice.

Rather than defend the district court's departures from precedent, Defendants double down on them. With respect to expert Zona, the court excluded one of his models—the "NFL tax" model—without finding *any* defect in it, identifying *any* evidentiary gap, or even *mentioning* the theory or evidence. Defendants attempt to defend that result by resurrecting arguments the district court (properly) rejected. And the court offered only a *factual* rationale for excluding Zona's other damages model. That "single competitor" model calculated damages by showing how much prices would have decreased if Defendants had allowed even one additional competitor beyond DirecTV. The court ruled that model inadmissible on the theory that no evidence "conclusive[ly]" established the "predicate fact" that a potential competitor could have existed. 1-ER-19. But this Court's precedent allocates such factual determinations to the jury; ample evidence allowed the jury to find that other companies could have distributed Sunday Ticket; and the requirement of "conclusive" evidence is exactly backwards.

Defendants' arguments regarding expert Rascher fare even worse. This Court repeatedly has held that yardstick analyses like Rascher's are admissible. Disputes about "differences in how [the comparable] markets worked" are for the jury. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 968-70 (9th Cir. 2013).

2

Defendants ignore that precedent, urging that the court, not the jury, makes the judgment. Worse, they caricature, rather than evaluate, Rascher's comparison of top-25 college football telecasts and NFL telecasts. As this Court recognized *in this very case*, the parallels are astounding. *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1146-47 (9th Cir. 2019) ("*In re Sunday Ticket*"). Rather than deny the usurpation of the jury's role, Defendants celebrate it, urging that "trial is the ultimate *Daubert* hearing." It is not. *Daubert* is about gatekeeping. Trial is about juries deciding facts.

Nor can Defendants justify the district court's failure to address non-expert evidence—that prices for the very same Sunday Ticket package in Canada, where competition exists, are about half those in the U.S.; the NFL's own study showing that eliminating even one of the anticompetitive restraints would increase output, enhance choice, and lower prices; and exhibits and testimony showing Defendants conspired with DirecTV to increase prices and restrict output to prevent competition with CBS's and Fox's offerings. That evidence—and common sense—permitted the jury to reasonably conclude that the classes suffered antitrust injury. "[R]educed output and increased prices" are "precisely the kinds of harms" antitrust law seeks to prevent. *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 457 (9th Cir. 2021).

The district court's unreasoned denial of injunctive relief—to prevent future harm from a concededly actionable anticompetitive restraint of trade—is impossible

3

to defend. Defendants' unpersuasive and newly invented theories cannot salvage a district court decision that offered none.

## ARGUMENT

### I. The District Court Erred in Excluding Both Economists

#### A. The District Court's Rationale for Excluding Professor Rascher's Testimony Does Not Withstand Scrutiny

Defendants do not dispute that Dr. Rascher is a recognized expert on sports economics, that he was the only such expert to testify, or that courts routinely rely on his opinions. Blue.Br.20. They do not deny that the "yardstick" methodology he employed has been accepted by economists and this Court for years. Blue.Br.48-49; Sports Economists' Br.14, Dkt.47.1 ("[T]he methodologies selected by Dr. Rascher are standard and reliable approaches routinely performed by experts and accepted by courts in antitrust litigation."). Nor can they contest that both the NFL, in its New Frontier study, and this Court, in its prior opinion, embraced economic comparisons between professional and college football when evaluating the effects of Defendants' agreements and restraints.

Instead, Defendants denigrate Rascher's analysis as resting entirely on assertions that college football and the NFL are "both football"; that market participants would "figure it out"; and that games "would-all-be-free." Red.Br.27-30. That bears no resemblance to Rascher's actual testimony. Rascher did not testify that any game would be "free." He opined networks would derive revenue from

4

advertisers and distributors, not viewers. *See* 19-ER-3944 (¶279); 19-ER-3978-84 (¶¶349-64). That is precisely how CBS and Fox make money from NFL games, and how television channels profit from broadcasting virtually all top-25 college games. The Super Bowl is the single most-watched program in America. It has been available to viewers over-the-air, *for free*, for the last 57 years, because advertisers pay handsomely. 19-ER-3869 (¶131).

Rascher's comparison between professional and college football, moreover, closely examined each league's methods of generating revenues and fanbases. Blue.Br.21-22. He did not vaguely urge that market participants would "figure it out," but showed *how* they would do so in three different but-for scenarios—each of which showed that, absent the anticompetitive restraints, the out-of-market NFL games would have been available on network or cable television. Blue.Br.44-45; 15-ER-3064-66. In each scenario, class members would have saved billions in Sunday Ticket subscription fees.

Defendants' complaints about whether college football "properly compares to the" NFL at most presented a "question of fact for the jury." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1221 (9th Cir. 1997). After a full trial, the jury agreed with Plaintiffs. Defendants cannot substitute the district court as factfinder by attempting, without citation, to recast trial as the "ultimate *Daubert*

hearing." Red.Br.25. Rascher met this Court's standard for yardstick analyses. After-the-fact exclusion was error.

**1.    The District Court Disregarded What This Court and the Field of Economics Require for Yardstick Methodologies**

The district court's analysis of Rascher's testimony rested on a misunderstanding of what the yardstick method requires. Yardstick analysis juxtaposes the market that was subjected to anticompetitive restraints with a "comparable" one "not affected by the anticompetitive conduct." *Image Tech.*, 125 F.3d at 1221. Three times this Court has held that, where an expert presents "evidence that the two markets were comparable," *the jury* must "weigh the conflicting evidence." *Syufy Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990, 1003 (9th Cir. 1986); *see Alaska Rent-A-Car*, 738 F.3d at 968-70; *Image Tech.*, 125 F.3d at 1221. Treatises agree. 1 ABA Antitrust Law Section, *Antitrust Law Developments* 834 (9th ed. 2022). So do economists. *See* Sports Economists' Br.12, Dkt.47.1.

Plaintiffs' opening brief described this standard. Blue.Br.48-49. Defendants respond with silence. They do not mention *Alaska Rent-A-Car*, *Image Technical*, or *Syufy*, much less address the standard those decisions reaffirm. Defendants cannot mention the governing standard because the district court's rationale so clearly contradicts it. The district court did not ask whether Rascher "presented evidence that the two markets were comparable." *Syufy*, 793 F.2d at 1003. It could not: The court previously found Rascher had done so. 3-ER-319-20. But, after trial, the

6

district court fixated on whether Rascher had persuasively answered cross-examination questions asking whether he had accounted for supposedly "significant differences between college football" and the "but-for world" he described. 1-ER-16. He *had* amply accounted for those differences, *infra*, at 11-16, but any such differences provide no basis for exclusion regardless. Even "very significant differences in how [comparator] markets worked" at most "amount to impeachment" and do not "go to admissibility." *Alaska Rent-A-Car*, 738 F.3d at 969.

That makes sense. The but-for world is "unknown." *Alaska Rent-A-Car*, 738 F.3d at 970. It is unknown because *Defendants'* anticompetitive conduct prevented it from existing. The yardstick method attempts to estimate that unknown world by comparing it "to an analogous known experience." *Id.*; Blue.Br.42. If differences between unknown features of the but-for world and the analogy rendered testimony inadmissible, no yardstick analysis could proceed. "*[N]o* model could provide a definitive account" of the but-for world. Antitrust Law Professors' Br.25, Dkt.48.1. Defendants would allow those who violate the antitrust laws to reap the benefits of "market uncertainties" their violations created. *Image Tech.*, 125 F.3d at 1221.

Experts need employ only "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Economics requires only that a yardstick analysis identify a comparator market with "some 'meaningful economic

7

similarity.'" Sports Economists' Br.12, Dkt.47.1; Blue.Br.42-43; 19-ER-3954-59; *see* Antitrust Law Professors' Br.19-22, Dkt.48.1.

Defendants disagree with none of that. Like the district court, they ignore it. The question, they assert, is whether there are "'significant differences' between" Rascher's but-for world and the college football landscape. Red.Br.39. Their "significant differences" standard defies precedent and economic practice. Both require only "some" meaningful *similarity* between markets; after that, any differences are for the jury to evaluate. For that reason alone, neither the district court's analysis, nor Defendants' attempts to backstop it, can be sustained.

## 2. The Market for Top-25 College Football Telecasts Is Very Similar to the Market for NFL Telecasts

There can be no credible dispute that Rascher "presented evidence" that markets for professional and college football telecasts "were comparable." *Syufy*, 793 F.2d at 1003. That analysis was hardly limited to the "surface-level similarities" Defendants identify—"They're both football," they "play during the same season," and are "very popular." Red.Brief.28. Rascher, an expert who has devoted his career to studying sports economics and is intimately familiar with college and professional football markets, went far deeper. He analyzed the "fixed-fee, multi-year telecast agreements" (with the same networks) from which college and NFL teams derive revenue. Blue.Br.22 (citing 19-ER-3964-68). He studied the teams' cross-country

8

fanbases. *Id.* College and professional teams, he explained, all seek "long-term success beyond immediate seasonal revenues and profits." 18-ER-3745 n.541.

Indeed, college football provides unique insights into the effects of removing the anticompetitive restraints at issue. As Rascher explained and this Court has observed, the NCAA previously pooled teams' TV rights and limited distribution, much like Defendants unlawfully did here. *In re Sunday Ticket*, 933 F.3d at 1146-47. After the Supreme Court invalidated the NCAA's restrictions, market participants swiftly figured out new distribution methods that *broadly increased distribution* within just six weeks. Blue.Br.22 (citing 7-ER-1147; 8-ER-1358-59). Those distribution methods made advertising-supported college football games widely available on network and cable television, without premium subscription fees. 19-ER-3883-84. What happened after *college football* eliminated anticompetitive pooling and distribution agreements is persuasive proof of what *NFL* distribution would look like in a but-for world without similar anticompetitive constraints.

Comparing college and professional football telecast distribution easily satisfies any threshold requirement of comparability. *See Syufy*, 793 F.2d at 1003. The NFL itself uses college football as a comparator when evaluating telecast distribution. Its "New Frontier" study modeled the effects of distributing out-of-market games through additional channels beyond DirecTV. To do that, Defendants compared the distribution of NFL games to the distribution of the most popular

9

college games. 20-ER-4295-96(TX-686). This Court, too, has relied on comparisons between college and professional football. *In re Sunday Ticket*, 933 F.3d at 1149. Given this Court's and the NFL's own reliance on that comparator, it is hard to imagine how Rascher's reliance on it fails to meet basic economic standards.

Case after case accepts yardstick analyses comparing markets far less similar than college and professional football. *See, e.g.*, *Nat'l Farmers' Org., Inc. v. Assoc. Milk Prods., Inc.*, 850 F.2d 1286, 1294-97 (8th Cir. 1988) (reversing exclusion of comparison between milk market in Minneapolis-St. Paul and ten-state region); *In re HIV Antitrust Litig.*, No. 19-cv-02573, 2022 WL 22609107, at *38-39 (N.D. Cal. Sept. 27, 2022) (comparing markets for medications treating different conditions); *Burnett v. Nat'l Ass'n of Realtors*, No. 19-cv-00332, 2022 WL 1203100, at *12 (W.D. Mo. Apr. 22, 2022) (broker commissions in U.S. and foreign real-estate markets); *Tawfils v. Allergan, Inc.*, No. 15-cv-00307, 2017 WL 3084275, at *5-6 (C.D. Cal. June 26, 2017) (Botox markets in U.S. and South Korea). Whatever any supposed differences, telecasts of college and professional football are no less similar than U.S. and foreign real-estate purchases, medications treating different conditions, or states and individual cities.

Defendants' citations are not to the contrary. In *Eleven Line, Inc. v. North Texas State Soccer Association*, 213 F.3d 198 (5th Cir. 2000), the Fifth Circuit excluded a yardstick model because the expert presented *no* "evidence of

10

comparability" between the markets. *Id.* at 208-09. Defendants' other out-of-Circuit cases—*Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039 (8th Cir. 2000), and *EcoFactor, Inc. v. Google LLC*, 137 F.4th 1333 (Fed. Cir. 2025) (en banc)—did not involve yardstick models at all.

### 3. Rascher Considered Any Putative Differences Between the Markets

Rascher's conclusion from his detailed comparison of college and NFL markets was not "*ipse dixit*." Red.Br.28. During trial, Defendants derided college football as a "mess." 7-ER-1153-54 (Tr. 756:5-757:10). College teams changed conferences. 7-ER-1162-63 (Tr. 765:24-766:6); 7-ER-1215 (Tr. 818:9-18). Conferences and teams negotiated new deals and switched TV networks. 7-ER-1154 (Tr. 757:1-10); 7-ER-1149 (Tr. 752:2-19). But one constant remained: Games between top-25 teams, with rare exceptions, were telecast nationwide at no additional cost to viewers; networks instead derived revenue from advertising. Blue.Br.23. Defendants pretend the same would not have occurred for out-of-market NFL games, but that was a question for the jury.

Rascher's economic analysis amply showed that NFL games, for which there is even more demand, would likewise have achieved nationwide distribution on widely available networks. The Jacksonville Jaguars, the NFL's least popular team, "draw[s] higher ratings than even some of the top colleges." 7-ER-1278-79 (Tr. 881:23-882:5); 7-ER-1270 (Tr. 873:17-20). Defendants question whether

11

Jaguars games could "compete" on the "West Coast" against "in-market games on CBS and FOX featuring local teams." Red.Br.32. But that is not the question. In a competitive market, Jaguars games would be broadcast on the West Coast if they could draw more viewers (and thus more advertising dollars) than *non*-NFL content. The experience of college football telecasts proves they could: NFL games, including Jaguars games, are concededly the "most popular programming on television." 1-ER-15. Since top college games are distributed nationally, NFL games would be as well. Defendants' New Frontier study agreed, positing that channels would pay $9 to $15 million to broadcast individual out-of-market NFL games, including Jaguars games. 20-ER-4322-24(TX-686).

Defendants contend Rascher "d[id] not acknowledge" or "ignor[ed] key distinguishing features" between the top-25 college football and NFL-game telecast markets. Red.Br.30-31. That argument was for the jury, as this Court has repeatedly made clear. *Alaska Rent-A-Car*, 738 F.3d at 968-70; *Image Tech.*, 125 F.3d at 1221. But Defendants are also wrong on the facts. This is not a case where an expert failed to account for salient differences. Rascher, an economist intimately familiar with the markets he examined, accounted for the very differences Defendants now invoke.

Sports Broadcasting Act. Defendants first urge "only the NFL—not college football—enjoys protection under the SBA [Sports Broadcasting Act]." Red.Br.31. But Defendants' JMOL motions never argued Rascher's yardstick analysis failed to

12

account for the SBA. 2-ER-256-60; 2-ER-159-60.[1] Nor did the district court invoke the SBA. 1-ER-16. It listed "significant differences" that supposedly require Rascher's exclusion. *Id.* The SBA was not among them. 1-ER-16-17. Defendants' argument is waived. *Animal Prot. Inst. of Am. v. Hodel*, 860 F.2d 920, 927 (9th Cir. 1988).

Regardless, Rascher did *not* "ignore" the SBA. He testified that it was "part of the analysis." 7-ER-1206-07(Tr.809:10-810:24). He prepared model TV schedules, one in which "*SBA-protected* CBS and Fox deals would have still existed," and two in which they did not. 1-ER-14 (emphasis added); 7-ER-1283-84(Tr.886:23-887:5); 15-ER-3064-66. In all three, *all* NFL games appeared on channels already available to class members without any additional Sunday Ticket subscription fees. 15-ER-3064-65.[2] The SBA's narrow exemption, moreover, extends only to sponsored telecasts on "over-the-air networks like CBS and FOX." 2-ER-195 (jury instruction). It does not apply to "the telecasting of games on cable or satellite TV." *Id.* Absent Defendants' unlawful, non-SBA-protected pooling of cable and satellite telecasting rights, networks would have competed to acquire each

---

[1] Defendants' rebuttal expert, Dr. Bernheim, mentioned the SBA only briefly—and not when criticizing Rascher's yardstick analysis. *See* 12-ER-2299(Tr.1897:6-17); 12-ER-2334-37(Tr.1932:6-1935:18).

[2] Rascher's regression analyses confirmed that consumer prices for basic cable or satellite subscriptions would not increase. Blue.Br.23-24.

team's rights to telecast its out-of-market games. *See In re Sunday Ticket*, 933 F.3d at 1147.

Defendants quibble that channels distributing out-of-market games might be at the "mercy" of those showing (more popular) in-market games. Red.Br.31-32. Such arguments were for the jury. *Alaska Rent-A-Car*, 738 F.3d at 968-70; *Image Tech.*, 125 F.3d at 1221. The jury had ample reason to reject them. The question is not the relative popularity of NFL games, but whether NFL games could compete for viewership with other content. *Supra*, at 11-12. The games' "popularity will help to ensure" they "are not relegated to obscure, difficult-to-find channels." 19-ER-3869 (¶131). Network and cable channels prioritize as many as 28 college games over other content on Saturdays. 15-ER-3062. A jury could find that they easily could have done the same for 13 extremely popular Sunday NFL games. 15-ER-3064-66.

Telecast pooling within conferences. Defendants urge that each of the "Power Five" college conferences separately pooled and licensed member-school telecast rights, whereas Rascher's but-for worlds would have had NFL teams negotiating telecast rights individually or in small groups. Red.Br.32. The district court never invoked that difference to exclude Rascher's yardstick. *See* 1-ER-14-16. And Rascher accounted for it. 19-ER-3966-67(¶¶328-30); 18-ER-3754-3758(¶¶422-30). Indeed, that difference *supported* Rascher's conclusion. Competition for

14

telecast rights among just five major college conferences (and independent schools like Notre Dame) was sufficient to ensure that matchups between top-25 college teams were virtually always shown on the most widely available networks. Blue.Br.50. Rascher concluded that greater competition for even more popular NFL games, among even more teams or groups, would have resulted in still broader distribution. 18-ER-3756-57(¶¶427-28). A jury could reasonably agree.

College games in premium offerings. The district court urged that some college games are "available only by purchasing premium offerings." 1-ER-16. Defendants barely try to defend that rationale. During the class period, only *3%* of games played between top-25 college teams were shown on platforms requiring a premium subscription. Blue.Br.49-51. Defendants do not contend otherwise. Nor do they claim that 3% variance is economically significant, much less sufficient to render Rascher's comparison unreliable. Red.Br.40.

Abandoned theories. Defendants abandon the district court's other supposed differences. For example, the court invoked the NFL's "guaranteed access to telecasts of local teams." 1-ER-16. Plaintiffs explained Rascher's analysis and his conclusion that the difference was insignificant. Blue.Br.51-52. Defendants repeat the district court's analysis without responding. Red.Br.40.

Nor do Defendants defend the district court's reference to questions about how teams would have "shared revenues." 1-ER-15. For good reason: At trial, Defendants

15

invoked their revenue-sharing arrangements as a pro-competitive justification for the challenged conduct. 14-ER-2844. The jury rejected that argument in finding Defendants "unreasonably restrained trade." 2-ER-237. That the district court's rationale for excluding Rascher is chock-full of indefensible theories underscores the abuse of discretion.

* * *

Rascher's careful analysis completely answers Defendants' fixation on one of Rascher's observations—that market participants would "figure out" details. Red.Br.15, 18, 30-34. For one thing, Rascher testified in detail about *how* they would figure things out—distributional issues, scheduling, and more. *Supra*, at 13-14; *infra*, at 17-20. For another thing, it is a standard economic expectation that market participants will "figure out distributional issues" when doing so will "increase total profits." Sports Economists' Br.26-27, Dkt.47.1; *see* 13-ER-2527-29 (Tr. 2124:16-2126:3); 13-ER-2611-14 (Tr. 2208:19-2210:10). Defendants cannot justify excluding Rascher unless every reasonable factfinder would be compelled to find that any supposed problem was insurmountable. The jury was entitled to find otherwise.

### 4. The District Court's Reliance on Supposed "Contradictions" Usurped the Jury's Factfinding Role

The district court usurped the jury's role as factfinder in other ways as well. It excluded Rascher based on its view that two partisan fact witnesses—Sean

McManus (CBS Sports) and Cathy Yancy (NFL)—allegedly "contradicted" his conclusions. 1-ER-15 n.6.

That was legal error, as *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017 (9th Cir. 2022), makes clear. In *Elosu*, this Court reversed exclusion of expert testimony the district court had found "incompatible with the statements of witnesses on the scene." *Id.* at 1027-29. That exclusion "was clear error" because such compatibility was "for the jury to decide." *Id.* at 1026-27. Defendants cite no contrary authority. The jury did not have to credit McManus and Yancy. And extensive evidence supported Rascher's contrary analysis anyway.

McManus and "feed sharing." Defendants do not dispute CBS and Fox have both shared their in-market telecast feeds with DirecTV, NFL Network, and Amazon Prime. Blue.Br.46-47; *see* 7-ER-1166-67 (Tr. 769:17-770:24); 19-ER-3978-79 (¶350 & n.480). But they and the district court invoke McManus's testimony that CBS "would not share feeds with rival broadcasting networks." Red.Br.37. The jury was not required to credit that testimony, especially given evidence of prior feed sharing. On cross-examination, moreover, McManus clarified that, *if* CBS did share feeds, CBS's over-the-air telecast rights simply "would be worth a lot less to CBS." 11-ER-2093 (Tr. 1692:14-20). That clarification, overlooked by the district court and Defendants, 1-ER-15 n.6, renders McManus's testimony wholly consistent with Rascher's.

17

Rascher testified that, if the NFL required CBS and Fox to share feeds, the networks "would just pay less money in order to get those rights." 7-ER-1290-91 (Tr. 893:15-894:9).[3] CBS paid Defendants more than ████████ *each year* for the right to telecast in-market games. 20-ER-4121 (TX-146A). Even if those rights would have been "worth a lot less," per McManus, discounts can account for differences. Indeed, the NFL's New Frontier study contained financial modeling that predicted CBS and Fox would, if forced to share feeds with rivals, pay the NFL 25% less for their in-market telecasting rights. 20-ER-4322-24. Defendants' own modeling thus contradicts their assertion that CBS would *never* share feeds under *any* circumstances.

Indeed, Elhauge's expert testimony—ignored by Defendants and the district court alike—supported Rascher's opinion. Elhauge observed that Defendants would have strong incentives to require feed-sharing in the but-for world, because doing so efficiently avoids duplicative production costs. 13-ER-2609-13 (Tr. 2206:4-2210:22); 13-ER-2640-41 (Tr. 2237:5-2238:24). Even without feed sharing, networks could create their own separate feeds, because production costs are low relative to the profits at stake. 13-ER-2611-12 (Tr. 2208:3-2209:23); *see* 7-ER-

---

[3] Feed-sharing could (and for college football does) occur within network families. 15-ER-3067. Fox could share feeds with FX and FS1, and ABC with ESPN and ESPN2. *Id.*

18

1185 (Tr. 788:10-19) (production less than 10% of overall cost, most of which is "rights fee"). The district court went beyond its gatekeeping role, and usurped the jury's, by crediting one witness and ignoring contrary evidence.

Defendants might make less money from licensing deals in a but-for world where feeds are shared and games are more broadly distributed. But that's what competition does—it removes monopoly rents, much to the disappointment of those who would profit from them. Thus, following the Supreme Court's *NCAA* decision, "'broadcasters collectively pa[id] half as much for the rights'" to college football games. *In re Sunday Ticket*, 933 F.3d at 1147. That was because the "NCAA's output restriction" had "rais[ed] the price the networks pay for television rights." *NCAA v. Bd. of Regents*, 468 U.S. 85, 105 (1984). The conspirators' loss was the public's gain.

<u>Yancy and Scheduling.</u> The district court also excluded Rascher's testimony by crediting the NFL's corporate representative, Cathy Yancy, who testified that TV networks would struggle to implement the last-minute scheduling changes Rascher envisioned. 1-ER-15 n.6. But the jury did not have to credit that partisan testimony. Ample record evidence showed the same networks *already* accommodate such schedules in the college-football market. Blue.Br.31 (citing 8-ER-1343-44 (Tr. 945:20-946:10)); *see* Blue.Br.47-48 (citing 7-ER-1147-51 (Tr. 750:6-754:3); 8-ER-1343-44 (Tr. 945:20-946:10) (describing "flex schedule" networks use for college football)); *see* 19-ER-3871-72 (¶135). They do the same for the NBA and MLB.

19

8-ER-1343-44 (Tr. 945:20-946:10). Here again, the NFL's New Frontier study demonstrates these scheduling challenges could be addressed. 20-ER-4305 (TX-686).

Citing *EcoFactor*, Defendants urge that expert testimony can be excluded if "'relevant evidence is contrary to a critical fact upon which the expert relied.'" Red.Br.37-38 (quoting 137 F.4th at 1346). That does not license district courts to resolve genuinely disputed facts—something the Federal Rules and precedent reserve for juries—at *Daubert*. District courts may not "select between competing versions of the evidence." *Hyer v. City & Cty. of Honolulu*, 118 F.4th 1044, 1058 (9th Cir. 2024); *Elosu*, 26 F.4th at 1026; *see Mountain Valley Pipeline, LLC v. 9.89 Acres of Land*, 127 F.4th 437 (4th Cir. 2025). The Advisory Committee Notes to Rule 702's 2023 Amendments make precisely that point: Experts can base their conclusions on "contested sets of facts," and the jury "can decide which side's experts to credit" by "deciding the disputed facts." It was for the jury, not the district court, to decide whether Yancy's putative scheduling concerns rendered Rascher's conclusions implausible.

In *EcoFactor*, the "critical fact" was "[c]ontract interpretation," a "question of law." 137 F.4th at 1341. The contract there was not "ambiguous" and did not "provide a basis" for the expert to opine that the parties had agreed to something when they had not. *Id. EcoFactor* thus was not a case where the court resolved a *factual* dispute; the fact critical to the expert's analysis simply could not be found as a matter of law.

### 5. Trial Is Not the "Ultimate *Daubert* Hearing"

Defendants' repeated (and unsupported) refrain that "trial" is the "ultimate *Daubert* hearing," Red.Br.2, 21, 25, lays bare the error below. *Daubert* hearings allow courts to act as gatekeepers and identify the evidence juries may hear. Trials, by contrast, are proceedings where juries hear the evidence, evaluate it, and make determinations of fact. Once the jury makes factual determinations, they are binding unless no "reasonable jury" could have had a "legally sufficient basis" for them. Fed. R. Civ. P. 50(a)(1); *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007).

District courts cannot contradict jury fact findings under the guise of re-evaluating an earlier *Daubert* determination—as the district court did here. After trial, Rule 702 still forbids "freeform factfinding," selecting "between competing versions of the evidence," and determining the "veracity of the expert's conclusions." *Hyer*, 118 F.4th at 1058 (quoting *Elosu*, 26 F.4th at 1026). *Daubert* does "not authorize[ ]" district courts to deny "the requisite favorable inferences" to the jury's factual findings. *In re Joint E. & S. Dist. Asbestos Litig.*, 52 F.3d 1124, 1137 (2d Cir. 1995). Although district courts retain authority to exclude experts post-trial, their discretion does not grow, much less reach an "apex." Red.Br.21. It remains constrained by the same *Daubert* principles—and the division of labor between court as gatekeeper and jury as factfinder—that govern throughout. *See* Evidence and Civil Procedure Scholars' Br., Dkt.43.1.

21

The district court purported to base exclusion on a "review of Dr. Rascher's testimony." 1-ER-16. It cited Defendants' cross-examination *22* times. 1-ER-14-16. It did not cite Rascher's reports once, much less the reports' description of his methodology. *Id.* That review was not gatekeeping. It was factfinding, on issues the jury had reasonably resolved differently. This Court's precedents require reversal. *Hyer*, 118 F.4th at 1058; *Elosu*, 26 F.4th at 1026-28.

## B. The Exclusion of Dr. Zona's Testimony Cannot Be Sustained

Defendants nowhere dispute that Dr. Zona presented *two* econometric models of the injury Plaintiffs suffered because of Defendants' anticompetitive conduct. First, he determined class members would have paid 49.7% less if the NFL had licensed out-of-market games to even one additional distributor (the "single competitor" model). Second, Zona determined that, absent anticompetitive agreements allowing Defendants to insist that DirecTV charge "premium" prices for Sunday Ticket—to prevent Sunday Ticket from competing horizontally with CBS and Fox telecasts—DirecTV's price for Sunday Ticket (and the amount class members would have paid) would have been 24.6% lower (the "NFL tax" model).

The district court gave no reason—literally none—for excluding the NFL tax model. That itself requires reversal. And the district court's sole reason for excluding the single competitor model was purely factual: Zona, it asserted, did not offer "conclusive" evidence that another company could have distributed Sunday Ticket

22

by streaming it over the internet. But economic experts like Zona are permitted to estimate harm based on assumptions about facts on the ground; whether those assumptions are reasonable is "'for the jury's consideration'" in light of all the evidence. *Dorn v. Burlington N. Santa Fe R.R.*, 397 F.3d 1183, 1196 (9th Cir. 2005). And the court ignored ample evidence that networks, programmers, and leagues often livestreamed sports events, including the Super Bowl, throughout the class period. A reasonable juror could have accepted that proof. The district court's ruling cannot stand.

### 1. The District Court's Rationale for Excluding Zona's Single Competitor Model Was an Abuse of Discretion

Zona determined that Defendants' interlocking agreements—which included offering out-of-market games through an exclusive distributor—imposed enormous financial harm. If the NFL had permitted just one additional distributor, he calculated, subscribers would have paid 49.7% less. 9-ER-1572-75 (Tr. 1173:7-1176:19). Data from Canada, where multiple distributors sell Sunday Ticket, corroborated that conclusion. Sunday Ticket's price in Canada is 49.5% lower than DirecTV's U.S. price. 7-ER-1169-70 (Tr. 772:19-773:13). That difference did not result from "lower demand." 19-ER-3995-96 (¶386).

Defendants nowhere deny Zona was an amply qualified "expert in applied econometrics and econometric modeling." 9-ER-1571 (Tr. 1172:6-9); Blue.Br.26. They do not deny that Zona's "nested logit models" and his application of the

"Berkson-Theil method" have been accepted methodologies for 50 years. 9-ER-1576(Tr. 1177:7-21). The sole reason the district court gave for excluding Zona's single competitor model was that Zona assumed, but did not prove, that another competitor could have streamed Sunday Ticket—"[t]here was no evidence," the court stated, "to make this predicate fact conclusive." 1-ER-19.

That was error many times over. This Court and others have long rejected the notion that experts must establish "predicate facts" underlying their opinions for them to be admissible, much less establish them "conclusive[ly]." Blue.Br.53-54. Plaintiffs offered Zona—and the district court qualified him—as an expert in econometrics, not streaming services. 9-ER-1571(Tr. 1172:6-9). Applying his expertise, Zona relied on an "underlying assumption" about the availability of a "direct to consumer" competitor. 9-ER-1622(Tr. 1223:12-21). That an expert's "model relied on assumptions 'cannot be sufficient to mandate exclusion,'" because "'every model relies on assumptions and no model can account for every conceivably relevant factor.'" *Crabar/GBF, Inc. v. Wright*, 142 F.4th 576, 588 (8th Cir. 2025). "Where an expert bases their opinion on assumed facts," supposed "'weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility.'" *Davis v. Sig Sauer, Inc.*, 126 F.4th 1213, 1224 (6th Cir. 2025). The "'reasonableness of the assumptions underlying'" the expert's analysis is a matter "'for the jury's consideration.'" *Dorn*, 397 F.3d at

24

1196. And here, ample evidence supported the jury's determination that livestreaming was viable. *See* Blue.Br.54-55; *infra*, at 26-28.[4]

Two *amici* urge that the 2023 Amendments to Rule 702 changed the standard. Int'l Ass'n of Defense Counsel Br.5-12, Dkt.113.1; Lawyers for Justice Br.8-22, Dkt.117.1. But this Court continues to interpret Rule 702 to forbid district courts from "select[ing] between competing versions of the evidence." *Hyer*, 118 F.4th at 1058. So do other circuits. *E.g.*, *Davis*, 126 F.4th at 1224. And these precedents remain law of the circuit unless "clearly irreconcilable" with the amended Rule 702. *Woods v. Kijakazi*, 32 F.4th 785, 790 (9th Cir. 2022) (quoting *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc)). The *amici* cannot clear that high bar—or any bar. As explained above, the Advisory Committee Notes to the 2023 Amendments permit experts to base their conclusions on "contested sets of facts," and the jury "can decide which side's experts to credit" by "deciding the disputed facts." Nor do Defendants join *amici*'s argument. They rely on some of the pre-amendment cases *amici* criticize. *Compare, e.g.*, Red.Br.25 & 39 (invoking *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036 (9th Cir. 2014)), *with* Int'l Ass'n of Defense Counsel Br.12, Dkt.117.1 (claiming *Pomona* is "emblematic of the

---

[4] *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802 (9th Cir. 1988), is not contrary. *McGlinchy* excluded a lost-profits calculation that relied on contradictory assumptions that had "no basis in the record." *Id.* at 807. Such bad-faith assumptions bear little resemblance to Zona's, which the evidence amply supported.

25

problem"). This Court generally does not consider issues "raised only by an amicus." *Swan v. Peterson*, 6 F.3d 1373, 1383 (9th Cir. 1993).

It is thus irrelevant that Zona himself "did *not* know" of a potential streaming service. Red.Br.43. Zona's model would be inadmissible under Rule 702 only if his assumption was so "fundamentally unsupported" that no jury could "reasonably conclude" there was evidence to support it. *Crabar/GBF*, 142 F.4th at 588-89. Defendants do not remotely approach that standard. The Super Bowl itself has been live-streamed over the internet since 2012, early in the class period. 11-ER-2199 (Tr. 1798:12-21). Defendants' media expert, Dr. Yurukoglu, conceded that other professional sports leagues offered livestreaming throughout the class period. 9-ER-1767-68 (Tr. 1368:15-1369:11); *see* 18-ER-3589; Blue.Br.54-55. The jury could credit that evidence and find the same would have been feasible for NFL games. Defendants cannot muster a substantive response—*i.e.*, a reason *every* reasonable juror would be compelled to reject all the evidence demonstrating that a competitor could have livestreamed out-of-market games.

Even the district court acknowledged "some evidence" that "live-streaming of sports . . . existed before the class period." 1-ER-18. The court only found "no evidence" that a distributor "other than DirecTV was working to provide live streaming of sports during the entire class period." 1-ER-19. Once again, the record showed the opposite: DISH, MLB.com, NBA.com, NHL.com, and DAZN all

livestreamed sports throughout the class period. 18-ER-3589; 7-ER-1171-72 (Tr. 774:25-775:25).[5] Neither the district court nor Defendants have suggested that DirecTV had unique technological capabilities that potential competitors lacked.

Defendants now contend no livestreaming service could reach "*all U.S. households*," because some lacked high-speed Internet. Red.Br.47. Defendants waived that argument by failing to raise it in their JMOL motions. *See* 2-ER-160-64; 2-ER-260-62. The proposed *amicus* brief of the so-called "NFL Media Partners" also presses the argument, citing evidence outside the record. But they overlook other outside-the-record evidence indicating that, in 2012, more than 2 million viewers watched the Super Bowl livestream. *Super Bowl XLVI Live Stream Sets Traffic Records*, NBC Sports (Feb. 7, 2012), https://tinyurl.com/2tntpa87. That is significantly more than the number of Sunday Ticket residential subscribers in 2012. *See* 20-ER-4280.

Regardless, the jury reasonably could have concluded—based on Yurukoglu's testimony that other professional sports leagues offered livestreaming options throughout the class period—that access to high-speed internet was *sufficiently*

---

[5] *See* 11-ER-2199 (Tr. 1798:12-18) ("Super Bowl was live-streamed" in 2012); 10-ER-1823 (Tr. 1423:9-11); 20-ER-4282-84 (2012 marketing deck for livestreaming Sunday Ticket). Plaintiffs' expert reports showed sports livestreaming occurred before and throughout the class period. *See* 19-ER-3993 (¶¶ 379-380); 18-ER-3586-87 (¶ 75 & n.111).

widespread to create real competition and lower prices. 10-ER-1809 (Tr. 1409:22-24). Defendants' arguments thus reduce to quibbles about the "exactness and precision" of damages. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931). That is something Defendants, as the parties who stifled competition, are "not entitled to complain" about. *Id.*

Finally, Defendants characterize the district court as having found "Zona's methodology unreliable for the independent reason that he failed to coherently 'define what "direct-to-consumer meant." ' " Red.Br.43 (quoting 1-ER-18-19). Defendants waived any such argument by failing to seek JMOL on that basis. Blue.Br.55. And Defendants nowhere show why a clearer definition was necessary to make Zona's model admissible. Zona testified that a "direct-to-consumer competitor" could be a "Netflix-like" streaming service. *See* 9-ER-1676 (Tr. 1277:14-19). The district court's evaluation of whether such a "standalone service" was "feasible" demonstrates that it understood Zona's definition. 1-ER-18-19. The jury, no doubt familiar with Netflix, could have conducted a similar evaluation and found ample evidence showing a direct-to-consumer competitor feasible. *Supra*, at 26-28.

Defendants insist that, during cross-examination, Zona "equivocated" on whether a direct-to-consumer competitor could have used other technology, like "cable." Red.Br.43-44. Not true: Zona testified his "model" did not require the

competitor to use any "specific" technology. 9-ER-1627(Tr. 1228:1-8). And whether the competitor could have used cable or internet would not change the calculations; Defendants' quibble is thus beside the point. Regardless, any "equivocation" on cross-examination at most "might be useful to the jury as impeachment." *Primiano v. Cook*, 598 F.3d 558, 566-67 (9th Cir. 2010). It would not "furnish[] an adequate basis for excluding [the expert's] opinion." *Id.*

Defendants' conspiracy precluded anyone from competing; they successfully foreclosed horizontal competition. The question for the jury (not the district court) was whether a competitor could have entered the market absent the antitrust violations. Because ample evidence allowed jurors to answer that question in the affirmative, the district court's exclusion of Zona's single competitor model cannot be sustained. That error requires reversal and remittitur to the resulting $2.81 billion estimate (pre-trebling) for the residential class. Blue.Br.72-73.

## 2. The NFL's Efforts To Invent New Rationales Fail As Well

Unable to defend the district court's actual rationale, Defendants invent new ones. When this Court reviews a "non-harmless *Daubert* error," however, it applies the "normal rules of appellate review." *United States v. Bacon*, 979 F.3d 766, 770 (9th Cir. 2020) (en banc). Consequently, if the district court's actual rationale fails, this Court cannot affirm under different reasoning—effectively making a discretionary call for the district court—unless "'it would have been an abuse of

29

discretion for the trial court to rule otherwise.'" *Ashby v. McKenna*, 331 F.3d 1148, 1151 (10th Cir. 2003); *Parsi v. Daioleslam*, 778 F.3d 116, 126 n.10 (D.C. Cir. 2015). Defendants cannot meet that standard.

Defendants contend that Zona's single competitor model fails to "presume . . . rational economic [consumer] behavior" because it supposedly assumes consumers would pay a competitor *more* than the amount DirecTV would charge for Sunday Ticket. Red.Br.41. But the district court *rejected* that theory. DirecTV subscribers had to incur additional costs beyond Sunday Ticket's subscription price, including paying $1,000 to "put a dish on their house," 7-ER-1111-12 (Tr. 714:23-715:16), and a "basic subscription" fee that did not include Sunday Ticket, 4-ER-590-91 (Tr. 196:6-197:12). Zona explained that, as a result, consumers could rationally choose to avoid those extra costs by paying $178/month to purchase out-of-market games from a direct-to-consumer competitor—rather than paying DirecTV $148/month *and* incurring all those extra costs. 9-ER-1624-25 (Tr. 1225:23-1226:9); 1-ER-18. The district court agreed. *See* 1-ER-18 ("overall price could have been comparable").[6]

---

[6] Zona's model predicted that some consumers would have subscribed to DirecTV and purchased out-of-market games from a direct-to-consumer competitor, *cf.* Red.Br.42, because econometric models always attribute a degree of randomness to consumer behavior. That attribution better reflects reality, where consumers misunderstand options or choose based on criteria other than price. Moshe Ben-

Defendants' contrary argument requires them to rewrite Zona's testimony. For example, Zona testified DirecTV would charge $148.41 for Sunday Ticket. 15-ER-3102. Defendants change that to "$52," Red.Br.41, invoking their own expert's theory that DirecTV's actual charge was $102.74 net of discounts, 9-ER-1746 (Tr. 1347:6-10); 15-ER-3104, and then reducing that number by 49.7%. But Zona rejected the $102.74 number as irrelevant to *class members* who paid full freight. 9-ER-1584 (Tr. 1185:11-22); 15-ER-3103. Neither the jury nor the judge was required to accept Defendants' revisions.

Defendants also err in arguing that the single competitor model is "[in]valid" because it focuses on "exclusivity" rather than pooling. Red.Br.40-41. Plaintiffs may recover losses flowing from any "*anticompetitive aspect* of the defendant's behavior." *Glen Holly Ent., Inc. v. Tektronix, Inc.*, 352 F.3d 367, 371 (9th Cir. 2003) (emphasis added). Exclusivity was undeniably one "aspect" of Defendants' anticompetitive agreements. And the jury was instructed that any harms "caused by a reduction in competition" are "antitrust injuries." 2-ER-223-24; *see* 2-ER-206-07.

### 3. The District Court's Failure To Address Zona's "NFL Tax" Model Independently Requires Reversal

Zona's NFL tax model calculated damages resulting from Defendants'

---

Akiva & Steven R. Lerman, *Discrete Choice Analysis* 55-57 (1985). Zona's choice to apply generally accepted econometric standards makes his model more reliable, not less.

insistence that co-conspirator DirecTV charge its subscribers "premium" prices. 9-ER-1582-83 (Tr. 1183:2-1184:10). Witness after witness, document after document, showed how Defendants' conspiracy ensured that DirecTV would charge more for Sunday Ticket than it or other providers would otherwise have charged—all to prevent Sunday Ticket from enticing viewers away from Fox and CBS broadcasts. NFL executives admitted, and documents showed:

- DirecTV was required to "price[ ]" Sunday Ticket "as a premium product," 14-ER-2943 (Tr. 94:06-94:10); 19-ER-4029, for the purpose of "limiting distribution," 20-ER-4328 (TX-750).

- DirecTV once lowered Sunday Ticket's price early on, significantly increasing viewership; that decision was brought up to NFL leadership, and no further price reductions occurred. 20-ER-4280 (TX-417); 5-ER-762-66 (Tr. 367:5-371:4). Instead, prices went back up. 20-ER-4280 (TX-417).

- The NFL regularly reviewed DirecTV's proposed price. 14-ER-2944 (Tr. 95:15-97:06).

- The NFL and DirecTV would "agree[ ]" on prices, 15-ER-3111 (TX-684), and DirecTV pricing was "[s]ubject to NFL approval," 15-ER-3108 (TX-267).

- DirecTV "wanted to drop the price" for Sunday Ticket but could not do so because "the NFL deems their product as a Premium Product" and "ha[s] pushed back hard." 20-ER-4278 (TX-269).

Indeed, ESPN offered to distribute Sunday Ticket in 2023, when DirecTV's contract expired, but the NFL rejected ESPN's offer because ESPN's proposed $70/year price was too "low" and not "complementary" to CBS's and Fox's offerings. 20-ER-4325 (TX-697); 8-ER-1421-23 (Tr. 1023:19-1025:8).

Zona's NFL tax model showed that, had Defendants not insisted on premium prices, DirecTV would have maximized its profits by charging 24.6% less for Sunday Ticket than it actually charged class members, *even if* DirecTV had remained Sunday Ticket's exclusive distributor. The district court offered no rationale for excluding Zona's NFL tax model. Its only concern with Zona's testimony was that he had not conclusively established that a "viable alternative distributor" could have existed. 1-ER-18-19. But that concern had no bearing on the NFL tax model, which analyzed pricing "without any additional competitors." 9-ER-1589 (Tr. 1190:20-22).

The district court offered no reason for excluding that analysis—literally none. That is a clear abuse of discretion. Defendants claim the district court's order "expressly acknowledged and rejected" the NFL tax model. Red.Br.49. Nonsense. The order contains only one "express" mention of the NFL tax model. 1-ER-18. That one mention indicates the court did not find Defendants' criticisms to "have merit." 1-ER-18.

So Defendants concoct a new rationale. Zona's model, they argue, is "not tethered" to the anticompetitive "pooling of telecast rights *or* the exclusivity of the NFL-DirecTV agreement." Red.Br.48. But DirecTV and the NFL's conspiracy to fix or raise prices *itself* violated the antitrust laws. Defendants conspired to artificially inflate the price of Sunday Ticket to ensure it would not compete with CBS and Fox. That price fixing itself was an unlawful restraint. 2-ER-223-24; *see* 2-ER-206-07.

33

Moreover, this violation *was* "tethered" to Defendants' pooling and exclusivity. The only reason Defendants had power to dictate prices in the first place is that they unlawfully *pooled* their rights and made DirecTV the *exclusive* distributor for out-of-market games. They did not merely prevent competition among teams and leagues in providing telecast rights. Defendants, in concert with Fox and CBS, exercised the resulting monopoly power to ensure DirecTV charged more for Sunday Ticket than the profit-maximizing price it otherwise would have charged. And Defendants did so for the express purpose of "limiting distribution" of out-of-market game telecasts, 20-ER-4328 (TX-750); 9-ER-1582-83 (Tr. 1183:2-1184:11), and preventing Sunday Ticket from "taking away more eyeballs from CBS [and Fox's] viewership," *i.e.*, to prevent it from competing with Defendants' broadcast partners. 11-ER-2073 (Tr. 1672:2-5); 20-ER-4276 (TX-257); *see* Blue.Br.17-19. "[R]educed output and increased prices" are "precisely the kinds of harms to competition" the antitrust laws prohibit. *Oakland Raiders*, 20 F.4th at 457-58.

Plaintiffs have always challenged that "classic horizontal supply restriction" to "reduce output, raise prices, and harm consumers." 3-ER-368 (¶99). This Court, in this very case, found "no reasoned basis" to "distinguish between price-fixing and output-restricting," describing them as "functionally indistinguishable." *In re Sunday Ticket*, 933 F.3d at 1158. That is not just law of the case, but common sense.

Defendants' contention that Plaintiffs "abandoned" the NFL tax model, Red.Br.49-50, blinks reality. The Red Brief quotes snippets of Plaintiffs' filings below, which argued that Zona's "reliable and valid" models were "no longer at issue *because the jury awarded more than his estimated damages amount*." 1-SER-232 n.15 (emphasis added). The emphasized language—which the Red Brief omits—makes clear Plaintiffs nowhere abandoned Zona's models as an alternative if the district court struck Rascher's testimony. Plaintiffs' Rule 50(b) opposition continued to argue that "Dr. Zona's testimony is reliable and valid" and incorporated by reference their Rule 50(a) opposition, *id.*, where Plaintiffs defended Zona at length. 1-SER-196-99.[7] The district court understood that Plaintiffs continued to "press" Zona's models. Red.Br.50. It devoted an entire section of its post-judgment order to Zona. 1-ER-18-19. It just inexplicably failed to discuss Zona's NFL tax model. *Id.*

Defendants claim that Zona's NFL tax model was "untimely." Red.Br.48. The district court acknowledged that argument but did not find it to "have merit." 1-ER-18. At trial, the court overruled the NFL's timeliness objection. 9-ER-

---

[7] Defendants urge that Plaintiffs "offered no response to Defendants' argument that [the NFL tax model] 'cannot be the basis for damages,'" Red.Br.49, but Plaintiffs explained that the model identified the overpayment due to the "NFL's control over price" and decision to set it above the "profit-maximizing list price" DirecTV would otherwise have charged, 1-SER-198. Defendants, moreover, did not re-raise their legal arguments about Zona's tax model in their Rule 50(b) motion; instead, they wrongly urged that the jury "rejected Dr. Zona's analyses." 2-ER-160. Given Defendants' failure to renew the challenge, Plaintiffs cannot be faulted for not saying more in their Rule 50(b) opposition.

1589 (Tr. 1190:3-22). Defendants do not acknowledge the district court's rejection of their timeliness argument, much less show the abuse of discretion necessary to overturn it. *S. Cal. Edison Co. v. Lynch*, 307 F.3d 794, 807 (9th Cir.), *as modified*, 307 F.3d 943 (9th Cir. 2002). Nor could they. Zona disclosed the "NFL tax" in his expert report, explaining that the "challenged conduct prevents DirecTV from setting prices determined to be too low." 17-ER-3458 (¶73); *see* 17-ER-3458-60. He specifically disclosed the precise difference, 24.6%, between Sunday Ticket's list price and the profit-maximizing price DirecTV would otherwise have charged. 17-ER-3460. Plaintiffs repeatedly told Defendants and the district court, long before trial, that trial would include their allegation that Defendants were violating the antitrust laws by requiring DirecTV to charge "premium" supracompetitive prices. *E.g.*, 3-ER-352 (¶46) (alleging conspiracy to "fix, raise, maintain or stabilize prices"); 2-FER-110-11 ("Plaintiffs will show that the NFL and its clubs intended to restrain trade . . . by making the high price of Sunday Ticket a priority."). Defendants "insisted" DirecTV charge "supracompetitive 'premium prices' to protect the networks from competing telecasts." 1-FER-69. And the district court, just before trial, found that "any evidence of price fixing between Defendants and DirecTV is plainly relevant to Plaintiffs' claims." 1-FER-52; 1-FER-50.

Despite all that, despite Zona's presentation of his tax model at trial, and despite finding no defect in that theory, the district court simply ignored Zona's NFL

36

tax model when evaluating whether there was an evidentiary basis for damages. The exclusion of that model, for no discernible reason, was a clear abuse of discretion. That error alone requires reversal and remittitur to Zona's resulting $1.39 billion estimate (pre-trebling) for the residential class. Blue.Br.72-73.

## C. The District Court Erred by Excluding *All* of the Experts' Testimony

Apart from their damages models, Rascher and Zona testified that Defendants' anticompetitive conduct necessarily raised prices as a matter of basic economic theory. Blue.Br.57&n.19 (collecting testimony). The district court offered no reason for retroactively excluding Rascher's testimony that, when similar anticompetitive restraints were removed from college football in 1984, the result was a rapid expansion of game telecasts, offering consumers more and better choices of games to watch. *See* 7-ER-1147 (Tr. 750:1-24); 8-ER-1358-59 (Tr. 960:14-961:10). It gave no reason for excluding Rascher's testimony that Sunday Ticket was approximately 50% cheaper in Canada, where competing distributors offered it. 7-ER-1180-81 (Tr. 783:7-784:12). At the very least, that testimony was relevant to prove the *fact* of Plaintiffs' injury, even if the district court was not persuaded that it quantified harm to a specific *dollar amount*. Yet the district court simply ignored it.

Defendants urge that, when they "asked the court to exclude all" the experts' testimony, Plaintiffs failed to argue for "partial exclusion." Red.Br.50. But Defendants never requested total exclusion. Defendants briefed their post-trial

37

*Daubert* challenges just once, in their Rule 50(a) motion. 2-ER-256-63. That Rule 50(a) motion was limited to challenging each expert's damages "model." The word "model" appears *42 times* on those ten pages.[8] The Rule 50(a) motion never requested total exclusion of every word Rascher and Zona said; no response to that never-made request was required.

Tellingly, Defendants never once cite their Rule 50(a) motion to support their new waiver theory; they cite their later *Rule 50(b)* briefing. Red.Br.50 (citing 2-ER-155; 2-ER-177; 1-SER-285). But that briefing barely mentioned the earlier *Daubert* challenges and, when it did mention them, it simply referred back to the Rule 50(a) motion just discussed.[9] Defendants cite *one page* of defense counsel's oral argument on the Rule 50(b) motion. 2-ER-66 ("I would recommend that you exclude Dr. Rascher and Dr. Zona"). But the rest of counsel's argument states time and again that he was asking the court to exclude the experts' damages *models*, not their *entire testimony*. 2-ER-50-70 (referring 28 times to alleged problems with Rascher's and Zona's "models"). Defendants invent a "rule" that "an expert who fails the *Daubert*

---

[8] *E.g.*, 2-ER-254 ("The *models* should thus be excluded."); 2-ER-260 ("Rule 702 requires exclusion of [Rascher's] *models*."); 2-ER-263 ("Neither Dr. Rascher's nor Dr. Zona's *model* is admissible.").

[9] 2-ER-155; 2-ER-160. Defendants also cite their *reply brief* on the Rule 50(b) motion. 1-SER-283. But a reply brief cannot preserve a new request for relief, and Defendants' reply brief did not request to exclude all Rascher's and Zona's testimony. *Id.*

test" for one model "is barred from offering *any* testimony at trial." Red.Br.50. The law of this circuit is to the contrary: It is an abuse of discretion to "exclud[e] the expert reports in their entirety" just because "some of the experts' statements and opinions would be inadmissible." *Hyer*, 118 F.4th at 1059.

## II. JMOL Must Be Reversed Regardless

Even without Rascher's and Zona's testimony, there was more than enough evidence of antitrust injury to defeat JMOL.

### A. The Jury Had Ample Non-Expert Evidence of Antitrust Injury

The trial record is replete with documents and testimony showing that Defendants' scheme "reduced output and increased prices"—"precisely the kinds of harms to competition" the antitrust laws forbid. *Oakland Raiders*, 20 F.4th at 457-58. Among other things, Defendants ensured DirecTV would charge "premium" prices, "pushed back hard" on any effort to reduce them, and rejected proposals from alternative distributors because they would charge less. *Supra*, at 32; Blue.Br.58-60; *see* 20-ER-4278 (TX-269); *see* 20-ER-4325 (TX-697); 8-ER-1421-23 (Tr. 1023:19-1025:8). That is real harm, even apart from *non*-monetary antitrust injuries of reduced output and consumer choice. Blue.Br.17-19.

The district court was required to "review the entire evidentiary record" in the light "most favorable to" Plaintiffs. *Wallace*, 479 F.3d at 624. Yet the court reversed the jury's finding of antitrust injury, despite agreeing there was ample evidence of

39

"anticompetitive effects." 1-ER-20. That ruling makes no sense. It appears to confuse antitrust injury with the quantification of damages. To find anticompetitive effects, the jury had to find the scheme "result[ed] in higher prices, decreased output, or lower product quality." 2-ER-206. The district court was not free to ignore that finding, or that the effects necessarily injured Sunday Ticket subscribers who faced fewer options and higher prices.[10]

Defendants ignore Rule 50's exacting requirements. They invoke evidence purportedly showing Plaintiffs "might" have been "worse off in the but-for world." Red.Br.55-56. But evidence favorable to Defendants is irrelevant under Rule 50 unless the jury would have been "required to believe" it. *Wallace*, 479 F.3d at 624. Every reasonable inference must be drawn in support of the verdict. *Id.* And "causation may be inferred" so long as the plaintiff's "injury was 'the type of loss that the claimed violations of the antitrust laws would be likely to cause.'" *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1051 (9th Cir. 1981). Here, the NFL's own experts admitted that exclusivity and lack of competition can cause higher prices—one of the "'type[s] of loss'" Plaintiffs established at trial. *Id.*; *see* Blue.Br.59-60.

---

[10] Plaintiffs did not "fail[] to raise" these issues below. Red.Br.56 n.8. Plaintiffs' Rule 50(a) opposition specifically identified as shared antitrust injury that "every class member had only one option to watch out-of-market games," a reduction in consumer choice. 1-SER-193; *see* 1-SER-260 (noting that Defendants' "agreements" had effect of "limiting output" and causing "anticompetitive harm").

Defendants protest that Rascher's and Zona's exclusion left the jury no way to quantify damages. Red Br.53,58. But an antitrust plaintiff need only prove the *fact* of injury, not the *quantum* of damages, to establish liability and obtain some recovery. Blue.Br.58 (citing *Knutson v. Daily Rev., Inc.*, 548 F.2d 795, 811 (9th Cir. 1976)); Antitrust Law Professors' Br.8, Dkt.48.1 (noting those are "separate inquiries").[11] Nor is expert testimony required. *See DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1223 (9th Cir. 2010). The jury had concrete, non-expert evidence that Plaintiffs would have paid less in a but-for world, including the price charged in Canada and the prices proposed by distributors like ESPN and Apple. Blue.Br.16, 70. That was amply sufficient to establish *the fact* of injury.

Defendants cannot explain away the incoherence of the district court's analysis: The court accepted that Defendants' interlocking agreements, premium pricing, and other restraints violated every step of the rule of reason, but denied Plaintiffs had proved injury. That makes no sense. A restraint that has the purpose and effect of artificially raising prices necessarily injures those who paid the higher price.

---

[11] The out-of-circuit cases Defendants invoke are not to the contrary. *See, e.g.*, *Ezzo's Invs., Inc. v. Royal Beauty Supply, Inc.*, 243 F.3d 980, 991 (6th Cir. 2001) (affirming JMOL where evidence of lost sales was "speculative" and damages not "calculable").

41

Even the quantum of damages can be proved without experts. *See DSPT*, 624 F.3d at 1222-23; Antitrust Law Professors' Br.13-17, Dkt.48.1. The NFL's own New Frontier study—admitted into evidence—did exactly that. That study's purpose was to model how out-of-market games would be distributed if Defendants abandoned one part of their anticompetitive scheme by ending DirecTV's exclusivity. It demonstrates that the games would have been distributed on networks Plaintiffs received as part of their ordinary DirecTV subscriptions, without any extra charge for Sunday Ticket. 7-ER-1160(Tr.763:10-17); 15-ER-3071. That is sufficient evidence to support damages in the full amount class members paid for Sunday Ticket—$7 billion over the 14-year class period.

## B. Exclusion of Rascher's and Zona's Testimony at Most Would Require a Retrial, Not JMOL

Before trial, the district court repeatedly ruled that Rascher's and Zona's testimony was admissible. Even if the district court's post-trial exclusion is sustained, Plaintiffs should have an opportunity to present the case they would have presented if the court had excluded Zona and Rascher before trial. Blue.Br.62-63.

Defendants contend Plaintiffs should have known their experts risked exclusion. Red.Br.58-60. But the district court *twice* rebuffed Defendants' *Daubert* challenges—the second time just three weeks before trial. 2-ER-283-85. The court never hinted that it might change its mind until several days *after* Plaintiffs rested their affirmative case. 11-ER-2022-24(Tr.1621:4-1623:8); *see* 9-ER-1709

42

(Tr.1312:20) (Plaintiffs rest). The court then ruled that it would not permit any rebuttal witnesses, including Rascher. 1-FER-3; 12-ER-2252(Tr.1850:6-18). Even when the court later allowed Plaintiffs to call Elhauge, that was too little, too late. 12-ER-2456-58(Tr.2054:9-2056:15). Plaintiffs cannot be faulted for failing to anticipate the trial court's about-face.

## III. The Conditional Grant of a New Trial on Damages Should Be Reversed and the Jury's Verdict Reinstated

Defendants do not dispute that jury verdicts must be respected unless they are "'grossly excessive,'" "clearly not supported by the evidence," or "'only based on speculation or guesswork.'" *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1360 (9th Cir. 1986). Squarely within the range supported by both expert and fact evidence, the jury's award below was entitled to "substantial deference." *In re Exxon Valdez*, 270 F.3d 1215, 1248 (9th Cir. 2001). The district court's effort to reverse-engineer the jury's calculation falls far short of the governing standard.

### A. The Damages Award Was Substantially Supported by the Evidence and Consistent with the Court's Instructions

To "avoid encroaching upon the jury's proper function under the Constitution," judicial review of jury damages awards is sharply "limited." *Mem'l Coliseum*, 791 F.2d at 1365. Courts cannot order a new trial based on vague notions that an award "reflects juror confusion or the rejection of evidence critical to

43

sustaining plaintiffs' case." Red.Br.77.[12] "Even a *total inadequacy* of proof on isolated elements of damages claims submitted to a jury will not undermine a resulting aggregated verdict which is nevertheless reasonable in light of the totality of the evidence." *Mem'l Coliseum*, 791 F.2d at 1366 (emphasis added).

Here, the district court's putative reverse-engineering at most indicates a jury carefully following the court's instructions. The court instructed the jury to calculate the overcharge by subtracting the "but-for prices" class members would have paid, absent the anticompetitive conduct, from the "prices Plaintiffs actually paid," while avoiding "guesswork or speculation." 2-ER-227-28. The jury was told (without objection) that it could use "the average overcharge paid by class members" or "estimate the overcharge paid by class members." 2-ER-229.

The jury could have determined the actual price paid by class members to be $294/year. That was Sunday Ticket's list price for many years. *See* 20-ER-4280 (TX-417). The jury could then have used as the "but for price" a number *Defendants themselves* presented as a reasonable price—"$102.74." *See* Blue.Br.68-70 (collecting citations); 9-ER-1583-84 (Tr. 1184:13-1185:10). It was within the range of alternative prices ($70/year-$149/year) the jurors heard. *See* Blue.Br.70; 20-ER-

---

[12] Defendants' only support is an unpublished memorandum disposition where the district court set aside a jury award because the court had given an "inadequate" instruction. *Assoc. Diesel Serv. & Equip. Co. v. Terex Corp.*, 46 F.3d 1138 (9th Cir. 1995). Here, there is no dispute the jury was properly instructed. The relevant instructions were jointly proposed. *See* 1-FER-36.

4325 (TX-697); 20-ER-4290 (TX-504); 7-ER-1170 (Tr. 773:7-13). Subtracting that but-for price of $102.74/year from the actual price of $294/year yields an "overcharge" of $191.26. That, times the number of annual subscriptions, equals the jury's actual damages estimate. 1-ER-22. Nothing in that method of estimating damages would violate the court's instruction to use the "average overcharge" class members paid. 2-ER-229.

That the jury did not use the but-for prices Plaintiffs' experts calculated is not evidence of speculation. The jury was entitled to rely on other figures "based on relevant data" to calculate damages. *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946). The "'liberal proof of damages standard'" in antitrust cases "require[s] only that the plaintiff provide sufficient evidence to permit a 'just and reasonable estimate of the damages.'" *Mem'l Coliseum*, 791 F.2d at 1360. The jury was entitled to rely on all the evidence presented—it was not required to accept any specific calculation. The district court should not have played "'Monday morning quarterback'" by "supplant[ing] the jury's evaluation of the complex and conflicting evidence with [its] own." *Id.* at 1366.

## B. Defendants' Counterarguments Fail

Defendants offered no damages expert of their own. They instead flyspeck what they and the district court presume the jury must have done. Given Defendants' "refusal to present a reasonable alternative measure, they may not now argue those

used are fatally speculative." *D&S Redi-mix v. Sierra Redi-mix*, 692 F.2d 1245, 1249 (9th Cir. 1982). Their arguments are without merit regardless.

1.      Defendants call using Sunday Ticket's $294/year list price as the "actual" residential subscriber price "irrational." Red.Br.75. But Defendants do not dispute that $294/year is what millions of residential subscribers actually paid during the last six years of the class period. 9-ER-1599 (Tr. 1200:3-23); 9-ER-1634-36 (Tr. 1235:21-1237:5). Defendants contend the jury should have used bespoke figures to calculate different damages for each year in the class period. But the law does not require such "mathematical certainty or precision." 2-ER-227 (jointly proposed instruction); *see Richfield Oil Corp. v. Karseal Corp.*, 271 F.2d 709, 714 (9th Cir. 1959). Regardless, the jury could have reasonably concluded that, when the list price was lower earlier in the class period, the but-for price would *also* have been lower by a similar amount. *See* Blue.Br.71. Defendants have no response.

2.      Defendants urge that the jury irrationally treated $102.74/year as the but-for price, because (according to them) $102.74/year was the actual price class members paid. Red.Br.74. But $102.74/year was *not* what class members paid for Sunday Ticket. They paid more—about full list price. *See, e.g.*, 10-ER-1797-98 (Tr. 1397:18-1398:10); 9-ER-1692-93 (Tr. 1293:22-1294:4) (class representative testifying he received only "small discounts" off list price). The $102.74/year figure was the average price for all residential *subscribers*, including many *non-class*

46

*members* who paid *nothing* for a year as part of a DirecTV promotion, but did not keep the service thereafter.[13] Defendants conceded as much at trial.[14]

Defendants further concede they "elicited testimony suggesting that charging $102.74 (on average) was reasonable." Red.Br.81; *see* Blue.Br.68-70 (collecting citations). Having heard *Defendants* press $102.74 as a "reasonable" price for Sunday Ticket, the jury would be within appropriate bounds in using that figure as a plausible but-for price. The district court erred in attempting to reverse-engineer the jury's damages figure. But even the district court's reverse-engineering shows rationality, not jurors lost "at sea." Red.Br.73.

3.      Defendants and the district court also faulted the jury for applying the residential overcharge ($191.26/year) to the commercial class. But that too was reasonable: The record lacked "viewership data" for commercial subscribers. Blue.Br.71. Zona thus relied on residential data to extrapolate results for commercial subscribers. 9-ER-1617-21 (Tr.1218:6-1222:16). The jury was justified in concluding that, without more data, it could not award commercial subscribers a

---

[13] *See* 3-ER-332 (residential class comprised "residential subscribers that purchased the NFL Sunday Ticket from DirecTV"); 17-ER-3425-26 (¶¶16-18) (Zona "d[id] not count . . . subscriptions . . . as affected commerce" for customers who "received their first season of NFL Sunday Ticket at no additional cost").

[14] In closing argument, Defendants' counsel admitted $102.74/year was the average price paid by "all the subscribers," "[n]ot just class members," acknowledging prior misstatements. 14-ER-2853 (Tr.2449:9-11).

greater overcharge than residential subscribers. Blue.Br.71.

## C.     The Conditional New Trial Was Limited to Damages Only

Defendants urge that the district court conditionally granted a new trial "on all issues." Red.Br.69-70. But the district court carefully explained it was *not* granting a new trial on liability. It conditionally vacated only the "jury's *damages* verdict." 1-ER-24 (emphasis added); 1-ER-20. The court rejected Defendants' argument that the jury's damages award reflected a "wholesale failure of proof." 1-ER-21. Even if the jury "disagreed with Plaintiffs' experts as to the *amount* of damages," the court explained, that did "not mean that the evidence in support of the *fact* of damages was inadequate as a matter of law." 1-ER-21 (emphasis added).

Elsewhere, the district court was clearer still: The court did "not find that it would be unreasonable for a juror to find there was a conspiracy that unreasonably restrained trade." 1-ER-20. To the contrary, the court found that "judgment as a matter of law is inappropriate" on liability because the "jury could find that there were anticompetitive effects" and "that Defendants' procompetitive justifications were pretextual or unrelated to the restraints." *Id.* Defendants ignore those conclusions. As explained below, the single sentence Defendants place in a footnote purporting to challenge those rulings is insufficient to preserve any cross-appeal of that ruling.

48

## IV. Defendants' Joint-Venture and Indirect-Purchaser Arguments Are Waived

In a single paragraph, Defendants purport to "preserve" two "alternative legal bas[es] for affirming": that they are a "joint venture," and that *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), bars damages here. Red.Br.62-63. Such unelaborated references to an issue preserve nothing. "[A] bare assertion does not preserve a claim, particularly when, as here, a host of other issues are presented for review." *Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994).

Nor does Defendants' nod to prior briefing (Red.Br.62-63) suffice. The prior appeal was from the district court's ruling on a motion to dismiss. *See In re Sunday Ticket*, 933 F.3d at 1144. Now that the case has "proceed[ed] to trial, the full record developed in court supersedes the record existing at" that earlier "time." *Ortiz v. Jordan*, 562 U.S. 180, 184 (2011). Any exception for "purely legal" issues cannot apply: Joint-venture issues and *Illinois Brick*'s application here cannot "be resolved without reference to any disputed facts." *Dupree v. Younger*, 598 U.S. 729, 735 (2023); *see Jackson v. E. Bay Hosp.*, 246 F.3d 1248, 1261 (9th Cir. 2001) ("[E]xistence of a joint venture is primarily a question of fact."); *Fox W. Coast Theatres Corp. v. Paradise Theatre Bldg. Corp.*, 264 F.2d 602, 605 (9th Cir. 1958)

49

(whether antitrust defendants "conspired . . . is a question of fact").[15]

Regardless, this Court already rejected Defendants' arguments. "Even though" Plaintiffs "purchased Sunday Ticket from DirecTV," this Court held, the allegation of a "single conspiracy" among Defendants and DirecTV eliminated any supposed *Illinois Brick* problem: Under that allegation, the injured class members all purchased from a member of the conspiracy (DirecTV). *In re Sunday Ticket*, 933 F.3d at 1157. That pleading has been confirmed—and superseded—by *the jury's finding* that such a conspiracy in fact existed. *See* 2-ER-239-40; *Ortiz*, 562 U.S. at 184. That finding also rebuts any suggestion that Defendants engaged in lawful joint-venture conduct. Defendants' brief addresses neither the jury's findings nor the record evidence that supports them. These arguments are waived.

## V. Plaintiffs' Claims for Injunctive Relief Should Be Reinstated

The district court dismissed Plaintiffs' request for injunctive relief without explanation and without hearing any evidence on that request. That was indisputable error. As Defendants concede, the district court barred Plaintiffs from introducing evidence or argument on claims for injunctive relief at trial because those claims would be addressed post-trial. 2-ER-296. But the court then simply ignored them after JMOL. Indeed, when Defendants sought judgment "as to all claims," 2-ER-36-

---

[15] Because Defendants did not preserve their *Illinois Brick* challenge, this Court need not resolve whether the district court abused its discretion by excluding additional documents showing DirecTV colluded with Defendants to set prices. Blue.Br.75-76.

40, Plaintiffs pointed out that they had "not had an opportunity to press" their equitable claims; "that the parties have not had an opportunity to litigate [them][;] and that the court has not had an opportunity to resolve [them]." 2-ER-29. But the district court ignored that filing without explanation, summarily entering Defendants' proposed judgment on all claims just hours later. 1-ER-4-8. As the government explains (U.S. Amicus Br.17-25, Dkt.45.1), that unreasoned termination of forward-looking claims requires vacatur and remand for further proceedings. *See Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1225 (9th Cir. 1998) (en banc).

Defendants' attempt to salvage that manifest error fails at every turn. True, the court (erroneously) found insufficient evidence to establish antitrust injury on Plaintiffs' *damages* claims. Red.Br.60. But damages require proof of past or existing injury. Requests for equitable relief, by contrast, require only that the challenged conduct *threaten* some injury *in the future*. Blue.Br.73-74; U.S. Amicus Br.17-19, Dkt.45.1. Defendants urge that Plaintiffs cannot establish that future threat without damages experts. Red.Br.61. But the court never heard or evaluated any expert testimony on *forward-looking* harms, including reduced choice and reduced quality. All such testimony—indeed, all evidence of forward-looking harm—was concededly (Red.Br.62) excluded from trial so it could be addressed separately, but it never was. The district court, moreover, upheld the jury's determination that Defendants' conduct had anticompetitive effects. 1-ER-20; Blue.Br.32-33. The

51

district court's objections to Rascher's and Zona's *quantification* of *past* harm from that conduct has no bearing on whether continuing that anticompetitive conduct threatened future harm (quantifiable or not).

Regardless, there is no requirement that a party put on expert testimony to establish threatened loss. *See* U.S. Amicus Br.21, Dkt.45.1. Nor would it have taken experts to establish that Defendants' conduct threatened harm. There was ample evidence that Defendants' unlawful conduct restricted consumer choice and increased prices. *Supra*, at 39-42; U.S. Amicus Br.21-25, Dkt.45.1. Because the same challenged conduct is ongoing, there is every reason to expect Plaintiffs will be able to establish class members—who have a demonstrated interest in viewing out-of-market games—face at least a threat of future injury. The district court never said otherwise.

Defendants contend further proceedings are pointless because the challenged contract with DirecTV expired. Red.Br.61. The district court considered and rejected that argument before trial—and rightly so. 3-ER-328-329. As the government explains, "[t]he NFL's illegal practices are continuing." U.S. Amicus Br.25, Dkt.45.1. Defendants continue to pool their game-telecast rights and pursue a pricing strategy "no different than how [they] operated with DirecTV for 20 years." 8-ER-1440(Tr.1042:3-8); *see* 20-ER-4130(TX-146A) (CBS Contract, operative through 2033 season) (requiring Sunday Ticket be sold as a "premium" subscription); 20-

ER-4151(TX-146D) (Fox Contract, operative through 2033 season) (similar); 14-ER-2960(Tr.15:11-17:12) (explaining distribution of Sunday Ticket by EverPass Media); *see* Sports Fan Coalition Br.13, Dkt.49.1 (expressing "outrage" that "the NFL may get away with restricting access and charging higher prices while fans are left holding the bag"). Whatever Defendants' objections to Plaintiffs' proof of *past* damages, Plaintiffs were entitled to prove that Defendants' ongoing antitrust violations threaten forward-looking harm, whether in the form of reduced choice, decreased quality, higher prices, or all three.

Insofar as Defendants contend that their new contracts are different, that is an argument for remand. This is "'a court of review, not first view.'" *Roth v. Foris Ventures, LLC*, 86 F.4th 832, 838 (9th Cir. 2023). Plaintiffs are entitled to a chance to prove their claims.

## CONCLUSION

The district court's order should be reversed, and the case remanded with instructions to enter judgment for Plaintiffs and to give Plaintiffs an opportunity to be heard on their claims for injunctive relief.

## CROSS-APPEAL RESPONSE

## INTRODUCTION AND SUMMARY OF ARGUMENT

Defendants do not argue that the district court abused its discretion when it originally certified Plaintiffs' classes on the record before it. They argue that, post-trial, Plaintiffs cannot establish classwide injury without Rascher and Zona. Red.Br.64-68. Defendants' cross-appeal is thus doubly conditional. It arises only if this Court (1) reverses JMOL, but *also* (2) upholds the exclusion of Rascher's and Zona's testimony. Red.Br.5,63,65,69.

Overwhelming non-expert evidence supports the finding of classwide economic injury, even without Rascher and Zona. The record shows that every single class member bought the same product, under common, uniform pricing schedules, subject to the same anticompetitive restrictions. Plaintiffs do not need experts to establish antitrust injury. And because any deviations from those uniform price schedules also would have existed in the but-for world, they would have no effect on damages. Moreover, if JMOL is reversed (one condition of the cross-appeal), then the jury's verdict is reinstated. The jury found classwide antitrust economic injury. If there is sufficient evidence to sustain *that* finding without Rascher and Zona, then the Rule 23(b)(3) certification decision must stand. It cannot have been an abuse of discretion for the district court to hold that economic injury *could* be proven on a classwide basis when a jury found just that.

54

Defendants' bid for decertification of the Rule 23(b)(2) injunctive-relief classes fares even worse. Plaintiffs seek uniform relief from Defendants' unlawful conduct. That is all the rules require. *See Parsons v. Ryan*, 754 F.3d 657, 688 (9th Cir. 2014).

Defendants' five-word argument on the district court's refusal to order a conditional new trial on liability is insufficient to preserve the issue.

### ISSUES PRESENTED

1.      Did the district court abuse its discretion by finding that common issues predominated among subscribers who bought the same product subject to the same anticompetitive restrictions?

2.      Did the district court abuse its discretion by certifying the injunctive relief classes based on Plaintiffs' request for uniform relief from Defendants' unlawful conduct?

3.      Did Defendants waive any challenge to the district court's denial of their motion for a new trial on liability?

### STATEMENT

The district court certified two classes—one for residential subscribers and another for commercial subscribers—for purposes of both damages under Rule 23(b)(3) and injunctive relief under Rule 23(b)(2). 3-ER-332. It determined that the facts and arguments " 'vividly point[ed] to the need for class treatment.' " 3-ER-327.

As to damages, the court held the "critical elements of Plaintiffs' claims"—"antitrust violation, antitrust impact, and damages"—were each "common questions capable of class-wide proof" that predominated over "any remaining individual questions." 3-ER-326. The antitrust violations, the court ruled, could be proved for "the whole class" with just "[t]he agreements in the record." 3-ER-324. Antitrust injury and damages could likewise be proved class-wide because "the baseline price to class members would have been lower absent Defendants' market-wide anticompetitive conduct." 3-ER-326.

As to the injunctive-relief class, the court determined that "an injunction restraining [Defendants'] conduct will necessarily benefit all class members." 3-ER-328. "[A]bsent Defendants' anticompetitive restraints, class members would have more market choices at lower prices." 3-ER-328. The district court rejected Defendants' counterarguments as "myopic and unconvincing." 3-ER-328.

## STANDARDS OF REVIEW

The district court's class-certification decision is reviewed for abuse of discretion. *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663 (9th Cir. 2022). Factual findings embedded in the jury's verdict must be accepted as true unless "no reasonable juror could have" made them. *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 459 (2016); *accord Olean*, 31 F.4th at 667 & n.11. The district court's denial of Defendants' motion for a new trial on liability

56

may be overturned only if it is properly presented and there was "'an *absolute absence of evidence* to support the jury's verdict.'" *Desrosiers v. Flight Int'l of Fla. Inc.*, 156 F.3d 952, 957 (9th Cir. 1998).

## ARGUMENT

I. **The District Court Did Not Abuse Its Discretion by Finding That Common Issues "Predominate" Under Rule 23(b)(3)**

Defendants do not deny that virtually every issue and consideration, including proof of anticompetitive conduct, favors class certification. They dispute only the district court's finding of predominance, and even for that as to just two issues—classwide injury and classwide proof of damages. Red.Br.64.

A. **Ample Evidence Apart from Rascher and Zona Supported the District Court's Finding of Predominance—and the Jury's Verdict Renders That Finding Virtually Incontestable**

Extensive *non*-expert evidence showed that "antitrust impact" was "capable of being established through a common body of evidence, applicable to the whole class." *Olean*, 31 F.4th at 666. The evidence showed that each class member had to buy Sunday Ticket to view out-of-market NFL games. The price for Sunday Ticket was set by schedule, not individual negotiation. *See, e.g.*, 19-ER-3828 (prices based on uniform fee schedule); 19-ER-3829 (summarizing national list prices); 19-ER-3952 ("Sunday Ticket pricing process . . . reli[es] on national list prices"); 9-ER-1584 (similar). And the anticompetitive conduct was nationwide. That makes this an *easy* case for finding classwide economic injury—class members all bought the

57

same product in the same market for the same set prices and suffered the same economic antitrust injury from common anticompetitive conduct. *Supra*, at 39-42 (summarizing the non-expert evidence of "premium" pricing). Indeed, the NFL's New Frontier study demonstrates that ending DirecTV's exclusivity alone would have resulted in distribution of out-of-market games on networks already available to Plaintiffs through their DirecTV base subscriptions. *Supra,* at 42. That by itself would support classwide damages awards of $5.66 billion for the residential class and $1.35 billion for the commercial class. Blue.Br.24.

The exclusion of Zona and Rascher thus does not defeat class certification. Expert testimony simply is not required. *See, e.g.*, *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 511-14 (9th Cir. 2013) (reversing denial of class certification where plaintiff did not present expert damages testimony).[16] Defendants' quotation from *In re Rail Freight Fuel Surcharge Antitrust Litigation*, 725 F.3d 244 (D.C. Cir. 2013)— "[n]o damages model, no predominance, no class certification"—addressed a case

---

[16] *Accord Buffington v. Progressive Advanced Ins. Co.*, 342 F.R.D. 66, 73-74 (S.D.N.Y. 2022) ("[W]hile a damages expert may be useful to the Court in determining class members' damages, it is not required by Rule 23(b)."); *Dickey v. Advanced Micro Devices, Inc.*, No. 15-cv-04922, 2019 WL 251488, at *6 (N.D. Cal. Jan. 17, 2019) (similar); *see also Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1026 (9th Cir. 2024) (affirming certification where expert intended to, but never did, perform a "conjoint survey" to show predominance), *cert. denied*, 145 S. Ct. 1308 (2025).

58

where the expert's models were concededly "essential" to the claim of "classwide injury." *Id.* at 253. Not so here—ample non-expert evidence existed.

Moreover, the jury *found* that Defendants' anticompetitive scheme injured each class member, 2-ER-240, and *found* (by dint of awarding $4.7 billion in damages) that this injury was economic in nature. If this Court reverses JMOL and reinstates the jury's finding of antitrust injury despite Rascher's and Zona's exclusions—express predicates of the cross-appeal—then the jury's finding of injury is necessarily sufficient for class certification as well. That finding is binding unless "no reasonable juror could have" made it. *Tyson Foods*, 577 U.S. at 459. Defendants do not even try to clear that high bar.

### B. Defendants' Contrary Arguments Fail

Defendants' argument (Red.Br.63-67) largely rests on inapposite cases where individualized inquiries were necessary to determine whether a class member had been injured. In those cases, there was no classwide proof of *injury*—let alone damages. For example, in *Lara v. First National Insurance Co. of America*, 25 F.4th 1134 (9th Cir. 2022), class members' injuries depended on whether they had received "fair market value" for their used cars—a necessarily individualized determination that turned on the unique characteristics of every car. *Id.* at 1136-37, 1139. Similarly, in *Nichols v. Mobile Board of Realtors, Inc.*, 675 F.2d 671 (5th Cir. 1982), class members' injuries turned on whether they had been charged

supracompetitive real-estate broker fees—a question the district court found would require an individualized assessment of the brokers, sellers, and properties involved in each transaction. *Id.* at 677-78. And, in *Rail Freight*, certain class members "were bound by rates negotiated" individually with shippers before the unlawful conspiracy, and the experts' models were unable to distinguish class members from uninjured parties with "legacy contracts." 725 F.3d at 252-53.

This case is nothing like that. Here, Sunday Ticket was sold to both classes according to uniform price schedules. *See supra,* at 57. The proof of antitrust injury and the measure of aggregate damages is therefore classwide. Any discounts given to particular class members would not detract from their claims of injury or from the classwide measure of aggregate damages. *Olean*, 31 F.4th at 670-73; *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1251 (10th Cir. 2014). If some class members received discounts, a jury could reasonably find that those same discounts would also have been granted in the but-for world absent the anticompetitive conduct; the net injury from the anticompetitive conduct thus remains unchanged. Here, moreover, the jury awarded lump-sum damages for all injuries. Any differences among class members would be addressed when Plaintiffs *allocate* the aggregate damages award among the class members. Defendants have no standing to challenge Plaintiffs' "method of distributing the aggregate damages award among the class members." *In re Urethane*, 768 F.3d at 1269. Moreover, even if individualized

60

"damages calculations" were required to determine these classes' *aggregate* damages (and they are not), that "'alone . . . cannot defeat certification.'" *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 988 (9th Cir. 2015); *see Olean*, 31 F.4th at 668-69.

Finally, Defendants speculate that "some class members" might "have been *worse* off in a world without Sunday Ticket." Red.Br.66. This Court "do[es] not permit a defendant to support its invocation of individualized issues with mere speculation." *Van v. LLR, Inc.*, 61 F. 4th 1053, 1068 (9th Cir. 2023); *see True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 932 (9th Cir. 2018) ("'We are unwilling to allow such speculation and surmise to tip the decisional scales in a class certification ruling.'"). In the real world, all class members paid inflated prices because of Defendants' misconduct. That Defendants' lawyers can imagine but-for worlds where some class members are happier than others cannot defeat predominance.

## II. The District Court Did Not Abuse Its Discretion by Certifying the Injunctive-Relief Classes

Rule 23(b)(2) is "unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole." *Parsons*, 754 F.3d at 688. That is precisely what Plaintiffs seek here. The district court did not abuse its discretion in concluding that Plaintiffs seek relief "across the board for the football-viewing class

members" by "put[ting] an end to the alleged restraints on NFL football telecasts."
3-ER-328.

Defendants argue that *injunctive-relief* certification falls with exclusion of Rascher's and Zona's *damages* models. Red.Br.67. The district court *did not rely* on those models in connection with injunctive relief. *See* 3-ER-327-329. Nor would that have made sense. A damages model is not a prerequisite for Rule 23(b)(2) certification. *See Laumann v. Nat'l Hockey League*, 105 F.Supp.3d 384, 398-99 (S.D.N.Y. 2015) (certifying 23(b)(2) class despite excluding plaintiffs' damages model). And unlike the class members in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), Plaintiffs are not attempting to use Rule 23(b)(2) as a vehicle to obtain money damages for *past* injuries; they seek *forward-looking* relief from Defendants' ongoing misconduct.[17]

Nor was it an abuse of discretion for the district court to certify these classes even though some class members "are no longer subscribed to Sunday Ticket." 3-ER-328; Red.Br.68-69. All class members demonstrated interest in watching out-of-market games through previous subscriptions; all stand to benefit from an injunction

---

[17] Cases addressing certification of *monetary damages* classes are even further afield. *See* Red.Br.67-68 (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021); *Lab'y Corp. of Am. Holdings v. Davis*, 605 U.S. 327, 332 (2025) (Kavanaugh, J., dissenting)).

that ends the agreements that raise prices and restrict consumer choice for viewing those games.

Defendants protest that Plaintiffs' forward-looking claims are moot and that subscriber preferences may have changed, leaving "no basis" to conclude that each class member "faces a threat of future harm." Red.Br.68-69. Those are arguments about Plaintiffs' *entitlement to relief*—not class certification. They are addressed in the principal appeal, *see supra*, at 50-53, and are not properly presented by cross-appeal.

## III. Defendants Have Waived Any Challenge to the Order Denying Their Motion for a New Trial on Liability

Defendants' cross-appeal of the district court's decision denying their motion for a new liability trial consists—in its entirety—of the following clause in a footnoted sentence: "Defendants cross-appeal on that issue." Red.Br.70 n.10. Defendants make no attempt to explain how the district court abused its discretion by refusing to vacate the jury's liability findings. The challenge is waived. *See, e.g.*, *W. Radio Servs. Co. v. Qwest Corp.*, 678 F.3d 970, 978-79 (9th Cir. 2012).

It is also meritless. Denial of a Rule 59(a) motion is "'virtually unassailable'" on appeal. *Desrosiers*, 156 F.3d at 957. The appellant must demonstrate "'an *absolute absence of evidence* to support the jury's verdict.'" *Id.* Defendants do not cite a single case that threw out a jury's *liability* verdict based on a problem with the jury's *damages award*. Nor do Defendants explain how the jury's purported error as

63

to damages "infected" the liability determination. *Larez v. Holcomb*, 16 F.3d 1513, 1520 (9th Cir. 1994). Having made no argument whatsoever in their opening brief, Defendants cannot attempt to mount one in reply. *See Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990).

## CONCLUSION

The conditional cross-appeal should be denied, and the district court's class certification order should be affirmed.

Dated:  August 11, 2025

Respectfully submitted,

*/s/ Marc M. Seltzer*
*/s/ Steven M. Shepard*

SUSMAN GODFREY LLP

Marc M. Seltzer
Kalpana Srinivasan
Amanda Bonn
Eliza Finley
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
Fax: (310) 789-3150
mseltzer@susmangodfrey.com
ksrinivasan@susmangodfrey.com
abonn@susmangodfrey.com
efinley@susmangodfrey.com

William Christopher Carmody
Steven M. Shepard
Seth Ard
Samir Doshi
One Manhattan West, Fl. 50
New York, NY 10001
Tel: (212) 336-8330
Fax: (212) 336-8340
bcarmody@susmangodfrey.com
sshepard@susmangodfrey.com
sard@susmangodfrey.com
sdoshi@susmangodfrey.com

Ian M. Gore
401 Union Street, Suite 3000
Seattle, WA 98101
Tel: (206) 516-3880
Fax: (206) 516-3883
igore@susmangodfrey.com


LANGER GROGAN & DIVER, P.C.

Howard Langer
Edward Diver
Peter Leckman
Kevin Trainer
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703
hlanger@langergrogan.com
ndiver@langergrogan.com
pleckman@langergrogan.com
ktrainer@langergrogan.com


HAUSFELD LLP

Scott Martin
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322
smartin@hausfeld.com

66

Michael P. Lehmann
Christopher L. Lebsock
Samuel Maida
600 Montgomery St., Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 633-4980
mlehmann@hausfeld.com
clebsock@hausfeld.com
smaida@hausfeld.com


Sathya S. Gosselin
Farhad Mirzadeh
888 16th Street, N.W., Suite 300
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201
sgosselin@hausfeld.com
fmirzadeh@hausfeld.com


MOLOLAMKEN LLP

Jeffrey A. Lamken
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
Tel: 202.556.2000
jlamken@mololamken.com

*Attorneys for Plaintiffs-Appellants*

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form17instructions.pdf

**9th Cir. Case Number(s)** | Nos. 24-5493 & 24-5691

The undersigned attorney or self-represented party states the following:

◉ I am unaware of any related cases currently pending in this court.

○ I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

○ I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | /s/ Marc M. Seltzer   **Date** | 08/11/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** Nos. 24-5493 & 24-5691

I am the attorney or self-represented party.

**This brief contains** 13,997 **words, including** 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

◉ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [            ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Marc M. Seltzer   **Date** 08/11/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

**Form 8**                                                                 *Rev. 12/01/22*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 15. Certificate of Service for Electronic Filing

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)** | Nos. 24-5493 & 24-5691

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

1. Form 20: Notice of Intent to Unseal;
2. Appellants' Response and Reply brief; and
3. Further Excerpts of Record, Volume 2

**Signature** | /s/ Marc M. Seltzer | **Date** | 08/11/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 15**                                                                 *Rev. 12/01/2018*